Karen I. Boyd (State Bar No. 189808)
boyd@turnerboyd.com
Jennifer Seraphine (State Bar No. 245463)
seraphine@turnerboyd.com
Zhuanjia Gu (State Bar No. 244863)
gu@turnerboyd.com
TURNER BOYD LLP
702 Marshall Street, Suite 640
Redwood City, California 94063
Telephone:  (650) 521-5930
Facsimile:  (650) 521-5931

*Attorneys for Defendants*
REARDEN LLC, REARDEN MOVA LLC,
MO2 LLC, MOVA LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| SHENZHENSHI HAITIECHENG SCIENCE AND TECHNOLOGY CO., LTD.,<br><br>Plaintiff,<br><br>v.<br><br>REARDEN LLC, REARDEN MOVA LLC, MO2 LLC, MOVA LLC<br><br>Defendant. | Case No. 3:15-cv-00797-JST<br><br>**DEFENDANTS' ANSWER AND AMENDED COUNTERCLAIMS** |

Defendants Rearden LLC ("Rearden LLC"), Rearden Mova LLC, MO2 LLC, and Mova LLC (collectively "Defendants"), hereby answer Shenzhenshi Haitiecheng Science and Technology Co., Ltd.'s, a People's Republic of China Corporation ("Shenzhenshi"), Complaint as set forth below.

## JURISDICTION AND VENUE

1.      Defendants admit that each Defendant is a citizen of the State of California and that the amount in controversy exceeds $75,000 exclusive of interest, attorneys' fees, and costs. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1 of the Complaint and on that basis deny them.

2.      Defendants do not contest that venue is proper in this district.

## PARTIES

3.      Defendants lack knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 3 of the Complaint and on that basis deny the allegations.

4.      Defendants admit that Rearden LLC is a California limited liability company that was registered with the California Secretary of State on or about June 5, 2006, and that it maintains its principal place of business at 355 Bryant St., Suite 110, San Francisco CA 94107.  Except as specifically admitted herein, Defendants deny the remaining allegations in Paragraph 4 of the Complaint.

5.      Defendants admit that Rearden Mova LLC is a California limited liability company that was registered with the California Secretary of State on or about April 19, 2013, and that it maintains its principal place of business at 355 Bryant St., Suite 110, San Francisco CA 94107. Except as specifically admitted herein, Defendants deny the remaining allegations in Paragraph 5 of the Complaint.

6.      Defendants admit that MO2 LLC is a California limited liability company that was registered with the California Secretary of State on or about September 8, 2014, and that it maintains its principal place of business at 355 Bryant St., Suite 110, San Francisco CA 94107.  Except as specifically admitted herein, Defendants deny the remaining allegations in Paragraph 6 of the Complaint.

7.      Defendants admit that Mova LLC is a California limited liability company that was registered with the California Secretary of State on or about September 18, 2014, and that it maintains its principal place of business at 355 Bryant St., Suite 110, San Francisco CA 94107. Except as specifically admitted herein, Defendants deny the remaining allegations in Paragraph 7 of the Complaint.

8.      Defendants deny the allegations in Paragraph 8 of the Complaint.

## SUMMARY OF THE DISPUTE

9.      Defendants admit this is a controversy that includes ownership of certain patented technology and related software and other intellectual property, some of which is known generally as "MOVA." Defendants admit that some of the technology can be utilized to capture the facial performance of an actor by means of a specially designed camera rig for use in motion picture, computer graphics, and other video applications.  Defendants admit that recently, MOVA received a science and technology award conferred by the Academy of Motion Picture Arts and Sciences. Defendants admit this award was the subject of widespread publicity in the film and related industries.  Except as specifically admitted herein, Defendants deny the remaining allegations in Paragraph 9 of the Complaint.

## GENERAL ALLEGATIONS

10.     Defendants admit that some services using some of the assets—whose ownership is the subject of this controversy (the "MOVA Assets") — were first introduced commercially in 2006. Defendants admit that some MOVA Assets can be used today in a process which encompasses a number of patents and patent applications, the registered trademarks "MOVA" and "CONTOUR" software, and related intellectual property.  Defendants admit that on its face Exhibit A appears to be a list of some of the MOVA Assets.  Except as specifically admitted herein, Defendants deny the remaining allegations in Paragraph 10 of the Complaint.

11.     Defendants admit that Mova LLC is a California limited liability company that was registered with the California Secretary of State on or about June 15, 2004.  Except as specifically admitted herein, Defendants deny the remaining allegations in Paragraph 11 of the Complaint.

12.     Defendants admit that as of July 31, 2012, the ownership of the MOVA Assets was vested in OnLive, Inc.  Except as specifically admitted herein, Defendants deny the remaining allegations in Paragraph 12 of the Complaint.

13.     Defendants admit that in or about August 2012, OnLive, Inc. transferred substantially all of its assets (through an Assignment for the Benefit of Creditors), including the MOVA Assets. Defendants admit that following this transaction the MOVA Assets came to be owned by an entity called OL2, Inc.  Defendants deny that OnLive, Inc. suspended its operations on or about August 2012.  Except as specifically admitted or otherwise denied herein, Defendants lack knowledge and information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 13 of the Complaint and on that basis deny the allegations.

14.     Defendants admit that OL2, Inc. agreed to sell the MOVA Assets.  Except as specifically admitted herein, Defendants deny the remaining allegations in Paragraph 14 of the Complaint.

15.     Defendants admit that MO2 LLC is a California limited liability company that was registered with the California Secretary of State on or about November 9, 2012.  Except as specifically admitted herein, Defendants deny the remaining allegations in Paragraph 15 of the Complaint.

16.     Defendants admit that on or about February 11, 2013, MO2 LLC acquired the MOVA Assets from OL2, Inc.  Except as specifically admitted herein, Defendants either deny or lack knowledge and information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 16 of the Complaint and on that basis deny the allegations.

17.     Defendants deny the allegations in paragraph 17 of the Complaint.

18.     Defendants deny the allegations in paragraph 18 of the Complaint.

19.     Defendants lack knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 19 of the Complaint and on that basis deny the allegations.

20.     Defendants admit that MO2 LLC is a California limited liability company that was registered with the California Secretary of State on or about September 8, 2014.  Defendants admit that Mova LLC is a California limited liability company that was registered with the California

Secretary of State on or about September 18, 2014.  Except as specifically admitted herein, Defendants deny the remaining allegations in Paragraph 20 of the Complaint.

21.     Defendants admit that on September 18, 2014, eight (8) assignments of patents from the MOVA Assets were recorded in the U.S. Patent and Trademark Office as assigned from OL2, Inc. to MO2 LLC with an execution date of February 11, 2013, consistent with the execution date of the February 11, 2013 agreement whereby MO2 LLC acquired the MOVA Assets from OL2, Inc., and which was recorded with the assignments.  Defendants admit that, on its face, Exhibit B appears to be one such assignment document.  Except as specifically admitted herein, Defendants deny the remaining allegations in Paragraph 21 of the Complaint.

22.     Defendants admit that the next day, September 19, 2014, eight (8) assignments of patents from the MOVA Assets were recorded in the U.S. Patent and Trademark Office as assigned from MO2 LLC to Rearden Mova LLC with erroneous execution dates of September 18, 2014, and in one case, September 8, 2014, and that upon discovery of the errors, a Petition to Expunge the erroneous September 19, 2014 assignments was recorded with each patent along with a corrected chain of assignments from MO2 LLC to Rearden Mova LLC with corrected execution dates and a Statement of Interest including signed documents evidencing the assignment.  Except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 22 of the Complaint.

23.     Defendants admit that the U.S. Patent and Trademark office reflects a recording date of September 29, 2014 for an assignment of the marks "MOVA" and "CONTOUR" from Mova LLC, by its sole member OL2, Inc., to MO2 LLC with an execution data of February 11, 2013. Defendants admit that Exhibit D appears on its face to be assignment documents maintained by the U.S. Patent and Trademark Office reflecting these assignments.  Except as specifically admitted herein, Defendants deny the remaining allegations in Paragraph 23 of the Complaint.

24.     Defendants admit that one or more Defendants have made public statements to the effect that one or more Defendants is the owner of some of the MOVA Assets.  Except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 24 of the Complaint.

25.     Defendants admit that one or more Defendants have made public statements to the effect that one or more Defendants is the owner of some of the MOVA Assets.  Defendants admit

that Mova LLC has been publicly presented as a "Rearden Company."  Except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 25 of the Complaint.

26.    Defendants admit that Perlman said in February 2015 that his companies had not granted a license of the MOVA Assets to certain parties and he was unaware of how such parties could have obtained such a license.  Except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 26 of the Complaint.

## FIRST CLAIM FOR RELIEF

### Declaratory Relief

### (Against All Defendants)

27.    Defendants incorporate by reference their responses to paragraphs 1-26 of the Complaint.

28.    Admitted.

29.    Defendants lack knowledge of what Shenzhenshi desires and on that basis deny those allegations.  Defendants admit that the Complaint requests the declaration recited in it.  Except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 29 of the Complaint.

30.    Defendants admit that a judicial declaration is necessary and appropriate at this time and that they have disputed Shenzhenshi's ownership of the MOVA Assets.  Except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 30 of the Complaint.

## SECOND CLAIM FOR RELIEF

### False Advertising, California Business And Professions Code § 17500 Et Seq.

### (Against All Defendants)

31.    Defendants incorporate by reference their responses to paragraphs 1-30 of the Complaint.

32.    Defendants deny the allegations in Paragraph 32 of the Complaint.

33.    Defendants deny the allegations in Paragraph 33 of the Complaint.

34.    Defendants deny the allegations in Paragraph 34 of the Complaint.

35.    Defendants deny the allegations in Paragraph 35 of the Complaint.

36.     Defendants deny the allegations in Paragraph 36 of the Complaint.

## THIRD CLAIM FOR RELIEF

**Unfair Competition, California Business And Professions Code § 17200 Et Seq.**

**(Against All Defendants)**

37.     Defendants incorporate by reference their responses to paragraphs 1-36 of the Complaint.

38.     Defendants deny the allegations of Paragraph 38 of the Complaint.

39.     Defendants deny the allegations of Paragraph 39 of the Complaint.

40.     Defendants deny the allegations of Paragraph 40 of the Complaint.

## FOURTH CLAIM FOR RELIEF

41.     Defendants incorporate by reference their responses to paragraphs 1-40 of the Complaint.

42.     Defendants deny the allegations in Paragraph 42 of the Complaint.

43.     Defendants deny the allegations in Paragraph 43 of the Complaint.

44.     Defendants deny the allegations in Paragraph 44 of the Complaint.

## PRAYER FOR RELIEF

Defendants deny that Shenzhenshi is entitled to any relief in any form whatsoever from any Defendant, and specifically denies that Shenzhenshi is entitled to any of the relief requested in the Prayer for Relief.  Defendants deny the allegations contained in the Prayer for Relief.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

(FAILURE TO STATE A CLAIM)

45.     The complaint fails to state a claim upon which relief may be granted.

46.     Shenzhenshi's Complaint fails to allege facts sufficient to support a claim that the statements it attributes to Defendants that allegedly constitute false advertising under California Business and Professions Code § 17500 *et seq.* were made on behalf of any Defendant.

47.     Shenzhenshi's Complaint fails to allege facts sufficient to support a claim that the statements it attributes to Defendants, even if made, would violate California Business and Professions Code § 17500 *et seq.*

48.     Shenzhenshi's Complaint fails to allege facts sufficient to support a claim that any specific business relationship exists that would lead to future economic benefit for Shenzhenshi.

49.     Shenzhenshi's Complaint fails to allege facts sufficient to support a claim that any Defendant knew of the alleged business relationships, if any exist.

50.     Shenzhenshi's Complaint fails to allege facts sufficient to support a claim that any Defendant intended to disrupt any of the alleged business relationships, if any exist.

51.     Shenzhenshi's Complaint fails to allege facts sufficient to support a claim that any Defendant engaged in any independent wrongful conduct relating to its alleged disruption of the alleged business relationships, if any exist.

52.     Shenzhenshi's Complaint fails to allege facts sufficient to support a claim that any of these alleged business relationships, if any exist, were disrupted.

53.     Shenzhenshi's Complaint fails to allege facts sufficient to support a claim that Shenzhenshi was harmed by such alleged disruption.

54.     Shenzhenshi's Complaint fails to allege facts sufficient to support a claim that any of Defendants' respective conduct was a substantial factor in causing any alleged harm to Shenzhenshi.

## SECOND AFFIRMATIVE DEFENSE

### (NO STANDING)

55.     Shenzhenshi lacks standing to assert ownership of the MOVA Assets.

## THIRD AFFIRMATIVE DEFENSE

### (LACHES AND ESTOPPEL)

56.     Shenzhenshi's claims are barred in whole or part by the doctrines of laches, acquiescence and/or estoppel.

57.     Shenzhenshi delayed in initiating this law suit.

58.     Shenzhenshi's delay was unreasonable.

59. Shenzhenshi's delay resulted in prejudice to Defendants, who have made continuous and substantial investments related to the MOVA Assets.

60. Shenzhenshi has been aware of the facts concerning its claim of ownership of the MOVA Assets and related transfers of them.

61. Despite having been aware of Defendants' asserted rights in the MOVA Assets, Shenzhenshi never contacted or otherwise informed Defendants of its alleged claim of ownership of the MOVA Assets.

62. Defendants have not been aware of Shenzhenshi's alleged ownership and alleged licensing of the MOVA Assets and provision of services using the MOVA physical assets, intellectual property, and trade secrets from the MOVA Assets.

63. Defendants relied on Shenzhenshi's misleading silence to their detriment in that their ownership of the MOVA Assets has been put in doubt, improper credit has been given, and proper credit has been denied for founding and developing MOVA technology and for offering MOVA services.

## FOURTH AFFIRMATIVE DEFENSE

### (UNCLEAN HANDS)

64. Shenzhenshi is entitled to no equitable relief because it has unclean hands.

65. Shenzhenshi acted improperly, violating good faith and conscience, in its alleged acquisition of the MOVA Assets and subsequent use of them.

## FIFTH AFFIRMATIVE DEFENSE

### (WAIVER)

66. Shenzhenshi's claims are barred in whole or part by the doctrine of waiver.

67. Shenzhenshi knew that authority from at least one of the Defendants was required for the proper transfer of the MOVA Assets.

68. Shenzhenshi freely and knowingly gave up any right it may have had relating to any Defendant doing so, in that Shenzhenshi never contacted any Defendant concerning an acquisition of the MOVA Assets.

## SIXTH AFFIRMATIVE DEFENSE

### (NO DAMAGES)

69.     Defendants are informed and believe, and therefore allege without admitting that the Complaint states a claim, that Shenzhenshi has not sustained any loss, damage, harm, or detriment in any for or any amount, monetary or otherwise, as a result of any acts alleged against Defendants in the Complaint.

### RESERVATION OF RIGHT TO ASSERT OTHER DEFENSES

70.     Defendants reserve the right to assert any other defenses that discovery may reveal.

## COUNTERCLAIMS

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Rearden LLC, Rearden Mova LLC, MO2 LLC, and Mova LLC (together "Counterclaimants"), through their attorneys and for their Amended Counterclaims against Shenzhenshi Haitiecheng Science and Technology Co., Ltd., a People's Republic of China Corporation ("Shenzhenshi"), allege as follows:

## THE PARTIES

71.     Rearden LLC is a California limited liability company having its principal place of business at 355 Bryant Street, Suite 110, San Francisco, California 94107.

72.     Rearden Mova LLC is a California limited liability company having its principal place of business at 355 Bryant Street, Suite 110, San Francisco, California 94107.

73.     MO2 LLC is a California limited liability company having its principal place of business at 355 Bryant Street, Suite 110, San Francisco, California 94107.

74.     Mova LLC is a California limited liability company having its principal place of business at 355 Bryant Street, Suite 110, San Francisco, California 94107.

75.     As represented in its Complaint in this action, Shenzhenshi "is a corporation organized under the laws of the People's Republic of China having its principal place of business somewhere in Shenz[h]en, China."

## JURISDICTION AND VENUE

76.     This Court has jurisdiction under 28 U.S.C. § 1332(a) because Counterclaimants are each citizens of California, on information and belief Counterdefendant Shenzhenshi is a citizen of

the People's Republic of China, and the amount in controversy exceeds $75,000 exclusive of

interest, attorneys' fees, and costs.  This Court also has jurisdiction under 28 U.S.C. § 1331, federal

question jurisdiction, and § 1138, granting jurisdiction over patent, trademark and copyright claims.

77.     Venue is proper in this District because Counterclaimants each resides in San

Francisco, California and a portion of the events giving rise to Counterclaimant's claims occurred in

this District.

## FACTUAL ALLEGATIONS

## I.     THE MOVA ASSETS

78.     The technology in dispute includes MOVA® Contour® Reality Capture ("MOVA"

or "MOVA Contour") technology that was created and developed by Counterclaimant Rearden LLC.

79.     In one embodiment, MOVA uses an array of cameras in conjunction with

phosphorescent makeup applied in random patterns, and advanced software to capture 3D facial

performances for use in motion picture special effects and video games.

80.     MOVA has been used for films such as "*The Curious Case of Benjamin Button*"

(2008) to capture Brad Pitt's facial performance (i.e., the detailed 3D motion of the surface of Mr.

Pitt's face as he performed the part of his character, Benjamin Button), which then was used to

animate a computer-generated face for Benjamin Button, that aged backwards with such a high

degree of realism that it appeared to be a genuine human face (resulting in an 2008 Academy Award

for Best Visual Effects—awarded to the special effects team that relied upon MOVA and many other

special effects systems, not yet an award for MOVA itself).

81.     To date, the MOVA technology has been used in at least fifteen major motion

pictures.

82.     On January 13, 2015, the Academy of Motion Picture Arts and Sciences awarded the

Scientific and Technical Awards to the MOVA facial performance capture system.

83.     The "MOVA Assets" at issue herein include the MOVA technology, and related

hardware and software, source code, patents and patent applications, trademarks, copyrights, trade

secrets, domain names, business records, and various physical goods (the "MOVA Assets").

## II.   OWNERSHIP OF THE MOVA ASSETS

84.   The MOVA Assets are owned by Rearden Mova LLC.

### A.  Creation and Development of MOVA by Rearden LLC

85.   MOVA (http://www.rearden.com/mova.html) is one of many technologies incubated and offered as a service by Rearden LLC (www.rearden.com), a San Francisco Bay Area company founded in 1999 by Steve Perlman as an incubator for fundamental technology, creative works, and their interplay.  Facial performance motion capture, as both a technology and a tool for motion picture and video game production, falls squarely within the focus of Rearden LLC's business.

86.   Perlman had previously worked as Principal Scientist at Apple where he developed, among many other technologies, the multimedia underpinnings of the color Macintosh as well as QuickTime.  He left Apple for two startups that later went public, and designed and co-founded WebTV, which was later acquired by Microsoft.  Microsoft named Perlman President of a new division focused on television products, which ultimately developed Microsoft's cable, satellite, IPTV and Xbox 360 systems.  Perlman left Microsoft in 1999 and self-funded a technology incubator and visual effects production studio in San Francisco, called Rearden, Inc. (now Rearden LLC).  Rearden LLC largely focused on developing fundamental media-related technologies whose development times (e.g. 5 to 13 years) are beyond the horizon of venture capital and corporate R&D.  Perlman has operated Rearden LLC continuously through to this day.

87.   A major technology focus of Rearden LLC from its 1999 founding to this day is "performance motion capture," a production technology typically used to create a 3D animated character in a movie or a video game that moves exactly like a performer.  While existing motion capture systems could realistically capture body ("skeletal") motion, there was no practical technology that could realistically capture the subtleties of facial motion.

88.   Over the course of several years, Rearden LLC's team invented and perfected a solution to the problem—a technology that could precisely track the 3D shape and motion of a face to sub-millimeter precision, producing highly realistic results.  The technology was branded MOVA Contour Reality Capture and introduced at the SIGGRAPH Conference in July of 2006.

**B.   Transfer of MOVA Assets to OnLive, Inc. and OL2, Inc.**

89.     MOVA technology, along with video game streaming technology, was spun out of Rearden LLC in 2007 into OnLive, Inc.  OnLive, Inc. thereafter owned all of the MOVA Assets. Working on its own, together with Rearden LLC and with other visual effects companies, OnLive, Inc. offered MOVA performance facial capture services for video games and motion pictures, including "*Gravity*" (2013), "*The Avengers*" (2012), "*Harry Potter and the Deathly Hallows: Part 2*" (2011), "*Pirates of the Caribbean: On Stranger Tides*" (2011), "*TRON: Legacy*" (2010), "*Harry Potter and the Deathly Hallows: Part 1*" (2010), and "*The Curious Case of Benjamin Button*" (2008).

90.     On August 17, 2012, OnLive, Inc. assigned all of its assets, including the MOVA Assets, to OL2, Inc.  On information and belief, OL2, Inc. was primarily focused on the video gaming unit of OnLive, Inc., and was not interested in offering MOVA movie production services.

**C.   Reacquisition of the MOVA Assets by Rearden LLC**

91.     In the fall of 2012, Rearden LLC learned that OL2, Inc. was interested in selling the MOVA Assets, and ultimately decided to reacquire those assets.  Rearden LLC formed a wholly-owned subsidiary, MO2 LLC, as a vehicle to acquire the MOVA Assets from OL2, Inc.

92.     Rearden LLC's CEO Perlman tasked its employee Greg LaSalle with management of MO2 LLC.  LaSalle had worked with Rearden LLC on and off since 1999, and between 2007 and 2012 worked for OnLive, Inc. providing MOVA facial capture services.  Perlman asked LaSalle to work with Rearden LLC's corporate counsel of more than a decade, Alan Kalin of Bingham McCutchen, to effect the MOVA Asset reacquisition on Rearden LLC's behalf.

93.     Perlman closely supervised LaSalle to be certain that the terms of the acquisition met Rearden LLC's needs to secure its intellectual property rights and to be able to operate the MOVA business.  Perlman supervised the negotiations between MO2 LLC and OL2, Inc. over the asset transfer, and commented on drafts of the proposed agreement between MO2 LLC and OL2, Inc.

94.     Throughout the time that LaSalle managed the transfer of the MOVA Assets from OL2, Inc. to MO2 LLC, he was employed full-time by Rearden LLC.

95.    Rearden LLC paid all legal fees and all California corporation fees associated with the formation of MO2 LLC.

96.    Rearden LLC paid all of MO2 LLC's legal fees associated with the negotiation and transfer of the MOVA Assets from OL2, Inc. to MO2 LLC.

97.    The negotiation over the transfer of MOVA Assets from OL2, Inc. to MO2 LLC lasted for months, through February 2013.  During this time, Rearden LLC employee LaSalle continued to schedule projects using the MOVA Assets.

98.    Rearden LLC paid the costs associated with transporting physical assets comprising a portion of the MOVA Assets ("the physical MOVA Assets") to a locked storage facility, which costs were submitted on an expense report by LaSalle.

99.    On February 11, 2013, OL2, Inc. transferred the MOVA Assets to MO2 LLC through a Membership Interest and Asset Purchase and Sale Agreement.

100.    On February 14, 2013, LaSalle sent Perlman a list of patents and trademarks transferred from OL2, Inc. to MO2 LLC.  The email attaching the list explained, "FYI: Attached is a copy of the Trademark and patent lists.  Some due dates have already passed."  The list specifically informed Perlman of which patents and trademarks had upcoming deadlines or otherwise required attention and action by Rearden LLC.

101.    Rearden LLC immediately began paying maintenance fees for the patents and trademarks included in the MOVA Assets.  Rearden LLC has continuously and diligently maintained and prosecuted the patents and trademarks of the MOVA Assets to this day.

102.    For example, in April 2013, Rearden LLC paid an $800 maintenance fee to the USPTO in connection with U.S. Patent No. 7,605,861, serial number 11/077,628, which is one of the MOVA Assets.

103.    In June 2013, Rearden LLC paid an $800 maintenance fee to the USPTO in connection with U.S. Patent No. 7,633,521, serial number 11/066,954, which is one of the MOVA Assets.

104.    In August 2013, Rearden LLC paid $1,310 in examination-related fees to the USPTO in connection with U.S. Patent Application serial number 11/255,854 (later issued as the U.S. Patent No. 8,659,668), which is one of the MOVA Assets.

105.    Also in August 2013, Rearden LLC paid an $800 maintenance fee on U.S. Patent No. 7,667,767, serial number 11/449,131, which is one of the MOVA Assets.

106.    In January 2014, Rearden LLC paid $480 in examination-related fees to the USPTO in connection with U.S. Patent Application serial number 11/255,854 (later issued as the U.S. Patent No. 8,659,668), which is one of the MOVA Assets.

107.    In addition to U.S. patent and trademark MOVA Assets, Rearden LLC has diligently maintained the international patent and trademark MOVA Assets throughout the world, paying foreign patent office and trademark office fees in countries including Canada, Japan, South Korea, Australia and European countries.

108.    In addition to paying USPTO and international patent office fees, Rearden LLC has retained and paid counsel in connection with U.S. and foreign patent and trademark MOVA Assets.

### D.  Transfer of the MOVA Assets from MO2 LLC to Rearden Mova LLC

109.    On April 19, 2013, MO2 LLC transferred the MOVA Assets to another Rearden LLC company, Rearden Mova LLC.

110.    On September 18, 2014, Rearden LLC correctly recorded patent assignments for the MOVA Asset patents, reflecting the assignment from OL2, Inc. LLC to MO2 LLC made in the Membership Interest and Asset Purchase and Sale Agreement.

111.    Rearden LLC also recorded patent assignments for the MOVA Asset patents, reflecting the assignment from MO2 LLC to Rearden Mova LLC on April 19, 2013.  However, the execution dates of the online forms were incorrectly filled in with the recordation dates of September 18, 2014 (and in one case, September 8, 2014).  Rearden LLC corrected the execution dates, to April 19, 2013.  Rearden LLC made these corrections before it was aware of Shenzhenshi's existence, let alone the claims in this case.

### E.  Greg LaSalle

112.   The history between Perlman and LaSalle dates back decades.  Growing up in Connecticut, Perlman took some classes at a science center founded by Dr. Donald LaSalle, PhD. Greg LaSalle was Donald LaSalle's son, but Perlman does not recall meeting LaSalle until after college in the 1980s.

113.   In 1999, LaSalle heard that Perlman was setting up Rearden LLC, a new San Francisco incubator that included a production studio. LaSalle proposed to join, citing his degree in electronic music and experience in small theatrical productions. Rearden LLC hired LaSalle as an employee in 1999, and LaSalle moved from Connecticut to San Francisco with his wife, renting an apartment on Treasure Island.

114.   LaSalle told Perlman that LaSalle's wife was going to leave him because of the cold windy weather on Treasure Island.  Out of concern for their marriage, Perlman personally provided a loan signed by both LaSalle and his wife (countersigned by Perlman) to assist them in buying a home in San Mateo.  LaSalle's wife left him anyway.  Perlman assumed that after the divorce LaSalle would sell the house and pay back the balance of the loan.  LaSalle refused.  Perlman felt betrayed, but he agreed to revise the loan to be signed in just LaSalle's name (countersigned by Perlman) and extend the term of payment.  Perlman also resolved that, other than seeing the loan through to its completion, he would never again help LaSalle financially with anything of significant monetary value.

115.   But LaSalle also caused problems at Rearden LLC.  For example, in May 2006, a few days before the MOVA unveiling at the SIGGRAPH trade show the exhausted core team was desperately trying to get all of the pieces to work to get a professional-quality facial capture in time to meet submission deadlines.  LaSalle was asked to assemble a support structure to handle the cameras.  The support structure was too unstable to enable a high-quality capture.  Perlman stepped in and directed the team to tear down LaSalle's structure and instead install a steady structure. LaSalle erupted into a fit before the core team saying Perlman was simply taking credit for the structure so that LaSalle wouldn't be able to say he contributed to MOVA.  LaSalle then stormed off, and told Perlman he would send in his resignation and didn't want to be a part of what would

surely be a failure.  The core team was stunned.  A steady support structure was standard for production work and a trivial contribution to a multi-year project.  The team installed the stable support structure, and barely made the deadline with a professional capture.  LaSalle contacted Perlman and apologized for what he said.  Perlman's concern was team morale and cohesion, but LaSalle pleaded with Perlman to give him another chance, citing, for example, his relationship with Perlman and saying Perlman's family was like his family.  Perlman made it clear friendship had zero to do with the decision, and if it happened again, it would be a human resources matter that might lead to termination.  LaSalle apologized to the core team and resumed work.  This was one of a series of encounters between LaSalle and Perlman where LaSalle would threaten bad behavior or acts, and then apologize and retract his threats.

### 1.   LaSalle's 2012 Employment Agreement and PIIA with Rearden LLC

116.   From 2007 to 2012, LaSalle, and another former Rearden LLC employee Ken Pearce, worked for OnLive, Inc., providing MOVA facial capture services and related studio work, including studio construction.

117.   On August 17, 2012, when the MOVA Assets were transferred to OL2, Inc., OL2, Inc. hired roughly half of OnLive, Inc.'s employees.  OL2, Inc. did not, however, hire any of the employees who worked on the MOVA facial capture services.

118.   On August 20, 2012, Rearden LLC offered employment to several just-terminated OnLive, Inc. employees, including Greg LaSalle and Ken Pearce.

119.   LaSalle and Pearce each accepted their Rearden LLC offers of employment on August 20, 2012, and agreed with multiple signatures to the express terms of the Rearden LLC Full-Time Exempt Offer of Employment ("Employment Agreement") and Proprietary Information and Inventions Agreement ("PIIA").

120.   LaSalle's Employment Agreement, including its PIIA, is included as Exhibit 1 hereto. (Personal information is redacted.)

121.   Section A.2 of the PIIA defines "the Company [Rearden LLC's] Business" as including, among other things, "creation and production of … performance motion capture,"

"technology development and production," and "development of motion, facial and surface capture technology and related human and non-human 2D and 3D rendering and animation technologies."

122.   Section A.3 of the PIIA defines "Proprietary Information" as "information that was or will be developed, created, or discovered by or on behalf of the Company, or which became or will become known by, or was or is conveyed to the Company, which has commercial value in the Company's Business."

123.   Section A.3 of the PIIA further explains, "By way of illustration but not limitation, Proprietary Information includes (a) inventions, discoveries, improvements, mask works, trade secrets, ideas, processes, formulas, copyrightable subject matter, source and object codes, data, programs, other works of authorship, know-how, developments, designs and techniques parentheses hereinafter collectively referred to as 'Inventions'; (b) intellectual property, such as … copyrights, trademarks, service marks, trade secrets, …; and (c) information regarding plans for research, development, new products …"

124.   Section B of the PIIA, entitled "Assignment of Rights" states: "All Proprietary Information … is and shall be the sole property of the Company.  I hereby assign to the Company any and all rights, title and interest I may have or acquire in such Proprietary Information."

125.   Exhibit A to the PIIA provides a space for the employee to list "all Inventions or improvements relevant to the subject matter of my employment by the Company and/or that relate to the Company's Business … that I desire to remove from the operation" of the PIIA.  The copy of the PIIA signed by LaSalle bears a hand-written "x" next to the option, "[n]o inventions or improvements."

126.   Section C of the PIIA, entitled "Maintenance and Return of Company Documents and Materials," provides: "I agree that during my employment by the Company I will not remove any company documents and materials from the business premises of the company or deliver any company documents and materials to any person or entity outside the Company except as I am required to do in connection with performing the duties of my employment.  I further agree that, immediately upon termination of my employment by me or by the Company for any reason, or during my employment as requested by the Company, I will return all Company documents and

materials, apparatus, equipment and other physical property, or any reproduction of such property …"

127.   Section H of the PIIA, entitled "Duty of Loyalty," states: "I agree that, during my employment with the Company, I will not provide consulting services to or become an employee of, any other firm or person engaged in a business in any way competitive with the Company, without first informing the company at the existence of such proposed relationship and obtaining the prior written consent of my manager and the Human Resources Manager for the organization in which I work."

128.   Section 5 of the Employment Agreement is a merger clause; it incorporates by reference the PIIA. It states: "[o]ur agreement [the Employment Agreement] cannot be changed except in writing signed by both of us."

129.   Section M of the PIIA also contains a merger clause, which states: "No modification of or amendment to this Agreement [the PIIA] nor any waiver of any rights under this Agreement will be effective unless in writing signed by the CEO of the Company and me [LaSalle]."

130.   The PIIA provides that it may only be modified by writing and signed by the CEO of the Company, at all relevant times herein Perlman, and by the employee, and further provides that the employee will not become engaged in a business in any way competitive with the Company without prior written consent of Perlman and the Human Resources Manager, at all relevant times herein, Cindy Ievers.

131.   The Employment Agreement similarly provides that it may only be modified by writing and signed by the CEO of the Company and by LaSalle.

132.   Neither LaSalle's PIIA nor his Employment Agreement was ever modified by writing, signed or otherwise, by Perlman or Ievers.

### 2.  LaSalle's Work with MO2 LLC On Behalf of Rearden LLC

133.   In August and September 2012, Perlman discussed with LaSalle and Pearce the possibility that the two would leave their Rearden LLC employment and start their own company that would acquire and then use the MOVA Assets.

134.   LaSalle and Pearce stated to Perlman that they were prepared to terminate their Rearden LLC employment and acquire the MOVA Assets at their own expense.  Perlman agreed that he would help LaSalle and Pearce in this endeavor, but was clear that he would be helping them out as non-employees.

135.   Perlman made it clear to LaSalle and Pearce, that, per the express terms of the PIIA, if an employee sought to personally acquire or control MOVA Assets, he would have to first terminate his employment from Rearden LLC and cover the full cost of negotiating the acquisition himself.

136.   Consistent with this, Perlman told OL2, Inc.'s Chairman, Gary Lauder, that if LaSalle and Pearce chose to quit Rearden LLC and fund further development of the MOVA Assets themselves, Rearden LLC would not object to OL2, Inc.'s transferring the assets to them.

137.   However, on October 2, 2012, Pearce proposed to OL2, Inc. that, while he and LaSalle remained Rearden LLC employees, they would use their industry relationships to find a buyer for the MOVA Assets, and in return they would personally keep 25% percent of the transaction, completely excluding Rearden LLC from the transaction.

138.   OL2, Inc.'s Chairman Lauder emailed Perlman about this proposed transaction, admitting that it would be unreasonable to deprive Rearden LLC of the benefit of the deal while Rearden LLC supported LaSalle and Pearce as employees.

139.   Perlman immediately notified Pearce and LaSalle that their actions had violated the terms of the PIIA, and also their fiduciary obligations to Rearden LLC.

140.   Pearce was placed on leave without pay and ultimately terminated.  LaSalle denied any involvement, and also made it clear to Perlman that he had decided to stay as a Rearden LLC employee and not start his own business.  Perlman accepted LaSalle's representations.

141.   LaSalle proposed a business case to Perlman for Rearden LLC to reacquire the MOVA Assets and allow LaSalle to run the business as an employee of Rearden LLC.

142.   By this point, an early-stage prototype of a new Rearden LLC motion capture technology was working, and the MOVA motion capture technology would be complementary.  In mid-October 2012, Perlman decided that Rearden LLC would invest in the cost of negotiating with

OL2, Inc. to reacquire the MOVA Assets.  Perlman assigned LaSalle the responsibility of directly negotiating with OL2, Inc. on Rearden LLC's behalf, under Perlman's direct supervision and final decision-making.

143.   Perlman instructed LaSalle to keep potential Mova customers "warm" in the hope that the OL2, Inc. Mova Asset negotiation would be concluded quickly.  LaSalle emailed OL2, Inc. on October 16, 2012, "[w]e have a Mova job scheduled on Nov. 7th and I'd rather not cancel it."

144.   At the time, it was unclear whether Rearden LLC would need to form a separate LLC, depending on the terms OL2, Inc. would agree to in the Mova Asset transfer.  On October 16, 2012 LaSalle emailed OL2, Inc.:  "[w]e haven't set up an entity yet because we haven't seen any terms regarding the transfer.  Would be possible to see the terms before we set up the LLC?"

145.   Rearden LLC concluded a wholly-owned LLC would be an appropriate vehicle for the MOVA Asset transaction and reserved the California corporate name "MO2 LLC" on October 30, 2012.  Shortly thereafter Rearden LLC engaged its corporate counsel to set up a wholly-owned subsidiary, MO2 LLC that would hold the MOVA Assets. The MO2 LLC engagement letter with Bingham McCutchen expressly states that Rearden LLC will pay fees for the formation of MO2 LLC and the transfer of the MOVA Assets to MO2 LLC.  LaSalle, on behalf of Rearden LLC, filed the corporate paperwork, and signed the MO2 LLC engagement letter with Bingham McCutchen.

146.   LaSalle's actions up to that time and from that point forward demonstrate that he was continuing to act in his capacity as an employee of Rearden LLC when he participated in the formation of MO2 LLC and transfer of MOVA Assets from OL2, Inc. to MO2 LLC.

147.   LaSalle continuously received and accepted a full-time salary and benefits from Rearden LLC through the entire negotiation and transfer for MOVA Assets from OL2, Inc. to MO2 LLC.  LaSalle, as an at-will employee, was free to quit his Rearden LLC employment, cease collecting his large Rearden LLC compensation package, and commence employment elsewhere or become self-employed.  By this time, LaSalle had extensive experience in motion capture and performance facial capture work, both in supporting development, managing shoots and in business development.  He had experience hiring and managing employees and contractors as well as negotiating his own employment package.  He had extensive connections in the visual effects

industry, and specifically in the motion capture sub-specialty of visual effects.  In short, LaSalle was a highly experienced employee who voluntarily remained bound by the terms of his Rearden LLC employment obligations, including his August 20, 2012 Employment Agreement and PIIA.

148.   Rearden LLC provided LaSalle with a Rearden LLC corporate phone and phone number; a key-card accessed Rearden LLC office space; and an "@rearden.com" email address. Throughout the negotiations between MO2 LLC and OL2, Inc., LaSalle used his "@rearden.com" email address to correspond with OL2, Inc., consistent with his continued employment with Rearden LLC.

149.   LaSalle filed monthly expense reports for Rearden LLC business expenses, including expensing the cost of moving the MOVA Assets to a storage facility and the entire cost of his mobile phone service and home Internet service to enable him to work from home.  All expenses were promptly reimbursed by Rearden LLC.

150.   Pursuant to the express language of LaSalle's PIIA, for MO2 LLC to have been formed for the benefit of any person or entity other than Rearden LLC, Rearden LLC's Human Resources Manager Ievers and CEO Perlman would both have had to sign a prior written consent. No such consent was ever given, let alone in a signed writing.

151.   Indeed, Ievers was not notified at the time of MO2 LLC's formation, because MO2 LLC was a wholly owned subsidiary of Rearden LLC and therefore not a human resources matter.

152.   Immediately after the transfer of assets from OL2, Inc. to MO2 LLC, LaSalle submitted the list of MOVA patents and trademarks to Rearden LLC, noting maintenance deadlines. Rearden LLC commenced paying all fees to maintain them as discussed above.

153.   All of these events and actions are consistent with the fact that MO2 LLC was formed on behalf of Rearden LLC.

### 3.  LaSalle Reneges On—and Breaches—His Agreements with Rearden LLC

154.   Rearden LLC believed that LaSalle was performing in accordance with his Employment Agreement and PIIA when managing the transfer of MOVA Assets from OL2, Inc. for Rearden LLC's benefit.

155.   Only after the February 11, 2013 transfer of MOVA Assets to MO2 LLC, on February 14, 2013, did LaSalle tell Perlman that LaSalle intended to operate MO2 LLC, and keep the MOVA Assets for his own benefit.  In response, Perlman reminded LaSalle that per his fiduciary obligations and his PIIA obligations, MO2 LLC and the MOVA Assets were owned by Rearden LLC.  Perlman further reminded LaSalle that LaSalle had signed an engagement letter with Rearden LLC's long-time counsel at Bingham McCutchen clearly stating that Rearden LLC would be paying the legal fees related to the MOVA Asset acquisition.

156.   Just as he had done in the 2006 SIGGRAPH incident prior to MOVA's launch, LaSalle retreated from his position and pleaded with Perlman for forgiveness, which he reiterated in an email to Perlman, "[y]ou are my friend, my 'family' and you mean a great deal to me. I would never do anything to purposefully jeopardize that."

157.   Unknown to Rearden LLC, LaSalle was in negotiations with a company called Digital Domain 3.0, Inc., a Delaware Corporation ("DD3"), A Delaware Corporation doing business in Venice Beach, California under "DD3" or "Digital Domain" business names.  DD3 is a successor company to prior Digital Domain companies that Rearden LLC, OnLive, Inc. and LaSalle (on behalf of Rearden LLC and OnLive, Inc.) had worked with in movie productions using the MOVA technology.  At the same time that LaSalle was assuring Perlman he would never "purposely jeopardize" their friendship or family relationship, LaSalle was texting with DD3's CEO, Ed Ulbrich, negotiating the sale of the MOVA Assets to the exclusion of Rearden LLC.

158.   After Perlman reminded LaSalle about Rearden LLC paying the legal fees related to the MOVA Asset acquisition, LaSalle immediately asked Ievers (in her capacity as VP Finance of Rearden LLC) about the status of the legal fees, confirming what Perlman had told him: that Rearden LLC had regularly (and routinely) paid the fees per the Bingham McCutchen MO2 LLC engagement agreement.

159.   LaSalle then quickly texted Ed Ulbrich (DD3's CEO) that "Steve [Perlman] paid the attorney fees for the Mova transfer.  **There is/was no agreement regards to him doing that**.  I will reimburse the to date legal costs on Tuesday."  (emphasis added)  Not only was there an agreement which explicitly called for Rearden LLC to pay all of the legal fees associated with the OL2, Inc.-

MO2 LLC transfer—because that transfer was made on behalf of Rearden LLC—but LaSalle himself had signed it.  LaSalle's statement to Ulbrich was clearly untrue.  On information and belief, LaSalle denied the existence of the Bingham McCutchen engagement agreement to support the pretense that he owned MO2 LLC and the MOVA Assets, and could sell them to DD3.  If LaSalle had believed the legal fees were a gift from Perlman (or Rearden LLC), then there would have been no reason for him to tell this lie to DD3.

160.   At this time, still unaware of LaSalle's ongoing discussions with DD3, Perlman assumed LaSalle was going through a similar tantrum as the one before the SIGGRAPH MOVA launch in 2006.  LaSalle disappeared, failing to report to work and became largely unreachable.  This continued over the next 2-3 weeks.  LaSalle finally spoke to Ievers (in her capacity as Rearden LLC's Human Resources Manager), and told her he would turn over the MOVA Assets to Rearden LLC.

161.   Then, on March 12, 2013, LaSalle emailed Ievers that he hadn't decided whether or not to turn over the MOVA Assets to Rearden LLC.

162.   Ievers responded the same day by emailing LaSalle a copy of his Employment Agreement with the email message, "You need to review your employment agreement.  I've attached it here for reference.  Specifically, you should review the Proprietary Information and Inventions Agreement sections A2 and section B."

163.   Thereafter, LaSalle failed to report for work and was largely unreachable, but continued to receive and cash Rearden LLC paychecks.

164.   On March 20, 2013, Perlman sent an email to LaSalle.  That email stated in part, "you are refusing to turn over to the Company the performance motion capture intellectual property and production assets that you recently acquired during your employment (collectively, 'Acquired IP').  Your refusal to do so is a clear violation of your Proprietary Information and Inventions Agreement ('PIIA') and other obligations as a Rearden LLC employee."

165.   Perlman's email further stated, "Another significant unresolved issue is your refusal to turn over the Acquired IP.  The PIIA states that the Proprietary Information related to the Company's Business includes 'performance motion capture', and further states 'I hereby assign to

the Company any and all rights, title and interest I may have or acquire in such Proprietary Information.' It cannot be disputed that the Acquired IP is performance motion capture technology. Under the express terms of the PIIA, therefore, you acquired the Acquired IP as a Rearden LLC employee and it is Rearden LLC property, which you are improperly attempting to withhold from the Company. You even signed an agreement acknowledging Rearden LLC's payment of the legal fees associated with acquiring the Acquired IP, which Rearden LLC has paid regularly throughout the transaction."

166. LaSalle did not reply to Perlman's email or to efforts to reach him by Perlman and Ievers, but nonetheless continued to be paid by Rearden LLC.

167. On March 27, 2013, an employment attorney representing Rearden LLC wrote a letter to LaSalle, stating, "As you know, when you began your employment with the Company, you signed a Proprietary Information and Inventions Agreement ('PIIA'). The PIIA states that the Proprietary Information related to the Company's Business includes 'performance motion capture.' You are obligated under the PIIA to assign the rights to any Proprietary Information you acquired while an employee to the Company. The Acquired IP consists of performance motion capture intellectual property, which is Propriety Information subject to the PIIA. Accordingly, your failure to turn over to the Company the Acquired IP is a clear violation of your obligations under the PIIA, for which the Company has instructed to seek any and all available legal remedies if we are unable to resolve this issue immediately."

168. An attorney representing LaSalle responded and agreed to settlement discussions. As discussed above, Rearden LLC set up another wholly-owned subsidiary, Rearden Mova LLC on April 19, 2013 and on that day transferred the entirety of the MOVA Assets from MO2 LLC to Rearden Mova LLC. Rearden LLC notified LaSalle's counsel of the transfer from MO2 LLC to Rearden Mova LLC in writing and received acknowledgement in writing. Settlement discussions continued well past the May 8, 2013 date on which LaSalle alleges he sold the MO2 LLC MOVA Assets to Shenzhenshi. Then, later in May 2013, LaSalle's counsel became largely unreachable.

### III.   COUNTERDEFENDANT SHENZHENSHI'S FALSE OWNERSHIP CLAIMS

169.   Shenzhenshi claims that it acquired the MOVA Assets from MO2 LLC/Greg LaSalle on May 8, 2013.

170.   As set forth above, MO2 LLC did not own the MOVA Assets as of that date.  Rather, the MOVA Assets had been transferred to Rearden Mova LLC as of April 19, 2013.  Further, LaSalle did not own MO2 LLC or the MOVA Assets, and therefore could not at any time have sold those assets to Shenzhenshi.

171.   Moreover, Shenzhenshi knew, or should have known, that MO2 LLC and the MOVA Assets belonged to Rearden LLC.  *First,* the Asset Purchase Agreement on which Shenzhenshi bases its claim of ownership in the MOVA Assets expressly acknowledges Rearden LLC's asserted rights in the MOVA Assets.  *Second*, Shenzhenshi's representative and counsel, Joseph Gabriel, admits to having received and reviewed LaSalle's Employment Agreement and PIIA *before* Shenzhenshi entered into the Asset Purchase Agreement.  *Third,* LaSalle accepted a reduced price for the MOVA Assets in return for his demand that Shenzhenshi indemnify him for any claims in the MOVA Assets by Rearden LLC.

172.   Because Shenzhenshi had no rights to the MOVA Assets, Shenzhenshi has converted the MOVA Assets by taking and claiming possession thereof, and has infringed the MOVA patents, trademarks and copyrights by using, selling and/or offering to sell the MOVA technology to others.

173.   Shenzhenshi also knowingly interfered with Rearden LLC's Employment Agreements with LaSalle by working with LaSalle to take possession of the MOVA Assets, and by negotiating for the purported purchase of the MOVA Assets.  Shenzhenshi, with LaSalle, also misappropriated trade secrets associated with the MOVA Assets.

174.   Shenzhenshi's wrongful acts described herein constitute unfair competition, and Shenzhenshi has been unjustly enriched by its wrongful acts.

#### A.   Shenzhenshi, Digital Domain Holdings, Ltd. and DD3

175.   It is first important to understand the relationship between Plaintiff/Counterdefendant Shenzhenshi and Digital Domain Holdings Limited ("DDHL") and DD3.  Shenzhenshi is closely related to a number of other companies, including: (a) DDHL, a Bermuda corporation listed on the

Hong Kong Stock Exchange (listed as 547:HK) and (b) DD3. (Sun Innovation Holdings Limited changed its name to DDHL in 2013 after a reverse takeover of DD3, and will be referenced as "DDHL" herein, irrespective of the applicable time period.)

176. Shenzhenshi has identified DD3 and Mova Technologies LLC, a Delaware LLC, as parties having an interest in this lawsuit, in its Certificate of Interested Parties filed in this case. DDHL is the now-parent, of DD3. Shenzhenshi claims to have granted an exclusive and perpetual license to the MOVA Assets to Mova Technologies LLC, which in turn Shenzhenshi claims to have granted an exclusive and perpetual license to DD3.

177. On information and belief, Shenzhenshi did not act alone in its wrongful acts at issue in this case, but conspired with DDHL and DD3. On further information and belief, Shenzhenshi, DDHL and DD3, and individuals controlling these companies, all profited from skyrocketing price increases in DDHL's publicly traded stock, driven by these parties' false claims of acquisition and rights in the MOVA Assets. These events are discussed in detail in Section IV below.

**B. Interference with Rearden LLC's Employment Agreements with LaSalle**

178. Shenzhenshi, DDHL and DD3 all had knowledge of Rearden LLC's Employment Agreements with LaSalle when they entered into the Asset Purchase Agreement with MO2 LLC.

179. Discussions between LaSalle and DD3 regarding the transfer of the MOVA Assets to DD3 began in the fall of 2012, at the same time that LaSalle was telling Rearden LLC that he would remain a Rearden LLC employee, and form and manage MO2 LLC to hold and use the MOVA Assets on behalf of, and for the benefit of, Rearden LLC.

180. DD3 knew that LaSalle was still employed by Rearden LLC while negotiating with him to acquire the MOVA Assets. On February 25, 2013, DD3's CEO texted LaSalle, "[w]e want to make this happen." LaSalle texted back two minutes later that he needed certainty before breaking ties with Rearden LLC: "[m]e to [sic] but if I have to cut away from Steve [Perlman] tomorrow I'd like to be pretty sure and I have a few questions."

181. LaSalle continued negotiations with DD3 through April/May 2013. Again, these discussions and negotiations were unknown to Rearden LLC. LaSalle's sporadic communications with Rearden LLC went back and forth on whether he would return the Mova Assets to Rearden

LLC. In hindsight it appears to Rearden LLC that LaSalle was keeping open the possibility of returning to Rearden LLC as a backup plan in case his negotiations with DD3 fell through.[1]

182. Shenzhenshi's representative and counsel, Joseph Gabriel, admits to having received and reviewed LaSalle's Employment Agreement and PIIA *before* Shenzhenshi entered into the Asset Purchase Agreement.

183. Gabriel, General Counsel and Vice President of Business Affairs of DD3, has stated in a sworn declaration that by the end of March 2013, LaSalle had informed DD3 that Rearden LLC claimed rights in the MOVA Assets. Gabriel was, at the time, representing both DD3 and Shenzhenshi: "I represented SHST in connection with its acquisition of the MOVA property, as well as with respect to the Digital Domain license."

184. Gabriel further testified that he received and reviewed LaSalle's Employment Agreement and PIIA during negotiations with LaSalle, before Shenzhenshi purportedly acquired those assets from MO2 LLC.

185. According to Gabriel, DD3 decided to go ahead with the acquisition of the MOVA Assets, disregarding both Rearden LLC's asserted rights therein, and also Rearden LLC's Employment Agreement and PIIA with LaSalle: "[i]n early May 2013, I was instructed to move forward with acquiring the MOVA Assets and investing in a MOVA-related business through a company called Shenzhenshi Haitiecheng Science and Technology Co., Ltd ("SHST"). In early May 2013, SHST acquired the MOVA Assets from Original MO2 LLC for $25,000. DD3 entered into an exclusive license to the MOVA intellectual property, took possession of the MOVA physical assets for SHST, and hired Messrs. LaSalle and Pearce to re-establish a MOVA-based business. I represented SHST in connection with its acquisition of the MOVA property, as well as with respect to the Digital Domain license."

---

[1]     It was not until late May, 2013, when Rearden LLC forensically recovered the signature page of LaSalle's February 5, 2013 NDA with DD3, that it became aware that LaSalle had been in negotiations with DD3. Perlman immediately contacted DD3's CEO Ed Ulbrich by email and phone to find out what was going on, and to see if the matter could be resolved amicably. Ulbrich confirmed DD3 intended to hire LaSalle, but would not confirm any details of DD3's involvement with the Mova Assets. Perlman made it clear that Rearden LLC owned the Mova Assets in their entirety and LaSalle was in violation of his PIIA.

186.   In his own sworn declaration, LaSalle confirms Gabriel's statements: "I [LaSalle] was told that the parent company of Digital Domain (Digital Domain Holdings Limited) had decided that it wanted MOVA Assets to be owned by another affiliate[d] company, Shenzhenshi Haitiecheng Science and Technology Co., Ltd. (SHST).  As a result, the final contract transferring MOVA Assets was entered between Original MO2 and SHST. I signed that agreement on May 8, 2013."

187.   The Asset Purchase Agreement on which Shenzhenshi bases its claim of ownership in the MOVA Assets expressly acknowledges Rearden LLC's asserted rights in the MOVA Assets, stating:  "Seller has advised Purchaser that since February 11, 2013, Stephen G. Perlman ("Perlman"), whether individually or in his apparent capacity as an officer or manager of Rearden LLC, a California limited liability company, or any of his or its related entities, subsidiaries or affiliates (collectively, Rearden) has communicated the possibility of claims against Seller and/or Greg LaSalle in relation to the MOVA Assets (Perlman Claim) …"

188.   The Asset Purchase Agreement further indemnifies LaSalle for claims by Counterclaimants.  The Asset Purchase Agreement defines the "Perlman Claim" as follows:

> "Seller has advised Purchaser that since February 11, 2013, Stephen G. Perlman (Perlman, whether individually or in his apparent capacity as an officer or manager of Rearden LLC, a California limited liability company, or any of his or its related entities, subsidiaries or affiliates (collectively 'Rearden') has communicated the possibility of claims against Seller and/or Greg LaSalle in relation to the MOVA Assets ('Perlman Claim'). …"

189.   The Asset Purchase Agreement then provides an indemnification from Shenzhenshi to LaSalle:

> "any complaint, dispute or claim brought by Perlman, Rearden [LLC], or any affiliated entity controlled by him or it, against any of the Seller Indemnified Parties relating to the Mova Assets or the Business(the 'Indemnified Perlman Claims'); provided, however, except in the case of any actions by Seller Indemnified Parties that are requested by Purchaser or required pursuant to this Agreement, the foregoing obligation to defend or indemnify will not apply to intentional or willful acts committed' by the Seller Indemnified Parties after the Effective Date. Notwithstanding any obligations provided in Section 7.4, Seller shall, at Purchaser's sole expense, cooperate fully with Purchaser and shall perform such other acts and deeds consistent herewith as may be reasonably necessary, prudent and requested by Purchaser in the performance of its obligations to defend or indemnify hereunder. The parties acknowledge and agree that

Purchaser's indemnity obligations under this subsection do not prejudice or limit Purchaser's indemnity rights under this Article 6 in the event that a Perlman Claim also constitutes a Purchaser Loss."

190.   The Asset Purchase Agreement then allegedly establishes[2] an escrow account for the indemnified claims:

"Section 7.3 Establishment of Escrow Account for Indemnified Perlman Claims.  Solely with respect to the Indemnified Perlman Claims, at the Closing, Purchaser will (a) deposit US$75,000.00 in cash in the client trust account of the law firm of Hopkins & Carley in trust for the purposes described in this Section 7.3 and (b) promptly establish a separate escrow account (the 'Escrow Account') at Wells Fargo Bank, or such other financial institution that is mutually acceptable to the parties (the 'Escrow Agent') pursuant to the form of Escrow Agreement attached hereto as Exhibit B."

191.   According to Gabriel, LaSalle accepted a reduced price for the MOVA Assets in return for his demand that Shenzhenshi indemnify him for any claims in the MOVA Assets by Rearden LLC.

192.   On information and belief, despite having knowledge of Rearden LLC's rights in the MOVA Assets, as acknowledged in the Asset Purchase Agreement, DDHL did not disclose to its shareholders that there was any risk of litigation liability associated with the purported acquisition of or claim of ownership in the MOVA Assets.

## C.  Misappropriation of The MOVA Assets and Trade Secrets

193.   Shenzhenshi has asserted ownership of the MOVA Assets, and claims to have granted an exclusive license of the MOVA Assets to DD3.

194.   According to Joe Gabriel (again, DD3's General Counsel and Vice President of Business Affairs), once LaSalle was hired by DD3, DD3 "took possession of the MOVA physical assets for [Shenzhenshi]."  On information and belief, because LaSalle had access to the secure storage facility where the physical assets were kept, he assisted DD3 in taking the physical MOVA Assets.

---

[2]      The Exhibit B escrow agreement is unsigned and unmarked by any party.  The required escrow number field is blank, as is the required signature from a third-party bank official.

195.   Neither LaSalle, nor DD3 or Shenzhenshi, had permission to take the physical MOVA Assets from storage.  LaSalle refused to return the physical MOVA Assets when requested by Rearden LLC.

196.   Shenzhenshi also, on January 5, 2016, recorded assignments for the MOVA Patents. Shenzhenshi made the same date error that was made when, on September 19, 2015, Rearden LLC recorded assignments from MO2 LLC to Rearden Mova LLC.  Both parties erroneously recorded the wrong execution date.  In the case of Shenzhenshi, the execution date should be May 8, 2013, as included in May 8, 2013 document it filed allegedly evidencing the assignment, not February 11, 2013.

197.   Rearden LLC and Rearden Mova LLC also maintained certain trade secret information relating to the MOVA Assets.  LaSalle had access to this trade secret information, including the source code used in operating the MOVA physical assets; certain of the processes used along with the MOVA physical assets, such as the timing configurations for the Mova system; the process of calibrating the Mova system; the process of adjusting the aperture and focus of the Mova cameras; specific makeup formulations; techniques for applying makeup to performers being captured; and information regarding MOVA's prior customer relationships and business terms.

198.   Additionally, LaSalle had access to Rearden LLC trade secrets including internal technical business discussions and strategies as well as technical business discussions and strategies with other entities, including OL2, Inc., suppliers and investors.

199.   LaSalle also was involved in new technology under development at Rearden LLC, including breakthrough next-generation motion capture technology.  In some cases, LaSalle received internal communications containing confidential technical information relating to this new motion capture technology.  This information is also Rearden LLC's trade secrets.

200.   These trade secrets were not generally known to the public or to others, and have substantial value.  When Gary Lauder, the Chairman of OL2, Inc. sought a studio that would purchase the Mova Assets, Greg LaSalle sent an email to Lauder stating that knowledge of such trade secrets were essential to the Mova facial capture system's operation, "Contour [the Mova facial capture system] requires the skill and knowledge of its recent employees and without that it is

valueless.  I wish this technology came with instructions or a how to manual, but unfortunately, it doesn't."

201.   Rearden LLC and Rearden Mova LLC have protected these trade secrets by, *inter alia*, maintaining email, documents, source code and software in secure locations; controlling access to these locations; and by including confidentiality provisions in its agreements with all of its employees and contractors.  The following confidentiality provisions of LaSalle's employment agreements with Rearden LLC (referenced as "the Company"), for example, are representative of those in other Rearden LLC employment agreements:

- "At all times, both during my employment by the Company and after its termination, I will keep in confidence and trust and will not use or disclose any Proprietary Information or anything relating to it without the prior written consent of an officer of the Company… ;" and

- "I agree that during my employment by the Company I will not remove any Company Documents and Materials from the business premises of the Company or deliver any Company Documents and Materials to any person or entity outside the Company, except as I am required to do in connection with performing the duties of my employment.  I further agree that, immediately upon the termination of my employment by me or by the Company for any reason … I will return all Company Documents and Materials, apparatus, equipment and other physical property, or any reproduction of such property …"

202.   LaSalle gained access to Rearden LLC's trade secret confidential information in the course of his employer-employee relationship with Rearden LLC.  LaSalle was at all times under an obligation to maintain the confidence and secrecy of the information obtained during his employment with Rearden LLC, as set forth above.

203.   Again, LaSalle is indemnified by Shenzhenshi for any claims by Rearden LLC relating to, *inter alia*, this trade secret information.

204.   On information and belief, Shenzhenshi, alone or in concert with DDHL and/or DD3, has obtained access to Rearden LLC's trade secret information by accepting it from LaSalle, and has benefited from their use of Rearden LLC's trade secret information in connection with the other

MOVA Assets.

### D.  Infringement of the MOVA Intellectual Property

205.   Shenzhenshi, DDHL and DD3 have also benefitted substantially from their unlawful

and unauthorized use of the MOVA Assets, including the MOVA intellectual property.

206.   DD3, DDHL, visual effects companies, performers, the Directors Guild of America,

the Academy Awards and/or video game movie studios have publicly stated that DD3 has used

MOVA technology in the production of at least the following movies: *"Deadpool", "Fantastic*

*Four", "Pixels", "The Avengers: Age of Ultron", "Terminator Genisys", "Night at the Museum:*

*Secret of the Tomb",* and *"Guardians of the Galaxy"* and in the following video games: *"Halo 2",*

*and "Rise of the Tomb Raider."*

207.   On information and belief, Shenzhenshi, alone or in concert with DDHL and/or DD3,

have been compensated by the movie studios and video game studios developing and/or releasing

these movies and video games, and by affiliated parties, directly or indirectly, for the use of the

MOVA Assets.

### 1.  Patent Infringement

208.   The MOVA Assets include, among others, the following U.S. Patent Nos. 7,548,272

("the '272 patent"), 7,567,293 ("the '293 patent"), 7,605,861 ("the '861 patent"), and 8,659,668

("the '668 patent")  (collectively the "MOVA Patents", attached as Exhibits 2-5).  The MOVA

Patents are owned by Rearden Mova LLC.

209.   Generally, the MOVA Patents relate to performance motion capture using phosphor

makeup application techniques combined with strobing lights and camera shutters.  For example, the

patents describe and claim, applying a phosphor-makeup mixture in random patterns on surface

regions of a motion capture subject, strobing a fluorescent light source on and off, and strobing

camera shutters to capture images of the glowing phosphor-makeup as the subject moves or changes

facial expressions.  Claim 1 of the '668 patent, for example, recites:

"A method comprising:

applying a random pattern of material to specified regions of a performer's face, body and/or clothing;

capturing sequences of images of the random pattern with a first plurality of cameras as
the performer moves and/or changes facial expressions during a motion capture session;

correlating the random pattern across two or more images captured from two or more different cameras to create a 3-dimensional surface of the specified regions of the performer's face, body, and/or clothing;

generating motion data representing the movement of the 3-dimensional surface across the sequence of images;

strobing a light source on and off, the light source charging the random pattern when on; and

strobing the shutters of a first plurality of cameras synchronously with the strobing of the light source to capture the sequences of images of the random pattern ("glow frames") as the performer moves or changes facial expressions during a performance, wherein the shutters of the first plurality of cameras are open when the light source is off and the shutters are closed when the light source is on."

210.   Again, Shenzhenshi purports to have granted an exclusive license to the MOVA Assets to DD3, including the MOVA system that was taken from Rearden LLC, and that embodies—and infringes—the MOVA Patents.

211.   On information and belief, DD3 is commercially using, and offering to others to use the same physical MOVA Assets, including the hardware, software, and source code that Shenzhenshi, DDHL and DD3 misappropriated from Rearden LLC, as described above.

212.   For example, in February 2015, actress Camilla Luddington, during an interview regarding her role as Lara Croft in the Tomb Raider video game, made with DD3, described the use of MOVA technology in the process as follows:

"This time around we are using something called **Mova** which is really exciting because it just captures so much more of what you are doing in a scene and makes it just so much more realistic.

I've kind of spoken about it before, but just to put it in terms for people to understand, facial capture is usually 90 points of reference on a face and what **Mova is a fluorescent paint that gets airbrushed on your face and you can see it under a fluorescent light.** It actually captures 7,000 points of reference." (emphasis added)



[http://www.gameinformer.com/b/features/archive/2015/02/27/7331300.aspx]

213.   A photograph of Ms. Luddington during the process is shown above.  Ms. Luddington tweeted in reference to the photograph "…This is #mova. Florescent [sic] paint that is sprayed all over my face 2give 7000 points of ref!!! ... you can only see the paint in a black light."  This photograph shows a random pattern of fluorescent paint was applied to Ms. Luddington's face as makeup.  It can also be seen that the "black light" (ultra-violet light) referenced by Ms. Luddington has illuminated the phosphor in the fluorescent paint causing it to glow such that it is highly visible to a camera relative to the otherwise dark room.

214.   In the process shown above, the fluorescent lights would strobe on and off, repeatedly illuminating the phosphor makeup, while camera shutters synchronously strobing on and off would capture the random patterns of phosphor makeup so as to precisely track the changing expressions of the performer's face.

215.   In summary, the speckled random pattern of glowing makeup on Ms. Luddington's face, Ms. Luddington's reference to the makeup only being visible in black light, and the dark background to enable high contrast when lights are flashed off and camera shutters are open, all are

indications that the system being used by DD3/DDHL is the same system that DD3, Shenzhenshi and DDHL, took from Rearden Mova LLC, which embodies, and also infringes, the MOVA Patents.

216.    DD3/DDHL also used the MOVA system with Arnold Schwarzenegger in *"Terminator Genisys",* as shown below. (https://www.youtube.com/watch?v=DKlbaU_uWpI). The "MOVA raw" and "MOVA retarget" images are output data resulting from the operation of the Mova technology.



217.    The following photograph appeared in DDHL's 2014 Annual Report, on DD3's website and in DDHL's January 16, 2015 press release about "Digital Domain's Exclusive Visual Effects Technology MOVA." (The photo was cropped slightly differently in the report.) This photograph further confirms that the system being used by DD3 is the same system developed by, and misappropriated from Rearden LLC, which both embodies and infringes the MOVA Patents. The photograph shows the same arc-shaped rigging, synchronized cameras, fluorescent white and black lights as used in the MOVA system that DD3, Shenzhenshi and DDHL took from Rearden Mova LLC.  Additionally, the "MOVA" mark can be seen in the upper right hand corner of the photo.



218.    On information and belief, Shenzhenshi agreed with DD3 to infringe the MOVA Patents. Alternatively, Shenzhenshi induced DD3's infringement of the MOVA Patents, including through its purported license of the technology to Mova Technologies LLC and to DD3.

219.    On information and belief, DD3 has profited from its sales and offers to sell the patented methods to movie studios, video game studios and affiliated entities.  In addition to the specific monies that DD3 has charged the studios for its work, the benefits to DD3, and Shenzhenshi and DDHL, also include increased goodwill, whereby, on information and belief, DD3 has been able to build into its brand and better market and sell its other visual effects services and attract visual effects talent.

220.    On information and belief, Shenzhenshi, alone or in concert with DDHL and/or DD3, also induced others to infringe the MOVA Patents, including production studios that developed and/or released movies and video games that were made by infringing the MOVA patents (the "Induced Parties").

221.    On information and belief, each of the Induced Parties has directly infringed at least one claim of each of the MOVA patents, by themselves using, or by retaining DD3 to use the

infringing MOVA system.  Examples of DD3's infringing use of the MOVA system have been described above.

222.  The movies made by the Induced Parties by infringing the MOVA Patents include some of the largest box-office hits of recent years, with reported box office sales of:  "*Fantastic Four*" - $168M, "*Pixels*" - $244M, "*The Avengers: Age of Ultron*" - $1.4B,  "*Terminator Genisys*" $441M, "*Night at the Museum: Secret of the Tomb*" - $363M, and "*Guardians of the Galaxy*" - $773M.

### 2.  Trademark Infringement

223.  Rearden Mova LLC is the owner of the federally registered trademark "MOVA", U.S. Registration No. 3,843,152, for "Rental of hardware and software, licensing of hardware and software all for use in the field of entertainment," and U.S. Registration No. 3,641,201, for "Clothing, namely, t-shirts, hats."

224.  Rearden Mova LLC is also the owner of federally registered trademark "CONTOUR", U.S. Registration No. 3628974, for "Visual effects and motion picture production services, all in the field of entertainment; entertainment services, namely, special effects, visual effects and animation services featuring motion capture for translating movement of a real subject and mapping such movement onto a 3-dimensional computer-generated model or as a computer-generated subject."

225.  There is substantial goodwill in the "MOVA" mark, including goodwill built by the use of the mark in association with the following movies: "*Gravity*" (2013), "*Jack and the Giant Slayer*" (2013), "*Snow White and the Huntsman*" (2012), "*The Avengers*" (2012),  "*John Carter*" (2012), "*Harry Potter and the Deathly Hallows: Part 2*" (2011), "*Transformers: Dark of the Moon*" (2011), "*Green Lantern*" (2011),  "*Pirates of the Caribbean: On Stranger Tides*" (2011), "*TRON: Legacy*" (2010), "*Harry Potter and the Deathly Hallows: Part 1*" (2010), "*Percy Jackson & the Olympians: The Lightning Thief*" (2010), "*The Hulk*" (2008), and "*The Curious Case of Benjamin Button*" (2008).

226.   Shenzhenshi, alone or in concert with DDHL and/or DD3, have infringed the federally registered "MOVA" mark.  Shenzhenshi, alone or in concert with DDHL and/or DD3, have also infringed Rearden Mova LLC's common law rights in the "MOVA" mark.

227.   Again, Shenzhenshi purports to have exclusively licensed the MOVA Assets, which include the "MOVA" mark, to DD3.

228.   On information and belief, DD3 and DDHL have traded on the goodwill that Rearden Mova LLC has built in the "MOVA" mark, by using that mark to market its services in connection with the MOVA Assets, including on its own website and on social media, including Facebook.

229.   Upon information and belief, Shenzhenshi, alone or in concert with DDHL and/or DD3, has and continues to use the domain name www.mova.com, and that domain name resolves to websites controlled by Shenzhenshi, DDHL and/or DD3.  The "MOVA" mark also appears on that website.

230.   DDHL has featured the "MOVA" mark on its website, www.ddhl.com, in connection with its digital human business, referencing a "'virtual image reconstruction technique' (MOVA)."

231.   DD3 has also featured the "MOVA" mark on its websites, www.digitaldomain.com and www.d2.com, including the "MOVA" mark and logo in the upper right of the picture of the Mova rig (below), as well including a link to a Hollywood Reporter article, "Digital Domain Aims to Advance Facial Capture" that details DD3's MOVA service offerings.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



232.   Upon information and belief the webpage found at https://www.facebook.com/Mova/ (shown below), similarly featuring the "MOVA" mark, is maintained by Greg LaSalle for DD3.



233.   On January 16, 2015, DDHL announced that "Digital Domain's Exclusive Visual Effects Technology MOVA" had won the Academy Award.  MOVA's Science & Technology Academy Award was introduced with a statement that MOVA had been used for facial capture in

The Walt Disney Company movie "*Guardians of the Galaxy*."  The end credit of the film lists "Facial Capture Services provided by MOVA, a division of Digital Domain".

234.   "*Guardians of the Galaxy*" was the highest grossing movie of 2014, and the Academy Awards is the most prestigious event in the movie industry.  Thus, these reports confirm not only that Shenzhenshi, DD3 and DDHL have infringed the "MOVA" mark, but that the infringement has been incredibly visible, especially to consumers of the MOVA technology—for example, the movie studios who use the technology.  Shenzhenshi, DDHL and DD3's infringement of the "MOVA" mark is likely to cause confusion among these consumers.

235.   DDHL has also used the "MOVA" mark in several public filings, including annual and interim reports:

- DDHL's 2014 Annual Report states that the "Academy of Motion Picture Arts and Sciences, Science and Technical Awards for **MOVA** … technologies" was an award for technology owned by DDHL.  The report includes a picture of the Mova rig with the label "**MOVA**" beneath. The report also states, "Digital Domain plans to use its ground breaking Academy Award winning **MOVA** technology to…create a virtual likeness of the legendary POW! founder."  (emphasis added)

- DDHL's 2015 Interim Reports references the creation of a virtual image of Teresa Teng in Taipei on May 9, 2015 and in Shanghai on August 8, 2015. "Making use of a technology consisting of virtual image reconstruction technique known as "**MOVA**", DD3I [DD3] reproduced the glamour of the Taiwanese pop diva Miss Teresa Teng on stage and, even more challenging, arranged a soulful duet with Taiwanese's [sic] prominent singer Mr. Fei Yuquig (費玉清先生)) transcending time and space." (emphasis added)

236.   On information and belief, Shenzhenshi, DD3 and DDHL have profited from the infringement of the "MOVA" mark, including in the same ways that they have profited from their infringement of the MOVA Patents, described above.

237.   On information and belief, Shenzhenshi, in concert with DD3, also contributed to the infringement of the "MOVA" mark by others, and specifically by the Induced Parties (*e.g.*, movie and video games studios to whom DD3 sold and/or used the MOVA Assets).  For example, as

discussed above, actress Camille Luddington refers repeatedly to "MOVA" as she describes the process used to capture her facial movements during the making of "*Rise of the Tomb Raider.*"  In addition, the "MOVA" mark appears in the credits of "*Guardians of the Galaxy,*" produced by Marvel Studios, a division of The Walt Disney Company, which states: "Facial Capture Services provided by **Mova**, a division of Digital Domain."  (emphasis added)

### 3.   Copyright Infringement

238.   The source code that is a part of the MOVA Assets is an original work of authorship fixed in a tangible medium of expression in the nature of a computer program that serves as a tool for capturing and processing images for use in, among other things, motion pictures (collectively, the "MOVA Copyrighted Source Code").

239.   Upon the completion of the first version of the MOVA Copyrighted Source Code in 2006, the author and owner was Rearden, Inc. (f/k/a/ Rearden Studios, Inc.).

240.   Starting on and after April 19, 2013, Rearden Mova LLC has been the sole owner of all rights in and to the MOVA Copyrighted Source Code pursuant to a series of transfers of copyright ownership as follows: (i) Rearden, Inc. (f/k/a Rearden Studios, Inc.) to Rearden LLC; (ii) Rearden LLC to OnLive, Inc.; (iii) OnLive, Inc. to Insolvency Services Group; (iv) Insolvency Services Group to OL2, Inc.; (v) OL2, Inc. to MO2 LLC; and (vi) MO2 LLC to Rearden Mova LLC.

241.   At various times since 2004, the MOVA Copyrighted Source Code has been revised, and Rearden Mova LLC is the sole owner of all rights in and to all versions of the MOVA Copyrighted Source Code.

242.   An application for registration of the MOVA Contour Copyrighted Software was filed on February 11, 2016, by Rearden Mova LLC in the U.S. Copyright Office, which has assigned Case No. 1-3121154701 to the pending application.

243.   The MOVA Copyrighted Source Code does the vast majority of the work in the process of transforming images of a live performer into the computer-generated and fully-animated images that appear in a finished movie, video game or other production, or utilized for other applications.  The process typically begins with photographed or video-recorded images of a performer whose face has been airbrushed or otherwise applied with a random pattern of proprietary

phosphor makeup that creates thousands or even millions of points of reference for digital capture by the MOVA Copyrighted Source Code.  The resulting captured images are entered into the MOVA Copyrighted Source Code, which generates output in the form of animated three-dimensional ("3D") digital image with 3D, mask-like features in motion (the "MOVA Raw").  The MOVA Raw then can be manipulated to be retargeted to a different 3D shape (e.g. the 3D shape of the performer's face at a younger or older age) to create additional output in the form of an altered animated 3D image (the "MOVA Retarget"), with 3D, mask-like features in motion that resemble a "targeted" character (e.g. a younger or older version of the performer), but retain the distinctive 3D facial performance of the performer when he or she was captured.  The MOVA Raw can be retargeted to a MOVA Retarget with the 3D shape of a wide range of characters, including age transformation (e.g. Brad Pitt transforming to different ages in "*The Curious Case of Benjamin Button*," transformation into a creature (e.g. Edward Norton transforming into the "*The Hulk*"), transformation to another character (e.g. Rupert Grint ("Ron Weasley")) transforming into Daniel Radcliffe ("Harry Potter")), etc.  The MOVA Raw and/or the MOVA Retarget can be further manipulated to achieve computer-generated, fully-animated images for insertion into a finished motion picture, video game or other production, or utilized for other applications.

244.   The sequences in a finished motion picture whose visual effects are created with the MOVA Copyrighted Source Code are derivative works based on the output (e.g. MOVA Raw, motion data, etc.) of the MOVA Copyrighted Source Code, and the manipulation of output of the MOVA Copyrighted Source Code to create animated sequences, such that any use of the MOVA Copyrighted Source Code and/or its output without the consent of the copyright owner is infringement.

245.   An example of the output of the MOVA Copyrighted Source Code, which depicts the MOVA Raw and the MOVA Retarget as used pursuant to a paid license from the copyright owner in the motion picture titled *Terminator Genisys* starring Arnold Schwarzenegger is shown above.

246.   The MOVA Copyrighted Source Code has been used in several major motion pictures under a paid license from its copyright owner, including the 2008 "*The Curious Case of Benjamin Button,*" starring Brad Pitt.

247.   The MOVA Copyrighted Source Code enabled the producers of "*The Curious Case of Benjamin Button*" to achieve a visual effect that could not have been produced without the unique tools that the MOVA Copyrighted Source Code provides, that is, the depiction of a man who ages backward from old age to infancy.

248.   The unique function and high value of the MOVA Copyrighted Source Code has been affirmed by Ed Ulbrich, former CEO of DD3 and the visual effects executive producer of *The Curious Case of Benjamin Button*, in a 2009 TED Talk titled "How Benjamin Button Got His Face," in which Ed Ulbrich stated:  "We first got involved in the project in the early 90s…. We took a lot of meetings and we seriously considered it.  And at the time, we had to throw in the towel.  It was deemed impossible.  It was beyond the technology of the day to depict a man aging backward.  The project came back to us a decade later….  We found a system that would allow Benjamin to do everything that a human can do…. **We came across a remarkable technology called Contour [a Mova brand]**…. This was the breakthrough…. That 'secret sauce' was effectively software that allowed us to match the performance footage of Brad [Pitt] in live action with our databases of aged Benjamin… On a frame-by-frame basis we can actually reconstruct a head that exactly matched the performance of Brad."  (emphasis added)

249.   The MOVA Copyrighted Source Code is made available for use only by authorized licensees and only pursuant to a paid license issued by the copyright owner to the licensee.

## IV.   SHENZHENSHI, DDHL AND DD3 HAVE BEEN UNJUSTLY ENRICHED

250.   As set forth above, but for Rearden LLC's maintenance of the MOVA Patents and Trademarks, those assets would not exist.  Neither Shenzhenshi, DDHL nor DD3, has taken any steps to maintain or prosecute the MOVA Patents and Trademarks.  In contrast, example of Rearden LLC's maintenance efforts are set forth above.  But for Rearden LLC's maintenance efforts, the MOVA Patents and MOVA Trademarks would have been abandoned.  Shortly after the announcement that MOVA had won an Academy Award, DDHL's January 16, 2015, press release referenced that Award as being attributed to "Digital Domain's **Exclusive** Visual Effects Technology **MOVA**" (emphasis added)  Thus, the only reason DDHL could credibly state any party

had exclusivity was because of Rearden LLC's diligent maintenance of the intellectual property rights.

251.    Moreover, on information and belief, Shenzhenshi, DDHL and DD3, along with the individuals controlling and/or having large equity interests in these companies, were also unjustly enriched when they profited from price increases in DDHL's publicly traded stock, driven by claims of acquisition and rights in the MOVA Assets.  These profits amount to hundreds of millions of dollars.

### A.  Increase To DDHL's Stock Price

252.    In the five months following the announcement that MOVA had won the Academy Award in January 2013, and DDHL and DD3's concurrent public announcement that they had rights in the MOVA Assets, DDHL's stock price rose from approximately $274 million to **$4 billion**—an increase of almost 1500%.  On information and belief, this spectacular increase in DDHL's stock price[3] was largely driven by Shenzhenshi, DDHL and DD3's false claims of ownership of the MOVA Assets and their subsequent promotion and demonstration of the MOVA technology.

253.    DDHL stock's rise and fall in value, and surrounding events discussed herein, are shown on the chart ("DDHL Stock Chart") attached as Exhibit 6.  The DDHL Stock Chart shows DDHL's stock price relative to its stock price on July 4, 2013, when DDHL completed a reverse merger with a controlling interest in DD3 and affiliated entities, through January 8, 2016, when this chart was prepared.

254.    DDHL's stock price, shown in a black line, is normalized relative to the Hang Seng Composite Index (HK:HSCI) in a blue line (the "HSCI").  The HSCI, similar to the S&P 500, tracks the overall performance of the Hong Kong stock exchange.  Thus, when the black line of DDHL's stock price dips below the blue line of the HSCI, then it is underperforming the overall market; when the black line rises above the HSCI, it is over-performing. Thus, the black line shows how DDHL is performing relative to the Hong Kong stock market overall.

---

[3]      To place this in context, Google stock took eleven (11) years to increase by 1500%. Google's stock rise is one the most successful in history.

255.   The gray chart on the bottom of the DDHL Stock Chart shows the volume of transactions of DDHL stock.  Low or high volume reflects low or high investor activity, respectively in the trading of DDHL stock.

256.   Shenzhenshi purports to have acquired the MOVA Assets in May of 2013. DDHL completed its reverse merger with DD3 and its affiliated entities on July 4, 2013.  DDHL's 2013 Annual Report stated: "In order to diversify the existing business portfolio of the Group and to broaden its source of income, the Group has acquired the VFX production business in July 2013 as mentioned in the paragraph headed 'Material Acquisition' below.  The media entertainment segment mainly provides VFX for major motion picture studios and advertisers."

257.   As can be seen in the DDHL Stock Chart, the market showed very little interest in DDHL stock as of the July 4, 2013 reverse merger with DD3 and its entry into VFX production. In fact, up to the August 1, 2015 release of "*Guardians of the Galaxy*," the first movie where DDHL's DD3 used MOVA, DDHL stock was valued at $131 million, 30% lower than its July 4, 2013 value of $188 million, and underperforming the HSCI.  As mentioned previously, "*Guardians of the Galaxy*" was phenomenally successful movie, becoming the highest grossing movie in 2014. As articles and other events associated DDHL with MOVA (such as a LaSalle's MOVA presentation at the Directors' Guild of America), DDHL stock began to climb, starting to outperform the HSCI.

258.   On January13, 2015, the Academy of Motion Picture Arts and Sciences announced the MOVA technology had won a Science and Technology Academy Award.  On January 16, 2015, DDHL publicly announced that "Digital Domain's **Exclusive** Visual Effects Technology MOVA" (emphasis added) had won the Academy Award, and confirmed that it had been utilizing MOVA intellectual property.  Between DDHL's public announcement of its alleged exclusive interest in the MOVA Assets in January of 2015 and DDHL' stock price peak in May of 2015, DDHL's stock price skyrocketed from a valuation of approximately $274 million to $4 billion, increasing almost 1500%, a relative increase of over 2000% from the August 1, 2013 release of "*Guardians of the Galaxy*," when it was first revealed the DDHL was using MOVA technology.  Indeed, on Sunday, May 10, 2015, DDHL announced at a press conference and press release that MOVA technology was used creating a "Virtual Human" of the late pop diva Teresa Teng (DD3's CEO stating, "The Virtual

Human process involves a combination of the groundbreaking work of our visual effects artists and our exclusive, Academy Award winning MOVA technology"). In just one week, DDHL's stock value rose from $1.7 billion to $4 billion, more than doubling its already extremely high price.

259. The DDHL 2014 Annual Report included a picture of the MOVA system (shown above in the Patent Infringement section) and identified MOVA's Academy Award, specifically: "The following list of recent awards and nominations is a recognition for the Group's VFX technology ... Academy of Motion Pictures Arts and Sciences, Science and Technical Awards for **MOVA** and Drop technologies." (emphasis added)

260. Similarly, DDHL's 2014 Annual Report claimed: "In addition, Digital Domain plans to use its ground breaking and **Academy Award winning MOVA technology** to, with the blessing of Mr. Stan Lee, create a virtual likeness of the legendary POW! founder." (emphasis added).

261. On information and belief, it was DDHL's claim of ownership of the MOVA Assets, in the wake of MOVA winning the Academy Award, followed by DDHL's promotion and demonstration of its purported "exclusive" MOVA technology, that resulted in this sharp increase: prior to DDHL's announcements regarding the MOVA Assets, its stock price had showed relatively minor variability. This was true even following DDHL's acquisition of DD3 on July 4, 2013, after which DDHL's stock declined and underperformed the market. Not until the Academy Award announcement and DDHL claims of exclusive ownership interest in MOVA did DDHL's stock price suddenly rise, far outperforming the market.

### B. Executives and Shareholders of Shenzhenshi, DDHL and DD3

262. There is substantial overlap among several major shareholders and executives (identified below) of Shenzhenshi, DDHL and DD3 ("Related Parties"). The connections between these Related Parties, further supports the conclusion that they worked in concert with one another, such that it is fair to treat them as one entity in this case. Further, on information and belief, the Related Parties profited from sales of DDHL stock at its increased value. The following statements in ¶¶ 263-268 are upon information and belief.

263. **Che Feng** (aka Che Fung) is the beneficial owner of Shenzhenshi and Shenzhenshi Wohu Investment Development Limited ("SWIDL"), which owns 56.67% of Shenzhenshi. In 2013

and 2014, Che Feng owned 48.44% of the issued ordinary share capital of DDHL through Harmony Energy Limited ("HEL"), which is wholly owned by Ever Union Capital Limited, which itself is wholly owned by Che Feng.  Che Feng also controlled Beijing Galloping Horse Film Co, Ltd. (BGH) (北京小馬奔騰集團), which in turn controlled Galloping Horse America LLC (GHA), which acquired 70% of DD3's predecessor, Digital Domain Media Group ("DDMG") out of bankruptcy on September 23, 2012 for $21 million.  DDHL became the parent of that 70% stake in DD3 on July 4, 2013, DDHL a concluded a reverse merger in which it bought the entire issued share capital of Upfield Sky Limited.  The principal asset of Upfield is its equity interest in a group of companies, including GHA's 70% ownership of DD3.  DDHL paid Che Feng's BGH $50.5 million in the July 4, 2013 transaction *and* established Che Feng as the controlling shareholder of DDHL.  The relationships between Che Feng and DDHL are in conflict with statements made by DDHL in its formal disclosures to shareholders on June 14, 2013 regarding the reverse merger, in which DDHL stated, "To the best knowledge information and belief of the Directors, Beijing Galloping Horse [BGH] and its associates are **independent from** the Company [DDHL] and its connected persons." (emphasis added)  Che Feng held the role of director of DD3 upon its formation in September 2012.  Che Feng was arrested in Beijing shortly before June 2, 2015 on charges including over $15 billion in money laundering.  DDHL stock, which skyrocketed after announcements that DDHL had exclusive rights to the MOVA Assets, collapsed by 90% in the wake of Che Feng's arrest.

264.    Certain owners and executives of Shenzhenshi, DDHL and DD3, however, still profited from the increase in DDHL's stock price, including **Guo Haoyun**[4].  **Che Tao**, Che Feng's brother, owned 9.66% of the issued ordinary share capital of DDHL, through his wholly owned Oriental Fortune Investment Limited.  On September 26, 2012, Che Tao sold shares to **Guo Haoyun** for over $10 million.  Guo Haoyun sold these shares for $21M two business days after the January 13, 2015 announcement that MOVA had won the Academy Award.

---

[4]      On information and belief, aliases include Guo Haoyun/Kwok Ho Wan/ Miles Kwok (郭浩 云) AKA Guo Wengui (郭文贵).  On information and belief, Guo Haoyun fled China to avoid arrest and is currently a fugitive from the Chinese government.

265.   **Zhang Xiaoqun** is the brother of the wife of Che Tao, Che Feng's brother.   Zhang Xiaoqun owns twenty-five percent (25%) of Shenzhenshi and is a director of Shenzhenshi. Together with Zhou Jian (below) Zhang Xiaoqun provided the founding capitalization of DDHL through wholly owned companies in 2009.   On May 18, 2015, one week after the "Virtual Human" performance of Teresa Teng in Taipei—promoted as a technology based on MOVA—and one day before DDHL peaked, Zhang Xiaoqun sold over $200 million of his DDHL stock.

266.   **Zhou Jian** owns 70% of SWIDL and is a director and manager of SWIDL which, as noted, owns 56.67% of Shenzhenshi.  Zhou Jian provided the founding capitalization of DDHL in 2009 with Zhang Xiaoqun.  As detailed in DDHL's June 14, 2013 public filings, Che Feng expressly invited Zhou Jian to assume the role of Chairman of DD3 from its September 2012 formation to acquire DDMG assets out of bankruptcy through October 26, 2012.  He again became a Director of DD3 in 2013.  Zhou Jian was Chairman from DDHL's founding in 2009 until he resigned on January 12, 2015, one day before the Academy Award.  Zhou Jian ultimately sold his DDHL stock for $63 million on September 14, 2015.  Prior to this sale, Zhou Jian owned approximately 28% of the issued ordinary share capital of DDHL.

267.   **Zhang Xiaoyan** is a director of Shenzhenshi.  She is Che Tao's wife (Che Feng's sister-in-law) and Zhang Xiaoqun's sister.

268.   **Xiao Ping** is the Chairman of Shenzhenshi. He is the signatory for Shenzhenshi on the alleged May 8, 2013 Asset Purchase Agreement with MO2. He has been a major shareholder of DDHL since shortly after its founding in 2009.

### C.  Unjust Enrichment

269.   Many of the actions of Shenzhenshi, DDHL and DD3 in this case do not make sense. It did not make sense for these companies to go forward with the acquisition of the MOVA Assets in disregard of Rearden LLC's known asserted rights therein.  It did not make sense for DDHL (which wasn't actually yet in existence at the time) to instruct Joseph Gabriel, General Counsel and Vice President of DD3, to change the party acquiring the MO2 MOVA Assets from DD3, who would ultimately license those assets, to Shenzhenshi.  It did not make sense for Shenzhenshi to then

1   license the MOVA Assets to DD3, but retain all liabilities, including known litigation liabilities

2   associated with Rearden LLC's claims.

3        270.   One explanation is that Shenzhenshi, DDHL and DD3 did not intend to use the

4   MOVA Assets as a part of any ongoing business concern, but instead hoped to simply pump up the

5   value of the DDHL stock, to the benefit of the individual executives and shareholders, and leave

6   Rearden LLC with devalued MOVA Assets, and no meaningful recourse.  This explanation is

7   consistent with the fact the Shenzhenshi took no action to maintain the patents and trademarks, but

8   nonetheless claimed "exclusive" ownership in the wake of the Academy Award.  If there is no

9   intention to create an ongoing concern, there is no need to maintain patents and trademarks; simply

10  stating that DDHL has "exclusive" ownership of the MOVA Assets is enough to pump up the value

11  of DDHL stock long enough to profit from it.  It could also be the case that DDHL, DD3, and their

12  executives and shareholders intended this from the beginning, which explains the irregularities in

13  their corporate formation and structure, some of which are described next.

14       271.   On information and belief, for example, on November 18, 2012, DDHL and DD3

15  entered into a Memorandum of Understanding to conduct due diligence for a reverse takeover of

16  Upfield Sky Limited ("Upfield").  On March 27, 2013, DDHL entered into a conditional sale and

17  purchase agreement with Harmony Energy Limited ("HEL"), with Ms. Gegen Tana and Mr. Che

18  Feng as the guarantor of HEL.

19       272.   Under the agreement, DDHL agreed to buy the entire issued share capital of

20  Upfield.  The principal asset of Upfield is its equity interest in a group of companies, including

21  GHA's 70% ownership of DD3 and its affiliates.  Documents related to the takeover state, "To the

22  best of Directors' knowledge, information and belief, having made all reasonable enquiries, each of

23  Harmony Energy Limited (Che Feng-wholly owned), Ever Union Capital Limited (Che Feng-wholly

24  owned), Mr. Che [Feng] and Ms. Gegen Tana is a third party **independent** of the Company [DDHL]

25  and its connected persons."  (emphasis added)

26       273.   According to those same documents, DDHL plans the takeover DD3 because Beijing

27  Galloping Horse intends to appoint DD3 and its affiliates to exclusively provide visual effects on all

28

Beijing Galloping Horse feature films.  As noted previously, Che Feng controls Beijing Galloping Horse, which controls Beijing Galloping America, which controls DD3.

274.   Documents related to the transfer further state that, "To the best knowledge information and belief of the Directors, Beijing Galloping Horse [BGH] and its associates are **independent** from the Company [DDHL] and its connected persons."  (emphasis added)  Again, though, there were material connections between BGH and DDHL, as described above.

275.   For these reasons, there is no corporate veil, and liability should not stop with Shenzhenshi in this case.

276.   DDHL itself issued and sold new shares, bringing in $12.5 million in revenue; Zhang Xiaoqun sold over $200 million of his DDHL stock one day before DDHL's stock peaked on May 19, 2015; and Zhou Jian sold $63 million while the stock was still trading at a very high price. Shenzhenshi, DDHL and DD3 have been unjustly enriched.

277.   This unjust enrichment has and continues to do serious harm to Rearden LLC and Rearden MOVA LLC.  Not only have Rearden LLC and Rearden MOVA LLC been deprived of the benefits of the MOVA Assets, but because of these activities, the MOVA brand and reputation of the MOVA Assets has been tarnished.  Rearden LLC has developed and patented a breakthrough virtual reality technology that it had intended to integrate with the Mova Assets and promote to the very same customers and investors in a very similar manner (but with legitimate ownership rights).  It will be easy to confuse the DDHL and DD3 MOVA virtual reality announcements with the legitimate announcements by Rearden LLC and Rearden Mova LLC.  The spike in DDHL's stock showed how large potential investor interest was for a combined MOVA/virtual reality technology. It will, however, be difficult for Rearden LLC to benefit as it might have had Shenzhenshi, DDHL and DD3 not already exploited the opportunity.

278.   Further, it is logical to believe that the many investors and customers who associate MOVA technology and MOVA combined with virtual reality with DDHL's spectacular stock rise, will also make the same association with the spectacular collapse in the wake of Che Feng's arrest on very serious charges.  To the extent Rearden LLC or Rearden Mova LLC legitimately associate an investment or stock offering in the future associate with MOVA technology or its combination

1   with virtual reality technology, Rearden LLC fears that investors are likely to associate it with Che

2   Feng's arrest.  This will forever impair Rearden LLC and Rearden Mova LLC to attract investors to

3   MOVA technology in the future.

4   **V.   FRAUDULENT CONVEYANCE**

5       279.   Shenzhenshi claims that, on December 17, 2015, it transferred the MOVA Assets to a

6   related company, Virtue Global Holdings Limited ("VGH").  This was one day after the Court's

7   decision in this case granting Defendants' request to file amended counterclaims against SHST.

8       280.   SHST did not disclose the purported transfer of the MOVA Assets to Defendants (or

9   the Court), instead continuing to act as Plaintiff in this case for weeks after the Asset Purchase

10  Agreement was supposedly executed and did not bring the purported transfer to Defendants'

11  attention until after Defendants' amended counterclaims were filed.

12      281.   VGH is a related company to Shenzhenshi, and on information and belief a wholly-

13  owned subsidiary of DDHL incorporated in the British Virgin Islands in 2014 with 1 Hong Kong

14  Dollar in capitalization, with offices based in Hong Kong at the same address as DDHL's main

15  office.  The relationship between DDHL and Shenzhenshi, and also DD3, is discussed in Section

16  III.A. above.  Shenzhenshi claims to have granted an exclusive license to the MOVA Assets to DD3.

17  On information and belief, DD3 has maintained its exclusive license and possession of the MOVA

18  Assets following the purported transfer to VGH.

19      282.   The Asset Purchase Agreement between SHST and VGH purports to transfer only the

20  MOVA Assets, and none of the liabilities associated with those Assets.  This includes liabilities

21  specifically relating to claims brought by the Defendants in this case.

22      283.   On information and belief, including the facts set forth in paragraphs 178-189, SHST

23  was never anything more than a holding company for the MOVA Assets.  As admitted in his sworn

24  declaration filed in this case, Shenzhenshi's representative and counsel Joseph Gabriel represented

25  DD3 in negotiations for the acquisition of the MOVA Assets, and only shortly before that purported

26  transfer was made, "was instructed to move forward with acquiring the MOVA Assets and investing

27  in a MOVA-related business through a company called Shenzhenshi Haitiecheng Science and

28  Technology Co., Ltd."

284.    Finally, the consideration received by SHST was less than the reasonably equivalent value of the MOVA Assets that were transferred to VGH.  For example, on information and belief, the consideration received by SHST from VGH is at most half – the amount is partially contingent on the outcome of this litigation – of what SHST paid (upfront and in indemnifying Greg LaSalle) for the MOVA Assets in May 2013.

285.    Therefore, on information and belief, SHST's purported transfer of the MOVA Assets was made with the actual intent to hinder, delay or defraud Defendants in this case.

## FIRST COUNTERCLAIM

### (DECLARATORY RELIEF)

286.    Counterclaimants reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

287.    An actual controversy has arisen and now exists between Counterclaimants and Shenzhenshi concerning ownership of the MOVA Assets.  Counterclaimants contend that they own the MOVA Assets, whereas Shenzhenshi disputes this contention and contends that it owns the MOVA assets.  Valuable legal rights flowing from ownership of the MOVA Assets are directly and substantially affected by this controversy.

288.    Counterclaimants desire a judicial determination of the ownership rights in the MOVA Assets, and request a declaration that Rearden Mova LLC, a wholly-owned subsidiary of Rearden LLC, owns the MOVA Assets.

289.    A judicial declaration is necessary and appropriate at this time.  On information and belief, Shenzhenshi has purported to license the MOVA Assets, which it does not own, to at least one other entity, thereby potentially impairing Rearden Mova LLC's ability to use, control, and benefit from its intellectual property and the MOVA Assets.

## SECOND COUNTERCLAIM

### (INTENTIONAL INTERFERENCE WITH CONTRACT)

290.    Counterclaimants reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

291.   Counterclaimant Rearden LLC and Greg LaSalle were parties to the Employment Agreement and PIIA ("LaSalle Employment Agreements").

292.   Shenzhenshi knew of the LaSalle Employment Agreements between Rearden LLC and LaSalle.

293.   On information and belief, Shenzhenshi, alone or in concert with DDHL and/or DD3, intended to disrupt the performance of these contracts by, *inter alia*, entering into the Asset Purchase Agreement with MO2 LLC, converting the MOVA Assets, and claiming ownership of the MOVA Assets.

294.   Shenzhenshi's wrongful conduct, alone or in concert with DDHL and/or DD3, prevented performance of the LaSalle Employment Agreements, including *inter alia*, the provisions of those agreements wherein LaSalle agreed that:

- "all Proprietary Information, and all patents, patent rights, copyrights, trade secrets rights, trademark rights and other rights (including without limitation intellectual property rights) … shall be the sole property of the Company;"

- "I assign to the Company any and all rights, title and interest I may have or acquire in such Proprietary Information …;"

- "At all times, both during my employment by the Company and after its termination, I will keep in confidence and trust and will not use or disclose any Proprietary Information or anything relating to it without the prior written consent of an officer of the Company…;"

- "during my employment by the Company, I will not remove any Company Documents and Materials from the business premises of the Company or deliver any Company Documents and Materials to any person or entity outside the Company, except as I am required to do in connection with performing the duties of my employment.  I further agree that, immediately upon the termination of my employment by me or by the Company for any reason … I will return all Company Documents and Materials, apparatus, equipment and other physical property, or any reproduction of such property …;" and

- "during my employment with the Company, I will not provide consulting services to or become an employee of, or any other firm or person engaged in a business in any way

competitive with the Company, without first informing the Company of the existence of such proposed relationship and obtaining the prior written consent of my manager and the Human Resources Manger responsible for the organization for which I work."

295.   Counterclaimant Rearden LLC has been harmed by Shenzhenshi's interference with the LaSalle Employment Agreements.

296.   Shenzhenshi's wrongful conduct, alone or in concert with DDHL and/or DD3, was a substantial factor in causing this harm.

297.   Shenzhenshi's wrongful conduct, alone or in concert with DDHL and/or DD3, has damaged Rearden LLC.

298.   On information and belief, Shenzhenshi's conduct, alone or in concert with DDHL and/or DD3, was intentional and was engaged in for the purpose of depriving Counterclaimant Rearden LLC of property or legal rights, or otherwise causing injury, entitling Counterclaimant Rearden LLC to an award of exemplary or punitive damages.

<u>**THIRD COUNTERCLAIM**</u>

(INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE)

299.   Counterclaimants reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

300.   Counterclaimant Rearden LLC and LaSalle were in an economic relationship that at least probably would have resulted in an economic benefit to Counterclaimant Rearden LLC, *to wit*: the agreement to acquire the MOVA Assets for the benefit of Rearden LLC.

301.   On information and belief, Shenzhenshi knew of the economic relationship between Rearden LLC and LaSalle.

302.   Shenzhenshi, alone or in concert with DDHL and/or DD3, intended to disrupt the economic relationship between Rearden LLC and LaSalle.

303.   Shenzhenshi, alone or in concert with DDHL and/or DD3, engaged in wrongful conduct through the acts described herein, including *inter alia*: (a) unfair competition, (b) interference with the LaSalle Employment Agreements, (c) conversion of the MOVA Assets, (d)

misappropriation of trade secrets, and (d) infringement of the MOVA Patents, MOVA Trademarks, and MOVA Copyrighted Source Code.

304.   Counterclaimant Rearden LLC's economic relationship with LaSalle was disrupted.

305.   Counterclaimant Rearden LLC was harmed by Shenzhenshi's wrongful conduct, alone or in concert with DDHL and/or DD3.

306.   Shenzhenshi's wrongful conduct, alone or in concert with DDHL and/or DD3, was a substantial factor in causing harm to the Counterclaimant Rearden LLC.

307.   Shenzhenshi's wrongful conduct, alone or in concert with DDHL and/or DD3, has resulted in damages to Counterclaimant Rearden LLC.

308.   On information and belief, Shenzhenshi's conduct, alone or in concert with DDHL and/or DD3, was intentional and was engaged in for the purpose of depriving Counterclaimant Rearden LLC of property or legal rights, or otherwise causing injury, entitling Rearden LLC to an award of exemplary or punitive damages.

## **FOURTH COUNTERCLAIM**

### (NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS)

309.   Counterclaimants reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

310.   Shenzhenshi, alone or in concert with DDHL and/or DD3, negligently interfered with a relationship between Counterclaimant Rearden LLC and LaSalle that at least probably would have resulted in an economic benefit to Rearden LLC.

311.   Counterclaimant Rearden LLC and LaSalle were in an economic relationship that at least probably would have resulted in a future economic benefit to Rearden LLC, *to wit*: the agreement to acquire the MOVA Assets for the benefit of Rearden LLC.

312.   Shenzhenshi knew or should have known of this relationship.

313.   Shenzhenshi knew or should have known that this relationship would be disrupted if Shenzhenshi failed to act with reasonable care.

314.   Shenzhenshi, alone or in concert with DDHL and/or DD3, failed to act with reasonable care.

315.    Shenzhenshi, alone or in concert with DDHL and/or DD3, engaged in wrongful conduct through the acts described herein, including, *inter alia*: (a) unfair competition, (b) interference with the LaSalle Employment Agreements, (c) conversion of the MOVA Assets, (d) misappropriation of trade secrets, and (d) infringement of the MOVA Patents, MOVA Trademarks, and MOVA Copyrighted Source Code.

316.    Counterclaimant Rearden LLC's economic relationship with LaSalle was disrupted.

317.    Counterclaimant Rearden LLC was harmed by Shenzhenshi, alone or in concert with DDHL and/or DD3, disrupting the economic relationship with LaSalle.

318.    Shenzhenshi's wrongful conduct, alone or in concert with DDHL and/or DD3, was a substantial factor in causing harm to Counterclaimant Rearden LLC, entitling Rearden LLC to an award of exemplary or punitive damages.

## FIFTH COUNTERCLAIM

### (CONVERSION)

319.    Counterclaimants reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

320.    In May 2013, Counterclaimant Rearden Mova LLC owned and possessed the MOVA Assets.

321.    Shenzhenshi, alone or in concert with DDHL and/or DD3, intentionally and substantially interfered with Counterclaimant Rearden Mova LLC's property by, *inter alia*: (a) taking physical possession of the hardware, software and source code included in the MOVA Assets; (b) preventing Rearden LLC and Rearden Mova LLC from having access to the physical hardware, software and source code included in the MOVA Assets; (c) refusing to return the hardware, software and source code; (d) falsely claiming ownership of the MOVA Assets; (e) claiming intellectual property rights that it did not have to the MOVA Patents and Trademarks; (f) licensing intellectual property and other rights in the MOVA Assets to others; and (g) inducing others to use the MOVA Assets and infringe the MOVA IP.

322.    Counterclaimant Rearden Mova LLC did not consent to Shenzhenshi's interference with or possession of its property.

323.   Counterclaimant Rearden Mova LLC was and continues to be harmed by Shenzhenshi's interference with Rearden Mova LLCs possession of the MOVA Assets, and Shenzhenshi's false assertion of ownership rights in the MOVA Assets.

324.   Shenzhenshi's wrongful conduct, alone or in concert with DDHL and/or DD3, was a substantial factor in causing harm to Counterclaimant Rearden Mova LLC.

325.   On information and belief, Shenzhenshi's conduct, alone or in concert with DDHL and/or DD3, was intentional and was engaged in for the purpose of depriving Counterclaimant Rearden Mova LLC of property or legal rights, or otherwise causing injury, entitling Rearden Mova LLC to an award of exemplary or punitive damages.

## SIXTH COUNTERCLAIM

### (TRESPASS TO CHATTELS)

326.   Counterclaimants reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

327.   In May 2013, Counterclaimant Rearden Mova LLC owned and possessed the MOVA Assets.

328.   Shenzhenshi, alone or in concert with DDHL and/or DD3, intentionally interfered with Counterclaimant Rearden Mova LLC's use and/or possession of the MOVA Assets.

329.   Counterclaimant Rearden Mova LLC did not consent to Shenzhenshi's interference, alone or in concert with DDHL and/or DD3, with or possession of its property.

330.   Counterclaimant Rearden Mova LLC was and continues to be harmed by Shenzhenshi's interference, alone or in concert with DDHL and/or DD3, with Rearden Mova LLC's possession of, and false assertion of ownership rights in, the MOVA Assets.

331.   Shenzhenshi's wrongful conduct, alone or in concert with DDHL and/or DD3, was a substantial factor in causing Counterclaimant Rearden Mova LLC harm, entitling Counterclaimant Rearden Mova LLC to an award of exemplary or punitive damages.

### SEVENTH COUNTERCLAIM

### (MISAPPROPRIATION OF TRADE SECRETS)

332.   Counterclaimants reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

333.   Counterclaimants Rearden LLC and Rearden Mova LLC had and maintained certain trade secret information relating to the MOVA Assets and to Rearden LLC technology, business relationships, investor relationships, and negotiation strategies, as described above.

334.   These trade secrets had independent economic value to Counterclaimants Rearden LLC and Rearden Mova LLC from not being generally known to the public or to others who can obtain economic value from their disclosure or use.

335.   LaSalle gained access to Counterclaimants Rearden LLC and Rearden Mova LLC's trade secret confidential information in the course of an employer-employee relationship with Rearden LLC.  LaSalle was at all times under an obligation to maintain the confidence and secrecy of the information obtained during his employment with Rearden LLC.

336.   On information and belief, Shenzhenshi, alone or in concert with DDHL and/or DD3, obtained access to Counterclaimants Rearden LLC and Rearden Mova LLC's trade secret information by accepting it from LaSalle.  On information and belief, LaSalle became employed by DD3 immediately following his employment by Rearden LLC, remains employed by DD3 at this time, and is indemnified by Shenzhenshi for any claims by Rearden LLC, or its affiliates, relating to, *inter alia*, this trade secret information.

337.   Counterclaimants Rearden LLC and Rearden Mova LLC at all times took reasonable precautions to maintain this trade secret information as confidential and secret by, *inter alia*, maintaining the source code, software in a secure location, email and documents, accessible only to Rearden LLC personnel, and by including confidentiality provisions in its agreements with its employees.

338.   The following confidentiality provisions LaSalle's employment agreements, for example, are also representative of those of other Rearden LLC employees:

- "At all times, both during my employment by the Company and after its termination, I will keep in confidence and trust and will not use or disclose any Proprietary Information or anything relating to it without the prior written consent of an officer of the Company…"; and

- "I agree that during my employment by the Company, I will not remove any Company Documents and Materials from the business premises of the Company or deliver any Company Documents and Materials to any person or entity outside the Company, except as I am required to do in connection with performing the duties of my employment.  I further agree that, immediately upon the termination of my employment by me or by the Company for any reason … I will return all Company Documents and Materials, apparatus, equipment and other physical property, or any reproduction of such property …"

339.   On information and belief, Shenzhenshi, alone or in concert with DDHL and/or DD3, has and continues to use and disclose Counterclaimants Rearden LLC and Rearden Mova's trade secrets without their consent or permission, and in an attempt to benefit itself or its related companies.

340.   On information and belief, Shenzhenshi, alone or in concert with DDHL and/or DD3, have disclosed these trade secrets to third parties, maliciously and in willful and conscious disregard of these Counterclaimants' rights.

341.   As a direct result of Shenzhenshi's wrongful acts, Counterclaimants Rearden LLC and Rearden Mova LLC have suffered and will continue to suffer harm, including irreparable harm with no adequate remedy at law.  Counterclaimants Rearden LLC and Rearden Mova LLC will continue to be irreparably harmed unless Shenzhenshi is enjoined from further use and disclosure of this trade secret information.

342.   Shenzhenshi's wrongful acts, alone or in concert with DDHL and/or DD3, in wrongfully misappropriating these trade secrets were and continue to be willful and malicious, warranting an award of exemplary and punitive damages, and an award of reasonable attorneys' fees, as provided by law.

**EIGHTH COUNTERCLAIM**

(INFRINGEMENT OF U.S. PATENT NO. 7,548,272)

343.   Counterclaimants reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

344.   Counterclaimant Rearden Mova LLC is the owner by assignment of U.S. Patent No. 7,548,272 ("the '272 Patent"), entitled "System and Method for Performing Motion Capture Using Phosphor Application Techniques," issued on June 16, 2009.  A true and correct copy of the '272 Patent is attached as Exhibit 2.

345.   The '272 Patent teaches an improved apparatus and method for performing motion capture using phosphor application techniques.  For example, a method for mixing phosphorescent makeup with a makeup base, applying the mixture on surface regions of a motion capture subject, strobing light source on and off, and strobing camera shutters synchronously with the strobing light source to perform motion capture.

346.   On information and belief, Shenzhenshi, alone or in concert with DDHL and/or DD3, has infringed and continues to infringe at least claim 1 of the '272 Patent.  Shenzhenshi's activities, alone or in concert with DDHL and/or DD3, in the United States include using, selling, and/or offering to sell products and devices that embody and/or practice the patented invention, as described above.

347.   On information and belief, Shenzhenshi has induced infringement of the '272 Patent by purporting to license that patent and the rights thereto to DD3.  DD3 has, in turn, on information and belief, used, sold or offered for sale the MOVA system that embodies and, therefore, infringes the MOVA Patents.

348.   On information and belief, Shenzhenshi has, alone or in concert with DDHL and/or DD3, has also induced infringement by others, as described above.

349.   On information and belief, Shenzhenshi's direct and induced infringement of the '272 Patent, either alone or in concert with DDHL and/or DD3, has caused and continues to cause substantial damage to Counterclaimant Rearden Mova LLC, including harm that cannot for which

there is no adequate remedy at law, entitling Rearden Mova LLC to injunctive relief and monetary damages as provided by law.

350.   On information and belief, Shenzhenshi's direct and induced infringement of the '272 Patent, either alone or in concert with DDHL and/or DD3, has and continues to be willful and deliberate, entitling Counterclaimant Rearden Mova LLC to enhanced damages and attorneys' fees.

## NINTH COUNTERCLAIM

### (INFRINGEMENT OF U.S. PATENT 7,567,293)

351.   Counterclaimants reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

352.   Counterclaimant Rearden Mova LLC is the owner by assignment of U.S. Patent No. 7,567,293 ("the '293 Patent"), entitled "System and Method for Performing Motion Capture by Strobing a Fluorescent Lamp," issued on July 28, 2009.  A true and correct copy of the '293 Patent is attached as Exhibit 3 to this Complaint.

353.   The '293 Patent teaches systems and methods for performing motion capture using fluorescent lamps.  For example, capturing motion by generating synchronization signals, strobing fluorescent lamps in response to the synchronization signals to charge phosphorescent makeup or dye, and strobing camera shutters synchronously with the lamps or light source.

354.   On information and belief, Shenzhenshi, alone or in concert with DDHL and/or DD3, has infringed and continues to infringe at least claim 1 of the '293 Patent.  Shenzhenshi's activities, alone or in concert with DDHL and/or DD3, in the United States include using, selling, and/or offering to sell products and devices that embody and/or practice the patented invention, as described above.

355.   On information and belief, Shenzhenshi has induced infringement of the '293 Patent by purporting to license that patent and the rights thereto to DD3.  DD3 has, in turn, on information and belief, used, sold or offered for sale the MOVA system that embodies and, therefore, infringes the MOVA Patents.

356.   On information and belief, Shenzhenshi, alone or in concert with DDHL and/or DD3, has also induced infringement of the '293 Patent by others, as described above.

357.   On information and belief, Shenzhenshi's direct and induced infringement of the '293 Patent, either alone or in concert with DDHL and/or DD3, has caused and continues to cause substantial damage to Counterclaimant Rearden Mova LLC, including harm that cannot for which there is no adequate remedy at law, entitling Counterclaimant Rearden Mova LLC to injunctive relief and monetary damages as provided by law.

358.   On information and belief, Shenzhenshi's direct and induced infringement of the '293 Patent, either alone or in concert with DDHL and/or DD3, has and continues to be willful and deliberate, entitling Counterclaimant Rearden Mova LLC to enhanced damages and attorneys' fees.

## TENTH COUNTERCLAIM

### (INFRINGEMENT OF U.S. PATENT NO. 7,605,861)

359.   Counterclaimants reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

360.   Counterclaimant Rearden Mova LLC is the owner by assignment of U.S. Patent No. 7,605,861 ("the '861 Patent"), entitled "Apparatus and Method for Performing Motion Capture Using Shutter Synchronization," issued on October 20, 2009.  A true and correct copy of the '861 Patent is attached as Exhibit 4 to this Complaint.

361.   The '861 Patent teaches performing motion capture using shutter synchronization and/or using phosphorescent paint.  For example, a method for mixing phosphorescent makeup with a makeup base, applying the mixture on surface regions of a motion capture subject, strobing light source on and off, and strobing camera shutters synchronously with the strobing light source to perform motion capture.

362.   On information and belief, Shenzhenshi, alone or in concert with DDHL and/or DD3, has infringed and continues to infringe at least claim 1 of the '861 Patent.  These parties' activities in the United States include using, selling, and/or offering to sell products and devices that embody and/or practice the patented invention, as described above.

363.   On information and belief, Shenzhenshi has induced infringement of the '861 Patent by purporting to license that patent and the rights thereto to DD3.  DD3 has, in turn, on information

and belief, used, sold or offered for sale the MOVA system that embodies and, therefore, infringes the MOVA Patents.

364.    On information and belief, Shenzhenshi, alone or in concert with DDHL and/or DD3, has also induced infringement of the '861 Patent by others, as described above.

365.    On information and belief, Shenzhenshi's direct and induced infringement of the '861 Patent, either alone or in concert with DDHL and/or DD3, has caused and continues to cause substantial damage to Counterclaimant Rearden Mova LLC, including harm that cannot for which there is no adequate remedy at law, entitling Rearden Mova LLC to injunctive relief and monetary damages as provided by law.

366.    On information and belief, Shenzhenshi's direct and induced infringement of the '861 Patent, either alone or in concert with DDHL and/or DD3, has and continues to be willful and deliberate, entitling Counterclaimants to enhanced damages and attorneys' fees.

## ELEVENTH COUNTERCLAIM

### (INFRINGEMENT OF U.S. PATENT NO. 8,659,668)

367.    Counterclaimants reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

368.    Counterclaimant Rearden Mova LLC is the owner by assignment of U.S. Patent No. 8,659,668 ("the '668 Patent"), entitled "Apparatus and Method for Performing Motion Capture Using a Random Pattern on Capture Surfaces," issued on February 25, 2014.  A true and correct copy of the '668 Patent is attached as Exhibit 5 to this Complaint.

369.    The '668 Patent teaches a method for applying a random pattern to specified regions of an object, tracking the movement of the random pattern, and generating motion data representing the movement of the object.

370.    On information and belief, Shenzhenshi, alone or in concert with DDHL and/or DD3, has infringed and continues to infringe at least claims 1 and 33 of the '668 Patent.  Defendants' activities in the United States include using, selling, and/or offering to sell products and devices that embody and/or practice the patented invention, as described above.

371.   On information and belief, Shenzhenshi has induced infringement of the '668 Patent by purporting to license that patent and the rights thereto to DD3.  DD3 has, in turn, on information and belief, used, sold or offered for sale the MOVA system that embodies and, therefore, infringes the MOVA Patents.

372.   On information and belief, Shenzhenshi, alone or in concert with DDHL and/or DD3, has also induced infringement of the '668 Patent by others, as described above.

373.   On information and belief, Shenzhenshi's direct and induced infringement of the '668 Patent, either alone or in concert with DDHL and/or DD3, has caused and continues to cause substantial damage to Counterclaimant Rearden Mova LLC, including harm that cannot for which there is no adequate remedy at law, entitling Counterclaimant Rearden Mova LLC to injunctive relief and monetary damages as provided by law.

374.   On information and belief, Shenzhenshi's direct and induced infringement of the '668 Patent, either alone or in concert with DDHL and/or DD3, has and continues to be willful and deliberate, entitling Counterclaimant Rearden Mova LLC to enhanced damages and attorneys' fees.

## **TWELFTH COUNTERCLAIM**

### (TRADEMARK INFRINGEMENT – 15 U.S.C. § 1114 and 1125(a))

375.   Counterclaimants reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

376.   Rearden Mova LLC is the owner of the federally registered "MOVA" mark.

377.   Shenzhenshi, alone or in concert with DDHL and/or DD3, has used the "MOVA" mark in commerce to advertise, market, sell, use and profit from an affiliation with the MOVA Assets throughout the United States, as described above.

378.   On information and belief, Shenzhenshi's infringing use, alone or in concert with DDHL and/or DD3, of the "MOVA" mark is likely to cause, and has caused, confusion, mistake or deception as to the affiliation, connection or association of the MOVA Assets.

379.   On information and belief, Shenzhenshi's actions, alone or in concert with DDHL and/or DD3, if not enjoined, will continue.  Counterclaimant Rearden Mova LLC has suffered and will continue to suffer damages consisting of, among other things, injury to business and diminution

in the value of and goodwill associated with the "MOVA" mark.  This harm is irreparable, and has no adequate remedy at law.  Counterclaimant Rearden Mova LLC is therefore entitled to injunctive relief.

380.   Counterclaimant Rearden Mova LLC is also entitled to recover damages, profits made by Shenzhenshi on sales of products and services, and the costs of this action.  On information and belief, Shenzhenshi's actions were undertaken willfully and with the intention of causing confusion, mistake, or deception, making this an exceptional case entitling Counterclaimant Rearden Mova LLC to recover additional treble damages and reasonable attorneys' fees.

### THIRTEENTH COUNTERCLAIM

### (CONTRIBUTORY TRADEMARK INFRINGEMENT – 15 U.S.C. § 1125(a))

381.   Counterclaimants reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

382.   Counterclaimant Rearden Mova LLC is the owner of the federally registered "MOVA" trademark.

383.   On information and belief, Shenzhenshi, alone or in concert with DDHL and/or DD3, has knowingly facilitated and materially contributed to third party infringement of the "MOVA" mark in violation of § 43 the Lanham Act, 15 U.S.C. § 1125(a).

384.   On information and belief, Shenzhenshi, alone or in concert with DDHL and/or DD3, has contributed to and encouraged the use of the "MOVA" mark by others, as described above. Shenzhenshi, DDHL and DD3 have no right to authorize such use.

385.   Shenzhenshi knew or should have known that the underlying infringing acts that Shenzhenshi, alone or in concert with DDHL and/or DD3, facilitated, and to which they contributed, are likely to cause consumer confusion, or to cause mistake and/or deceive consumers as to the affiliation, connection, or association between Shenzhenshi, DDHL and/or DD3 and the "MOVA" mark and MOVA Assets.

386.   On information and belief, Shenzhenshi's facilitation of and material contribution to the third party infringing acts was willful, intentional and with knowledge and indifference to Counterclaimants' rights in the "MOVA" mark.  On information and belief, Shenzhenshi's wrongful

acts, taken alone or in concert with DDHL and/or DD3, were intended to encourage and direct others to use the MOVA Assets, in order to increase Shenzhenshi, DDHL and/or DD3's unauthorized sale or use of the MOVA Assets.

387.   As a direct, proximate and foreseeable result of Shenzhenshi's wrongful acts, Counterclaimant Rearden Mova LLC has suffered and will continue to suffer damages.

388.   As a direct and proximate result of Shenzhenshi's wrongful acts, Counterclaimant Rearden Mova LLC has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law, including without limitation the loss of consumer good will.  Counterclaimant Rearden Mova LLC is therefore entitled to injunctive relief.

389.   Counterclaimant Rearden Mova LLC is also entitled to recover damages, profits made by Shenzhenshi, DDHL and DD3, on sales of products and services, and the costs of this action.  On information and belief, Shenzhenshi's actions, alone or in concert with DDHL and/or DD3, were undertaken willfully and with the intention of causing confusion, mistake, or deception, making this an exceptional case entitling Counterclaimant Rearden Mova LLC to recover additional treble damages and reasonable attorneys' fees.

## FOURTEENTH COUNTERCLAIM

### (UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN 15 U.S.C. § 1125(a))

390.   Counterclaimants reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

391.   Counterclaimant Rearden Mova LLC is the owner of the federally registered "MOVA" trademark.

392.   Shenzhenshi, alone or in concert with DDHL and/or DD3, has deliberately and willfully traded on the goodwill in the "MOVA" mark, and the reputation established in the "MOVA" mark in connection with its products and services, as evidenced by Shenzhenshi's actions described above, performed alone or in concert with DDHL and/or DD3, and specifically, without limitation, Shenzhenshi's use, alone or in concert with DDHL and/or DD3, of the "MOVA" mark in commerce to advertise, market, sell and profit from an affiliation with the "MOVA" mark and

MOVA Assets throughout the United States, and Shenzhenshi's false claim of ownership, alone or in concert with DDHL and/or DD3, of the MOVA Assets.  In so doing, Shenzhenshi, alone or in concert with DDHL and/or DD3, has also confused consumers as to the origin and sponsorship of goods and services in order to pass off its products and services in commerce as those of Counterclaimants.

393.   Shenzhenshi's unauthorized and tortious conduct, alone or in concert with DDHL and/or DD3, has also deprived and will continue to deprive Counterclaimant Rearden Mova LLC of the ability to control the consumer perception of its products and services offered under the "MOVA" mark, placing the valuable reputation and goodwill of Rearden Mova LLC in the hands of Shenzhenshi.

394.   Shenzhenshi's wrongful conduct, alone or in concert with DDHL and/or DD3, is likely to cause confusion, mistake or deception as to the affiliation, connection or association of Shenzhenshi with the MOVA Assets and/or Rearden Mova LLC, and as to the origin, sponsorship or approval of Counterclaimants and their products and services.  Shenzhenshi knew or should have known that its wrongful acts were false and likely to mislead.

395.   On information and belief, Shenzhenshi had direct and full knowledge of Counterclaimant Rearden Mova LLC's use of and rights in its trademarks prior to Shenzhenshi's wrongful acts set forth above.

396.   As a direct and proximate result of Shenzhenshi's wrongful conduct, Counterclaimant Rearden Mova LLC s suffered commercial damage, as well as the continuing loss of the goodwill and reputation in the "MOVA" mark.  This continuing loss of goodwill cannot be properly calculated and thus constitutes irreparable harm and an injury for which Rearden Mova LLC has no adequate remedy at law.  Counterclaimant Rearden Mova LLC is therefore entitled to injunctive relief.

397.   Counterclaimant Rearden Mova LLC is entitled to recover damages, profits made by Shenzhenshi on sales of products and services, and the costs of this action.

398.   On information and belief, Shenzhenshi's actions were undertaken willfully and with the intention of causing confusion, mistake, or deception, making this an exceptional case entitling

Counterclaimant Rearden Mova LLC to recover additional treble damages and reasonable attorneys' fees.

## FIFTEENTH COUNTERCLAIM

### (VIOLATION OF ANTI-CYBERSQUATTING – 15 U.S.C. § 1125(d))

399.   Counterclaimants reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

400.   On information and belief, Shenzhenshi, alone or in concert with DDHL and/or DD3, is using www.mova.com without Counterclaimant Rearden Mova LLC's authorization and with a bad faith intent to profit from Rearden Mova LLC's federally registered trademarks.

401.   On information and belief, the domain name www.mova.com resolves to websites controlled by Shenzhenshi, alone or in concert with DDHL and/or DD3, and/or their employees or affiliates, which profit from their use.

402.   On information and belief, Shenzhenshi, alone or in concert with DDHL and/or DD3 did not believe and could not reasonably have believed their use of the www.mova.com constituted fair use or was otherwise lawful.

403.   As a result of Shenzhenshi's wrongful registration and use of www.mova.com, Counterclaimant Rearden Mova LLC has suffered substantial damages, as well as the continuing loss of the goodwill and reputation established in Counterclaimant Rearden Mova LLC's trademarks.  This continuing loss of goodwill cannot be properly calculated and thus constitutes irreparable harm and an injury for which Counterclaimant Rearden Mova LLC has no adequate remedy at law.  Counterclaimant Rearden Mova LLC will continue to suffer irreparable harm unless this Court enjoins this conduct and orders that www.mova.com be transferred to Rearden Mova LLC.

## SIXTEENTH COUNTERCLAIM

### (DIRECT COPYRIGHT INFRINGEMENT)

404.   Counterclaimants reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

405.   On information and belief, starting on or around May 2013, and continuing thereafter, Shenzhenshi, alone or in concert with DDHL and/or DD3, have made, stored and used copies of the MOVA Copyrighted Source Code, both in connection with services that Shenzhenshi, alone or in concert with DDHL and/or DD3, provide to their customers and by providing copies of the MOVA Contour Copyrighted Software and/or the output generated by the MOVA Copyrighted Source Code to its customers for their own copying, storage and use, all without the authorization or consent of Counterclaimant Rearden Mova LLC, the exclusive owner of the copyright in the MOVA Copyrighted Source Code.

406.   By reason of the wrongful conduct alleged above, Shenzhenshi, alone or in concert with DDHL and/or DD3 have directly infringed, and continue to directly infringe, the copyright in and to the MOVA Copyrighted Source Code in violation of the United States Copyright Act and the exclusive rights of Counterclaimant Rearden Mova, LLC, thereunder.

407.   The acts of infringement of the MOVA Copyrighted Source Code by Shenzhenshi, alone or in concert with DDHL and/or DDH3 as alleged above have been, and are, willful, intentional, purposeful and knowing, in that Shenzhenshi, alone or in concert with DDHL and/or DD3, at all times relevant hereto, had actual knowledge that the copyright in the MOVA Copyrighted Source Code has been, and is, owned by Rearden Mova LLC as successor-in-interest to its original author and claimant, and have acted, and continue to act, in knowing disregard of and indifference to the rights of Rearden Mova, LLC, and without seeking consent of any kind.

408.   Shenzhenshi is liable for each of direct infringement because Shenzhenshi, alone or in concert with DDHL and/or DD3, had actual knowledge of the acts of infringement, personally and actively directed and participated in such acts of infringement, and financially benefitted from such acts of infringement.

409.   Counterclaimant Rearden Mova LLC has been harmed as the direct and proximate result of the infringing acts of the foregoing Shenzhenshi, alone or in concert with DDHL and/or DD3, including irreparable harm that has no adequate remedy at law.  Counterclaimant Rearden Mova LLC is entitled to injunctive relief, actual damages, profits of the infringer, and such other remedies as may be available under the Copyright Act.

1

2

### SEVENTEENTH COUNTERCLAIM

(SECONDARY  COPYRIGHT INFRINGEMENT)

3

4

410.   Counterclaimants reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

5

6

7

8

9

10

11

12

411.   By making and providing copies of the MOVA Copyrighted Source Code and/or the output generated by the MOVA Copyrighted Source Code to the customers of Shenzhenshi, alone or in concert with DDHL and/or DDH3 for use by such customers as alleged above, all with the knowledge and intent that such customers would, and did, copy, store and use the MOVA Copyrighted Source Code without the consent of the copyright owner, and by participating in and facilitating such uses of the MOVA Copyrighted Source Code by such customers, Shenzhenshi is liable as a secondary infringer under the Copyright Act for each act of direct infringement by such customers.

13

14

15

16

17

18

19

20

21

22

412.   Shenzhenshi is liable under the Copyright Act for the infringing acts of such customers as contributory copyright infringers in that Shenzhenshi, alone or in concert with DDHL and/or DDH3, had actual and constructive knowledge of the acts of direct infringement by such customers, and contributed actively and materially to such infringements by providing copies of and supporting the use of the MOVA Copyrighted Source Code and/or the output generated by the MOVA Copyrighted Source Code by such customers.  Without such active and material contributions from Shenzhenshi, alone or in concert with DDHL and/or DDH3, the infringements by such customers would not and could not have taken place.  The Shenzhenshi is therefore contributorily liable for the direct infringement of the MOVA Copyrighted Source Code by such customers.

23

24

25

26

27

413.   Shenzhenshi is separately liable under the Copyright Act for the infringement of the MOVA Copyrighted Source Code by such customers as vicarious copyright infringers in that Shenzhenshi, alone or in concert with DDHL and/or DDH3, had, and continue to have, the right and ability to supervise and control the use of the MOVA Copyrighted Source Code by such customers, and derive a financial benefit directly attributable to such infringing uses by such customers.

28

Shenzhenshi is thus vicariously liable for the direct infringement of the MOVA Copyrighted Source Code by such customers.

414.   The acts of infringement of the MOVA Copyrighted Source Code by Shenzhenshi, alone or in concert with DDHL and/or DDH3 as alleged above have been, and are, willful, intentional, purposeful and knowing, in that Shenzhenshi, DDHL and/or DDH3, at all times relevant hereto, had actual knowledge that the copyright in the MOVA Copyrighted Source Code has been, and is, owned by Counterclaimant Rearden Mova LLC as successor-in-interest to its original author and claimant, and Shenzhenshi, alone or in concert with DDHL and/or DDH3, has acted, and will continue to act, in knowing disregard of and indifference to the rights of Counterclaimant Rearden Mova, LLC, and without seeking consent of any kind.

415.   Shenzhenshi, alone or with DDHL and/or DD3, is liable for each instance of direct infringement because Shenzhenshi had actual knowledge of the acts of infringement, personally and actively directed and participated in such acts of infringement, and financially benefitted from such acts of infringement.

416.   Counterclaimant Rearden Mova LLC has been harmed by the infringing acts of Shenzhenshi, alone or in concert with DDHL and/or DD3, including irreparable harm with no adequate remedy at law.  Counterclaimant Rearden Mova LLC is entitled to injunctive relief, actual damages, profits of the infringer, and such other remedies as may be available under the Copyright Act.

## EIGHTEETH COUNTERCLAIM

### (UNJUST ENRICHMENT)

417.   Counterclaimants reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

418.   Shenzhenshi, alone or in concert with DDHL and/or DD3, has unjustly retained the benefits of the unauthorized and wrongful conversion of the MOVA Assets; misappropriated MOVA trade secrets; unauthorized and wrongful use of the MOVA technology, including the MOVA Patents, Trademarks and MOVA Copyrighted Source Code; inducement of others to infringe, or contribution to infringement by others, of the MOVA Patents, Trademarks and MOVA Copyrighted

Source Code; and profits from the increase in the DDHL stock price that, upon information and belief, resulted from their false assertions of ownership in the MOVA Assets.

419.   As a direct, proximate and foreseeable result of the wrongful acts described above, Shenzhenshi has been unjustly enriched, and Counterclaimants Rearden LLC and Rearden Mova LLC have been deprived of money that was wrongfully paid to Shenzhenshi, or its related companies, but for Shenzhenshi's wrongful acts.  Counterclaimants are entitled to restitution of any and all such sums.

420.   As a direct and proximate result of the wrongful acts described above, Counterclaimants Rearden LLC and Rearden Mova LLC have sustained and will continue to sustain substantial, immediate and irreparable injury, for which there is no adequate remedy at law, including without limitation the loss of consumer goodwill.  Counterclaimants are therefore also entitled to injunctive relief.

### NINETEENTH COUNTERCLAIM

(UNFAIR COMPETITION – CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)

421.   Counterclaimants reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

422.   Shenzhenshi's actions discussed herein, alone or in concert with DDHL and/or DD3, constitute unfair competition within the meaning of California Business and Professions Code § 17200.

423.   Pursuant to California Business and Professions Code § 17203, Counterclaimants Rearden LLC and Rearden Mova LLC are entitled to preliminary and permanent injunctive relief ordering Shenzhenshi, and all those in concert with Shenzhenshi, to cease this unfair competition, and an award of damages as provided by law, including disgorgement of all profits associated with this unfair competition.

## TWENTIETH COUNTERCLAIM

(CALIFORNIA UNIFORM FRAUDULENT TRANSFER ACT
CALIFORNIA CIVIL CODE § 3439)

424.   Counterclaimants reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

425.   On information and belief, based on the facts set forth herein, SHST's purported transfer of the MOVA Assets to VGH was made with the actual intent to hinder, delay or defraud Defendants in this case.

426.   The purported transfer was made to an "insider," related-company VGH.

427.   The purported transfer has not changed the possession of the control of the MOVA Assets which, on information and belief, remain with SHST's purported exclusive licensee, DD3.

428.   SHST did not disclose the purported transfer of the MOVA Assets to Defendants (or the Court), instead continuing to act as Plaintiff in this case for weeks after the Asset Purchase Agreement was supposedly executed and did not bring the purported transfer to Defendants' attention until after Defendants' amended counterclaims were filed.

429.   The purported transfer of the MOVA Assets from SHST to VGH occurred the day after SHST learned that it would face Defendants' counterclaims in this case.

430.   The purported transfer of the MOVA Assets from SHST to VGH was made without receiving a reasonably equivalent value in exchange for the transfer or obligation.

431.   Defendant Rearden Mova has been and will continue to be harmed by SHST's actual and constructive fraudulent transfer of the MOVA Assets.

432.   Defendants are entitled to avoidance of SHST's purported transfer of the MOVA Assets to VGH, a preliminary and permanent injunction against further transfer of the MOVA Assets, and an order requiring the return of the MOVA Assets to Rearden Mova.

433.   On information and belief, SHST acted with malice, oppression, and in conscious disregard of Rearden Mova's rights in the MOVA Assets.  Accordingly, Defendants Rearden Mova is therefore also entitled to punitive and exemplary damages as will be proven at trial.

## **PRAYER FOR RELIEF**

Wherefore, Defendants and Counterclaimants pray that the Court:

A.  Dismiss Shenzhenshi's Complaint in its entirety, with prejudice;

B.  Issue an Order declaring that:

    a.  Rearden Mova LLC, a wholly-owned subsidiary of Rearden LLC, owns the MOVA Assets;

    b.  The portion of the MOVA Assets held by Shenzhenshi have been and are held in constructive trust for Rearden Mova LLC, a wholly-owned subsidiary of Rearden LLC;

    c.  Shenzhenshi shall transfer all physical property and all other assets associated with or derived from the MOVA Assets to Rearden Mova LLC, a wholly-owned subsidiary of Rearden LLC; and

    d.  avoiding the purported transfer of the MOVA Assets from Shenzhenshi to Virtue Global Holdings Limited, and granting an attachment on the MOVA Assets or appointing of a receiver to take charge of the MOVA Assets;

C.  Award Rearden LLC and Rearden Mova LLC damages:

    a.  Money damages to compensate Rearden Mova LLC for wrongful conversion and fraudulent conveyance of the MOVA Assets, including explanatory and punitive damages;

    b.  Money damages to compensate Rearden Mova LLC for infringement of the MOVA Patents, Trademark and Copyrighted Source Code, under applicable statutes;

    c.  Money damages to compensate Rearden LLC and Rearden Mova LLC for unfair competition and unjust enrichment, including disgorgement of all profits resulting from Shenzhenshi's unfair business practices, and those operating in concert with Shenzhenshi, as described herein;

    d.  Enhanced damages under applicable statutes;

D.  Issue a Preliminary and/or Permanent Injunction Order:

    a.  Enjoining, preventing and restraining Shenzhenshi, and all those acting in concert with Shenzhenshi who have actual notice of the order, from engaging in any acts of infringement of the MOVA Patents, MOVA Trademarks or MOVA Copyrighted Source Code, including but not limited to using, selling or offering for sale the MOVA technology; and/or reproducing, copying, storing, transmitting, distributing, displaying, performing, exhibiting, broadcasting, downloading and/or streaming motion pictures and television programs that have been or are produced by infringing the MOVA Patents or Mova Copyrighted Source Code;

    b.  Requiring Shenzhenshi to take all reasonable steps to cease further use of infringing motion pictures and television programs that have been or are produced by infringing the Mova Patents or Copyrighted Source Code;

    c.  Enjoining any further disposition, transfer or dissipation of the MOVA Assets by Shenzhenshi;

E.  Award Counterclaimants reasonable attorneys' fees and costs to the extent permitted by law; and

F.  Grant Counterclaimants all other relief that the Court deems just and proper.

Dated: March 18, 2016

Respectfully submitted,


By: */s/ Jennifer Seraphine*

Karen I. Boyd (State Bar No. 189808)
boyd@turnerboyd.com
Jennifer Seraphine (State Bar No. 245463)
seraphine@turnerboyd.com
Zhuanjia Gu (State Bar No. 244863)
gu@turnerboyd.com
TURNER BOYD LLP
702 Marshall Street, Suite 640
Redwood City, California 94063
Telephone:  (650) 521-5930
Facsimile:  (650) 521-5931

*Attorneys for Defendants*
REARDEN LLC, REARDEN MOVA LLC,
MO2 LLC, MOVA LLC