UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRTUE GLOBAL HOLDINGS LIMITED,<br><br>    Plaintiff,<br><br>    v.<br><br>REARDEN LLC, et al.,<br><br>    Defendants. | Case No. 15-cv-00797-JST (SK)<br><br>Redacted<br>**FILED UNDER SEAL**<br><br>**ORDER ON JOINT DISCOVERY LETTER BRIEF: GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE**<br><br>Regarding Docket No. 85 |

Plaintiff Virtue Global Holdings Limited (formerly known as "Shenzhenshi Haitiecheng Science and Technology Co., Ltd.") moves to compel production of documents from Defendants Rearden, LLC; Rearden MOVA, LLC; MO2, LLC;[1] and MOVA, LLC. At issue in these motions are two sets of documents: (1) documents exchanged by a company called MO2, LLC and its lawyer(s), and (2) documents exchanged between Defendants and their lawyers regarding the formation of the Second MO2, LLC and registration of assignments of patents and trademarks of certain technology over which the Second MO2, LLC claimed ownership.

For the reasons stated below, the motion is GRANTED IN PART and DENIED IN PART.

I.     BACKGROUND

This dispute centers on ownership of technology known as MOVA Contour, a technology to "capture the facial performance of an actor" to be used in movies, "computer graphics, and

---

[1] There are two entities named "MO2, LLC" in this litigation. The first MO2, LLC was created on November 9, 2012 and dissolved in November 2013. That entity will be referred to as the "Original MO2." The second MO2, LLC was formed on September 28, 2014 and remains active. That entity will be referred to as the "Second MO2."

1  other video applications" (the "MOVA technology"). Complaint at ¶ 9 (Dkt. 1). The principal

2  actors in this drama are Greg LaSalle and Stephen Perlman, who were long-time friends who

3  engaged in business together. Declaration of Greg LaSalle in Opposition to Defendants' Motion

4  for Summary Judgment ("LaSalle Decl.") at ¶¶ 2 – 6 (Dkt. No. 44-2). Mr. LaSalle worked for

5  several businesses owned by Mr. Perlman over a long period of time. *Id*.

6  OnLive, Inc. ("Onlive") was a company affiliated with or owned by either Rearden, Inc. or

7  Rearden LLC. LaSalle Decl., ¶ 6 . (Dkt. 44-2); Perlman Decl., ¶ 6 (Dkt. 35-1). Mr. LaSalle was

8  employed by OnLive. LaSalle Decl., ¶ 6 (Dkt. 44-2); Perlman Decl., ¶ 8 (Dkt. 35-1). In 2012,

9  OnLive entered into an Assignment for the Benefit of Creditors, and substantially all of Onlive's

10 assets (including the MOVA technology) were assigned a company called OL2, Inc. ("OL2").

11 OL2 did not hire Mr. LaSalle. Declaration of Stephen G. Perlman in Support of Defendants'

12 Motion for Summary Judgment ("Perlman Decl."), ¶ 8 (Dkt. 35-1).

13 Mr. Perlman was the head of Rearden, Inc. and later Rearden LLC (collectively,

14 "Rearden"). Perlman Decl., ¶¶1 – 2 (Dkt. 35-1). On August 20, 2012, Rearden LLC hired Mr.

15 LaSalle, and the parties signed a written agreement (the "Employment Agreement"). Perlman

16 Decl., Ex. A, page 2 of 17 (Dkt. 34-5, redacted version). The Employment Agreement states: "I

17 am very pleased to confirm our offer to you of employment with Rearden, LLC, a California

18 limited liability company (the 'Company') [.]" *Id.* The parties also signed, with the Employment

19 Agreement, another document labeled "Proprietary Information and Inventions Agreement" (the

20 "PIAA"). The PIAA defined the "Company" in a manner different from the Employment

21 Agreement; the PIAA defined the "Company" as "Rearden, LLC, a California limited liability

22 company, and each of its subsidiaries or affiliated companies." Perlman Decl., Ex. A, page 4 of

23 17, § A.1 (Dkt. 34-5, redacted version). Neither the Employment Agreement nor the PIAA

24 addressed Mr. LaSalle's status as a managing member, director, officer, or employee of any

25 affiliate or subsidiary of Rearden, LLC, but the PIAA did contain a provision preventing him from

26 obtaining employment with another company that competed with Rearden without express

27 permission. Perlman Decl., Ex. A, page 9 of 17, § H (Dkt. 34-5, redacted version).

28 In 2012, after OL2 acquired the MOVA technology, Mr. LaSalle and Mr. Perlman began

United States District Court
Northern District of California

2

1  discussing the opportunity for Mr. LaSalle to form a new company to acquire the MOVA
2  technology. Mr. Perlman told OL2's Chief Executive Officer that he (Mr. Perlman) did not want
3  the MO2 technology, that OL2 should sell the MOVA technology to Mr. LaSalle's new company
4  for $1, and that the MOVA technology would never be a substantial business. LaSalle Decl., ¶ 17
5  (Dkt. 44-2) and Exs. 1 - 6 (Dkt. 44-3 – 44-8). ███████████████████

[lines 6–25 redacted]

---

[2] Defendants at oral argument stated that the Bingham McCutchen firm also represented Rearden LLC. The Amended Cross-Complaint confirmed that statement. Defendants' Answer and Amended Counterclaims, at ¶s 92 (Dkt. 100).

[3] Defendants argued for this motion that Rearden was the actual client (Letter Brief, Dkt.

3

Documentation with the California Secretary of State shows that Original MO2 was formed as of November 9, 2012 with Mr. LaSalle listed as the agent for service of process and "organizer". LaSalle Decl. Ex. 10 (Dkt. 44-12). In addition, the box for "One Manager" was checked on the same form. *Id.* No name other than Mr. LaSalle was listed on the form. *Id.* Defendants conceded at oral argument that there are no corporate documents showing that Mr. Perlman or Rearden had any managerial role in Original MO2, but Defendants argue that other documentary evidence in the form of electronic mail communications showed that Mr. Perlman or Rearden exercised managerial control over Original MO2. Defendants also agreed at oral argument that there was no Operating Agreement for Original MO2.[4]

Original MO2 acquired the MOVA technology from OL2 on February 11, 2013 for $1 and the assumption of OL2's liabilities. Complaint, Ex. C (Dkt. 1-1). Mr. LaSalle, on behalf of Original MO2, signed the contract with OL2. Complaint, Ex. C (Dkt. 1-1).

[REDACTED]

---

78), because Original MO2 had not yet been created. [REDACTED]

[4] After the hearing, Defendants submitted a letter brief in which they claimed that the PIAA provided that Mr. LaSalle was not allowed to join a company other than Rearden LLC and its affiliates and subsidiaries without Rearden LLC's express permission. (Dkt. 101) [REDACTED]. An express prohibition against other employment might have run afoul of Cal. Bus. & Prof. Code §16600 *et seq.* [REDACTED]

4

Plaintiff alleges that Mr. LaSalle, purportedly acting on behalf of Original MO2, then sold the MOVA technology to Plaintiff in May 2013. LaSalle Decl., ¶ 45-47 (Dkt. 44-2). In addition, Mr. LaSalle's employment with Rearden ended. LaSalle Decl., ¶ 41-42 (Dkt. 44-2); Perlman Decl. ¶¶ 23, 29, (Dkt. 35-1). At oral argument, Defendants stated that there is a dispute about when Mr. LaSalle's employment with Rearden ended, but that his employment with Rearden LLC ended before April 2013. Mr. LaSalle then caused Original MO2 to be dissolved in November 2013. LaSalle Decl., ¶ 47 (Decl. Dkt. 44-2). There is no evidence that, when Mr. LaSalle's employment with Rearden ended, Rearden took any steps to inform Mr. LaSalle that he no longer had a managerial role with Original MO2 or that Rearden took any steps to document any change in Mr. LaSalle's status as a manager of Original MO2.

Defendants have a different timeline of events and set of facts regarding the transfer of MOVA technology. Defendants allege that Original MO2 was a "wholly owned subsidiary of Rearden." Defendant's Answer and Amended Counterclaim, ¶ 151 (Dkt. 100). Rather than agreeing that Original MO2 transferred the MOVA technology to Plaintiff in May 2013, Defendants allege that, on April 19, 2013, *before* Mr. LaSalle purportedly caused Original MO2 to transfer the MOVA technology to Plaintiff, Mr. Perlman or others at Rearden caused Original MO2 to transfer the MOVA technology to another entity called Rearden Mova LLC, identified as a wholly-owned subsidiary of Rearden.[5] *Id*. ¶ 109 (Dkt. 100). There is no documentation in the record of the alleged transfer on April 19, 2013. The only documentation in the record shows that Second MO2 was created on September 8, 2014, and the alleged transfer of MOVA technology (patents) from MO2 to Rearden Mova is dated September 18, 2014. Complaint, Ex. C (Dkt. 1-1). That date is after the date Mr. LaSalle claims to have transferred the MOVA technology to Plaintiff.

///

---

[5] A review of the California Secretary of State website shows that Rearden Mova LLC was formed on April 19, 2013. Defendant's Answer and Amended Counterclaim at ¶5 (Dkt. 100).

Thus, Plaintiff's timeline is as follows:

November 2012 – Original MO2 is formed.

May 2013 – Original MO2, under Mr. LaSalle's control, transfers MOVA technology to Plaintiff.

November 2013 – Original MO2 is dissolved.

Defendants' timeline is as follows:

November 2012 – Original MO2 is formed.

April 19, 2013 – Rearden Mova is formed.   April 19, 2013 – Original MO2, under Rearden's control, transfers MOVA technology to Rearden Mova.

September 8, 2014 – Second MO2 is formed.

September 18, 2014 – Documentation of transfer from Original MO2 of MOVA technology to Rearden Mova occurs.

Exhibit A to this order shows the conflicting version of events.

## II.    ANALYSIS OF ATTORNEY-CLIENT PRIVILEGE TO DOCUMENTS IN QUESTION

This Court applies the common law of attorney-client privilege under Federal Rule of Evidence 501. However, Rule 501 provides that, "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Jurisdiction here is based on diversity jurisdiction. Complaint, ¶ 1 (Dkt. 1). The claims in the Complaint are state law claims, but the claims in the Counterclaims are mixed state and federal (patent infringement, trademark infringement, and copyright infringement). The corporate entities in question exist under California law. Therefore, this Court will look to California's substantive law regarding a corporate entity's right to the attorney-client privilege, and there appears to be no conflict between California law and federal common law on the issues presented here.

Defendants, citing *United States v. Mett*, 178 F.2d 1058, 1065 (9th Cir. 1999), argue that, if there is doubt about the attorney-client privilege, a court should refuse to compel production of documents. However, the party asserting the attorney-client privilege has the burden of establishing the privilege. *United States v. Martin,* 278 F.3d 988, 999-1000 (9th Cir. 2002).

6

1    A limited liability company possesses an attorney-client privilege, and, although the Ninth
2    Circuit has not yet addressed this question, at least two District Court opinions have held that the
3    privilege is similar to the type of privilege held by a corporation. *See*, *e.g.*, *Carpenters Pension*
4    *Trust v. Linquist Family LLC*, 2014 WL 1569195 (N.D. Cal. April 18, 2014); *Montgomery v.*
5    *eTrepid Technologies, LLC*, 548 F.Supp.2d 1175, 1881 (D. Nev. 2008) (internal citation omitted)
6    ("under federal common law, partnerships and limited partnership are treated as corporations for
7    purposes of the attorney-client privilege"). The LLC can act only through its management, so
8    management exercises that privilege. *Carpenters Pension Trust*, 2014 WL 1569195, at *3.

9    I.    Documents between Bingham McCutchen and Original MO2, LLC

10    Here, there is no dispute that Original MO2 was dissolved in November 2013 and that
11    Second MO2 did not come into existence until September 8, 2014. Where a corporation is
12    dissolved, "it continues to exist for the limited purposes of winding up." *Melendrez v. Superior*
13    *Court*, 215 Cal.App.4th 1343, 1354 (2013). However, the *Melendrez* Court noted that there is a
14    "distinction between a *dissolved* corporation and one *no longer in existence*." *Id*. (emphasis in
15    original). There are three categories: (1) a dissolved corporation that is winding up its processes,
16    (2) a corporation that is no longer in existence, for which a successor, trustee, or other similar
17    representative holds the privilege, or (3) a corporation which no longer exists and for which there
18    is no successor, trustee, or other similar representative. *Id*. and n. 14.

19    A.    Dissolved Corporation Winding Up Assets

20    Original MO2 is dissolved, but it is not winding up its processes. There is no question that
21    there was a gap in time between the dissolution of Original MO2 in November 2013 and the
22    creation of Second MO2 in September 2014. Under California law, once a corporation is
23    dissolved, . . . the corporation has no authority to 'reinstate' its corporate status. *City of Rialto v.*
24    *U.S. Dept. of Defense*, 492 F.Supp.2d 1193, 1198 (C.D. Cal. 2007) (*citing Catalina Invs., Inc. v.*
25    *Jones*, 98 Cal.App. 4th 1, 7 (2002)).[6]

26    Defendants argue that a dissolved LLC can continue to assert its attorney-client privilege if

---

[6] Thus, the creation of Second MO2 does not allow the managing members of Second MO2 to assert the attorney-client privilege of Original MO2.

7

it continues to exist for purposes of defending itself in litigation. *City of Rialto v. U.S. Dept. of Defense*, 492 F.Supp.2d at 1198 (dissolved corporation can exist to wind up, which includes defense in litigation); *Reilly v. Greenwald & Hoffman, LLP*, 196 Cal.App.4th 891, 901-902 (2011); Cal. Corp. Code § 2010(a). Here, Original MO2 is not the defendant in this action. Although Plaintiff names as a defendant the corporate entity known as "MO2, LLC," Plaintiff is clear to identify the defendant as Second MO2, as the "California limited liability company which was formed on or about September 8, 2014." Complaint, ¶. 6 (Dkt. 1). The only evidence about whether Original MO2 is winding up its processes is the LaSalle Declaration in which he explains that Original MO2's business ceased after the sale of the MOVA technology. LaSalle Decl., ¶ 47 (Dkt. 44).

### B.  Corporation No Longer in Existence but with Successor or Trustee

Plaintiff argues that the attorney-client privilege died with the dissolution of Original MO2. (Dkt. 78). Defendants argue that, although Original MO2 is no longer in evidence, there is a successor or trustee – Rearden Mova – to assert the privilege, because Rearden Mova acquired the assets of Original MO2.[7] It is accurate that there is a limited ability for a successor to assume the privilege of the defunct corporation, but those situations are limited in scope to situations either in which a bankruptcy trustee is appointed or if "control of a corporation passes to new management." *City of Rialto*, 492 F.Supp.2d at 1198 (*citing Commodity Futures Trading Comm. v. Weintraub* , 471 U.S. 343, 349 (1985)). A transfer of assets alone does not cause a transfer of privilege. *Id*. (*citing Fed. Deposit Ins. Corp. v. McAtee*, 124 F.R.D. 662, 664 (D. Kan. 1988)).

Moreover, even if the law were to support such a proposition, Defendants cannot meet their burden to show that Original MO2 did in fact transfer all its assets to Rearden Mova. Defendants allege that the transfer of all of Original MO2's assets and liabilities occurred in April 2013, before the alleged transfer, by Mr. LaSalle, from Original MO2 to Plaintiff. (Dkt. 78) However, there is no evidence submitted for that statement. The only documentary evidence

---

[7] Although all of the pleadings refer to the ability of "Defendants" to assert the attorney-client privilege of Original MO2, this specific theory appears to apply to Rearden Mova.

1  shows that, as of April 2013, Mr. LaSalle was the person named in any corporate documents of
2  Original MO2, as noted above, and that the transfer of MOVA technology by an entity called
3  "MO2, LLC" to Rearden Mova LLC occurred on September 18, 2014.   This timing is consistent
4  with the creation of Second MO2 on September 8, 2014.  In other words, there was a gap in time
5  between the dissolution of Original MO2 in November 2013 and the creation of Second MO2 on
6  September 8, 2014 and a gap in time between the dissolution of Original MO2 and the alleged
7  transfer of the MOVA technology to Rearden Mova on September 18, 2014.
8         This issue – whether Plaintiff or Rearden Mova assumed all assets and liabilities of
9  Original MO2, is the heart of this entire lawsuit.  The ruling on this issue is not case dispositive
10  but limited to the narrow question of whether Defendants have met their burden to show that
11  Rearden Mova or some other named Defendant has obtained the ability to assert the attorney-
12  client privilege for Original MO2.
13                    C.  <u>Corporation No Longer in Existence and with No Successor or Trustee</u>
14         Original MO2 falls into the third category of a dissolved corporation that no longer exists.
15  When a corporation ceases to exist, "the corporate powers, rights and privileges of the corporation
16  shall cease." Cal. Corp. Code §1905(b).  In that case, no entity holds the attorney-client privilege
17  for Original MO2. *City of Rialto*, 492 F.Supp.2d at 1197 ("a dissolved corporation is not entitled
18  to assert the attorney-client privilege").   Given that Defendants cannot meet their burden to show
19  that they (or Rearden Mova, specifically) hold the attorney-client privilege for Original MO2,
20  Plaintiff's motion to compel documents listed on the privilege log (Exhibit A to the letter brief
21  submitted to the Court) is GRANTED.[8]
22                    D.  <u>Rearden's Right to Assert Attorney-Client Privilege against Plaintiff</u>
23         Defendants argue that they and/or Mr. Perlman exercised control over Original MO2 in
24  actual practice and thus that Defendants can assert the attorney-client privilege of Original MO2.
25  However, even though Mr. Perlman claims that he knew that Mr. LaSalle refused to turn over the

---

[8] The parties did not file Exhibits A and B to Dkt. 78 with the Clerk but rather provided chambers copies to the Court directly.  The parties are ordered to file Exhibits A and B to Dkt. 78 by April 15, 2016.  Any administrative motion to seal should be filed by April 15, 2016 and will be heard by this Magistrate Judge.

9

assets of Original MO2 to Rearden as of February 14, 2013, Perlman Decl., ¶ 21 (Dkt. 35-1), Mr. Perlman and Rearden took no action to change the corporate records to reflect Rearden's or Mr. Perlman's alleged status as a managing member or owner of Original MO2 and took no action to create an operating agreement or other documents reflecting this managerial control.  This Court takes judicial notice of the fact that documents regarding the formation of California limited liability companies are a matter of public record, and Mr. Kalin from Bingham McCutchen also represented Rearden, so Rearden and/or Mr. Perlman could easily have reviewed the documents filed with the California Secretary of State for Original MO2.   In addition, Defendants were obviously aware that there was no corporate document such as an Operating Agreement listing any Defendant or Mr. Perlman as having any ownership or managerial responsibility for Original MO2.  Defendants and Mr. Perlman failed to take action to preserve their status as alleged owners or managers of Original MO2, and Defendants were not able to provide a reason for this failure.  Defendants appear to be sophisticated entities, and Mr. Perlman appears to be, based on his own declaration, a sophisticated businessman.

Defendants argue that Mr. LaSalle did not have the right to transfer the assets and liabilities of Original MO2 to Plaintiff in May 2013 because Defendants had already transferred them as of April 29, 2013 to Rearden Mova.  Defendants argue that Mr. LaSalle did not have the right to transfer the assets to transfer the assets and liabilities of Original MO2 to Plaintiff in May 2013 because Mr. LaSalle's employment with Rearden LLC had ended before May 2013 and because Original MO2, acting under Rearden's management, had already transferred the MOVA technology to Rearden Mova.  This argument appears to be that Rearden all along, as Original MO2's real manager, and not Mr. LaSalle, has the right to assert the attorney-client privilege.

[redacted]

Defendants also argue that, under the terms of the PIAA, at the termination of Mr. LaSalle's employment with Rearden LLC, his ability to control Original MO2 ended and thus the

10

1   only manager left was Rearden. The PIAA does not support this argument. Although the PIAA
2   discusses Mr. LaSalle's ability to disclose or use intellectual property and confidential information
3   and also discusses the duty of loyalty and other issues, there is nothing in the PIAA that addresses
4   his ability to control Original MO2. The Court notes that there is a dispute about whether Original
5   MO2 was created for Rearden LLC at Rearden LLC's request. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In addition, there is no dispute that the only documentary evidence
8   regarding the corporate governance of Original MO2 showed that Mr. LaSalle was the only person
9   named in any corporate documents.
10  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15  ▮▮▮▮▮▮▮▮

16      E.  <u>Waiver of Attorney-Client Privilege</u>

17  Plaintiff also argues that Mr. LaSalle voluntarily waived the attorney-client privilege of
18  Original MO2 when he disclosed the allegedly privileged information in question to Plaintiff as
19  part of the sale of the MOVA technology to Plaintiff. Defendants argue that Mr. LaSalle's
20  disclosure of Original MO2's attorney-client privilege information, if any, violated the terms of
21  his PIAA with Rearden. Both parties agree that Original MO2 had an attorney-client privilege,
22  and some manager had the ability to waive that privilege, as least while Original MO2 was in
23  existence. Both parties seem to agree that Mr. LaSalle had some managerial role for Original
24  MO2 at least before his employment with Rearden ended. The parties differ though, as Plaintiff
25  argues that Mr. LaSalle's managerial role for Original MO2 ended in November 2013 with the
26  dissolution, and Defendants argue that Mr. LaSalle's managerial role with Original MO2 ended
27  before April 2013, when his employment with Rearden ended.
28  Defendants' argument is thus legal and factual. Defendants argue that Mr. LaSalle did not

United States District Court
Northern District of California

have a managerial role with Original MO2 after his employment with Rearden ended as of April 2013 and thus that he was not entitled to waive Original MO2's privilege after April 2013. Defendants fail to meet their burden of proof on this factual issue. First, as noted above, there is no evidence that Rearden took any steps to notify Mr. LaSalle that his managerial role with Original MO2 ended and no evidence that Rearden documented in any way the alleged change in managerial control. Second, the documentation upon which Defendants rely does not support their position. Defendants point to the PIAA as proof that Mr. LaSalle no longer had managerial control after his employment with Rearden ended as of April 2013. The PIAA provides for confidentiality of the information for the "Company," defined more broadly as any subsidiary or affiliated company of Rearden. The PIAA defines "Proprietary Information" in a detailed manner – largely intellectual property and confidential business information or generally any information that has "commercial value." (Dkt. 38-3) The definition of Proprietary Information follows:

> information that was or will be developed, created, or discovered by or on behalf of the Company, or which became or will become known by, or was or is conveyed to the Company, which has commercial value in the Company's Business. "Proprietary Information" includes, but is not limited to information about trade secrets, confidential knowledge, data or other proprietary information of the Company. By way of illustration but not limitation, "Proprietary Information" includes (a) inventions, discoveries, improvements, mask works, trade secrets, ideas, processes, formulas, copyrightable subject matter, source and object codes, data, programs, other works of authorship, know-how, developments, designs and techniques (hereinafter collectively referred to as "Inventions"); (b) intellectual property, such as all intellectual, artistic, literary, dramatic or musical rights, works or other materials of any kind or nature (whether or not entitled to protection under applicable copyright laws, or reduced to or embodied in any medium or tangible form), including but not limited to all copyrights, patents, trademarks, service marks, trade secrets, contract rights, titles, characters, plots, themes, dialogue, stories, scripts, treatments, outlines, submissions, ideas, concepts, packages, compositions, artwork and logos, and all audio, visual or audio-visual works of every kind and in every stage of development, production and completion, and all rights to distribute, advertise, promote, exhibit or otherwise exploit any of the foregoing by any means, media or processes now known or hereafter devised; and (c) information regarding plans for research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, suppliers and customers; and information regarding the skills and compensation of other employees of the Company.

(Dkt. 38-3) The PIAA also provides: "I will keep in confidence and trust and will not use or

1   disclose any Proprietary Information or anything relating to it without the prior written consent of
2   an officer of the Company, except as may be necessary in the ordinary course of performing my
3   duties to the Company." (Dkt. 38-3)
4         There is no link between the definition of Proprietary Information and the privileged
5   information at issue here. This Court has reviewed the documents in question *in camera* and finds
6   that the vast majority do not fall within that definition of Proprietary Information. But even if the
7   documents fell within the PIAA, there is no legal authority for that proposition Defendants' legal
8   argument that the existence of the PIAA precluded Mr. LaSalle from disclosing MO2's privileged
9   information. And at least for Mr. LaSalle's disclosure of Original MO2's privileged information
10  before April 2013, Mr. LaSalle has a valid argument that his disclosure of privilege information
11  was within the ordinary course of performing his duties, a permitted exercise of his discretion
12  under the PIAA. Defendants have hinted that a nefarious reason was behind Mr. LaSalle's
13  disclosure of privileged information to Plaintiff, but even a cursory review of the documents in
14  question show that the documents address MO2's "chain of title" for the MOVA technology, an
15  area that a buyer of technology would want to understand.

      F.   <u>Status of Documents as Privileged</u>

17        Finally, Plaintiff argues that the documents contained on the privilege log in question are
18  not in fact protected by any attorney-client privilege. Because this Court holds that any attorney-
19  client privilege died with the dissolution of Original MO2 and that Mr. LaSalle's actions in
20  disclosing MO2's allegedly privileged information to Plaintiff constituted a waiver, this Court
21  need not address this issue at this time.

22    II.   <u>Documents Regarding Formation of Entity called MO2, LLC in September 2014</u>

23        Plaintiff also seeks to compel production of documents relevant to the formation of Second
24  MO2 and communications with lawyers about the MOVA technology as requested in Document
25  Requests Nos. 26, 27, 49, and 50. *See* Ex. B to Dkt. No. 78.[9] These documents issued to a
26  Defendant or Defendants seek "[a]ll documents which memorialize or reflect any participation by

---

[9] Document Requests Nos. 26 and 27 appear to be identical. *See* Ex. B to Dkt. No. 78.

1    you in the formation of an entity called MO2, LLC in or about September 2014" and "[a]ll
2    communications between you" and Thomas Webster and Jennifer Lee Taylor "concerning the
3    MOVA Assets . . . between February 1, 2013 and February 20, 2015."[10]  Although not completely
4    clear from the record, it appears that both Mr. Webster and Ms. Taylor are attorneys who
5    represented a defendant or defendants before the United States Patent and Trademark Office.
6    Defendants asserted the attorney-client privilege in responding to these document requests and
7    either agreed to meet and confer or produce only non-privileged documents.

8          Plaintiff argues that the documents are not protected by the attorney-client privilege
9    because the crime-fraud exception applies.  Plaintiff impliedly concedes that the attorney-client
10   privilege protects disclosure of the requested documents – or at least some subset.   Plaintiff
11   argues that the crime-fraud exception applies because the Defendants' actions in seeking to
12   transfer the trademarks and patents for the MOVA technology from Second MO2, which allegedly
13   did not own the trademarks and patents, to Rearden Mova, constituted either a crime or fraud.

14         The burden of overcoming attorney-client privilege under the crime-fraud exception is
15   high.  A mere accusation of crime or fraud is not sufficient to overcome the attorney-client
16   privilege.  *BP Alaska Exploration, Inc. v. Superior Court,* 199 Cal.App.4th 1240, 1262 (1988).
17   Here, Mr. Perlman has provided a declaration under penalty of perjury in support of Defendants'
18   motion for summary judgment in which he explained why he genuinely believed that the Rearden
19   owned the MOVA technology (patents and trademarks).  Perlman Decl., ¶¶ 17, 29, 30 (Dkt. 35-1).
20   Although Mr. Perlman might be proved to ultimately mistaken in this litigation, his attempt to
21   seek legal advice and legal assistance to protect the patents and trademark for the MOVA
22   technology is not sufficient proof of a crime or fraud.  The evidence provided for this motion is
23   not sufficient proof to show that defendants were "engaged in or planning a criminal or fraudulent
24   scheme" to overcome the attorney-client privilege.  *See, e.g., United States v. Doe (In re Grand*
25   *Jury Investigation)*, 2016 U.S. App. LEXIS 1241 (9th Cir. Jan. 14, 2016).

26         The motion to compel production of attorney-client privileged documents responsive to

---

[10]  It was not clear from the documents submitted if these requests were directed to all Defendants or simply a subset.

14

1  Document Requests Nos. 26, 27, 49, and 50 is therefore DENIED.

2  Because this Order may contain information within the scope of the parties' protective order, this Order shall remain under seal pending further Order of the Court. By no later than April 15, 2016, the parties shall jointly advise the Court (this Magistrate Judge) which facts, if any, they contend should be redacted from the public version of this ruling. To the extent any party seeks redaction of any part of the Court's Order, such party shall provide this Court with the legal authority for such a request and a proposed redacted version of this Order for public filing.

**IT IS SO ORDERED**.

Dated: April 5, 2016

_____
SALLIE KIM
United States Magistrate Judge

# EXHIBIT A



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRTUE GLOBAL HOLDINGS LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>REARDEN LLC, et al.,<br><br>Defendants. | Case No. 15-cv-00797-JST   (SK)<br><br>**CERTIFICATE OF SERVICE**<br>[UNDER SEAL] |

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on April 5, 2016, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Scott Kolassa
Frances Bruen Cox
Kilpatrick Townsend & Stockton LLP
1080 Marsh Road
Menlo Park, CA 94025-5743

Jennifer Seraphine
Karen I. Boyd
Turner Boyd LLP
702 Marshall Street, Suite 640
Redwood City, CA 94063

Dated: April 5, 2016

Susan Y. Soong
Clerk, United States District Court

By:_____
Melinda K. Lozenski, Deputy Clerk to the
Honorable SALLIE KIM