Volume 7

Pages 1063 - 1123

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JON S. TIGAR

SHENZHENSHI HAITIECHENG SCIENCE      )
AND TECHNOLOGY CO., LTD., a          )
People's Republic of China           )
corporation,                         )
                                     )
            Plaintiff,               )
                                     )
   and                               )
                                     ) No. C 15-0797 JST
VIRTUE GLOBAL HOLDINGS, LIMITED,     )
a business company incorporated in   )
the British Virgin Islands,          )
                                     ) San Francisco, California
            Intervenor,              ) Wednesday
   vs.                               ) December 14, 2016
                                     ) 8:30 a.m.
REARDEN, LLC, a California Limited    )
Liability Company; REARDEN MOVA,     )
LLC, a California Limited Liability)
Company; and MOVA, LLC, a            )
California Limited Liability         )
Company,                             )
                                     )
            Defendants.              )
_____)

**TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**          KILPATRICK TOWNSEND AND STOCKTON, LLP
                            1080 Marsh Road
                            Menlo Park, California 94025
                      **BY: JON MICHAELSON, ESQ.**
                            **SCOTT KOLASSA, ESQ.**
                            **FRANCES B. COX, ESQ.**

*Reported By:* *Debra L. Pas, CSR 11916, CRR, RMR*
              *JoAnn Bryce, CSR 3321, CRR, RMR*
              *Official Reporters - US District Court*

1  **APPEARANCES:   (CONTINUED)**

2

3                          KILPATRICK TOWNSEND AND STOCKTON, LLP
                           Two Embarcadero Center
4                          Suite 1900
                           San Francisco, California 94111
5                    BY:   **HOLLY GAUDREAU, ESQ.**
                           **BENJAMIN M. KLEINMAN-GREEN, ESQ.**
6

7
   **For Defendant:**         TURNER AND BOYD, LLP
8                          702 Marshall Street
                           Suite 640
9                          Redwood City, California 94063
                     BY:   **KAREN I. BOYD, ESQ.**
10                         **JENNIFER SERAPHINE, ESQ.**
                           **KEELEY IRENE VEGA, ESQ.**
11                         **ZHUANJIA GU, ESQ.**
                           **JACOB ZWEIG, ESQ.**
12

13                         KERR & WAGSTAFFE LLP
                           101 Mission Street
14                         18th Floor
                           San Francisco, California 94105
15                   BY:   **FRANK BUSCH, ESQ.**

16

17 **Also Present:**           **STEVE PERLMAN**

18                              - - - -

19

20

21

22

23

24

25

1

2                               **I   N   D   E   X**

3

4   **DEFENDANT'S WITNESSES**                                 **PAGE**   **VOL.**

5   **PERLMAN, STEPHEN**
    (PREVIOUSLY AFFIRMED)                                   1069    7
6   Redirect Examination by Ms. Seraphine                   1069    7
    Recross Examination by Mr. Michaelson                   1100    7

7

8   **LEI, FAN**
    By Deposition Reading (not reported)                    1112    7

9

10  Defendants' Rest                                        1113    7
    Plaintiff's Rest                                        1113    7

11                               —   —   —

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**E X H I B I T S**

| PLAINTIFF'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 93 |  | 1066 | 7 |

- - -

| DEFENDANT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 265 |  | 1067 | 7 |
| 406 | 1077 | 1078 | 7 |
| 238 |  | 1081 | 7 |

- - -

1    **P R O C E E D I N G S**

2    DECEMBER 14, 2016                              8:33 A.M.

3                    ---o0o---

4         THE COURT:  All right.  Let's go back on the record in

5    the VGH versus Rearden case.  Good morning, everyone.

6         VGH has used 11 hours and 51 minutes.  They have 9 minutes

7    remaining.  Rearden has used 9 hours and 26 minutes and they

8    have 2 fours and 34 minutes remaining.

9         I think yesterday we finished -- first of all, before we

10   get going, are there any housekeeping matters to address?

11        MS. BOYD:  Okay.  I think we're down to the exhibit

12   that you wanted to enter.

13        MR. MICHAELSON:  I think we have Exhibit 93, which is

14   not been admitted and an agreement among counsel that it can

15   be.

16        THE COURT:  All right.  Ms. Boyd, is that accurate?

17        MS. BOYD:  Yes, that is correct.

18        THE COURT:  All right.  Exhibit 93 is admitted.

19     (Plaintiff's Exhibit 93 received in evidence)

20        MS. BOYD:  And I don't know if this would go into

21   the exhibit record of the Court, but Exhibit 265, which was

22   discussed by both parties, is the equivalent of entered

23   Exhibit 17.

24        THE COURT:  Yes, okay.

25        MS. BOYD:  And there is an issue on timing.

1      **THE COURT:**  Do we need to admit Exhibit 265, just to

2  eliminate any confusion?

3      **MS. BOYD:**  That may be the easiest thing to do.

4      **THE COURT:**  Any objection?

5  (Brief pause.)

6      **MR. KLEINMAN-GREEN:**  No, your Honor.

7      **THE COURT:**  Exhibit 265 is admitted.

8  (Defendant's Exhibit 265 received in evidence).

9      **MS. BOYD:**  It's your timing question.

10      **MR. KOLASSA:**  I don't know that we have an issue yet.

11      **MS. BOYD:**  In the deposition designations that the

12  parties have prepared, we did an estimation on how much time is

13  designation versus counter designation.  The counter

14  designations, we estimate, are about six minutes of nine

15  minutes remaining for VGH.

16      **THE COURT:**  All right.

17      **MR. KOLASSA:**  Your Honor, to the extent that there is

18  any of -- you know, we use three or four minutes before the

19  designations, we would ask for a little bit of -- a few minutes

20  of leniency.

21      To the extent that Mr. Michaelson has some recross

22  after -- I'm assuming Mr. Perlman will take the stand and

23  testify in redirect.  To the extent that Mr. Perlman -- sorry.

24  To the extent that Mr. Michaelson has one or two questions of

25  recross and that we may end up being a minute short, we would

 1    ask the Court for a little bit of leniency.

 2            **THE COURT:**  Ms. Boyd, any objection to my extending

 3    five minutes of grace to your opponents?

 4            **MS. BOYD:**  No objection.

 5            **THE COURT:**  Five minutes of grace it is.  Five minutes

 6    will be self executing.

 7            **MR. KOLASSA:**  Thank you, your Honor.

 8            **THE COURT:**  Everyone here is a big kid and even the

 9    five minutes should be unnecessary.  So it should go without

10    saying that any further discussion of this topic shall be even

11    more unnecessary.

12            **MR. KOLASSA:**  Thank you, your Honor.

13            **THE COURT:**  All right.

14            **MS. BOYD:**  Thank you.

15            **THE COURT:**  We will welcome Mr. Perlman back to the

16    stand.

17        Mr. Perlman, you're still under oath.

18                        **STEPHEN PERLMAN**,

19    called as a witness for the Defendant herein, having previously

20    affirmed to tell the truth in open court, resumed the stand and

21    testified further as follows:

22                      **REDIRECT EXAMINATION**

23    BY MS. SERAPHINE

24    **Q.**   Good morning again, Mr. Perlman.

25    **A.**   Good morning.

```
 1   Q.   I have just a few questions this morning.

 2        First, I wanted to talk very briefly about the settlement

 3   discussions between Mr. Tate and Mr. Levy in March and April of

 4   2013.

 5        Plaintiff's counsel had handed you and marked an exhibit,

 6   101.  Do you have that?  I'm not sure if you still have it from

 7   yesterday.

 8   A.   I left all of the things I had up here behind.

 9   Q.   I had provided them back to counsel yesterday.

10        (Brief pause.)

11   Q.   I may have an extra copy.

12        (Whereupon document was tendered to the witness.)

13            MS. SERAPHINE:  My apologies, your Honor.

14   BY MS. SERAPHINE

15   Q.   Mr. Perlman, does this settlement agreement talk about a

16   subsidiary?  Does it define that term?

17   A.   I'm looking.

18   Q.   In the very first paragraph of the agreement.

19   A.   Yes, it does.

20   Q.   And what is the name of the subsidiary that this

21   settlement agreement contemplates?

22   A.   Rearden Mova, LLC.

23   Q.   Does this settlement agreement draft also contemplate a

24   termination date for Mr. LaSalle's employment with Rearden in

25   Section E?
```

1   **A.**   Yes.

2   **Q.**   And what is the termination date that is in this

3   settlement agreement draft?

4   **A.**   April 22, 2013 the, quote, separation date, quote.

5   **Q.**   This agreement was never finalized, is that right?

6   **A.**   That's correct.

7   **Q.**   But you had an understanding of the terms that were being

8   discussed between Mr. Levy and Mr. Tate in regard to the

9   agreement?

10  **A.**   Yes.

11  **Q.**   And what was the date of Mr. LaSalle's termination from

12  Rearden of his employment?

13  **A.**   I believe it was --

14       **MR. MICHAELSON:**  I'm going to object, your Honor.  I

15  think we're well within Evidence Code 408 and as the other side

16  objected to my --

17       **THE COURT:**  Well, you're permitted to proceed.  So I

18  don't think the objection is well taken.

19       What I said then, and what I had intended to say later

20  this morning, is that for the reasons set forth in Rule 408 of

21  the Federal Rules of Evidence, and after timely objection, the

22  Court has given no weight to Exhibits 101 or 102 or any of the

23  testimony regarding those negotiations.

24       I might have to modify those remarks if I receive

25  substantial testimony on that issue this morning, but that's

1    where I was at the time I took the bench this morning.

2         **MS. SERAPHINE:**  Your Honor, may I make a point about

3    Rule 408 in reference to the testimony that I'm eliciting from

4    the testimony from Mr. Perlman at this time?

5         **THE COURT:**  Sure.

6         **MS. SERAPHINE:**  My understanding of the rule is that

7    it excludes discussions of settlement in particular instances

8    and for particular reasons.  Specifically, it cannot prove the

9    liabilities and it cannot be used for that purpose.

10        However, I think -- I don't recall that the very last

11   section of the rule allows expressly the use of settlement

12   discussions for other purposes and lists those purposes and

13   then says any other purpose.

14        The reason that we are showing this document now that it

15   has been shown in court by plaintiff is to show and confirm

16   that Mister -- or Rearden acted when it formed Rearden Mova and

17   when it terminated Mr. LaSalle's employment from Rearden based

18   on what it had talked about between its attorneys at this time.

19        **THE COURT:**  Rule 408(a) explicitly provides that

20   evidence of the matters described in Rule 408 are not

21   admissible to, among other purposes, quote, impeach by a prior

22   inconsistent statement or a contradiction, close quote.

23        I would be surprised if the drafters of the rule thought

24   it was not okay to impeach by a prior inconsistent statement,

25   but okay to admit the document or testimony about it for

1   purposes of showing a prior consistent statement, which I think

2   is what you're trying to do now.

3       As I said to Mr. Michaelson, I'm not going to prevent the

4   testimony.  I'm just saying I think it's a two-way street.  I

5   don't think that -- that Mr. Michaelson's questioning about the

6   agreement can be out of bounds and your questioning about the

7   agreement and the negotiations about the agreement can be in

8   bounds if you're both talking about the same stuff.

9       Regardless of what the specific words of Rule 408 are and

10  to the extent that you're attempting to effectuate a waiver of

11  your rights under 408 by the questioning, I'm not sure I'm

12  obligated to take it.

13          **MS. SERAPHINE:**  Your Honor, we are not trying to

14  effectuate a waiver of 408.  We see a distinction between

15  408(a) and I believe it's 408(b), and we think that -- but I

16  won't argue and I won't belabor the point.

17  **BY MS. SERAPHINE**

18  **Q.**   When did you first know that Mr. LaSalle had been hired by

19  DD3?

20  **A.**   I never received confirmation he had been hired by DD3.

21  When I spoke to Ed Ulbrich, he said they had decided.  They

22  planned to hire Greg.

23  **Q.**   Was that when you spoke to Mr. Ulbrich at the very end of

24  May, 2013?

25  **A.**   Yes.

**Q.** And at that time Mr. LaSalle had taken the physical Mova assets?

**A.** Yes.

**Q.** And did you think at some point in time that it was possible he had given those assets to DD3?

**A.** Umm, at that -- after the -- the circumstances which were previously discussed, his -- his disappearance and difficulty to reach, the fact that the attorneys that were settling with us couldn't be reached any longer, the discovery of the -- the signature page of a document from February 4, 2013 in his email, the fact that a very sophisticated hacker had tried to subvert his -- our email system, and did get through by the way -- they thought they did, but they didn't -- and tried to delete key emails that he had in his email. Then when Ed Ulbrich was nonresponsive after I spoke to him and, finally, I got directed to Joe Gabriel when I tried to -- kept calling his assistant.

I would say all of those together led me to conclude that it was likely that Greg had given the physical assets over to DD3.

**Q.** And did you understand that DD3 was a company that ultimately was owned by Chinese companies?

**A.** Yes. There was quite a bit of press about that.

**Q.** When Rearden negotiated with Mr. LaSalle, did Rearden ever offer to pay Mr. LaSalle money for the Mova assets?

1    **A.**    No, we never did.

2    **Q.**    What Rearden offered was to settle an employment date

3    termination and to give Mr. LaSalle a release from liability,

4    is that right?

5    **A.**    That's correct.

6           **MR. MICHAELSON:**   Your Honor, I interpose an objection

7    here under 408, and I think we've talked about this.   This is

8    outside the document, but it's the same issue.

9           **THE COURT:**   Sustained.

10   **BY MS. SERAPHINE**

11   **Q.**    At any time from October, 2012 through today have you ever

12   offered Mr. LaSalle money for the return of the Mova assets?

13   **A.**    Never.

14   **Q.**    Mr. Michaelson read to you parts of your deposition

15   yesterday that talked about the monetary value of the Mova

16   assets to Rearden.   Do you remember that?

17   **A.**    Yes.

18   **Q.**    And do you remember that the testimony from your

19   deposition was that you didn't really think about the money

20   value of those assets at that time?

21   **A.**    Yes.

22   **Q.**    Did Mova have value other than money to Rearden in

23   connection with the other work that Rearden was doing in 2012

24   and 2013?

25   **A.**    Yes.

1   **Q.**   And what was that value?

2   **A.**   We were developing a motion capture technology.  It was a

3   whole new approach, you know, new capabilities and so forth.

4        But the -- you know, all work you do, if you can, you like

5   to build on other work.  And it -- we had solved many, many

6   very practical, difficult problems with Mova for facial

7   capture, for actually deformable surface capture.  Generally,

8   now we can do things at a distance, which is really, really

9   cool.  And so if we could go and combine those two things, it

10  would be a significant, you know, added benefit.

11       I mean, look, if we couldn't and we were, you know,

12  limited to DIDO because, you know, that -- that was what we

13  were thinking about earlier, okay, fine, we will go in other

14  directions.  But, hey, if we have this stuff and can go and add

15  it to this cool new thing we developed that allows us -- that

16  captures actors on a set with their normal costumes on, I mean,

17  how cool that is.  They are just performing without any makeup

18  or anything.

19       And so, anyways, the -- that was the dream, that we could

20  finally get there.

21  **Q.**   Could Rearden have used Mova before it -- before the ABC

22  when it was held by OnLive?

23  **A.**   No.

24  **Q.**   And so was it after that ABC that you first considered the

25  use of Mova with DIDO?

1   **A.**   Yes.

2   **Q.**   I'm going to ask you to look at what is -- should be in

3   the binder that you had, PTX-34.

4   (Witness complied.)

5   **Q.**   Do you see that?

6   **A.**   Yes.

7   **Q.**   And is this the Articles of Organization for the State of

8   California for MO2 filed in November of 2012?

9   **A.**   Yes, it is.

10  **Q.**   And, again, Mr. LaSalle was an employee of Rearden at this

11  time?

12  **A.**   Yes.  I -- I have to comment, that the screen shifted

13  here.

14  **Q.**   I think it should be in your binder as well.

15  **A.**   What's the number here, 34?

16  **Q.**   34.

17  **A.**   Okay.  Once again, the -- if you ask the question again,

18  I'll...

19  **Q.**   Okay.  At the time that this was filed on November 9th,

20  2012, Mr. LaSalle was an employee of Rearden?

21  **A.**   Yes.

22  **Q.**   Okay.  And does this document in any -- anywhere identify

23  the members of MO2?

24  **A.**   It does not.

25  **Q.**   Does it identify that there will be one manager?

1  **A.**   It does.

2  **Q.**   Does it identify who that manager is?

3  **A.**   It does not.

4  **Q.**   And where Mr. LaSalle's name and home address are listed,

5  what section of the document are those included in?

6  **A.**   The Agent of Service of Process is where his name and

7  address is.

8        **MS. SERAPHINE:**  I'd like to have marked for

9  identification a document bearing SHST 0002169.

10        **THE CLERK:**  This will be Defendant's Exhibit 406.

11     (Defendant's Exhibit 406 marked for identification)

12  **BY MS. SERAPHINE**

13  **Q.**   Do you recognize this document, Mr. Perlman?

14  **A.**   Yes.

15  **Q.**   And what is this document?

16  **A.**   This is also an Articles of Organization for the State of

17  California.

18  **Q.**   Is this the same form that we looked at in Plaintiff's

19  Exhibit 34, except that maybe the California state changed the

20  way that it was presented in the two years in between these two

21  documents?

22  **A.**   Yes.  It says "LLC-1" on both of them.  I'm just guessing

23  that that is the form number, but it -- but both of these

24  documents, to my understanding serve a -- the very same

25  purpose.  This is how you organize an LLC.

1   Q.   And who is shown as the service of process, both name and

2   address, on this document?

3   A.   On the one you just handed me, Rick Ballard at 99 South

4   Almaden Boulevard, No. 575, in San Jose.

5   Q.   And on PTX-34, Mr. LaSalle was identified as the organizer

6   as well and he signed that?

7   A.   Yes, that's correct.

8   Q.   Who signs as the organizer in the document that I've

9   handed you?

10   A.   Rick Ballard.

11        MS. SERAPHINE:   Rearden would move to admit this as an

12   exhibit.

13        THE COURT:   Any objection?

14        MR. MICHAELSON:   No objection, your Honor.

15        THE COURT:   Exhibit 406 is admitted.

16   (Defendant's Exhibit 406 received in evidence)

17   BY MS. SERAPHINE

18   Q.   Did you hear Mr. Gabriel testify that he did not own DD3

19   even though he had signed similar documents for DD3?

20   A.   I did hear that testimony.

21   Q.   And Mr. Ballard didn't own Mova?

22   A.   That is correct.

23   Q.   And Rearden's name doesn't appear on here, but Mova was a

24   Rearden subsidiary, correct?

25   A.   Yes, it absolutely was.

1  **Q.**   I'm going to ask you to turn to PTX-72 that you looked at

2  yesterday.  We're going to talk a little bit about patent

3  assignments.

4  **A.**   This particular binder goes up to 71, and then it jumps to

5  221.

6       (Whereupon document was tendered to the witness.)

7  **Q.**   This is another document that Mr. Kolassa -- I'm sorry,

8  Mr. Michaelson showed you yesterday, and I want to draw your

9  attention to the page that is PTX-02 -- I'm sorry, 072.039.

10 **A.**   These are not labeled with PTX numbers.  They have SHST

11 numbers on the bottom, Bates numbers.

12      (Whereupon document was tendered to the witness.)

13 **A.**   I now am looking at PTX-072.039.

14 **Q.**   And what is this document?

15 **A.**   This is an assignment document assigning the -- the assets

16 listed in Exhibit A from MO2, LLC, which we would call Original

17 MO2, LLC, to Rearden Mova, LLC.

18 **Q.**   And you signed this document?

19 **A.**   I did.

20 **Q.**   And you put a date of execution of this document of

21 September 18th, 2014?

22 **A.**   That's correct.

23 **Q.**   Is that the date that you signed the document?

24 **A.**   That is the date that I signed the document.

25 **Q.**   And if you had so chosen, you could have backdated this to

1    April of 2013, right?

2    **A.**    Yes.

3    **Q.**    And you didn't?

4    **A.**    No, I did not.

5    **Q.**    Because the date that you actually signed it was on

6    September 18th, 2014?

7    **A.**    That is the reason I put that date on there, is because

8    that's the date I signed it.

9    **Q.**    If I understand correctly, it was based on this date that

10   Rearden made some errors in patent filings that Mr. Michaelson

11   talked to you about?

12   **A.**    Yes.  The word "execution" here has a different meaning

13   than the word "execution date" on the website.  And the

14   paralegal that works for Tom Webster -- first of all, Carla is

15   really good, okay?  She does tons and tons of stuff, but on

16   this particular thing she didn't get it right.

17   **Q.**    And is this the patent assignment that Rearden then

18   corrected that we looked at on your direct testimony?

19   **A.**    Yes.

20   **Q.**    Okay.  And is that Exhibit 238 in your binder?

21   **A.**    Yes.

22   **Q.**    Do you have that there?

23   **A.**    Yes.

24            **MS. SERAPHINE:**  We would move to admit Exhibit 238.

25            **THE COURT:**  Any objection?

1    **MR. MICHAELSON:**  No objection, your Honor.

2    **THE COURT:**  Exhibit 238 is admitted.

3    (Defendant's Exhibit 238 received in evidence)

4    **BY MS. SERAPHINE**

5    **Q.**  And in connection with submitting the corrected patent

6    assignment to the Patent Office you, or Rearden, attached both

7    Mr. LaSalle's PIIA agreement, the original MO2 to -- I'm sorry,

8    the original OL2 to MO2 assignment and, also, a statement of

9    interest that explained how the error had come about?

10   **A.**  That is correct, all those things.  The only thing we

11   redacted was, you know, personal details about his employment

12   agreement.

13   **Q.**  I'm going to move on.  Mr. Michaelson talked you to a

14   little bit about standard operating procedures at Rearden --

15   **A.**  Yes.

16   **Q.**  -- in terms of how Rearden performs when it brings in new

17   technology to the company.

18   In this case Rearden started MO2, LLC, is that right?

19   **A.**  Yes.

20   **Q.**  Had Rearden done that in the past, started a new

21   subsidiary to accept incoming technology into the company?

22   **A.**  Many, many times.

23   **Q.**  Why does Rearden does that?

24   **A.**  Umm, there is a bunch of different considerations, but

25   very often we do it because we don't know of any liabilities

1083

1    that might be -- attach to the companies.  And until we control

2    the assets and really can look at them closely, we can't be

3    certain we're not bringing in, you know -- bringing in assets

4    which could have some -- you know, some big liabilities or

5    maybe someone else has a claim to or something.  It's just --

6    it is good practice to do that, if we can.

7    **Q.**   I want to talk about Mr. Kalin and your communications

8    with Mr. Kalin and Mr. LaSalle in between October of 2012 and

9    February 2013.

10        Is that the time period during which Rearden was

11   negotiating the transfer of Mova from OL2 to MO2?

12   **A.**   Yes.

13   **Q.**   Were you involved in the discussions between Mr. Kalin and

14   Mr. LaSalle in determining how Rearden would conduct those

15   negotiations?

16   **A.**   Yes.

17   **Q.**   You sometimes used Mr. LaSalle's name, his first name,

18   Greg, in reference to the business, is that right?

19   **A.**   That's correct.

20   **Q.**   Can you look at PTX-38, which is in your binder?

21        (Witness complied.)

22   **A.**   This binder goes from 38 to 58.

23   **Q.**   I apologize.  There were documents that --

24   **A.**   It's 38 you wanted?

25   **Q.**   38.

1   **A.**   Okay, sorry.  I thought you said 39 for some reason.

2   We're good.

3   **Q.**   I think you looked at this document also with

4   Mr. Michaelson yesterday.

5   **A.**   Oh, no.  This is 36.  Sorry, I don't have 38.

6       (Whereupon document was tendered to the witness.)

7   **A.**   This is 38.  We're good.

8   **Q.**   Is this -- I'm sorry.  Let me give you a second.

9       (Brief pause.)

10   **Q.**   Is this an email exchange between yourself, Mr. Kalin and

11   Mr. LaSalle?

12   **A.**   It is.

13   **Q.**   This is in January of 2013?

14   **A.**   It is.

15   **Q.**   And the comments here that you include, they stretch maybe

16   two-thirds of a page, where you're commenting to Mr. Kalin with

17   changes that you would suggest be made in the MO2 agreement

18   transferring the assets from OL2?

19   **A.**   That's correct.

20   **Q.**   Do you see in section -- well it's numbered Paragraph 2

21   there, you say:

22       "Section 6.04 last sentence is problematic.  It

23      says that Greg can't assign any rights or interest in

24      anything to anyone without OL2's permission

25      perpetually."

1    And then you go on for quite some time explaining why

2  that's a problem.

3  **A.**   Yes.  I see that.

4  **Q.**   What do you mean when you use Greg's name in this context;

5  that "Greg can't assign any rights or interest in anything to

6  anyone without OL2's permission"?

7  **A.**   Well, any time I use the name Greg, particularly with Alan

8  because we know each other well, but, you know, also, sometimes

9  people outside, depending on the context of the conversation, I

10  mean Greg's division.

11    When I say that "Cindy has been audited," you know, or

12  "I'm worried about Cindy's audit" and so forth, everyone knows

13  that it is not Cindy's audit.  It's Rearden's audit.  Cindy is

14  the person who's in charge of finance and so forth.

15    When I talk about Allan's email server, I say, you know,

16  "We've got to do something about Allan's email."  I'm talking

17  about the server.  He's the IT guy.  So it's just the way we

18  talk.

19  **Q.**   When you say Allan there, you mean Allan Ievers?

20  **A.**   Allan Ievers, yes.  Not Alan Kalin.  Different Alan.  Two

21  "L"s in Allan Ievers.

22    But in this particular case I'm actually even meaning

23  something slightly different, which, again, couldn't possibly

24  be Greg.  Okay?

25    Remember, this is a transaction not between Greg and OL2.

1   It is a transaction between MO2 and OL2.  So this can't

2   possibly mean about Greg assigning rights.  This is about MO2

3   assigning rights.

4       So there is no way Alan would think that I'm talking about

5   this, but, you know -- but nonetheless it -- I understand.  I'm

6   not challenging the decision about the privileged documents

7   here.  I just want to point out that when I wrote these things,

8   rightly or wrongly, I was under the impression that these

9   weren't going to be scrutinized in a courtroom.  I assumed they

10  were just between me and an attorney I knew for -- for ages.

11          MR. MICHAELSON:  Your Honor --

12  BY MS. SERAPHINE

13  Q.   An attorney who was representing Rearden and MO2 at that

14  time, right?

15          THE COURT:  Hold on a second.  Please, Ms. Seraphine.

16  Counsel is trying to say something.

17      Yes, Mr. Michaelson.

18          MR. MICHAELSON:  I object and move to strike to the

19  extent Mr. Perlman testified as to what Mr. Kalin would have

20  thought.

21          THE COURT:  I don't understand his testimony in that

22  way.  Overruled.

23          MR. MICHAELSON:  Okay.

24  A.   Could you ask the last thing again?  I didn't catch it.

25

1  BY MS. SERAPHINE

2  Q.   I'm sorry.  In your view, Mr. Kalin was representing both

3  Rearden and MO2 in these discussions that you had with

4  Mr. Kalin and Mr. LaSalle, is that right?

5  A.   Yes.  Absolutely.

6  Q.   And I think we covered that Mr. Kalin never told you that

7  he had a conflict representing both you, Rearden, Mr. LaSalle

8  and MO2 at this time; not representing all of them, but

9  speaking to all of you about these issues?

10  A.   Yes.  I will say one thing further.  I mean, I think the

11  term I've heard is "unvarnished," okay?

12      There are a bunch of things I say here of which I think I

13  would be -- try to be a little bit more diplomatic if I knew

14  that some day the world would be seeing these things.

15      So I really understood this to be a privileged discussion

16  because Rearden -- Alan Kalin is representing Rearden, MO2, and

17  MO2 is a wholly-owned subsidiary created for a functional

18  purpose, wholly-subsidiary of Rearden created for a functional

19  purpose and this was a privileged discussion.

20      We had many such discussions like this over the years and

21  even concurrently with this.  So I don't -- this was the big

22  surprise for me, to find out that this could -- that things

23  could be divided up the way I've seen it happen, I've seen

24  happen in this matter.

25  Q.   Mr. Kalin ultimately did say that he had a conflict

1    representing both Mr. LaSalle and MO2, is that right?

2    **A.**    He did.

3    **Q.**    And that was after Mr. LaSalle said he was going to take

4    the Mova assets?

5    **A.**    That's correct.

6    **Q.**    I want to draw your attention to -- actually, first, can I

7    ask you -- let's go ahead and look at 82, Plaintiff's

8    Exhibit 82.

9        (Whereupon document was tendered to the witness.)

10   **Q.**    Mr. Michaelson also showed you this document and he

11   stressed in this document how you talked to Greg saying:

12            "I just don't see how you can be limited in what

13        you disclose about Mova and then once you own it, you

14        can't be restricted."

15       Was this you saying that Mr. LaSalle was going to own it,

16   himself, personally?

17   **A.**    Actually, this particular section, I'm using "you" -- I'm

18   talking about "you" as a hypothetical person.  I think.

19   **Q.**    I see.  So you don't say "Greg."  You say "you," like I

20   don't see how this could be --

21   **A.**    I don't see how someone can be limited in what they

22   disclose about Mova and expect to operate any sort of business.

23   **Q.**    And this was your concern, that the NDA would extend after

24   the deal had closed?

25   **A.**    Let me read this thing.

1    (Brief pause.)

2  **A.**   That's right.  After the deal closed.  You're trying to --

3  okay.  We get the assets.  So what you're saying now we can

4  be -- we have to be limited in what we disclose about them?

5  How am I going to run a business?  How would someone run a

6  business?

7  **Q.**   In this same document the paragraph that has a number 4,

8  you say:

9          "To the extent an MO2 of OL2 NDA is put in place,

10         it probably will extend to the parties that are

11         affiliated with MO2."

12     What party were you referring to that was affiliated with

13  MO2 that you were concerned would fall within the NDA?

14  **A.**   Rearden, LLC and all of our other companies.

15  **Q.**   How was Rearden, LLC affiliated with MO2?

16  **A.**   It was the parent of MO2.  In other words, MO2 was the --

17  a wholly-owned subsidiary of Rearden.

18  **Q.**   In the documents that we looked at yesterday -- because we

19  looked at a number of documents between yourself, Mr. LaSalle

20  and Mr. Kalin -- Mr. LaSalle regularly copied you on that

21  correspondence, is that right?

22  **A.**   That's correct.

23  **Q.**   This is the same period between October, 2012 and

24  February, 2013 that we heard testimony that Mr. LaSalle was

25  also speaking to DD3.  Do you recall that?

1   **A.**   Yes, that is correct.

2   **Q.**   Did Mr. LaSalle copy you on any of his correspondence with

3   DD3?

4   **A.**   He did not.

5   **Q.**   And in the emails between yourself, Mr. LaSalle and

6   Mr. Kalin, what email address did Mr. LaSalle use?

7   **A.**   With just a couple slip-ups, which sometimes happens

8   depending on your email system set-up, it's -- I would say it's

9   99.9 percent of the time Rearden.com.  It was G2@rearden.com,

10   which is his Rearden employee email address.

11   **Q.**   And what email address did he use when he corresponded

12   with Ed Ulbrich?

13   **A.**   G2@mova.com.

14   **Q.**   Which was his email address from OnLive?

15   **A.**   Left over from OnLive.  That was -- you know, again, we

16   weren't -- we weren't keeping an eye on that because I trusted

17   him.

18   **Q.**   The last thing I want to talk about is your correspondence

19   with Mr. Lauder following the ABC.  Can you take a look at

20   Exhibits 18, 20 and 22?  And I just want to ask you to confirm

21   the date on those documents.

22   (Witness complied.)

23   **A.**   I can confirm the date on all of these emails is -- the

24   part that I wrote and, to the extent that I remember, the part

25   I received.

1   **Q.**   And is that all in September of or before 2012?

2   **A.**   I didn't check, but they were all... yes.  Yes.  This one

3   goes back a little further, but it's all in September.

4   **Q.**   You were asked a lot of questions about what you

5   communicated to Mr. Lauder in 2012.  Mr. Lauder was not an

6   employee of Rearden, was he?

7   **A.**   No.

8   **Q.**   And he was not subject to a Rearden PIIA, was he?

9   **A.**   No.

10  **Q.**   Okay.  In the email correspondence that you went through

11  between October 2nd and October 4th yesterday, you testified

12  that there was another email chain that overlapped in time the

13  chains that you looked at with Mr. Michaelson, is that right?

14  **A.**   That's correct.

15  **Q.**   Can you turn to PTX-27?

16         (Witness complied.)

17  **A.**   Okay.

18  **Q.**   Is this an email chain that also was between October 2nd

19  and October 4th of 2012?

20  **A.**   Yes.  This one begins on October 2nd and ends on

21  October 8th, but I wasn't copied.  The part I was copied on --

22  well, I was copied on pieces of this, which then was part of

23  another email chain.

24  **Q.**   I actually want to draw your attention to an email on the

25  bottom of PTX-27.004.  This is from Mr. Pearce to Mr. Lauder?

1   **A.**   Yes.

2           **THE COURT:**   Is this also Exhibit 25 -- I beg your

3   pardon.  I have 27A.  Never mind.  I already made that mistake.

4   You would think I would have gotten that out of my system.

5           All right.  I'm there.

6   **BY MS. SERAPHINE**

7   **Q.**   And in this email Mr. Pearce tells Mr. Lauder:

8           "Steve called me tonight and was quite upset

9           having learned about the plan to sell Mova."

10          Right?

11  **A.**   Yes.

12  **Q.**   And Mr. Pearce also says:

13          "To make a long story short, I think the end of

14          my employment at Rearden will begin tomorrow.  It's

15          not right for Steve to be paying my time there, so I

16          think it's time for me to move on."

17  **A.**   Yes.

18  **Q.**   Then if you could turn to Plaintiff's Exhibit 23 -- I'm

19  sorry.  That was at 9:05 on August 2nd, that Mr. Pearce --

20  **A.**   Sorry?

21  **Q.**   Could you -- that was at 9:05 on the evening of August --

22  I'm sorry, October 2nd?

23  **A.**   What was the Plaintiff's Exhibit on that one again?

24  **Q.**   27, at Page 004.

25  **A.**   Yes.  So Ken wrote:

1          "Steve called me tonight and was quite upset

2      having learned about the plan to sell Mova and to make

3      a long story short, I think the end of my employment

4      at Rearden will begin tomorrow.  It's not right that

5      Steve is paying for my time there and so I think it's

6      time for me to move on."

7          That was on October 2nd at 9:05 p.m. from Ken Pearce.  All

8  right?

9  **Q.**  And then if you look at Plaintiff's Exhibit 23, did you

10 also send Mr. Lauder an email that same evening?

11 **A.**  I did.  Shortly thereafter, about an hour thereafter.

12 **Q.**  And in that email you also told Mr. Lauder that Ken had

13 just dropped off Rearden's payroll, is that right?

14 **A.**  Yes.  So, "Ken just dropped off Rearden's payroll," third

15 paragraph.

16 **Q.**  And in these emails generally you talked to Mr. Lauder

17 about the fact that you would not pay Ken and Greg while they

18 were doing a deal for OL2?

19 **A.**  That's correct.

20 **Q.**  So let's talk about what you communicated to Mr. LaSalle

21 and Mr. Pearce at that time.  And Mr. Michaelson read a portion

22 of your deposition testimony yesterday, and in that portion of

23 your deposition testimony he asked you:

24      "**QUESTION:**  Did you explicitly tell Mr. LaSalle and

25      Mr. Pearce that they could no longer -- they either

1         had to drop off of Rearden's payroll and do it

2         themself or they could go forward as a Rearden

3         employee."

4         Is that right?

5  **A.**   That's correct.

6  **Q.**   And you talked a lot about how generally they would know

7  that, because they were long-term Rearden employees, and they

8  knew the PIIA, and they knew this was Rearden's practice, is

9  that right?

10  **A.**   That's correct.

11  **Q.**   Okay.  But you didn't actually say that you had explicitly

12  told them that in that particular portion of your deposition,

13  is that right?

14  **A.**   That's correct.

15  **Q.**   I want to read what's another portion of your deposition

16  that starts on Page 89, Line 13.

17          **THE COURT:**  Where does it end?

18          **MS. SERAPHINE:**  93, Line 10.

19          **THE COURT:**  Is there any objection?

20         **MR. MICHAELSON:**  Just give me a minute, your Honor,

21  to take a look.

22     (Brief pause.)

23         **MR. MICHAELSON:**  No objection.

24  **BY MS. SERAPHINE**

25  **Q.**  (As read)

1    "**ANSWER:**  So while I was the CEO of OnLive, I wasn't

2    thinking about anything about motion capture that was

3    not related to Mova.  As soon as the ABC happened, I

4    was free and at that point I began to think it had --

5    began to look at some of the wireless stuff we were

6    doing.  I began to talk to potential" --

7    And I apologize.  This is marked as "Confidential" and

8    "Attorneys' Eyes Only", so it's difficult to read.

9        "... potential users of the technology and then

10   me saying:  Wow, this is a much better way to do

11   things.  Then Greg said:  Look, there is still a lot

12   of business for this older Mova technology.  There is

13   a lot of stuff we can do with it.  And I got to

14   thinking, okay, we can combine these things together.

15   Here are some things that we might be able to do,

16   et cetera.

17       "And then I thought:  Well, my challenge is I do

18   not have time to operate this Mova unit.  I do not

19   have all the stuff that I had at OnLive when Mova was

20   a subsidiary who handled the day-to-day of the

21   business stuff and so on.  I had -- very, very little

22   time of my day was spent on it.  If it was Rearden, it

23   would be taking on a lot more of my time.

24       "So basically a couple of things happened.  First

25   of all, this thing happened with Ken negotiating this

1    thing with Gary Lauder to do a transaction with the

2    technology while he remained an employee.  And when he

3    did that and I found out about it, I'm, like, holy

4    cow, I can't believe it.  Here is a guy, after all

5    these years, and he's cutting a deal for himself and

6    cutting me out of it and I'm just trying to help him

7    out.

8        "So, yeah, I got pretty upset.  And I told Greg

9    and Ken:  You can't do this.  Because Gary represented

10   that Greg was involved as well.  And then Greg said:

11   I had nothing to do with it.  I didn't know anything

12   about it.  It was just Ken.  So I'm, like, okay.

13       "So then Ken apologized and said he was going to

14   take a leave of absence.  He said his child has Lyme's

15   disease and so on.  And I'm like, okay, fine.

16       "And the other thing is, like, you know, people

17   do dumb things who are artists and who don't

18   understand business that will maybe join up.  Once we

19   have this thing sorted, keeping them around is not a

20   bad idea anyways.

21       "And then I said to Greg, I said:  This is the

22   clear thing.  You wanted to know when this thing

23   happened.  It's organic.  I said:  Here is the way the

24   thing goes down, dude.  Okay.  You said you have no

25   involvement with this thing.  I'm going to believe you

1    here.  According to Gary, you did, but I guess you

2    didn't talk to him, so maybe you didn't.  All right.

3    No, no, I didn't.

4        "And then I said:  I do not have time to run this

5    Mova business unit.  I just don't.  My hands are full

6    with what we were doing with this, particularly with

7    wireless stuff, and then with DiBot stuff I was just

8    starting up.  And if you are -- if we are going to go

9    and set up a business unit within Rearden, one of two

10   things is going to happen.  Either you're going to go

11   and learn how to go and handle the business

12   transaction side of it.  That's always been handled by

13   someone else other than you.  And you are going to do

14   this negotiation and you are going to learn from this

15   negotiation or we're not going to do this deal.  You

16   can leave.  You guys can take off and negotiate

17   whatever you want with Gary or go do something else.

18   Go work for another company.  But there is only one

19   way we are going to do this thing here, and that is,

20   it is something that we own, and it is something that

21   you are going to be operating and running as a

22   division within Rearden, and it is going to be

23   something that doesn't take up every hour of my day.

24   And if it doesn't come to pass, then that's it.

25   Either you stay here and work on something else or you

1      move on and go into technology yourself.

2         "So he assured me two things.  One thing he

3      understood.  He saw what happened with Ken.  He saw

4      what happened with the thing with Gary.  He understood

5      100 percent that anything having to do with these Mova

6      assets while he was a Rearden employee was going to

7      belong to Rearden 100 percent.  Thing one.

8         "Thing two, he understood that if this thing was

9      going to happen under Rearden and it was going to be a

10     division of Rearden, the only way Rearden was going to

11     pay for this stuff was if he was going to step up to

12     the plate and learn a lot more about business

13     transactions; that he was going to be the person that

14     does this negotiation.  He thought it was going to be

15     a really quick thing, but in my mind I figured it was

16     going to take awhile because of the complexity of the

17     portfolio."

18     Is that your testimony in July of 2015?

19  **A.**   Yes.

20  **Q.**   And is that consistent with the position that you have

21  always taken since 2012?

22  **A.**   It's consistent with the position I have always taken

23  since 2012.

24  **Q.**   And is that the same position that you wrote to

25  Mr. LaSalle in emails that you sent to him in March of 2013?

1    **A.**    It is.

2    **Q.**    And is that what your lawyers told Mr. LaSalle and his

3    lawyers in 2013?

4            **MR. MICHAELSON:**  Objection.  Hearsay.

5            **THE COURT:**  Overruled.  I think that's already in

6    evidence.  It's sort of a preview of a closing argument.

7    **A.**    Yes.  That is what I saw the lawyers write to the other

8    lawyers in 2013.

9    **BY MS. SERAPHINE**

10   **Q.**    And have you ever taken a position inconsistent with what

11   I just read?

12   **A.**    I've never taken a position inconsistent with what you

13   have just read.

14           I will say sometimes I write things not thinking they are

15   going to be scrutinized down to a tee that may not read exactly

16   that way, okay?  But if you look at things overall in the whole

17   set of things -- and there are phone calls, too, with these

18   people that are not recorded here -- that's highly, highly,

19   highly consistent with exactly what you read there.

20   **Q.**    Thank you.  I have nothing further.

21           **THE COURT:**  Mr. Noble, consistent with my prior

22   comments, would you please adjust VGH's time to 14 minutes?

23           **THE CLERK:**  Yes, your Honor.

24           **THE COURT:**  Mr. Michaelson.

25           **MR. MICHAELSON:**  I will be brief, your Honor.

**RECROSS EXAMINATION**

**BY MS. SERAPHINE**

Q.   I'd like to read from Mr. Perlman's deposition taken in June of 2015 starting at Line 23 of Page 264, ending at Line 21 of Page 265.

      **THE COURT:**  Any objection?

      **MS. SERAPHINE:**  Just one moment, your Honor.

  (Brief pause.)

      **MS. SERAPHINE:**  I'm sorry.  I don't understand the basis for reading.

      **THE COURT:**  He's allowed to just put in pieces of Mr. Perlman's deposition in this case if he wants to because Mr. Perlman is a party.

  So I don't know what the basis is either, but I'll overrule the objection.

  Go ahead.

      **MR. MICHAELSON:**  And this pertains to the assignment document that Mr. Perlman discussed on redirect.

**BY MR. MICHAELSON**

Q.   (As read)

  ▪**QUESTION:**  Who prepared this assignment document?

  ▪**ANSWER:**  Rick Ballard.

  ▪**QUESTION:**  Who provided Mr. Ballard the information

  he used to prepare this document?

  ▪**ANSWER:**  I don't know whether he provided it or is

```
1    looking it up.  As I said, it was a lot for him to

2    absorb and just, you know, some -- and he just, you

3    know, made some mistake here.

4    "QUESTION:  And your signature appears on this

5    document twice, correct?

6    "ANSWER:  Yes.

7    "QUESTION:  Did you review the document for accuracy

8    before you signed it?

9    "ANSWER:  Within the scope of my understanding.  I

10   didn't understand that.  I didn't understand that

11   there even were two different things for execution

12   date and then there was another thing for the date you

13   actually sign it and so on.  I believe it is the case

14   that Rick was -- had mixed up the two MO2s.

15        "If this could have been done differently, I

16   think it would have been nice to have done these

17   assignments and then gone and reserved the company

18   names afterwards and then maybe we wouldn't be having

19   this deposition."

20   Mr. Perlman, let me show you what's been marked as Exhibit

21   70.  I'll give you a copy, sir.

22 A.  Okay.

23   (Whereupon document was tendered to the witness.)

24 Q.  This is a form of the California Secretary of State.

25   Do you understand that in November, November 26th of 2013
```

1   what we've referred to as Original MO2 was dissolved?

2   **A.**   Yes.   I found that out from the discovery in this case.

3           **MR. MICHAELSON:**   Let me read from Mr. Perlman's

4   deposition an excerpt at Page 196, Line 5 to 11.

5           **THE COURT:**   Any objection?

6           **MS. SERAPHINE:**   Your Honor, it's only a portion of the

7   answer.   If I can have a moment to read the whole answer?

8           **THE COURT:**   Okay.

9       (Brief pause.)

10          **MS. SERAPHINE:**   Mr. Michaelson, what lines did you

11  say?

12          **THE COURT:**   196, 5 to 11.

13          **MS. SERAPHINE:**   That doesn't make sense, but...

14          **THE COURT:**   Would it resolve the objection --

15          **MR. MICHAELSON:**   I'm sorry, 194.

16          **THE COURT:**   Oh.   Ms. Seraphine, Page 194, Lines 5 to

17  11.

18          **MR. MICHAELSON:**   My apologies.

19          **MS. SERAPHINE:**   No objection.

20          **THE COURT:**   All right.

21  **BY MR. MICHAELSON**

22  **Q.**   (As read)

23          "**QUESTION:**   Is there anything in writing anywhere

24          which indicates that the Original MO2 organization

25          would be established as a division or subsidiary of

```
 1        Rearden?
 2        "ANSWER:  Yes.
 3        "QUESTION:  Where?
 4        "ANSWER:  In Greg LaSalle's PIIA."
 5             MR. MICHAELSON:  Nothing further for Mr. Perlman.
 6             THE COURT:  All right.  Thanks.
 7        Anything within the scope?
 8             MS. SERAPHINE:  No, your Honor.
 9             THE COURT:  Mr. Perlman, thank you for your testimony.
10   You can step down.
11             THE WITNESS:  Thank you.
12        (Witness excused.)
13             THE COURT:  Ms. Boyd, what's next?
14        MS. BOYD:  We have one pair of reading glasses for our
15   whole team.
16        I have discovery designations --
17             THE COURT:  I'm going to start doing like some of the
18   better restaurants do and keep a spare pair of reading glasses
19   at the podium.  So you get the house pair if you don't bring
20   yours.
21             MS. BOYD:  All right.  We've actually pared down our
22   discovery designations so there are many fewer than appear in
23   the pretrial statement.
24             THE COURT:  All right.  Is it possible, if we're just
25   going to be reading a string of deposition excerpts, that
```

1  counsel could submit a joint exhibit that just contains those

2  excerpts and that the court reporter could be relieved of

3  transcribing them and that you would simply say on the record,

4  it's this witness, this page, this line number and so forth,

5  and I would like to hear it right now in real time, as I would

6  at any trial, but that -- that the court reporter not have to

7  transcribe it?

8         **MS. BOYD:**  For the deposition designations, that

9  certainly makes sense.  We have submitted that page and line

10  number day before yesterday, I believe.

11        **THE COURT:**  All right.

12     Mr. Michaelson, any objection?

13        **MR. MICHAELSON:**  That would be acceptable.

14        **THE COURT:**  All right.  Debra, you don't have to

15  transcribe any depositions from this point forward.

16        **MS. BOYD:**  These are discovery response designations.

17        **THE COURT:**  Ahh.  Those need to be transcribed.

18        **MS. BOYD:**  All right.  So discovery in this matter

19  closed on June 10th, 2016.  And this is from VGH's May 2nd,

20  2016 Responses to Interrogatories.

21     Interrogatory 17:  Identify all directors, shareholders

22  and/or employees of SHST and/or VGH, including their names,

23  titles, current business addresses, telephone numbers and their

24  preferred spoken and written language, for the purposes of

25  their responsiveness to this case with knowledge of the alleged

1   acquisitions of the Mova assets by SHST from MO2 and describe

2   that knowledge.

3       Answer:  VGH responds that there are no current directors,

4   shareholders and/or employees of VGH with knowledge of SHST's

5   acquisitions of the Mova assets from MO2, LLC.

6       From VGH's June 10th, 2016 Supplemental and Amended

7   Responses to Interrogatories.

8       The amended response to Interrogatory 17 is:  VGH responds

9   that Daniel Seah has knowledge related to the acquisition of

10  the Mova assets.  They can be reached through plaintiff's

11  counsel.

12      From VGH's May 2nd, 2016 Responses to Interrogatories.

13      Interrogatory No. 18:  Identify all directors,

14  shareholders and/or employees of SHST and/or VGH, including

15  their names, titles, current business addresses, telephone

16  numbers and their preferred spoken and written language for the

17  purposes of their responsiveness to this case, with knowledge

18  of the alleged acquisition of the Mova assets by VGH from SHST

19  and describe that knowledge.

20      Answer:  VGH responds that there are no current directors,

21  shareholders and/or employers -- employees of VGH with

22  knowledge of the acquisition of the Mova assets from SHST.

23      From VGH's June 10th, 2016 Supplemental and Amended

24  Responses to Interrogatories.

25      The response to Interrogatory 18 is:  VGH responds that

 1   Daniel Seah has knowledge related to the acquisition of the

 2   Mova assets.   They can be reached through plaintiff's counsel.

 3        From VGH's June 10th, 2016 interrogatory responses --

 4   these are not amended interrogatory responses.   These are

 5   responses to different -- a different set of interrogatories.

 6        Interrogatory 21:   State what entity or person attempted

 7   to or paid fees for the Mova patents and/or the Mova trademarks

 8   and state when such attempts or payments were made as asserted

 9   in response to Requests for Admissions 30, 31 and 41.

10        Response:   In October of 2013 Digital Domain 3.0, DD3, in

11   its capacity as exclusive licensee asked counsel, Perkins Coie,

12   to handle issues related to the Mova assets including

13   maintenance of patents and trademarks.   Perlman became aware of

14   this, threatened Perkins Coie and forced them to withdraw from

15   representation of Digital Domain with respect to these Mova

16   assets.

17        In April of 2015, DD3 and DDHL investigated the status and

18   remaining duration of the Mova patents.   That investigation

19   identified maintenance fee due dates for certain Mova patents.

20   DDHL and DD3 subsequently determined that some but not all Mova

21   patents might be worth maintaining, but a final decision was

22   not made as to which, if any, patents should be maintained and

23   which should not.

24        In October of 2015, DDHL on behalf of VGH, its subsidiary

25   that was in the process of purchasing the Mova assets,

1    contemplated submitting materials to maintain one of the Mova

2    trademarks and the Contour trademark.  DDHL and VGH

3    subsequently decided not to maintain the Mova trademark in

4    question or the Contour trademark.

5        Starting in October 2015, DDHL, again on behalf of VGH,

6    also revisited whether to maintain those U.S. patents with

7    maintenance fees due in December 2015, Patent Number 8194093

8    and 8207963.

9        Upon investigation connected with an attempt by outside

10   counsel to submit the required fees on or about their

11   respective due dates, it was discovered that the fees had

12   already been paid.

13       In late 2015, DDHL on behalf of VGH decided to maintain

14   European Union Community trademark 004593596 for Mova in

15   Classes 9, 41, 42.  Attempted payment by outside counsel of the

16   maintenance fee revealed that the fee had already been paid.

17       From the September 29th, 2016, SHST Responses to Requests

18   for Admissions.

19       Request for Admission Number 22:  Admit that as of

20   May 8th, 2013, SHST was aware of the agreement produced at

21   Bates Numbers SHST 000564 to 565.  This is what is the offer

22   letter to Greg LaSalle that has been entered as PTX7.  It's the

23   first couple of pages of PTX7.

24       Response:  Admitted.

25       Request for Admission 23:  Admit that as of May 8th, 2013,

1    SHST was aware of the agreement produced at Bates Numbers SHST

2    566 to 575.  That's the PIIA that is also part of PTX7.

3         Response:  Admitted.

4         Request for Admission 24:  Admit that the agreement

5    produced at Bates Numbers SHST 1909 to 190 -- 1964 is not the

6    only agreement, written or oral, between SHST and MO2.  That is

7    the MO2 to SHST agreement that has been entered as PTX60A.

8         Response:  The agreements produced at Bates Numbers SHST

9    1909 to 1964, inclusive of attachments, are the only agreements

10   that SHST is aware of between SHST and Original MO2 LLC.

11        From SHST's September 29th, 2016, Interrogatory Responses.

12        Interrogatory Number 20:  Identify all natural persons in

13   English spelling and in their native language spelling at

14   Digital Domain and Galloping Horse Reliance LLC who

15   participated in the decision to, quote, "move forward with

16   acquiring the Mova assets for the then offered $75,000 price

17   tag," close quote, as stated in the declaration of Joseph

18   Gabriel, DI 4419, paragraph 4.

19        Response:  SHST responds that natural persons at

20   Digital Domain and Galloping Horse Reliance who participated in

21   the decision to move forward with acquiring the Mova assets

22   included Ed Ulbrich and Amit Chopra who can be reached through

23   counsel for SHST.

24        Interrogatory 21:  Identify all natural persons in English

25   spelling and in their native language spelling who instructed

1  Joseph Gabriel, quote, "to move forward with acquiring the Mova

2  assets and investing in a Mova-related business through a

3  company named Shenzhenshi Haitiecheng Science and Technology

4  Co. Limited, SHST, as stated in DI 4419, paragraph 8.

5      Response:  SHST responds that the natural person who

6  instructed Joseph Gabriel to move forward with acquiring the

7  Mova assets through SHST was Amit Chopra who can be reached

8  through counsel for SHST.

9      Interrogatory 24:  For each of Defendants' First Set of

10  Requests for Admission Numbers 1 through 56 served on SHST that

11  SHST denies, provide a detailed explanation for the bases of

12  the denial.

13      There's only one of those explanations that we will enter

14  into evidence, which is for Request for Admission Number 13:

15  Admit that SHST conducted no due diligence before entering into

16  the agreement produced at Bates Numbers SHST 1909 to 1964.

17  Again, PTX60A.

18      Explanation for Basis of Denial:  SHST denied this request

19  for admission because SHST's attorney, Joseph Gabriel,

20  conducted due diligence for DD3 before the agreement produced

21  at Bates Numbers SHST 1909 to 1964 was entered.

22      From VGH's June 10th, 2015, Responses to Requests for

23  Admission:

24      Admit that on or about January 5th, 2016, SHST made a

25  filing with the United States Patent and Trademark Office

recorded starting on Reel 37445, Frame 273, which were patent
assignments in which the assignor entity name was MO2 LLC, the
assignee was SHST, the execution date was February 11th, 2013,
and some or all of the patents listed were Mova assets; the,
quote, "'273 filing."

Response:  VGH admits that the cover sheet for the '273
filing incorrectly identifies the execution date February 11th,
2013.  VGH denies that the execution date on the actual
assignment documents included under that cover page in the '273
filing was February 11th, 2013.  The assignment documents
themselves reflect the correct assignment date of May 8th,
2013.

Request for Admission Number 58:  Admit that no Mova
assets were assigned to SHST on February 11th, 2013, by any
entity.

Response:  Admitted.

Request for Admission Number 59:  Admit that SHST did not
act fraudulent in effecting the '273 filing with the PTO.

Response:  Admitted.

Request for Admission Number 62:  Admit that on or about
February 12th, 2016, SHST made a filing with the United States
Patent and Trademark Office recorded starting on Reel 37810,
Frame 877, which are patent assignments in which the assignee
entity name was OL2 LLC and the assignor name was MO2 LLC.  The
execution date was February 11th, 2013, and some or all of the

1   patents listed were Mova assets.  The '877 filing.

2       Response:  VGH admits that the cover sheet for the '877

3   filing incorrectly identifies the execution date February 11th,

4   2013.  VGH denies that the execution date on the actual

5   assignment documents included under that cover page in the '273

6   filing was February 11th, 2013.  The assignment documents

7   themselves reflect the correct assignment date of May 8th,

8   2013.

9       Request for Admission Number 63:  Admit that the assignor

10  MO2 LLC in the '877 filing referred to as the Original MO2

11  identified in the complaint in this action.

12      Response to Request for Admission 63:  Admitted.

13      Request for Admission 64:  Admit that on February 12th,

14  2016, SHST was aware that the Original MO2 identified in the

15  complaint in this action had been canceled or dissolved prior

16  to February 12th, 2016.

17      Response:  It is admitted that prior to February 12th,

18  2016, SHST was aware that the Original MO2 identified in the

19  complaint in this action had been canceled or dissolved prior

20  to February 12th, 2016.

21      Request for Admission 65:  Admit that SHST did not act

22  fraudulently in effecting the '877 filing with the U.S. PTO.

23      Response:  Admitted.

24      That's all of them, Your Honor.

25          **THE COURT:**  Thank you.

1    **MS. BOYD:**  Next we will do the Fan Lei deposition

2  designations and counterdesignations.

3    We're going to have Mr. Zweig sit in the witness box as

4  Mr. Fan.  Ms. Gu will stand at the podium and read the

5  questions.  She is the person who took the deposition.  And

6  there are a couple of portions where Mr. Kolassa has interposed

7  commentary, and he will be reading those portions.

8    **THE COURT:**  Thank you.

9    (Pause in proceedings.)

10    **MS. GU:**  As Ms. Boyd said earlier, that we have

11  submitted a listing of D designation from the parties, although

12  I think that was before Your Honor ruled yesterday overruling

13  an objection on page 50 -- let me just double-check -- 54, and

14  line 16 through 18.  I just want to note that for the record so

15  that the reporters have a record of that.

16    (Deposition read but not reported.)

17    **THE COURT:**  Ms. Gu, anytime in the next five minutes.

18    **MS. GU:**  I think we're --

19    **THE COURT:**  I thought you might be getting close.

20    **MS. GU:**  I think so.

21    **THE COURT:**  That's why I waited until 9:59 to

22  interject myself.

23    **MS. GU:**  I'm pretty sure we can do this in the next

24  five minutes.

25    **THE COURT:**  Okay.  Fine.

1    **MS. GU:**  Okay.

2         (Deposition read but not reported.)

3    **MS. GU:**  That's all, Your Honor.

4    **THE COURT:**  Thank you.

5    **MS. GU:**  Thank you.

6    **THE COURT:**  So we can take our first morning recess.

7    After we have that recess, what remains?

8    **MS. SERAPHINE:**  We're going to rest.

9    **THE COURT:**  I see.  All right.

10   **MS. SERAPHINE:**  We're resting.

11   **MR. MICHAELSON:**  And we will too.

12   **THE COURT:**  Oh, okay.

13       So when I come back, we should firm up the post-hearing

14   schedule and put that on the record.

15       Could counsel for Rearden just remind me and just say on

16   the record the docket number, if you know, of the document that

17   contains the Fan Lei deposition designation so that will be

18   easy to find?  I'm just sort of dropping an anchor in the

19   transcript in case I come back.

20       (Courtroom Deputy and Court conferring.)

21   **THE COURT:**  Mr. Noble says 388, and I'm sure he's

22   correct, so you don't need to do that.

23       So let's just firm up the schedule on post-hearing

24   briefing and argument, if that's what the parties want; and if

25   you have any other housekeeping, talk to each other about that

1  so that we can deal with that also.

2      Court will be in recess for 15 minutes.  Thank you.

3          (Recess taken at 10:02 a.m.)

4          (Proceedings resumed at 10:20 a.m.)

5      **THE COURT:**  All right.  Let's go back on the record.

6  I don't recall if we set a post-hearing schedule before.

7  I don't think we did.  Did we?

8      **MR. MICHAELSON:**  We set, Your Honor, by agreement of

9  counsel, for submission of posttrial briefs the 22nd.  I

10  believe that's a week from Thursday.

11      **THE COURT:**  Okay.  And is it counsel's wish to make

12  oral argument after that, or just to have it be submitted as of

13  that date?

14      **MR. MICHAELSON:**  The preference is to submit subject

15  to if Your Honor thinks it would be useful to argue whatever

16  Your Honor thinks it would be useful to argue, we will do that.

17      **THE COURT:**  Okay.  So just get the briefs, read them,

18  and then decide whether we need further argument?

19      **MR. MICHAELSON:**  Yes.

20      **MS. BOYD:**  Yes.

21      **THE COURT:**  Okay.  Very good.

22      Are there other housekeeping matters to address?

23      **MS. BOYD:**  I do not think so.

24      **MR. MICHAELSON:**  I don't think so.

25      **THE COURT:**  Okay.  And the plaintiffs rested

immediately before our break.  And, Mr. Michaelson, if you could just confirm now that your side has rested, there's not a rebuttal case?

      **MR. MICHAELSON:**  That's correct, Your Honor.  No rebuttal case for VGH.

      **MS. SERAPHINE:**  And, I'm sorry, just to be clear, it was defendants who rested just before the break.

      **THE COURT:**  Thank you.

    Okay.  As I indicated I might do, I'm going to give you some tentative conclusions that I've reached after having heard the evidence.  This is in part for my own benefit because the evidence is fresh in my mind.

    I was careful to make clear that the evidence was submitted and that we had dealt with any housekeeping matters before I began because as soon as I finish providing these tentative conclusions, I'm going to get off the bench.

    I want to emphasize that these are tentative, that more deliberation on my part is required, that I will carefully consider the parties' post-hearing briefs, that the comments are skeletal, that in some places they're not even linear because I didn't take my notes and then retype them and put them in any kind of order.  So I apologize in advance for any lack of organization or clarity.

    I think this case boils down to whether Steve Perlman told Greg LaSalle he could take the Mova assets for himself; and if

1   he did do that, whether those representations, if they were

2   made, were sufficient to bring the transaction outside the PIIA

3   and its requirement that any modification or waiver be in

4   writing.

5        Greg LaSalle was an employee of Rearden at the time MO2

6   acquired the Mova assets.  He established MO2 and acquired the

7   Mova assets using money provided by Rearden; and under the

8   terms of his employment agreement and the PIIA, the assets

9   belonged to Rearden.

10       Mr. LaSalle's conduct in signing the DD3 NDA without

11  Mr. Perlman's knowledge and selectively including Mr. Perlman

12  in e-mails with counsel while setting up MO2, the secrecy of

13  his negotiations with DD3 from Mr. Perlman, and his evasiveness

14  in February and March of 2013 all show that Mr. LaSalle was

15  aware that he had acquired the Mova assets for Rearden's

16  benefit and that his attempts to transfer the Mova assets to

17  himself, DD3, or SHST were wrongful.

18       The fact that Steve Perlman became angry when he learned

19  that Gary Lauder was considering transferring the assets to a

20  third party and then giving Greg LaSalle and Ken Pearce a

21  percentage makes it unlikely that Mr. Perlman would have paid

22  his own money to facilitate a transaction that would have had

23  the same purpose and effect.  Greg LaSalle knew that, which is

24  why he concealed the true facts from Mr. Perlman.

25       Greg LaSalle's misrepresentations to Steve Perlman about

1   his discussion with Gary Lauder as reflected in Exhibits 23 and

2   24 also support this view.

3       Neither SHST nor DD3 nor VGH took the Mova assets in good

4   faith.  Joe Gabriel, who acted on behalf of all those entities

5   at one time or another, was aware of Mr. LaSalle's employment

6   agreement and his obligations under the PIIA, so was SHST as it

7   has admitted in writing in response to Request for

8   Admission 22.

9       The establishment of the escrow account during the

10  purported purchase of the Mova assets is further conclusive

11  proof that SHST knew of Mr. LaSalle's obligations and Rearden's

12  claim.

13      Given the close relationship between SHST, DD3, DDHL, VGH,

14  and Joe Gabriel, it is reasonable to infer that all of those

15  parties were aware of Mr. LaSalle's PIIA obligations, and I

16  find that they were so aware.

17      VGH's original Responses to Interrogatories Number 17 and

18  18 were false.  Much of the testimony by witnesses associated

19  with plaintiff entities and their affiliates was lacking in

20  credibility.

21      No witness in this proceeding testified entirely credibly.

22  No witness testified entirely consistently with the written

23  record and the logical inferences to be drawn therefrom.

24  Neither side succeeded in presenting a totally coherent picture

25  of the historical facts, but Steve Perlman's testimony was the

1    most credible and conflicts in the testimony have largely been

2    resolved in his favor.

3          The one respect in which Mr. Perlman's testimony was not

4    believable was in his explanation of why his participation in

5    the OL2 to MO2 transfer was disguised from Gary Lauder and OL2.

6    As to this aspect of the parties' dispute, I find that no one

7    testified credibly.

8          The real reason that Steve Perlman's participation was not

9    made manifest was not, as Greg LaSalle said, that Greg LaSalle

10   and Ken Pearce were acquiring the Mova assets for the their own

11   benefit.  It also was not, as Mr. Perlman said, because the

12   mention of Mr. Perlman's name would cause Gary Lauder to become

13   involved and slow things down.  It was because, as Gary Lauder

14   testified, Mr. Lauder would not have sold the Mova assets to

15   Steve Perlman or Rearden for 1 dollar, but he was willing to

16   sell them to Mr. LaSalle and Mr. Pearce for 1 dollar.  Now, a

17   dollar is a dollar, and Mr. Lauder's reasoning is unclear.

18   Maybe it had to do with spite or perhaps with ego.

19         So Rearden sought to acquire these assets -- excuse me --

20   so Mr. Perlman sought to acquire these assets the only way he

21   could.  He sent Greg LaSalle to acquire them for Rearden's

22   benefit masking Rearden's participation, and that's what Greg

23   LaSalle did.  Greg LaSalle was a willing cat's paw.

24         Steve Perlman's comments to Lauder regarding the low value

25   of the Mova assets and his desire to help Greg LaSalle and Ken

1    Pearce were a ploy to drive down the sale price of the Mova

2    assets, and it worked.

3        This explains what Michael Hoffman describes in Exhibit 67

4    as, quote, "the gymnastics for allegedly having Mr. LaSalle set

5    up MO2 LLC to purchase property that Rearden simultaneously

6    claimed was worthless and declines to buy itself," close quote.

7        But Greg LaSalle knew at all relevant times that he was

8    acquiring the Mova assets on behalf of and for the benefit of

9    Rearden.  Mr. Perlman's unwillingness to acknowledge the true

10   nature of the transaction led to other untrue statements in his

11   testimony.  For example, he testified that he told Mr. Lauder

12   that Greg LaSalle was acquiring the Mova assets for Rearden.  I

13   don't think Mr. Perlman ever told Mr. Lauder that.

14       All of the inconsistencies in Mr. Perlman's testimony can

15   be explained by his desire to disguise Rearden's participation

16   in the acquisition of Mova assets from OL2.  Mr. Perlman's

17   statements to Mr. Kalin can also be understood in this light.

18       Mr. Perlman's use of the word "Greg," for example, in an

19   e-mail that we discussed today did not mean Greg's division.

20   It meant Greg LaSalle.  But both Mr. LaSalle and Mr. Perlman

21   knew that Greg LaSalle was acquiring the Mova assets for

22   Rearden's benefit.

23       Rearden did not fire Greg LaSalle at any time before the

24   Mova assets were purportedly transferred.  Greg LaSalle did not

25   quit Rearden.  Even though he was an at-will employee, he did

not effectively terminate his employment.  His insistence on a severance payment, which had not been offered, turned his communication into something other than a resignation.  He was an employee of Rearden so long as Rearden paid his salary and he continued to accept it.  Mr. LaSalle was an employee until at least April 21 of 2013.

Gary Lauder said -- this leaves one kind of loose thread, which is Gary Lauder said that he would not have sold Mova the assets if he'd known that Rearden was the acquirer, and I think that testimony was credible.  Nonetheless, I conclude that there is no reason not to think that the sale to MO2 on behalf of Rearden was effective; in other words, I find that it was effective.  I would find tentatively that it was effective.

First, there was no injury to Lauder from the sale to Rearden.  As he acknowledged in writing, he had a fiduciary duty to his shareholders so his personal emotional considerations are not relevant.  Also, OL2 had already tried to find another buyer without success.

Next, Lauder testified without contradiction that OL2 had no interest in the Mova assets, not in a legal interest but no business interest, and that OL2's business objectives did not include the Mova assets.

Lastly, even if Mr. Lauder was misled, no plaintiff entity in this case was misled or injured in any way, and Mr. Lauder's state of mind carries little weight in determining equities in

1    this declaratory relief proceeding.

2        Rearden never waived or disclaimed its rights under the

3    employment agreement or the PIIA.  This fact by itself is

4    probably dispositive.

5        Exhibit 42 and specifically paragraph 6.03 of that

6    agreement are not a waiver of Rearden's rights under the -- or

7    not a written waiver of Rearden's rights under the PIIA.

8        Also, I should say that while I'm making occasional

9    references to exhibits, that any full -- that it certainly

10   would be possible to supplement many of these tentative

11   conclusions by reference to specific evidence.

12       I don't think there was ever an oral agreement by Greg

13   LaSalle or his lawyer to transfer the Mova assets back to

14   Rearden when Mr. LaSalle thought that he or his assignee owned

15   them.  And Mr. Perlman's testimony in that regard was not

16   credible, but that doesn't matter, because neither Mr. LaSalle

17   nor DD3 nor SHST owned the Mova assets in the first place.

18   Rearden owned them.

19       Rearden continued to pay maintenance fees and take all

20   other steps necessary to maintain the patents and the other

21   intellectual property associated with the Mova patents.  This

22   is further evidence that's consistent with a finding of

23   Rearden's ownership.

24       For the reasons set forth in Rule 408 of the Federal Rules

25   of Evidence and after timely objection, and notwithstanding our

1   discussion earlier this morning, I have not given any weight to

2   Exhibits 101 or 102 or any of the testimony regarding those

3   negotiations.  Regardless of the legal positions taken in the

4   proceeding, the fact is that people say and do things in

5   settlement negotiations that are not reflective of their actual

6   best case position as to what their legal rights are, and that

7   kind of evidence just doesn't tell me anything, which is why we

8   have that rule on the books.

9        I have never understood why the Academy of Motion Pictures

10  SCI tech award was important to the resolution of this case.  I

11  have not relied in any way on the Rearden demonstrative

12  exhibit, the admissibility of which was disputed.

13       There were huge credibility problems with the testimony

14  regarding the allegedly separate corporate status of DD3, DDHL,

15  SHST, and VGH and the role each of those companies played in

16  these transactions.  Under the Court's current thinking,

17  though, in these tentative comments, it is not necessary to

18  reach those issues.

19       VGH does not own the Mova assets because Rearden owns

20  them.  The Court is permitted to reach the question of

21  Rearden's ownership in this proceeding, and I am likely to

22  reach the question.  That Rearden owns the Mova assets is by

23  far the most compelling conclusion to be drawn from the

24  evidence.  Consistent with this conclusion, I will take no

25  action at this time regarding the preliminary injunction, and

1    that question is now off the table and need not be addressed

2    further.

3          Court is in recess.   Thank you.

4          (Whereupon at 10:36 a.m. further proceedings were

5           adjourned.)

## CERTIFICATE OF REPORTERS

        We certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

_____

JoAnn Bryce, CSR 3321, CRR, RMR, FCRR

Wednesday, December 14, 2016