Karen I. Boyd (SBN 189808)
boyd@turnerboyd.com
Jennifer Seraphine (SBN 245463)
seraphine@turnerboyd.com
Zhuanjia Gu (SBM 244863)
gu@turnerboyd.com
Keeley Vega (SBN 259928)
vega@turnerboyd.com
TURNER BOYD LLP
702 Marshall Street, Suite 640
Redwood City, CA 94063
Telephone: (650) 521-5930
Fax: (650) 521-5931

Attorneys for Defendants
REARDEN, LLC, REARDEN MOVA, LLC,
MO2, LLC, and MOVA, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| VIRTUE GLOBAL HOLDINGS LIMITED, a business company incorporated in the British Virgin Islands,<br><br>        Plaintiff-Intervenor,<br><br>   v.<br><br>REARDEN, LLC, a California Limited Liability Company; REARDEN MOVA, LLC, a California Limited Liability Company; MO2, LLC, a California Limited Liability Company; and MOVA, LLC, a California Limited Liability Company,<br><br>        Defendants/Counterclaim Plaintiffs,<br><br>   v.<br><br>SHENZHENSHI HAITIECHENG SCIENCE AND TECHNOLOGY CO., LTD., a People's Republic of China corporation,<br><br>        Counterclaim Defendant. | Case No. 3:15-cv-00797-JST (SK)<br><br>**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

# TABLE OF CONTENTS

I.      BACKGROUND ........................................................................................................ 1

II.     FINDINGS OF FACT .............................................................................................. 2

        A.      Undisputed Facts.......................................................................................... 2

        B.      Rearden Employment Agreements ............................................................... 3

        C.      Timeline of Events........................................................................................ 5

        D.      Alleged MO2-SHST Transfer of The MOVA Assets ................................. 10

        E.      Alleged SHST-VGH Transfer of The MOVA Assets ................................. 13

III.    CONCLUSIONS OF LAW ...................................................................................... 14

        A.      Rearden Owns the MOVA Assets ............................................................... 14

        B.      VGH Has Not Established That SHST Acquired The MOVA Assets,
                Or Transferred Those Assets to VGH.......................................................... 18

        C.      The Purported Transfer of The MOVA Assets from SHST to VGH
                Was Fraudulent and Is Therefore Void........................................................ 20

IV.     CONCLUSION........................................................................................................ 24

# TABLE OF AUTHORITIES

**Cases**

*Barisich v. Lewis*,
226 Cal. App. 3d 12 (1990) ........................................................................ 20, 21

*Boehringer Mannheim Corp.*,
1997 U.S. Dist. LEXIS 24550 (Feb. 21, 1997) ............................................. 17

*Cal. State Bd. of Equalization v. Renovizor's Inc.*,
282 F.3d 1233 (9th Cir. 2002) ..................................................................... 19

*Cohen v. Murphy*,
No. C 03-05793, 2004 U.S. Dist. LEXIS 25284 (N.D. Cal. 2004) ................. 1

*Doe v. City of San Diego*,
35 F. Supp. 3d 1195 (S.D. Cal. 2014) ........................................................... 19

*Edwards v. Arthur Andersen LLP*,
44 Cal. 4th 937 (2008) ................................................................................. 15

*Great Am. Ins. Co. v. M.J. Menefee Constr., Inc.*,
No. CV F06-0392 AWI DLB, 2006 U.S. Dist. LEXIS 64902  (E.D. Cal. Aug. 29, 2006) ............. 1

*Hedden v. Waldeck*,
65 P.2d 376 (Cal. Dist. Ct. App. 1937) ........................................................ 24

*In re Acequia, Inc.*,
34 F.3d 800 (9th Cir. 1994) .......................................................................... 24

*In re Beverly*,
374 B.R. 221 (B.A.P. 9th Cir. 2007) ....................................................... 22, 23, 24

*In re Cass*,
476 B.R. 602 (Bankr. C.D. Cal. 2012), *aff'd* 606 Fed. Appx. 318 (9th Cir. 2015) ....................... 24

*In re Japanese Elec. Prods. Antitrust Litig.*,
723 F.2d 238 (3d Cir. 1983) *rev'd on other grounds*, 475 U.S. 574 (1986) ................................. 19

*Lally v. Allstate Ins. Co.*,
724 F. Supp. 760 (S.D. Cal. 1989) ............................................................... 18

*Loughlin v. Ventraq, Inc.*,
No. 10-CV-2624-IEG (BGS), 2011 U.S. Dist. LEXIS 37012 (S.D. Cal. Apr. 4, 2011) ............... 15

*Marcotte v. Micros Sys.*,
No. CV14-01372 LB, 2014 U.S. Dist. LEXIS 146434 (N.D. Cal. Oct. 14, 2014) ........................ 18

*Newhouse v. Probert*,
608 F. Supp. 978 (W.D. Mich. 1985) ........................................................... 1

*Rodman v. Safeway Inc.*,
125 F. Supp. 3d 922 (N.D. Cal. 2015) (Tigar, J.) ......................................... 17

*San Diego Mun. Credit Union v. Smith,*
 176 Cal. App. 3d 919 (4th Dist. 1986) ....................................................................... 17

*Smith v. United States,*
 No. C 06-06103 WHA, 2007 U.S. Dist. LEXIS 67499 (N.D. Cal. Sep. 4, 2007) ...................... 20

*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.,*
 100 Cal. App. 4th 44 (2002) ...................................................................................... 18

*Swinford v. Rogers,*
 23 Cal. 233 (1893) ................................................................................................... 24

*United States on behalf of Army Athletic Ass'n v. Reliance Ins. Co.,*
 799 F.2d 1382 (9th Cir. 1986) ................................................................................... 17

*Waller v. Truck Ins. Exch., Inc.,*
 11 Cal. 4th 1 (1995) *as modified on denial of reh'g* (Oct. 26, 1995). .............................. 17

*Weiner v. Fleischman,*
 54 Cal. 3d 476 (1991) .............................................................................................. 19

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,*
 505 F. Supp. 1190 (E.D. Pa. 1980) ............................................................................ 19

## Statutes

28 U.S.C. § 1332 ............................................................................................................ 2

Cal. Bus. & Prof. § 16600 ............................................................................................ 15

Cal. Civ. Code § 3439 .................................................................................... 14, 21, 22, 24

Cal. Evid. Code § 115 ................................................................................................... 19

Cal. Evid. Code § 623 ................................................................................................... 17

1   This is an ownership dispute relating to certain assets called the "MOVA Assets"—a set of

2   hardware, software, intellectual property, and other assets related to the MOVA Contour Reality

3   Capture technology used in motion pictures and video games.  A bench trial of this matter was held

4   on Intervenor Plaintiff Virtue Global Holdings Limited's ("VGH") claim for a declaration of

5   ownership of the MOVA Assets, with VGH's other claims bifurcated for later trial if necessary.

6       As set forth below, the Court concludes that VGH is not entitled to a declaration of ownership

7   of the MOVA Assets, because Defendant Rearden LLC ("Rearden") at all times owned the MOVA

8   Assets.  The Court further finds that the conduct between and among VGH, original plaintiff in this

9   action Shenzhenshi Haitiecheng Science and Technology Co. Ltd. ("SHST"), VGH's parent company

10  Digital Domain Holdings Limited ("DDHL"), and DDHL's U.S. subsidiary Digital Domain 3.0, Inc.,

11  ("DD3") supports Rearden's affirmative defense that the claimed transfer from SHST to VGH is void

12  under the California Uniform Fraudulent Transfer Act.  The Court also finds that VGH did not

13  establish the chain of title for the MOVA Assets leading to it, and specifically that VGH did not

14  establish that SHST either acquired the MOVA Assets in May 2013, or transferred those assets to

15  VGH in December 2015, as VGH claims.

16  **I.      BACKGROUND**

17      This case started with a complaint filed by SHST, a Peoples' Republic of China corporation.

18  In May 2016, SHST's counsel informed the Court that its client was unreachable and would no longer

19  participate in the case.  (D.I. 132.)  After substantial motion practice, default was entered against

20  SHST on October 12, 2016.  (D.I. 306.)  Because default was entered against SHST before trial,

21  SHST (including any of its past and current representatives or agents) could not and did not appear or

22  present evidence at trial.  *See Great Am. Ins. Co. v. M.J. Menefee Constr., Inc.,* No. CV F06-0392

23  AWI DLB, 2006 U.S. Dist. LEXIS 64902, at *7 (E.D. Cal. Aug. 29, 2006) ("The Clerk of Court's

24  entry of default cuts off Defendants' rights to appear in this action, file counterclaims, or to present a

25  defense."); *Cohen v. Murphy,* No. C 03-05793, 2004 U.S. Dist. LEXIS 25284, at *1-2 (N.D. Cal.

26  2004) ("Entry of the defendants' default cuts off their right to appear in the action or to present

27  evidence"); *Newhouse v. Probert,* 608 F. Supp. 978, 985 (W.D. Mich. 1985) ("When a party is in

28  default … the party himself has lost his standing in court, cannot appear in any way, cannot adduce

any evidence, and cannot be heard at the final hearing.") (citation omitted).  Prior to trial, however, the Court denied Defendants' motion *in limine* (D.I. 314) that sought to exclude VGH from presenting SHST witnesses or evidence at trial.  (D.I. 383.)

On March 2, 2016, the Court bifurcated the action, such that the ownership claims would be tried to the Court first, with other claims tried at a later date.  (D.I. 80; *see also* D.I. 269.)  VGH filed its Intervenor Complaint on October 14, 2016, and Defendants responded to that complaint on Nov. 7, 2016.  While Defendants asserted a claim for declaration of ownership and other counterclaims in response to SHST's complaint, Defendants did not assert those counterclaims against VGH.  (D.I. 326.)  Defendants did, however, assert affirmative defenses, including: fraudulent conveyance, lack of standing, laches and estoppel, unclean hands, waiver, and no damages.  (*Id.*)

During the bench trial, VGH called Greg LaSalle, a former Rearden employee who claimed that he at one time owned, and then transferred the MOVA Assets to SHST; Ken Pearce, another former Rearden employee; Gary Lauder, the controlling shareholder of OL2, Inc. ("OL2") which owned the MOVA Assets in 2012; Daniel Seah, Director of VGH, CEO of DD3 between 2013 and 2015, and CEO of DDHL; Amit Chopra, COO of DDHL; Joseph Gabriel, General Counsel and Vice President of DD3; and Mark Heyl, an attorney who represented Greg LaSalle in relation to the MOVA Assets.  Defendants called Steve Perlman, founder and CEO of Rearden; and Cindy Ievers, HR Manager of Rearden.

This Court has jurisdiction over this action under 28 U.S.C. § 1332.

## II.    FINDINGS OF FACT

### A. Undisputed Facts

These facts were undisputed at trial: prior to August 2012, ownership of the MOVA Assets was held by a company called OnLive, Inc. ("OnLive"); in or about August 2012, OnLive transferred substantially all of its assets, including the MOVA Assets, to an entity called OL2; prior to the August 2012 transfer of assets to OL2, Greg LaSalle and Ken Pearce worked in OnLive's MOVA operations; OL2 did not hire Mr. LaSalle or Mr. Pearce; both Mr. LaSalle and Mr. Pearce were rehired by Rearden after their employment with OL2 was terminated; on or about August 20, 2012, Mr. LaSalle and Mr. Pearce each signed an Offer Letter and Proprietary Information and Inventions

Agreement ("PIIA"), as well as an agreement to arbitrate claims (collectively "Employment Agreements"); on February 11, 2013, the MOVA Assets were transferred from OL2 to a company called MO2; and Mr. LaSalle remained employed by Rearden through April 21, 2013. (D.I. 318, at 5; Trial Ex. 7; Trial Ex. 262.)

### B.   Rearden Employment Agreements

Messrs. LaSalle's and Pearce's Employment Agreements with Rearden are substantially the same and contain no material differences.  (Trial Ex. 7; Trial Ex. 262)  The relevant provisions of these agreements follow:

Section A.2 of the PIIA defines "the Company's [Rearden's] Business" to include "creation and production of … special effects, *performance motion capture*, … video editing," and "development of … *facial … capture technology*..."  (Trial Ex. 7, at 007.003; Trial Ex. 262, at 000278) (emphasis added).

Section A.3 of the PIIA defines "Proprietary Information" as "information that was or will be developed, created, or discovered by or on behalf of the Company, or *which became or will become known by,* or *was or is conveyed to the Company*, which has commercial value in the Company's Business. . . ."  "By way of illustration but not limitation, Proprietary Information includes… intellectual property… including but not limited to all *copyrights, patents, trademarks, service marks, trade secrets, contract rights*."  (Trial Ex. 7, at 007.003-007.004; Trial Ex. 262, at 000278-000279) (emphasis added).

Section B of the PIIA, entitled "Assignment of Rights" states: "All Proprietary Information … is and shall be the sole property of the Company.  I hereby assign to the Company any and all rights, title and interest I may have *or acquire* in such Proprietary Information."  (Trial Ex. 7, at 007.004; Trial Ex. 262, at 000279) (emphasis added).

Exhibit A to the PIIA provides a space for the employee to list "all Inventions or improvements relevant to the subject matter of my employment by the Company and/or that relate to the Company's Business … that I desire to remove from the operation" of the PIIA.  (Trial Ex. 7, at 007.012; Trial Ex. 262, at 000287.)  The copy of the PIIA signed by Mr. LaSalle bears a hand-written "x" indicating no exclusions to the agreement.  (Trial Ex. 7, at 007.012.)  A copy of the PIIA signed

by Mr. Pearce includes a signed "Attachment for Exhibit A: Inventions," which describes inventions relating to specific performance motion capture-related animation technology.  (Trial Ex. 262, at 000287-000288.)

Section 5 of the Employment Agreement is a merger clause; it incorporates by reference the PIIA.  (Trial Ex. 7, at 007.002; Trial Ex. 262, at 000277.)  It states: "[o]ur agreement [the Employment Agreement] cannot be changed except in writing signed by both of us."  (*Id.*)  Section M of the PIIA also contains a merger clause, which states:  "No modification of or amendment to this Agreement [the PIIA] nor any waiver of any rights under this Agreement will be effective unless in a writing signed by the CEO of the Company and [the employee].  I understand and agree that any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement."  (Trial Ex. 7, at 007.009; Trial Ex. 262, at 000284.)

Section P.6 of the PIIA states: "No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach.  No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right.  The Company shall not be required to give notice to enforce strict adherence to all terms of this Agreement."  (*Id.*)

Section A.3 of the PIIA states that, "I understand that my employment creates a relationship of confidence and trust between the Company and me with respect to Proprietary Information."  (Trial Ex. 7, at 007.004; Trial Ex. 262, at 000279.)  Section H "Duty of Loyalty" further provides:

> I agree that, during my employment with [Rearden], I will not provide consulting service to or become an employee of, any other firm or person engaged in a business in any way competitive with [Rearden], without first informing [Rearden] of the existence of such proposed relationship and obtaining the prior written consent of my manager and the Human Resources Manager responsible for the organization in which I work.

(Trial Ex. 7, at 007.008; Trial Ex. 262, at 000283.)

It was undisputed at trial that Mr. LaSalle was a party to his Employment Agreements with Rearden from August 20, 2012 through at least March 2013, and was subject to those agreements on February 11, 2013, the date on which Mr. LaSalle signed the agreement that transferred the MOVA Assets from OL2 to MO2.  (1 Trial Tr. 69:23-74:15; 1 Trial. Tr. 160:21-22; 2 Trial Tr. 237:21-246:18.)

Steve Perlman founded Rearden in 1999, and has been CEO since that time.  Mr. Perlman testified at trial that every Rearden employee has a written employment agreement that includes a PIIA substantially similar to that included in Mr. LaSalle and Mr. Pearce's agreements.  (5 Trial Tr. 781:16-19; 5 Trial Tr. 784:14-22.)  This testimony was confirmed by the testimony of Rearden's HR Manager, Cindy Ievers, at trial.  (4 Trial Tr. 678:8-683:4.)  VGH presented no signed writing, as required under Mr. LaSalle's Employment Agreements with Rearden for any modification of the terms of those agreements to be effective.  Ms. Ievers testified that she at no time signed any writing that would have allowed Mr. LaSalle to act contrary to Section H of the PIIA (Duty of Loyalty).  (4 Tr. Trial 681:25-683:11.)  Mr. Perlman testified that at no time did he intend to waive Rearden's rights under the PIIA.  (6 Trial Tr. 924:1-18.)

## C.   Timeline of Events

All witnesses with knowledge on the subject testified at trial that MOVA was created and developed by Rearden between 1999 and 2006, and has been used in several blockbuster movies, including the recent "Deadpool" film.  This included the testimony of VGH's witnesses, Mr. LaSalle and Mr. Pearce.  Both witnesses confirmed Rearden's, and specifically Mr. Perlman's contributions to the technology.  (1 Trial Tr. 52:5-53-19 (Greg LaSalle:  "he [Mr. Perlman] mostly explained and actually brought me up to San Francisco and showed me what he was building, which was actually really an exciting place with all kinds of technology"); Ken Pearce at 2 Trial Tr. 326:14-328:2.)  Both Mr. LaSalle and Mr. Pearce testified that they also participated in the development of MOVA while Rearden employees in this time frame. Mr. Perlman, Mr. LaSalle and Mr. Pearce are all named inventors on at least some of the patents relating to the MOVA technology.  (1 Trial Tr. 61:11-17; 2 Trial Tr. 329:7-8; Trial Ex. 346.)

The evidence at trial showed that Mr. LaSalle was employed by Rearden from 2004 until 2006 and by a Rearden spin-off called OnLive, Inc. ("OnLive") from 2007-2012.  Mr. LaSalle was rehired by Rearden in August 2012.  Mr. LaSalle's title at Rearden in 2004-2006 was "General Manager," and Mr. LaSalle testified that his work at Rearden during that time frame included work with the MOVA technology.  (2 Trial Tr. 236:21-237:3; 2 Trial Tr. 238:11-15.)  Mr. LaSalle's title at OnLive from 2007 to 2012 was "Motion Capture Supervisor" and "General Manager of Mova," and

Mr. LaSalle testified that while at OnLive his work again focused on MOVA, including making 2-4 feature films annually using the MOVA Assets.  (1 Trial Tr. 64:16-66:1; 1 Trial Tr. 205:8-206:22.) When Mr. LaSalle was rehired at Rearden in August 2012, his title returned to "General Manager," and he was paid the same salary that he had been paid while at OnLive, approximately $132,000 annually.  (Trial Ex. 7, at 007.001; 2 Trial Tr. 238:11-239:3.)  This was the third-highest salary at Rearden at the time.  (4 Trial Tr. 681:12-20.)

The evidence also showed that Mr. Pearce was employed by Rearden from 2003 until 2006; by OnLive, Inc. from 2007 to 2012; and then rehired by Rearden in August 2012.  (3 Trial Tr. 430:7-432:10.)  Mr. Pearce's title at Rearden from 2003 until 2006 was "Director of Visual Development" and during that time Mr. Pearce helped develop the facial motion capture technology that became known as MOVA.  (3 Trial Tr. 430:7-25.)  Mr. Pearce's title at OnLive from 2007 until 2012 was "Head of Motion Research," and Mr. Pearce testified that while at OnLive he worked closely with Mr. LaSalle on the technical aspects of building MOVA.  (3 Trial Tr. 4311-17.)  When Mr. Pearce was rehired by Rearden in August 2012, his title was returned to "Director of Visual Development," and he was paid the same salary that he had been paid while at OnLive, approximately $164,000 annually.  (3 Trial Tr. 432:15-433:1.)  When Mr. Pearce accepted the job with Rearden in 2012, he signed a Proprietary Information and Inventions Agreement, which Mr. Pearce testified was a condition of his employment.  (3 Trial Tr. 434:2-8.)

Following a failed acquisition, in August 2012 OnLive went through an assignment for the benefit of creditors ("ABC").  (1 Trial Tr. 66:25-67:4; 2 Trial Tr. 332:4-6.)  As a part of that process, the MOVA Assets were transferred to a company called OL2, Inc.  (D.I. 318, at 5; 2 Trial Tr. 332:7-9.)  That company was run by Gary Lauder, who testified at trial.  (2 Trial Tr. 332:12-14; 3 Trial Tr. 396:25-397:16.)  Mr. Lauder had been an investor in OnLive.  (3 Trial. Tr. 396:8-14.)

Mr. Perlman, Ms. Ievers, Mr. LaSalle, and Mr. Pearce all gave testimony that August 2012 (following the ABC at OnLive) was a time of stress and change at Rearden.  (1 Trial Tr. 66:20-68:18; 3 Trial Tr. 341:18-342:10; 3 Trial Tr. 431:18-432:10; 4 Trial Tr. 680:7-13; 5 Trial Tr. 790:6-791:2.) Many of the employees at OnLive had previously been employed by Rearden, and Steve Perlman was CEO of both companies (Rearden and OnLive).  (1 Trial Tr. 65:2-3; 2 Trial Tr. 326:2-4; 4 Trial Tr.

672:15-17; 4 Trial Tr. 669:21-670:4; 4 Trial Tr. 672:23-673:1; 5 Trial Tr. 769:4-8.)  Over 100

OnLive employees were unemployed after the ABC (the other approximately 100 employees having

been hired by OL2).  (1 Trial Tr. 67:2-18; 5 Trial Tr. 790:6-21.)  Rearden, and Mr. Perlman in

particular, made substantial efforts to help those individuals who had lost their jobs.  (1 Trial Tr.

68:16-69:6; 3 Trial Tr. 421:19-422:16; 5 Trial Tr. 790:6-21.)  Mr. LaSalle and Mr. Pearce were

among those who lost their jobs at OnLive.  (1 Trial Tr. 67:5-8; 2 Trial Tr. 332:2-18.)  Rearden hired

five of the unemployed former OnLive employees, including Mr. LaSalle and Mr. Pearce.  (1 Trial Tr.

68:16-25; 2 Trial Tr. 332:19-333:3; 5 Trial Tr. 728:21-24; 5 Trial Tr. 786:14-16.)

It was during this time frame, August and September 2012, that Mr. Perlman stated that he

was willing to assist Mr. LaSalle and Mr. Pearce in obtaining the MOVA Assets for their own

benefit.  (5 Trial Tr. 804:2-805:1.)  That later changed, according to Mr. Perlman, on October 2-4,

2013, when Mr. Perlman learned that Mr. LaSalle and Mr. Pearce had, without informing Rearden or

Mr. Perlman, arranged with Mr. Lauder to instead broker a sale of the MOVA Assets, in return for a

finders' fee of 25% of the sale.  (5 Trial Tr. 804:19-805:11; Trial Ex. 23.)  Email correspondence at

the time confirms Mr. Perlman's testimony that he was very upset to learn of this arrangement, as Mr.

LaSalle and Mr. Pearce could not remain on Rearden salary while they were acquiring MOVA for

their own personal gain or for the benefit of third-party OL2.  (5 Trial Tr. 809:16-819:19; Trial Ex.

23; Trial Ex. 25; Trial Ex. 27.)  That same email correspondence confirms Mr. Perlman's testimony

that having learned about this change in plans and Mr. Pearce's dealings (at the time Mr. Pearce and

Mr. LaSalle stated Mr. Pearce acted alone), Rearden terminated Mr. Pearce's salary.  (5 Trial Tr.

809:16-812:11; Trial Ex. 23.)  Mr. Perlman further testified that Mr. LaSalle was well aware that Mr.

Pearce's loss of salary was a direct consequence of his involvement with Mr. Lauder, and Pearce's

efforts to conceal such involvement from Mr. Perlman because (a) Mr. LaSalle was present at

meetings (either in person or on the phone) where Mr. Perlman told Mr. Pearce why his salary was

being terminated; (b) Mr. LaSalle was copied on emails where Mr. Pearce states why his salary was

terminated; and (c) Mr. Perlman told Mr. LaSalle why Mr. Pearce's salary was terminated.  (5 Trial

Tr. 818:6-25.)  According to Mr. Perlman, Mr. LaSalle then made clear his commitment to continue

working exclusively for Rearden's benefit instead of going out on his own.  (5 Trial Tr. 818:20-

819:19.)  It was after this date that Rearden tasked Mr. LaSalle with acquiring the MOVA Assets for Rearden's benefit.  (5 Trial Tr. 820:10-821:25.)

The evidence was consistent with Mr. Perlman's testimony.  Mr. LaSalle admitted to continuing to accept his full-time salary, and benefits, from Rearden until April 2013.  (2 Trial Tr. 269:20-270:2; 2 Trial Tr. 286:7-287:4.)  In the months between October 2012 and February 2013, Mr. LaSalle worked with Mr. Perlman and Alan Kalin, Rearden's long-time legal counsel, to negotiate the purchase of MOVA from OL2.  (2 Trial Tr. 237:21-23; 2 Trial Tr. 262:6-15; 2 Trial Tr. 265:15-266:9; 2 Trial Tr. 272:12-276:19; 2 Trial Tr. 282:8-283:16; 2 Tr. 301:5-306:19; Trial Ex. 365, at SHST0000193.)  Rearden paid all of the fees associated with forming MO2 LLC—a company formed to hold the MOVA Assets—and legal fees incurred in negotiating the acquisition from OL2.  (2 Trial Tr. 262:6-15; 2 Tr. 301:5-306:19; Trial Ex. 29; Trial Ex. 365, at SHST0000193.)  Mr. Perlman was copied on nearly all correspondence relating to the negotiation strategy and provided substantive input, including directing both Mr. LaSalle and Mr. Kalin in the negotiations, and Mr. LaSalle and Mr. Kalin regularly accepted and acted on Mr. Perlman's instructions.  (2 Trial Tr. 265:15-266:9; 2 Trial Tr. 272:12-276:19; 2 Trial Tr. 282:8-283:16; Trial Ex. 36; Trial Ex. 82; Trial Ex. 83; Trial Ex. 89.)  Mr. LaSalle used his Rearden corporate email address (rearden.com) on nearly all correspondence related to the Mova Asset acquisition negotiation.  (*E.g.*, Trial Ex. 36; Trial Ex. 82; Trial Ex. 88; Trial Ex. 89.)

The evidence at trial also showed that during this same time period, though, Mr. LaSalle was also communicating with DD3 regarding the MOVA Assets.  (2 Trial Tr. 253:1-22; 2 Trial Tr. 262:18-266:2.)  Mr. LaSalle did not disclose these discussions to Rearden or Steve Perlman, and the evidence showed that he took care to keep them a secret from Rearden, including by not using his rearden.com email address.  (2 Trial Tr. 262:18-266:2; 5 Trial Tr. 822:13-16.)  The evidence showed communications between Mr. LaSalle and Rearden personnel, including Mr. Perlman and Ms. Ievers, on the one hand, wherein Mr. LaSalle maintained the pretense of working for Rearden, while at the very same time Mr. LaSalle was communicating with DD3 personnel about MOVA.  (2 Trial Tr. 265:15-266:9; 2 Trial Tr. 269:5-271:13; 4 Trial Tr. 688:15-690:8; Trial Exs. 46, 367.)  This secrecy demonstrates that Mr. LaSalle knew that he was working for Rearden, including acquiring the

MOVA Assets for Rearden's benefit.

It was undisputed at trial that the MOVA Assets transferred from OL2 to MO2 on February 11, 2013.  (Trial Ex. 42.)   Following the February 11, 2013 transfer of the MOVA Assets from OL2 to MO2, Mr. LaSalle sent a list of the MOVA intellectual property to Mr. Perlman of Rearden (Trial. Ex. 45), and Rearden immediately began maintaining that intellectual property, including paying all maintenance and other fees on the complete worldwide portfolio.  (4 Trial. Tr. 705:11-707:2; 5 Trial. Tr. 840:2-842:5; 5 Trial Tr. 879:13-880:20; 6 Trial Tr. 910:24-915:13; Trial Ex. 204; Trial Ex. 205; Trial Ex. 206.)  Rearden also continued to prosecute the MOVA patents and trademarks, including domestic and foreign office actions, continuations and divisional patents to those at issue in this case.

Thus, at all times since the MOVA Assets were transferred from OL2 to MO2—including while VGH claims that SHST held the MOVA Assets (May 8, 2013 through December 17, 2015); and while VGH claims it owned the assets after the purported transfer of the MOVA Assets from SHST to VGH—Rearden has been attorney of record, has responded to all office actions with language translations as needed, paid all maintenance and other fees associated with the MOVA IP, worldwide.  (4 Trial. Tr. 705:11-707:2; 5 Trial. Tr. 840:2-842:5; 5 Trial Tr. 879:13-880:20; 6 Trial Tr. 910:24-915:13.)  In contrast, neither SHST nor VGH has ever been attorney or record, responded to any office action, paid any maintenance fees, or took any steps to protect or extend any MOVA related intellectual property rights.  (2 Trial. Tr. 285:5-10; 4 Trial Tr. 622:3-18; 4 Trial Tr. 626:3-8; 7 Trial Tr. 1106:6-1107:16.)

After the transfer of the MOVA Assets from OL2 to MO2, Mr. Perlman and Mr. LaSalle discussed which of them owned the assets.  Mr. Perlman and Mr. LaSalle presented different versions of how these conversations took place.  The evidence supports Mr. Perlman's version of events. First, Mr. LaSalle still did not disclose his discussions with DD3 to Mr. Perlman; instead, Mr. Perlman first learned of those discussions in late May 2013, by finding a signed NDA between Mr. LaSalle and DD3 dated February 5, 2013. (5 Trial Tr. 873:22-876:4; 5 Trial Tr. 876:13-877:2; Trial Exs. 320; 284.)  The evidence also showed that Mr. LaSalle affirmatively kept those discussions secret from Rearden and Mr. Perlman.  (2 Trial Tr. 262:21-265:14; 2 Trial Tr. 269:1-271:13; 2 Trial Tr. 286:1-287:1; 2 Trial Tr. 316:10-16; 5 Trial Tr. 857:19-24; Trial Ex. 286.)  Second, Rearden and

Mr. Perlman consistently told Mr. LaSalle that MOVA belonged to Rearden, under Mr. LaSalle's Employment Agreements with Rearden.  Substantial documentary evidence showed these positions, and in the evidence submitted at trial Rearden and Mr. Perlman never wavered from this position.  (2 Trial Tr. 288:18-290:8; 2 Trial Tr. 292:15-293:17; 2 Trial Tr. 294:7-295:7; 4 Trial Tr. 699:17-700:15; 5 Trial Tr. 862:17-863:13; Trial Exs. 58, 299, 300, 302, 306.)

### D.   Alleged MO2-SHST Transfer of The MOVA Assets

VGH claimed at trial that SHST acquired the MOVA Assets from MO2 pursuant to a May 8, 2013 Asset Purchase Agreement.  (Trial Ex. 60A.)  It was admitted that SHST was not the original intended purchaser; instead that was DD3.  (3 Trial Tr. 491:18-20; 4 Trial Tr. 634:1-11; 4 Trial Tr. 642:21-644:2; 5 Trial Tr. 536:6-539:22.)  DD3 is a subsidiary of DDHL, which is also VGH's parent company.  Joseph Gabriel, General Counsel and Vice President of Business Affairs for DD3, testified that he acted as SHST's attorney in connection with the MO2-SHST transfer, and acknowledged that he reviewed Mr. LaSalle's Employment Agreements with Rearden before SHST entered the Asset Purchase Agreement with MO2. (4 Trial Tr. 647:21-648:6; 4 Trial Tr. 589:1-591:15.)  Mr. Gabriel admitted, however, that he never communicated directly with any representative of SHST, but instead acted through intermediaries at all times.  (4 Trial Tr. 601:6-17; 4 Trial Tr. 634:1-4.)  Those intermediaries were not identified as persons with knowledge in the case during discovery.  (*See* Trial Ex. 397; 7 Trial Tr. 1104:21-1106:2.)  No witness from SHST appeared at trial.

It was also established at trial that the sequence of events in terms of DD3's substitution of SHST as plaintiff was as follows:  Mr. Gabriel requested and received copies of Mr. LaSalle's Rearden Employment Agreements on March 7, 2013 (2 Trial Tr. 290:22-292:1); Mr. Gabriel informed Mr. LaSalle that DD3 would be substituting a Chinese company as the owner, and Mr. LaSalle challenged that substitution based on concerns with a foreign entity indemnifying him with regard to the Perlman claims (2 Trial Tr. 292:2-312:21; Trial Exs. 60A, 394); Mr. LaSalle told his attorney that he spoke with DD3, and DD3 was "going to actually acquire the Mova assets through one of their Chinese companies" and he "believe[d] this is so it would be nearly impossible for Steve [Perlman] to go after them" (Trial Ex. 403); and on March 29, 2013, Mr. Gabriel identified SHST as the purchaser of the assets from MO2 (Trial Ex. 395, p. SHST0005133).

The MO2-SHST Asset Purchase Agreement acknowledges Rearden's ownership claims regarding the MOVA Assets.  Section C of the Recitals states:

> C.    Seller has advised Purchaser that since February 11, 2013, Stephen G. Perlman ("Perlman"), whether individually or in his apparent capacity as an officer or manager of Rearden LLC, a California limited liability company, or any of his or its related entities, subsidiaries or affiliates (collectively, "Rearden") has communicated the possibility of claims against Seller and/or Greg LaSalle in relation to the Mova Assets ("Perlman Claim"), though Seller is unaware of any basis, legal or factual, or any support, legal or factual, for any such claims by Perlman or Rearden.

(Trial Ex. 60A, at 060A.001.)

Section 3.6 of the MO2-SHST Assets Purchase Agreement states, "(a) except for the Perlman claim, no Material Adverse Effect has occurred, and no event, occurrence, development or state of circumstances or facts has occurred that will, or could reasonably be expected to, have a Material Adverse Effect; (b) Seller has not entered into any transaction or taken any other action other than (i) communicate with Morrison & Foerster LLP, counsel for Rearden, in relation to the Perlman Claim, and (ii) entering into this Agreement and the agreements and transactions contemplated hereby; and (c) Seller has not agreed to take, or committed to take, any of the actions referred to in clause "(b)" above."  (Trial Ex. 60A, at 060A.005.)

Section 3.10(d) further states that "[e]xcept as set forth in the Seller IP Schedule and except for the Perlman Claim, to the Knowledge of Seller, (i) there are no obligations (including royalty obligations), covenants or restrictions from third parties, or orders, writs, injunctions or decrees of any court, administrative agency or governmental authority adversely affecting either the use, disclosure, enforcement, transfer or licensing of the Seller Intellectual Property…"  (Trial Ex. 60A, at 060A.006.)

Mr. LaSalle required indemnification as a condition to the alleged sale of the MOVA Assets. Section 3.12 of the MO2-SHST Asset Purchase Agreement provides, "(a) To the Knowledge of Seller, there is no pending Legal Proceeding and, other than the Perlman Claim, no Person has threatened to commence any Legal Proceeding (i) that involves Seller or any of the Assets, or (ii) that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, the transactions contemplated by this Agreement or any of the Seller Related

Agreements." (Trial Ex. 60A, at 060A.008.) And Section 7.3: "<u>Establishment of Escrow Account for Indemnified Perlman Claims</u>," states, "Solely with respect to the Indemnified Perlman Claims, at the Closing, Purchaser will (a) deposit US$75,000.00 in cash in the client trust account of the law firm of Hopkins & Carley in trust for the purposes described in this Section 7.3 and (b) promptly establish a separate escrow account (the "Escrow Account") at Wells Fargo Bank, or such other financial institution that is mutually acceptable to the parties (the "Escrow Agent") pursuant to the form of Escrow Agreement attached hereto as Exhibit B." (Trial Ex. 60A, at 060A.011.)

Section 8.4 of the MO2-SHST Asset Purchase Agreement addresses waivers and amendments, and provides: "Any agreement on the part of a party to an extension or waiver of any provision hereof shall be valid only if set forth in an instrument in writing signed on behalf of such party, subject to Section 7.6. A waiver by a party of the performance of any covenant, agreement, obligation, condition, representation or warranty shall not be construed as a waiver of any other covenant, agreement, obligation, condition, representation or warranty. A waiver by any party of the performance of any act shall not constitute a waiver of the performance of any other act or an identical act required to be performed at a later time. This Agreement may not be amended or supplemented except by written agreement of the parties." (Trial Ex. 60A, at 060A.014-015.)

The SHST signature line in the MO2-SHST Asset Purchase Agreement is purportedly stamped with SHST's "chop". (Trial Ex. 60A, at 060A.018.) During discovery, both SHST and VGH admitted there were no directors, shareholders, and/or employees of SHST with knowledge of the alleged acquisition of the MOVA Assets by SHST.

No witness who appeared at trial was able to authenticate SHST's chop, nor was any witness able to address SHST's corporate requirements or limitations in using the chop. (4 Trial Tr. 575:2-576:9; 4 Trial Tr. 650:17-651:11; 6 Trial Tr. 1055:7-1060:16.) Payment under the MO2-SHST agreement was not made by SHST, but instead was made by wire transfer from a third-party Victor Alliance, Ltd. (4 Trial Tr. 567:21-569:13; Trial Ex. 64), and VGH took the position in litigation that DDHL had made that payment. (Trial Ex. 389, at 6.) No witness in the trial knew who Victor Alliance was, or what its relationship was to the parties in this case. As discussed below, that same third-party ultimately also made payments to SHST in the later exchange between SHST and VGH,

and VGH took the position in litigation that DDLH made that payment as well.  (Trial Exs. 79 and 389, at 6.)

### E.    Alleged SHST-VGH Transfer of The MOVA Assets

A case management conference was held on December 16, 2015.  At that hearing, over Plaintiff's objection, the Court granted Defendants' request to amend the counterclaims, to assert counterclaims in addition to the already-pending claim seeking a declaration of ownership of the MOVA Assets.  (D.I. 60.)

The day after the case management conference, on December 17, 2015, SHST purportedly transferred the MOVA Assets to VGH.  The consideration received by SHST was considerably less than the actual value of the MOVA assets.  While SHST purportedly paid $100,000 to acquire the MOVA Assets from MO2 LLC in February 2013 (although no proof of payment was made), VGH agreed only to pay at most half that amount—$25,000 for the MOVA Assets at the time of the SHST-VGH agreement, with an additional $25,000 upon a decision by the Court in SHST's favor in this case.  (3 Trial Tr. 492:1-2; 4 Trial Tr. 562:13-19; Trial Ex. 60A, at 060.003 (§ 2.1) and p. 060.011 (§ 7.3); Trial Ex. 78, at 078.003 (§ 2.1).)

The relationship between SHST and VGH was described by VGH witness Amit Chopra at trial as a "friend to the company".  (3 Trial Tr. 539:23-540:2.)  The evidence showed no due diligence, no investigation, and that Mr. Gabriel represented both SHST and VGH in the transaction. (3 Trial Tr. 493:19-21; 3 Trial Tr. 496:4-12; 4 Trial Tr. 648:2-16.)  As stated above, all of the payments for each transaction were made by the same third-party entity, Victor Alliance, Ltd.  Mr. Chopra also admitted, when shown his prior declaration in this case, that DDHL provided the funds for these transfers.  (4 Trial Tr. 564:23-566:4.)

The transfer agreement between SHST and VGH provides that while the MOVA Assets are to be transferred to VGH, all of the liabilities associated with the MOVA Assets, including liabilities and attorneys' fees in this case, remain with SHST, stating that:

C.    Seller has advised Purchaser that **since February 11, 2013**, Stephen G. Perlman ("Perlman"), whether individually or in his apparent capacity as an officer or manager of Rearden LLC, a California limited liability company, or any of his or its related entities, subsidiaries or affiliates (collectively, "Rearden") has communicated the possibility of claims against a prior owner of the Mova Assets and/or Greg LaSalle relation to the Mova

Assets ("Perlman Claim") and in connection there with the seller has initiated a lawsuit entitled Shenzhenshi Haitiecheng Science and Technology, Co., Ltd. v. Rearden LLC, et al., Case No.3:15-cv-0797-SC, filed in United States District Court, Northern District of California in response to which Rearden has filed a counterclaim against seller (collectively, the Action").

…

Section 1.4.  Specifically Excluded Liabilities.  Specifically, and without in any way limiting the generality of Section 1.3(a), the Assumed Liabilities shall not include, and in no event shall Purchaser assume, agree to pay, discharge or satisfy any liability or obligation of the Seller (the "Specifically Excluded Liabilities"): …(i) relating to the Perlman Claim and the Action incurred prior to the Effective Date, including without limitation attorneys' fees and litigation costs.

(Trial Ex. 78, at pp. 078.001, 078.003 (emphasis added).)

Shortly after SHST's purported transfer of the MOVA Assets, SHST's counsel represented to the Court that SHST had ceased communicating with its counsel and appeared to no longer exist. (D.I. 132.)  SHST did not participate in discovery, and did not comply with multiple court orders that it do so.  On October 12, 2016, following substantial motion practice, default was entered against SHST, based on its failure to comply with Court orders or to participate.  (D.I. 306.)

## III.    CONCLUSIONS OF LAW

The Court concludes that Rearden, and not VGH, owns and at all relevant times has owned the MOVA Assets.  Mr. LaSalle's actions in acquiring MOVA for MO2 were performed under his Employment Agreements with Rearden, and VGH failed to establish that Rearden should be estopped from or waived its rights under those agreements.  The Court also concludes that VGH did not meet its burden of proving that SHST acquired the MOVA Assets from MO2, or that SHST transferred the MOVA Assets to VGH.  Finally, the Court further concludes that even had VGH established SHST's ownership before it, which it did not, the purported transfer of the MOVA Assets from SHST to VGH was fraudulent, and therefore void under the California Uniform Fraudulent Transfer Act (Cal. Civ. Code § 3439, et seq.).

### A.    Rearden Owns the MOVA Assets

It was admitted at trial that Mr. LaSalle was employed by Rearden from August 20, 2012, through April 21, 2013.  (2 Trial Tr. 269:23-270:2.)  Mr. LaSalle was subject to the terms of his Employment Agreements with Rearden, including the PIIA, at the time that the MOVA Assets were transferred from OL2 to MO2.  The specific provisions of those agreements are set forth above.

VGH argued that the PIIA was unenforceable under California Business and Professions Code § 16600, et seq.  That section does not, however, apply to limitations on competition during employment.  *See* Cal. Bus. & Prof. § 16600; *see also Loughlin v. Ventraq, Inc.*, No. 10-CV-2624-IEG (BGS), 2011 U.S. Dist. LEXIS 37012, at \*12 (S.D. Cal. Apr. 4, 2011) ("Plaintiff correctly points out that the prohibition of post-employment noncompete agreements represents a fundamental state policy.  But Plaintiff does not dispute that section 16600 does not affect an employee's duty not to compete with an employer *during the course of his employment*.") (citing *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 949 (2008) (emphasis in original)).  The Court concludes that Rearden's PIIA is a valid and binding enforceable agreement under California law.

The Court further finds that the MOVA Assets fall within the scope of Mr. LaSalle's PIIA with Rearden.  The PIIA expressly includes proprietary information relating to both performance motion caption and facial motion capture technology.  *See* Trial Ex. 7, at PTX007.003 (defining "the Company's [Rearden's] Business" to include "creation and production of … special effects, performance motion capture, … video editing," and "development of … facial … capture technology...")).  The PIIA defines "Proprietary Information" as "information that was or will be developed, created, or discovered by, or was or is conveyed to the Company, which has commercial value in the Company's Business… intellectual property…including but not limited to all copyrights, patents, trademarks, service marks, trade secrets, contract rights."  (Trial Ex. 7, at 007.003-007.004; Trial Ex. 262, at 000278-000279).  Therefore, the PIIA provides that if the MOVA Assets were developed by Rearden, which is admitted, or conveyed to Rearden, which they were, they fall within the scope of the PIAA.  Mr. LaSalle therefore agreed that those assets belonged to Rearden.  *See* Trial Ex. 7, at PTX007.004 (under the section "Assignment of Rights": "All Proprietary Information … is and shall be the sole property of the Company.  I hereby assign to the Company any and all rights, title and interest I may have *or acquire* in such Proprietary Information").  VGH's attempts at trial to portray Mr. LaSalle as a manual laborer are belied by, *inter alia*, the evidence of his experience at OnLive before the OL2 to MO2 transfer, his high salary during his employment at Rearden, and the fact that DD3 hired Mr. LaSalle as "Director of Visual Development" in May 2013. (1 Trial Tr. 64:16-18; 1 Trial Tr. 206:3-22; 2 Trial Tr. 238:16-22; 2 Trial Tr. 239:1-3; 4 Trial Tr. 681:17-20; 5

1    Trial Tr. 731:4-8; Trial Ex. 316, at 1.)

2         The Court also finds that the MOVA Assets relate to the "Company's Business" and have

3    value to the company, as the testimony at trial confirmed that Rearden was in fact continuing to

4    develop motion capture technology in and continuing after August 2012, through the present time. (2

5    Trial Tr. 247:12-23; 4 Trial Tr. 671:17-22; 5 Trial Tr. 770:14-23; 5 Trial Tr. 797:8-799:10; 5 Trial Tr.

6    802:14-24; 7 Trial Tr. 1075:22-1077:2; Trial Exs. 14, 326.)

7         VGH also argued at trial that the PIIA should not apply to the MOVA Assets, either because

8    Rearden should be estopped from asserting its rights based on representations made by Mr. Perlman

9    to Mr. LaSalle, or that Mr. Perlman waived Rearden's rights under the PIIA by allowing Mr. LaSalle

10   to start his own business with those assets.  VGH's arguments fail in both instances.

11        First, the Court is not persuaded that Mr. Perlman intended to "gift" the MOVA Assets to Mr.

12   LaSalle.  The evidence at trial regarding Mr. Perlman's generosity does not extend to his business

13   dealings.  (1 Trial Tr. 158:10-14.)  Rather, the evidence shows that Mr. Perlman has built numerous

14   successful businesses.  (5 Trial Tr. 771:8-772:4.)  The suggestion, absent any evidence other than

15   Mr. LaSalle's assertion, that Mr. Perlman would conduct business in this way strains credulity.

16   Further, the evidence shows that any statements by Mr. Perlman suggesting that Mr. LaSalle or Mr.

17   Pearce could compete with Rearden by acquiring the MOVA Assets for their own benefit were (a)

18   conditioned on their resignation from Rearden; and (b) occurred before October 4, 2012, after which

19   date Mr. Pearce's salary was terminated, and Mr. Perlman was clear to Mr. LaSalle that any conduct

20   or actions taken while he was a Rearden employee were for the exclusive benefit of Rearden.  (2

21   Trial Tr. 258:4-12; 2 Trial Tr. 261:15-19; 5 Trial Tr. 804:2-806:20; 5 Trial Tr. 809:25-810:10; 5

22   Trial Tr. 814:7-815:23; 5 Trial Tr. 818:20; 5 Trial Tr. 819:19; 5 Trial Tr. 823:14-19; 6 Trial Tr.

23   906:8-22; 6 Trial Tr. 908:14-909:2.)

24        As stated above, it was not disputed at trial that Mr. LaSalle continued as an employee at

25   Rearden until April 21, 2013, including accepting a full-time salary up to and including April of

26   2013.  The evidence also showed that Mr. LaSalle used a Rearden corporate rearden.com email

27   address, and submitted expense reports, including expenses Mr. LaSalle incurred for Rearden

28   technology development.  (4 Trial Tr. 702:16-704:14; 5 Trial Tr. 820:10-23; Trial Exs. 267, 275, 278,

280, 282, 291.)

Equitable estoppel requires proof of "(1) a representation or concealment of material facts, (2) made with knowledge, actual or virtual, of the facts, (3) to a party ignorant, actually and permissibly, of the truth, (4) with the intent, actual or virtual, that the latter act upon it, and (5) the party must have been induced to act upon it." *Boehringer Mannheim Corp.*, 1997 U.S. Dist. LEXIS 24550, at *24-25 (Feb. 21, 1997) (citing *San Diego Mun. Credit Union v. Smith*, 176 Cal. App. 3d 919, 923 (4th Dist. 1986)); *see also* Cal. Evid. Code § 623 ("Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it.").

The Court finds that VGH did not meet its burden of showing that Rearden should be estopped from asserting its rights under the PIIA.  There was no evidence presented at trial that VGH ever relied on any statements or omissions by Rearden or Mr. Perlman.  To the contrary, all of the evidence at trial established that VGH was well aware of Mr. Perlman's claim of ownership of MOVA at the time that it alleged to have acquired those assets from SHST (and also that SHST was similarly aware when it acquired, purportedly, the assets from MO2/Greg LaSalle).  (3 Trial Tr. 496:13-497:23; 4 Trial Tr. 590:15-591:3.)

Waiver must be established by clear and convincing evidence:  "The burden . . . is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and doubtful cases will be decided against a waiver."  *Rodman v. Safeway Inc.*, 125 F. Supp. 3d 922, 940 (N.D. Cal. 2015) (Tigar, J.) (citing *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 31 (1995), *as modified on denial of reh'g* (Oct. 26, 1995)).  "Waiver occurs when there is an existing right, a knowledge of its existence, and an actual intention to relinquish it, or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished."  *Id.* at 939-40 (Tigar, J.) (quoting *United States on behalf of Army Athletic Ass'n v. Reliance Ins. Co.*, 799 F.2d 1382, 1387 (9th Cir. 1986) (internal citations and quotations omitted)).

The focus of the waiver inquiry is the intent of the person waiving the rights.  Also relevant is the timing of the waiver.  A waiver can be retracted at any time before another party relies on it.

*Marcotte v. Micros Sys.*, No. CV14-01372 LB, 2014 U.S. Dist. LEXIS 146434, at *13 (N.D. Cal. Oct. 14, 2014) ("California law states that, 'under general contract principles, in the absence of consideration or estoppel,' a waiver of contractual rights 'may be retracted' and the rights 'restored at any time.'") (quoting *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 100 Cal. App. 4th 44, 58 (2002)); *see also Lally v. Allstate Ins. Co.*, 724 F. Supp. 760, 763 (S.D. Cal. 1989) ("Waiver of a contractual condition will not be binding . . . unless the other party materially changes his position in reliance on the waiver.").

Section P.6 of the PIIA states: "No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach.  No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right.  The Company shall not be required to give notice to enforce strict adherence to all terms of this Agreement."  (Trial Ex. 7, at 007.010.)  No such writing was presented at trial.  Further, there is evidence that Rearden contacted Mr. LaSalle repeatedly, beginning in February 2013, to obtain a return of the MOVA Assets, including through its attorneys.  (*See e.g.*, 1 Trial Tr. 182:15-24; 4 Trial Tr. 596:5-12; Trial Ex. 66.)  Rearden, and Mr. Perlman, consistently cited to the PIIA obligations in these attempts.  (*Id.*; 2 Trial Tr. 289:22-290:8; 2 Trial Tr. 293:10-17; 4 Trial Tr. 596:3-22; Trial Exs. 300, 302.)  Finally, Mr. Perlman credibly testified that he never intended to waive Rearden's rights under Mr. LaSalle's PIIA, or any other similar agreement, at any time, and Ms. Ievers testimony supported Mr. Perlman's testimony.  (4 Trial Tr. 681:25-683:11; 5 Trial Tr. 924:1-9.)

Furthermore, VGH was formed in 2014, after these events occurred, and claims to have acquired the MOVA Assets after this litigation was already pending.  For these reasons, the Court finds that VGH has not met its burden of showing that Rearden waived its rights under its Employment Agreements, including the PIIA.

### B.   VGH Has Not Established That SHST Acquired The MOVA Assets, Or Transferred Those Assets to VGH.

VGH also did not establish that either the alleged MO2-SHST Asset Purchase Agreement, or the alleged SHST-VGH Asset Purchase Agreement (collectively "SHST Agreements"), were ever executed by SHST.  No VGH witness could or did attest to SHST's signature on the relevant

1    documents.  No VGH witness testified regarding requirements that might exist regarding the use of

2    SHST's chop, and the evidence showed that at least three different versions of SHST's chop were

3    used at varying times.  (4 Trial Tr. 575:15-576:9; 4 Trial Tr. 650:20-651:11; 6 Trial Tr. 1055:16-

4    1058:19; Trial Exs. 61, 79, 404.)  Because VGH's ownership claims are premised on the claim that

5    SHST owned those assets before it, VGH has therefore failed to meet its burden of proof on its

6    declaratory relief claim.  VGH must establish its ownership rights by a preponderance of the

7    evidence. *See* Cal. Evid. Code § 115; *Weiner v. Fleischman*, 54 Cal. 3d 476, 483 (1991) ("Except as

8    otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence."

9    (quoting Cal. Evid. Code § 115)); *Cal. State Bd. of Equalization v. Renovizor's Inc.,* 282 F.3d 1233,

10   1238 (9th Cir. 2002) (explaining that under Cal. Evid. Code § 115, there is a "default preponderance

11   standard"); *Doe v. City of San Diego*, 35 F. Supp. 3d 1195, 1214 (S.D. Cal. 2014) ("[I]ssues of fact in

12   civil cases are determined by a preponderance of the evidence.").

13        The MO2-SHST Asset Purchase Agreement includes unsigned exhibits, and the agreement

14   itself is "signed" only with SHST's "chop," a method of signing documents that is inherently

15   unreliable.  (*See* D.I. 234.)  Courts have recognized that "a 'chop,' like a signature, may not always be

16   genuine."  *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F. Supp. 1190, 1224 (E.D. Pa.

17   1980); *see also In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 287 (3d Cir. 1983), *rev'd*

18   *on other grounds*, 475 U.S. 574 (1986).  In addition, Exhibit A (Bill of Sale and Assignment) and

19   Exhibit C (Assignment and Assumption) of the Asset Purchase Agreement between MO2 and SHST,

20   for example, were not signed by any party (D.I. 122-18).

21        VGH failed to establish the veracity or legitimacy of the SHST Agreements for several

22   reasons.  First, SHST failed to adduce sufficient evidence to authenticate SHST's chop on the SHST

23   Agreements.  No SHST representative appeared to speak to the documents, and SHST and VGH both

24   admitted in discovery responses that no SHST directors, shareholders, and/or employees has

25   knowledge of SHST's alleged acquisition of the MOVA Assets.  Further, there was no evidence

26   presented that SHST paid MO2 for the MOVA Assets; instead, the evidence on this point weighs

27   against VGH, because that payment was made by a different party Victor Alliance, Ltd., whose

28   relationship to SHST was not confirmed by any SHST representative at trial.  Finally, as set forth

1   above, the MO2-SHST Asset Purchase Agreement requires at least LaSalle's signature on Exhibit A

2   (Bill of Sale and Assignment) and Exhibit C (Assignment and Assumption) (*see* Trial Ex. 60A, at

3   Sections 1.1 and 5); neither of which was presented at trial.  Under Section 5 of the agreement,

4   "Closing" could not occur absent delivery of these documents: "[a]t the Closing, Seller *shall deliver*"

5   the executed Exhibits A and C.  (Trial Ex. 60A, at 060A.009.) (emphasis added.) SHST and VGH

6   admitted during discovery that no signed copies of these documents exist.

7       Lastly, as the Court has recognized, SHST's and VGH's "conduct throughout this litigation …

8   has created an environment in which the Court cannot accept their representations at face value."

9   (D.I. 305 at 15-16; *see also* D.I. 264 at 15:21-17:21.)  Indeed, the Court specifically pointed out

10  credibility issues regarding Ms. Xiao Ping, the SHST representative who is purportedly signatory to

11  the SHST Agreements via the chop.  (D.I. 306, In response to SHST and VGH's request to

12  supplement the record with "evidence that counsel for SHST and VGH had 'reestablished contact'

13  with Ms. Xiao", the Court "refuses to give it any weight for several reasons.")  Those issues were not

14  resolved at trial, and VGH has not met its burden of showing that SHST ever owned the MOVA

15  Assets, such that VGH's claims of ownership, which are premised on SHST's alleged prior

16  ownership, also fail.

17              **C.    The Purported Transfer of The MOVA Assets from SHST to VGH Was**
18              **Fraudulent and Is Therefore Void.**

19      Rearden appropriately asserted fraudulent transfer under CUVTA as an affirmative defense to

20  VGH's ownership claims.  *See Smith v. United States*, No. C 06-06103 WHA, 2007 U.S. Dist. LEXIS

21  67499, at *1-2 (N.D. Cal. Sep. 4, 2007) (granting the defendant leave to file an amended answer to

22  raise an affirmative defense of fraudulent conveyance against plaintiff property owner—who had

23  acquired the property from her partner to aid the partner in avoiding his tax liabilities—in an action

24  plaintiff brought to establish that she did not have tax liability as a transferee or nominee and to

25  determine the parties' respective interest in the underlying property); *see also Barisich v. Lewis*, 226

26  Cal. App. 3d 12, 16-20 (1990).

27      In particular, an affirmative defense of fraudulent conveyance may be raised against a

28  *transferee* in order to show that the transferee obtained assets via a fraudulent transfer, as a defense in

an action brought by the transferee to establish the transferee's ownership over the defendant. *See Barisich*, 226 Cal. App. 3d at 16-20. For example, in *Barisich v. Lewis*, the plaintiff brought an action to quiet title to real property that he had acquired from the original owner. *Id.* at 16. The plaintiff sought to quiet title against the successor in interest to a judgment creditor of the original owner, who purportedly had a lien on the property. *Id.* The successor in interest (the defendant) raised an affirmative defense of fraudulent conveyance (against the plaintiff/transferee) under Cal. Civ. Code. § 3439, *et seq.*, arguing that the transfer of the property to the plaintiff was a conveyance in fraud of the original owner's creditors. *Id.* at 16, 19-20. The court allowed the affirmative defense of fraudulent conveyance, although it ultimately held that the plaintiff negated the defense by showing that he took the property in good faith and that the original owner received a reasonably equivalent value in exchange for the transfer. *Id.* at 20.

CUVTA provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

. . .

(b) In determining actual intent under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any or all of the following:

(1) Whether the transfer or obligation was to an insider.

(2) Whether the debtor retained possession or control of the property transferred after the transfer.

(3) Whether the transfer or obligation was disclosed or concealed.

(4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(5) Whether the transfer was of substantially all the debtor's assets.

(6) Whether the debtor absconded.

(7) Whether the debtor removed or concealed assets.

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

Cal. Civ. Code § 3439.04.

The enumerated factors are nonexclusive and are "regarded as circumstantial 'badges of fraud' that are probative of intent." *In re Beverly*, 374 B.R. 221, 235 (B.A.P. 9th Cir. 2007). "No minimum number of factors tips the scales toward actual intent." *Id*. at 236. However, "specific evidence may negate an inference of fraud notwithstanding the presence of a number of 'badges of fraud.'" *Id.*

A creditor is a person who has a claim, meaning "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *See id*. § 3439.01(b)–(c). A debtor is "a person who is liable on a claim." *Id*. § 3439.01(e). Under the CUVTA, a creditor may obtain "an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or its proceeds." *Id*. § 3439.07(a)(3)(A).

Several "badges of fraud" demonstrate SHST's fraudulent intent in transferring the MOVA Assets to VGH. In addition, SHST's transfer of the MOVA assets, but not the liabilities associated with those assets, shows that the transfer was fraudulent and designed to avoid a judgment against SHST. (3 Trial Tr. 502:4-503:9; 3 Trial Tr. 542:23-544:4; 4 Trial Tr. 566:13-18; Trial Ex. 78, at PTX078.001.)

First, the "transfer or obligation was to an insider." Cal. Civ. Code § 3439.04(b)(1). (3 Trial Tr. 463:2-20; 3 Trial Tr. 505:7-17; 3 Trial Tr. 526:1-17; 3 Trial Tr. 539:23-540:2.) As part of the initial acquisition of MOVA technology, DD3's general counsel "was instructed to move forward with acquiring the MOVA Assets and investing in a MOVA-related business through [SHST]." (4 Trial Tr. 642:21-644:24; D.I. 44-19, Trial Ex. 393, at ¶ 8.) No due diligence was conducted. (3 Trial Tr. 493:19-21; 3 Trial Tr. 496:4-12.) DD3's general counsel represented SHST in connection with the acquisition of the MOVA Assets and negotiation of the license with DD3. (4 Trial Tr. 648:2-16.)

1   The evidence at trial also showed that the decision in 2013 to place the assets in SHST's

2   name, instead of DD3's, was driven by the knowledge of Rearden's ownership claims.  Mr. Gabriel

3   requested and Mr. LaSalle provided copies of Mr. LaSalle's employment agreements with Rearden

4   on March 7, 2013.  (2 Trial Tr. 290:22-292:1.)  Shortly thereafter, DD3 told Mr. LaSalle that the

5   purchaser would be a Chinese company instead of DD3.  (2 Trial Tr. 309:11-13; Trial Ex. 394.)  Mr.

6   LaSalle did not want his indemnification for the Perlman claims to be from a Chinese company, and

7   in an email dated March 26, 2013 stated that his understanding/belief was that DD3 was putting the

8   assets in SHST's name because "it would be nearly impossible for Steve to go after them."  (Trial

9   Exs. 394, 403; 6 Trial Tr. 1053:25-1054:18.)  DD3's Mr. Gabriel provided SHST's name to Mr.

10  LaSalle on March 29, 2013, even though in prior declaration testimony Mr. Gabriel had stated that

11  decision was made in May.  (4 Trial Tr. 642:21-645:13; Trial Ex. 395.)  CUVTA allows

12  consideration of these facts as relevant to Rearden's fraudulent transfer defense, stating that

13  "consideration may be given, *among other factors*" to the "badges of fraud."  Cal. Civ. Code §

14  3439.04(b); *see In re Beverly* 374 B.R. at 235-236 ("The UFTA list of 'badges of fraud' provides

15  neither a counting rule, nor a mathematical formula. No minimum number of factors tips the scales

16  toward actual intent. A trier of fact is entitled to find actual intent based on the evidence in the case,

17  even if no 'badges of fraud' are present.")

18      Next, that a debtor has been sued or threatened with suit before the transfer was made

19  indicates fraudulent intent.  Cal. Civ. Code § 3439.04(b)(4).  SHST made the transfer a mere one day

20  after the Court granted Defendants' request to amend counterclaims.  VGH states that the process was

21  contemplated months before but was not executed until the day after the case management

22  conference.  This contention, particularly in light of the other suspicious circumstances of this

23  transfer and SHST's conduct, is not credible.  VGH's Daniel Seah, the only witness who claimed to

24  ever have communicated with any SHST personnel, testified that SHST wanted to transfer the

25  MOVA Assets to VGH to avoid the "burden or responsibilities associated with litigation."  (3 Trial

26  Tr. 509:19-25.)  The Court is persuaded that the timing of the transfer of the MOVA Assets indicates

27  that it was made to avoid liability.

28      The Court further finds that SHST concealed the transfer, another indicator of fraudulent

intent.  *See* Cal. Civ. Code § 3439. 04(b)(3).  SHST did not reveal the transfer for over two months after its occurrence and continued to act as the Plaintiff in the case, including participating in a Court-ordered mediation session on January 22, 2016.  SHST did not alert the Court or Defendants about the transfer until after Defendants filed their amended counterclaims.  *See* D.I. 92.

Whether "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred" is another badge of fraud. Cal. Civ. Code § 3439.04 (b)(8).  (3 Trial Tr. 472:16-473:7; 3 Trial Tr. 492:23-25; 3 Trial Tr. 493:25-494:7; 4 Trial Tr. 564:8-565:6; 4 Trial Tr. 567:15-20; Trial Ex. 69.)

Lastly, SHST explicitly transferred the MOVA Assets while retaining the liabilities, and thereafter "absconded."  (*See* D.I. 139 at 17 (citing to Cal. Civ. Code § 3439.04(b)(6)).  Defendants argue that SHST used the transfer as a means to "shoulder the debt but strip [it]self of assets with which to pay the debt." *Id.* (quoting *In re Beverly*, 374 B.R. at 227). SHST had gone dormant, and SHST's counsel admits that it had received no responses to counsel's attempts to communicate with SHST.  The Court finds SHST had absconded from this action.

The confluence of these several badges of fraud constitutes substantial evidence of VGH and SHST's actual intent to defraud. *See In re Acequia, Inc.*, 34 F.3d 800, 806 (9th Cir. 1994). VGH does not offer "significantly clear evidence of a legitimate supervening purpose." *Id.* The Court concludes Defendants have shown that the transfer from SHST to VGH was fraudulent under CUVTA, and is therefore void as a matter of law.  *In re Cass*, 476 B.R. 602, 614 (Bankr. C.D. Cal. 2012), *aff'd* 606 Fed. Appx. 318 (9th Cir. 2015) (explaining that a fraudulent transfer, which is "inherently wrong," is void from inception, not merely voidable) (citing *Swinford v. Rogers*, 23 Cal. 233, 235-236 (1893) ("[T]he law is well settled, that a conveyance made with intent to defraud creditors is void…"); *see also Hedden v. Waldeck*, 65 P.2d 376, 379 (Cal. Dist. Ct. App. 1937) ("A conveyance of property is rendered void when it appears that it was executed with intent to defraud creditors, even though it may have been accompanied with a valuable and adequate consideration.").

## IV.     CONCLUSION

For the foregoing reasons, the Court concludes that VGH is not entitled to a declaration of ownership of the MOVA Assets, and judgment is therefore appropriate against VGH.

Dated:  December 22, 2016

Respectfully submitted,

By:   */s/ Jennifer Seraphine*
    Karen I. Boyd (SBN 189808)
    boyd@turnerboyd.com
    Jennifer Seraphine (SBN 245463)
    seraphine@turnerboyd.com
    Keeley Vega (SBN 259928)
    vega@turnerboyd.com
    TURNER BOYD LLP
    702 Marshall Street, Suite 640
    Redwood City, California 94063
    Telephone:  (650) 521-5930
    Facsimile:  (650) 521-5931

    Attorneys for Defendants