1  KILPATRICK TOWNSEND & STOCKTON LLP
   JON MICHAELSON (SBN 83815)
2  jmichaelson@kilpatricktownsend.com
   SCOTT KOLASSA (SBN 294732)
3  skolassa@kilpatricktownsend.com
   FRANCES B. COX (SBN 133696)
4  ncox@kilpatricktownsend.com
   1080 Marsh Road
5  Menlo Park, CA  94025
   Telephone: 650 326 2400 / Facsimile: 650 326 2422
6
   KILPATRICK TOWNSEND & STOCKTON LLP
7  HOLLY GAUDREAU (SBN 209114)
   hgaudreau@kilpatricktownsend.com
8  BENJAMIN M. KLEINMAN-GREEN (SBN 261846)
   bkleinman-green@kilpatricktownsend.com
9  Two Embarcadero Center, Suite 1900
   San Francisco, CA  94111
10 Telephone: 415 576 0200 / Facsimile: 415 576 0300

11 Attorneys for Plaintiff and Counterclaim Defendant
   SHENZHENSHI HAITIECHENG SCIENCE AND
12 TECHNOLOGY CO., LTD. and Intervenor
   VIRTUE GLOBAL HOLDINGS LIMITED

13

14          **UNITED STATES DISTRICT COURT**

15      **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

16              **SAN FRANCISCO DIVISION**

17 SHENZHENSHI HAITIECHENG          Case No. 3:15-cv-00797 JST (SK)
   SCIENCE AND TECHNOLOGY CO., LTD.,
18 a People's Republic of China corporation,   **INTERVENOR VIRTUE GLOBAL
                                                HOLDINGS LIMITED'S POST-TRIAL
              Plaintiff,                         MEMORANDA**
19
           and
20
   VIRTUE GLOBAL HOLDINGS LIMITED,
21 a business company incorporated in the   Judge:  Hon. Jon S. Tigar
   British Virgin Islands,                  Trial:   December 5, 2016
22
              Intervenor,
       v.
23
   REARDEN, LLC, a California Limited
24 Liability Company; REARDEN MOVA,
   LLC, a California Limited Liability
25 Company; MO2, LLC, a California Limited
   Liability Company; and MOVA, LLC, a
26 California Limited Liability Company,

              Defendants.
27
   AND RELATED COUNTERCLAIMS.
28



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

1

**TABLE OF CONTENTS**

2

**Page**

3  I.   INTRODUCTION ........................................................................................1

4  II.  PERLMAN ACTIVELY ENCOURAGED AND SUPPORTED
     LASALLE'S GOAL OF ESTABLISHING HIS OWN BUSINESS
5    WITH MOVA UNTIL PERLMAN CHANGED HIS MIND .......................1

6  III. REARDEN IS NOT ENTITLED TO A DECLARATION THAT IT
     OWNS MOVA.............................................................................................4
7
         A.   Rearden is not Entitled to a Declaration of Ownership if it
8             Obtained MOVA By Misrepresenting and Concealing
              Material Facts From Gary Lauder, Lauder Partners, or OL2............4
9
         B.   The Court's Tentative Conclusions Properly Attribute
10            Fraudulent Intent and Behavior to Perlman, But Mistime the
              Genesis of that Deception. .................................................9
11
         C.   The PIIA Does Not Apply...............................................................10
12
              1.   Original MO2 and Mr. LaSalle Did Not Engage in any
13                 Business in any way Competitive with Rearden During
                   the term of LaSalle's Employment with Rearden. ...............11
14
              2.   LaSalle Did Not Breach any Duty of Loyalty Because
15                 Original MO2 and MOVA Were Not "In Any Way
                   Competitive With" Rearden. ...............................................13
16
              3.   LaSalle was Legally Entitled to Quit his Job and Keep
17                 Salary Overpayments. .........................................................15

18            4.   Perlman Waived LaSalle's PIIA. .........................................17

19            5.   The Parties to the PIIA Modified the PIIA Such That it
                   Did Not Apply to LaSalle's Mova-Related Activities. .........21
20
              6.   LaSalle Did Not Misappropriate "Proprietary
21                 Information"; thus, the Assignment Provision Does
                   Not Assign MOVA to Rearden. ...........................................23
22
  IV.  PERLMAN DISAVOWED ANY OWNERSHIP THAT REARDEN
23     MAY HAVE HAD IN ORIGINAL MO2.....................................................25

24  V.   THE RECORD CONTRADICTS DEFENDANTS' AND MR.
       PERLMAN'S STORY AT VIRTUALLY EVERY TURN. .......................27
25
         A.   LaSalle and Pearce Were Not Resuming Former Job Duties
26            When They Re-Joined Rearden in 2012 Because OL2, Not
              Rearden, Owned MOVA at the Time. ..............................................28
27
         B.   Perlman and Lauder Did Not Agree in September 2012 that
28            Lauder Would Give MOVA to Perlman; Instead, Lauder and



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                    -i-

OL2 Agreed Only to Sell to LaSalle and Pearce....................................29

C.  Perlman Never Told LaSalle or Pearce that he Would Support Their Acquisition of MOVA Only If They Left Rearden's Employ. ..........................................................................................30

D.  Perlman Never Told Anyone that LaSalle was Obtaining Mova for Rearden and, to the contrary, told Everyone that it was for LaSalle or LaSalle and Pearce....................................31

E.  All Contemporaneous Evidence Contradicts Perlman's Testimony that MOVA was to be a Division or Subsidiary of Rearden after Original MO2 Purchased It. .........................................33

F.  Perlman Never Fired Pearce; The Record Contains No Evidence Supporting a Contrary Finding................................34

G.  The Contemporaneous Documentary Evidence Supports that Perlman Fired LaSalle During a February 26, 2013 Confrontation. ..................................................................37

H.  Original MO2 did not Transfer Mova to Any Rearden Entity or Perlman in April 2013.................................................39

I.  DIDO is Unrelated to Facial Motion Capture. ...................................40

I.   PROPOSED FINDINGS OF FACT ...........................................................41

A.  The Parties....................................................................................................41

B.  MOVA and the MOVA Assets ....................................................................42

C.  Greg LaSalle and Stephen Perlman..............................................................42

D.  Rearden Transfers MOVA to OnLive, Which Fails .....................................43

E.  LaSalle is Hired (Again) by Rearden ...........................................................44

F.  In August 2012, the Future of MOVA Is Uncertain; Perlman Wants OL2 to Give MOVA to LaSalle ....................................................45

G.  Perlman Helps LaSalle Acquire MOVA.......................................................50

H.  After Original MO2 Acquires the MOVA Assets, Perlman Changes His Mind ....................................................................................54

I.  LaSalle Guarantees A Future for MOVA by Declining to Sell It To Rearden ......................................................................................55

J.  Rearden Decides to Not Pursue Its Claimed Ownership of MOVA.............57

K.  After Threat of Suit from Rearden Subsides, Original MO2 is Dissolved and DD3 Revives MOVA ...........................................58

L.  Recognition of MOVA by the Motion Picture Academy Provokes a



Fight ..............................................................................................58

II.   CONCLUSIONS OF LAW......................................................60

A.   VGH Has Standing to Protect Its Ownership of the MOVA Assets and
to Attack Defendants' Claims of Ownership ..................................60

B.   VGH Owns the MOVA Assets .....................................................62

 1.   VGH has established a prima facie case that it owns
the MOVA Assets ...........................................................62

 2.   Defendants have failed to establish that Perlman had
any authority over Original MO2.......................................65

 3.   Defendants have failed to establish that LaSalle was
obligated to manage Original MO2 for Rearden's
benefit...........................................................................66

 4.   Defendants do not and cannot maintain their allegation
that Original MO2 transferred the MOVA Assets to
Defendants....................................................................76

 5.   Payment of maintenance fees by Rearden does not
establish ownership .......................................................77

 6.   Defendants have failed to overcome the evidence that
Original MO2 sold the MOVA Assets to SHST...................79

  a)   SHST is not a Sham Entity .......................................79

  b)   The Contract Between Original MO2 and SHST is
Valid and Enforceable.............................................81

 7.   Defendants have not carried their burden to establish
that VGH's purchase of the MOVA Assets was the
result of a fraudulent transfer ........................................83

C.   Declaratory Judgment that None of the Defendants Owns the MOVA
Assets ..................................................................................89

 1.   Even if the Original MO2 sale of the MOVA Assets to
SHST cannot be sustained, MOVA does not belong to
any of the Defendants...................................................89

 2.   If the transfer from SHST to VGH was fraudulent, the
MOVA Assets belong to SHST, not any of the
Defendants..................................................................90

J.   Defendants Have Not Carried Their Burden of Proof with
Respect to Their Affirmative Defenses.........................................90

 1.   Defendants have not demonstrated laches,
acquiescence, or estoppel.............................................90



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

2.      Defendants have not proven unclean hands ...........................................92

3.      Defendants have not proven waiver ......................................................92



1

**TABLE OF AUTHORITIES**

2                                                                 **Page**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

-v-

## I.  INTRODUCTION

A comparison of the contemporaneous evidence and the testimony provided at trial shows that Rearden and Perlman deceived and misled in order to make a claim that the MOVA Assets belonged to them.  On the stand, Perlman's attempts to explain away the evidentiary record resulted in an egregious number of material testimonial statements that are contradicted by the evidence and by the more credible testimony of others.  Perlman's deception (whether it commenced in August 2012, October 2012, February 2013, March 2013, or August 2014), especially when combined with the overall mendacity of Perlman, fatally undermines any theory Defendants have advanced or which may be advanced for them. Defendants are not entitled to a declaration that they own MOVA.  Rather, the credible evidence—and particularly that which is contemporaneous and exists in documentary form—supports the conclusion that MOVA was sold to Original MO2 (for the benefit of Greg LaSalle) on February 11, 2013.  And as the chain of title for MOVA runs from that transaction to VGH, VGH is entitled to a decision in its favor in this proceeding.

## II.  PERLMAN ACTIVELY ENCOURAGED AND SUPPORTED LASALLE'S GOAL OF ESTABLISHING HIS OWN BUSINESS WITH MOVA UNTIL PERLMAN CHANGED HIS MIND

The Court's tentative conclusion that Rearden owns MOVA is based primarily on LaSalle's status as an employee of Rearden at the time Original MO2 acquired the MOVA Assets and the fact that Rearden provided some financial assistance to LaSalle's Original MO2 in connection with that acquisition.  Trial Testimony ("TT") 1116:5-9.  While an employee's spend of an employer's money generally inures to the benefit of the employer, the circumstances here, as shown through the evidence, compel a different result.

Perlman and LaSalle knew each other for a long time and became friends.  TT 39:14-42:6. In 2000, LaSalle sold his interest in several music stores and moved across the country.  TT 40:20-42:11.  He did so not just because he wanted a change of pace, but also because Perlman's wife (one of LaSalle's best friends) and others told LaSalle that Perlman needed people like him.  *See* TT 41:4-18 (discussing how Perlman's wife and sister "said that Steve had been looking for somebody to work with who he felt he could trust . . . he had come into money, there were people . . . trying to take advantage of him"), 52:5-53:25.  Over the next decade and change, LaSalle helped Perlman



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 1 -

1  with whatever he needed and Perlman mentored LaSalle.  *See*, *e.g.*, TT 46:5-16 (LaSalle helping

2  Perlman with his Tahoe and Palo Alto homes), TT 56:24-59:6 (discussing things LaSalle did and

3  learned at Rearden); 86:15-21 (discussing LaSalle welcoming Perlman's help and advice with

4  respect to acquiring MOVA).  The two worked together at multiple companies.  At Rearden, they

5  worked together on the development of MOVA facial motion capture.  TT 59:12-61:8 (discussing

6  working on the original MOVA team together).  When Perlman moved on to cloud gaming and

7  OnLive, he brought LaSalle with him.  TT 63:25-65:3 (discussing both working at OnLive but on

8  different things).  He also brought MOVA, despite the fact that OnLive's business focus was not

9  related to motion capture.  TT 62:23-25.

10  OnLive failed, and LaSalle found himself unemployed.  TT 66:25-67:8.  Perlman was

11  already looking forward to his next venture, a wireless technology then-referred to as DIDO (now

12  Artemis pCell).  TT 74:18-75:20.  Facial motion capture (and MOVA) was in Perlman's rearview

13  mirror, an endeavor of the past, and he had no interest in revisiting roads already traveled.

14  TT: 402:13-16 (Lauder testifying that Perlman never stated or insinuated that he was invested in

15  acquiring Mova); 98:20-24 (LaSalle testifying that Perlman said he and Rearden were not interested

16  in Mova); PTX 026.001 (Lauder email stating that Perlman said he didn't want it).  MOVA had not

17  been a breakout success and Perlman was convinced that MOVA was of little (if any) value.

18  PTX 017.001; PTX 018.001.  But he wanted to help those who lost their jobs in OnLive's demise,

19  especially his long-time friend LaSalle and long-term employee Pearce, neither of whom figured to

20  have a role in his DIDO-driven future and both of whom had suffered disproportionate financial

21  losses from the failure of OnLive.  *See* PTX 023.004 ("Greg and Ken lost more equity than any

22  other non-executives who were employed at the time of the ABC but were not hired back by OL2

23  To the extent there is some value in the MOVA assets, giving them to Greg and Ken not only is a

24  reasonable thing to do for their careers, but it is fair for them to derive what benefit they can from it,

25  and I'm sure it would be viewed very positively by OL2 people (or quite negatively were it not to

26  happen").  In other words, Perlman created an outplacement program for LaSalle and Pearce.  He

27  would employ them for a period of time to help with logistics, infrastructure, and other necessary

28  non-core DIDO tasks, while at the same time helping them to navigate a relaunch of the MOVA



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 2 -

business.  PTX 017.001; PTX 018.001; *see also* PTX 029.001, PTX 032.001 and PTX 035.001 (providing help in the form of legal fees).  He never thought MOVA would amount to much, but knew it was important to LaSalle and Pearce and, even if it was never hugely profitable, could be cost neutral and thus provide an opportunity for them to earn a living without being on Rearden's payroll long term.  *See* PTX 017.001; PTX 018.001.

As a result, Perlman encouraged fellow tech executive Gary Lauder to give MOVA to LaSalle and Pearce to "let them have a go at it."  PTX 018.001.  Lauder agreed, and Perlman provided business advice, Rearden office resources and some legal fees to get started and move things forward.  PTX 018.001.  That support was not unlike any other employer outplacement program, job skills training or work transition assistance, yet it was tailored to LaSalle and Pearce's abilities and experience.  Indeed, Perlman recognized that "MOVA is Greg and Ken's career right now" (PTX 018.001) and did what he could to make sure LaSalle and Pearce—who he admitted were experts in MOVA (see TT 785:10-11 (characterizing LaSalle as "one of the world's experts by that point in facial capture"), 785:22-25 (characterizing Pearce as "the world's expert in motion capture and facial capture" and as "really good at doing 3D animation stuff")—could continue in their occupations.  But when Perlman learned months later that his assessment of the value and viability of MOVA might be wrong, ego kicked in and he changed his mind.  By that time, however, Original MO2 had acquired MOVA and LaSalle was working to make MOVA a viable source of employment for himself and Pearce, and did not want to give up on those opportunities.  *See, e.g.*, TT 168:6-170:20 (discussing negotiations to sell Mova to one of Disney, ILM or Digital Domain and the goal of "getting Mova back up and running" and jobs for LaSalle and Pearce).  So Perlman tried to force LaSalle to cede MOVA, but when his long-time friend did not agree immediately (which Perlman no doubt could not either understand or accept) he adopted a hard line and would not even make an offer to ensure employment for LaSalle and Pearce—which was of course the entire purpose of trying to revive MOVA in the first place.  *See id.* (identifying that Perlman was not offering anything for MOVA); *see also* TT:156:10-158:20 (Perlman's demands during February 26, 2013 discussion). When initial threats failed, Perlman tried everything else he could to lay claim to MOVA, including actions that were the genesis for this lawsuit.  *See* PTX 72.



1

### III.   REARDEN IS NOT ENTITLED TO A DECLARATION THAT IT OWNS MOVA

2

3

#### A.   Rearden is not Entitled to a Declaration of Ownership if it Obtained MOVA By Misrepresenting and Concealing Material Facts From Gary Lauder, Lauder Partners, or OL2.

4

5

6

The Court tentatively concluded that Perlman sought to acquire MOVA from OL2 for Rearden's benefit and did so by "masking Rearden's participation" and using LaSalle as a "willing cat's paw" to obtain MOVA for one dollar.  TT 1118:8-1121:1.  The Court stated:  "Steve Perlman's comments to Lauder regarding the low value of the MOVA assets and his desire to help Greg LaSalle and Ken Pearce were a ploy to drive down the sale price of the MOVA Assets, and it worked."  TT 1118:24-1119:2.

7

8

9

10

VGH respectfully submits that this tentative conclusion is contrary to the record. But even if the Court were to maintain this tentative conclusion, it is inappropriate to find in favor of Defendants on this basis, because this theory is premised on the assumption that Perlman and Rearden acquired MOVA by concealing and misrepresenting material facts.  In other words, under this theory of the case, just as under most other theories that are consistent with Perlman's testimony, Perlman and Rearden have unclean hands.[1]

11

12

13

14

15

16

According to the Court, Perlman deceived OL2 (including Gary Lauder of Lauder Partners, the majority shareholder of OL2) by leading OL2 to believe that MOVA was worthless and that Original MO2 was purchasing MOVA for the benefit of LaSalle and Pearce.  All the while, Lauder and OL2 understood, based on representations from Perlman, that Perlman and Rearden were not part of the transaction and that Perlman and Lauder were working together to help Pearce and LaSalle.

17

18

19

20

21

22

In fact, if the Court's theory and Perlman's testimony are credited, Perlman was acting for at least part of the time with full awareness that: (1) the deal was for the benefit of him and Rearden, (2) Rearden attributed significance to obtaining MOVA, and (3) the intellectual property was worth at least the money that Rearden spent on it post-acquisition.  Perlman's deception was

23

24

25

26

27

28

---

[1] Defendants are also not entitled to a declaration of ownership of the MOVA Assets based on additional evidentiary and legal grounds as set forth below.



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 4 -

(and remains) so comprehensive that on the stand he struggled to *explain away statements that he made to his long time personal and corporate attorney Alan Kalin.* In an email toward the end of the MOVA acquisition from OL2, Perlman told Kalin that "Greg was to get all of the assets for free. End of story." PTX 087.001. After admitting that this was a particularly candid email that he never intended to be public, Perlman argued it had some secret meaning that Kalin would understand differently than an objective observer. *See* TT 1085:22-1086:10.[2]

Perlman's deception—if that is what it was—continued throughout the negotiations. The final OL2/MO2 agreement includes a "no third-party beneficiaries" clause at Section 6.03 providing that "nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or to give any Person, other than the Parties, any rights … by reason of this Agreement or the Transaction[]." PTX 042.010. This clause was present in at least one draft that Perlman reviewed. PTX 090.013. Although there is evidence that Perlman made extensive redlines to the agreement and sent multiple emails containing his suggestions and thoughts, none of these revisions or messages show that he sought to have this provision removed. *See, e.g., id.* Moreover, Perlman does not recall having done so. TT 958:16-959:7. By allowing this language to remain, Perlman furthered the expectation among Kalin, LaSalle, Lauder, MO2, and OL2 that the agreement—which does not identify Original MO2 as the subsidiary of any entity—was intended solely for the benefit of LaSalle via LaSalle's Original MO2.[3]

These misrepresentations mattered. Lauder and OL2 believed Perlman, and because they understood him to be not adverse to them in the transaction and to have expertise related to MOVA, they were entitled to believe him.

For instance, Lauder testified that he sold MOVA to LaSalle and Pearce (via Original MO2), not Perlman or Rearden. *See* TT 407:17-18 ("We both agreed to the recommendation by

---

[2] And, of course, it strains credibility even further to think that Kalin would thereby become—like LaSalle—a willing participant in the effort to deceive OL2 into entering a contract.

[3] Indeed, nowhere in the agreement is Perlman or Rearden mentioned. LaSalle is identified as the individual to receive notice (at his then-home address) on behalf of Original MO2 in Section 6.01 (PTX 042.010) and executed the agreement as "President" of Original MO2 (PTX 042.013.)



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 5 -

Steve that we give the company to Greg and Ken.")  *See also* PTX 18, 19, 20, 21, 22, 23, 24, 25, 26; 27, 27A. TT 411:17-20; 413:12-414:4].  OL2 CEO Charlie Jablonski and general counsel Eve Saltman, who negotiated the terms of the transaction and prepared related papers, also understood that OL2 was selling MOVA to LaSalle and Pearce.  *See* PTX 021.002-003 (September 20-22, 2012 email chain including Jablonski and Saltman forwarding Perlman's proposal to transfer MOVA to LaSalle and Pearce, to which Jablonski responds: "Makes sense and in complete agreement."); PTX 027A.001 (October 16, 2012 email from E. Saltman to G. LaSalle and others ("Could you please provide the name of the entity you and Ken have incorporated to buy the assets?").

Lauder, believing he had a duty to maximize value to shareholders of OL2, briefly explored alternatives to giving MOVA to LaSalle and Pearce.  But, in furtherance of the hypothetical scheme to defraud , Perlman had represented to Lauder that even if a buyer could be found for MOVA, "I can't imagine they'd pay much."  PTX 018.001.  Given Perlman's expertise in MOVA, Lauder was entitled to rely on Perlman's statements about the value of MOVA. Lauder and OL2 did in fact rely on those representations.  They put MOVA on the market only for less than one week, with "sales efforts" that amounted to sending unsolicited emails to contacts at just two potential buyers.  PTX 027.002, TT 148:15-149:19.  And, because Lauder was relying on Perlman's assessment and only going through the motions, there is no evidence of any concerted follow-up after the initial contacts were made. *Cf.* PTX 20 (September 22, 2012 Lauder agreeing to give MOVA to LaSalle and Pearce), PTX 23 (October 2, 2012 Perlman complaining about the sales effort), PTX 25 (including October 2, 2012 email from Lauder to Pearce and LaSalle saying that solicitation of Disney was dependent on content from them), PTX 27 (referencing an October 4, 2012 call to Lucas Film by LaSalle, after which Lucas Film reached out to Lauder, and including an October 4 email from Lauder which reverts to the plan to provide MOVA to LaSalle and Pearce because Disney and Lucas Film were not interested.).

Under the Court's theory (and any theory which concludes from the evidence and testimony that Perlman intended to deceive Lauder, OL2, Kalin, or LaSalle), Defendants are not entitled to a declaration of ownership of the MOVA Assets because, as shown above, the property



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 6 -

was acquired by way of a transaction infused with unfairness and even fraud—through unclean hands. The doctrine of unclean hands requires that those seeking equitable relief from the courts—including declaratory relief—"have acted fairly and without fraud or deceit as to the controversy in issue." *Ellenburg v. Brockway, Inc.,* 763 F.2d 1091, 1097 (9th Cir. 1985). A party "must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim." *Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 978 (2000). As the California Court of Appeal in *Pond v. Ins. Co*., 151 Cal. App. 3d 280 (1984) explained:

> The equitable principles underlying the clean hands doctrine do not require a finding that Pond was guilty of perjury, concealment or other illegal conduct, "[f]or it is not only fraud or illegality which will prevent a suitor from obtaining equitable relief. *Any unconscientious conduct* upon his part which is connected with the controversy will repel him from the forum whose very foundation is good conscience.

*Pond*, 151 Cal. App. 3d at 291 (internal cites omitted) (emphasis in original). The Court's tentative conclusion rests on the accurate observation that Perlman acted with unclean hands in acquiring MOVA. That deception constitutes, at a minimum, "unconscientious conduct" which bars declaratory relief in favor of Rearden.

If Perlman's misrepresentations led to Original MO2 acquiring MOVA for Rearden's benefit, as opposed to LaSalle's, they also constitute fraud in the inducement, rendering the sale of MOVA to Original MO2, memorialized in the February 11, 2013 Membership Interest and Asset Purchase and Sale Agreement (PTX 42), voidable. *See Rosenthal v. Great W. Fin. Sec. Grp.,* 14 Cal. 4th 394, 415 (1996) (fraud in the inducement occurs when "the promisor knows what he is signing but his consent is *induced* by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is *voidable*" ) (internal cite omitted and emphasis in the original). If Lauder knew that MOVA was being sold to Rearden, he would have structured the deal differently: Lauder testified that while he would not have been "philosophically averse" to "working out an arrangement" with Perlman for the sale of MOVA, he would not have sold MOVA to Perlman "without having a lot more due diligence." TT 406:-20. He explained: "More likely, I would have tried to structure something whereby if it was successful, I would benefit in



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 7 -

1  some way." TT 406:16-18.  The deal, as structured, did not provide any financial benefit to

2  Lauder or OL2 because Lauder and OL2 executives believed MOVA was being sold to Original

3  MO2 as owned by LaSalle, not Rearden.[4]  As Lauder said, a deal for one dollar was effectively

4  "giving it" away.  TT 405:3-6.

5        Perlman's testimony and the evidentiary record show that Perlman (if the ultimate owner

6  or controller of Original MO2) also violated the covenant of good faith and fair dealing.  This

7  covenant is implied by law in every contract and "means that each party will not do anything to

8  unfairly interfere with the right of any other party to receive the benefits of the contract."  *See*

9  Judicial Council of California Civil Jury Instructions (2016) ("CACI"), No. 325.  Perlman violated

10  the duty to act fairly and in good faith by denying Lauder and OL2 the benefit of the bargain—that

11  MOVA be sold to *LaSalle and Pearce* for one dollar, not Rearden.

12        The Court need not reach these last two conclusions: OL2 is not a party to this case and no

13  one in this proceeding has challenged that OL2 sold MOVA to Original MO2.  However, if the

14  evidence adduced at trial supports the tentative conclusion articulated by the Court (that this

15  acquisition was for the benefit of Rearden and Perlman was aware of that throughout the course of

16  negotiations with Lauder and OL2) then Perlman and Rearden acquired MOVA via unfair and

17  inequitable conduct.  The doctrine of unclean hands prevents the Court from rewarding

18  Defendants for such conduct.

19

20  _____

[4] In its tentative conclusion, the Court states "there was no injury to Lauder from the sale to
21  Rearden."  TT 1120:14-15.  However, as noted above, Lauder testified that he would not have sold
   MOVA to Perlman for one dollar.  He (and more precisely OL2) was therefore injured because he
22  did not obtain any "benefit" out of the transaction due to Perlman's deception.  Moreover, Lauder
   testified that if he did not "quickly find a third party buyer," he would give MOVA to LaSalle and
23  Pearce.  TT 413:16-414:4; PTX 025.002 (October 3, 2012 email from Lauder to Perlman, including
   the statement: "If there are no indications of interest shortly, then I don't see why we can't revert to
24  your original proposal.") A reasonable inference can be drawn that had LaSalle and Pearce *not* been
   willing to acquire MOVA from OL2, Lauder would have spent additional time looking for a third
25  party buyer.  Regardless, the point is not whether OL2 would have a viable cause of action against
   Rearden and Perlman, but whether under the circumstances defined by the Court's theory—where
26  transfer of ownership of the property in dispute has been procured by unclean hands—equitable
27  relief in the form of a declaration as to who owns MOVA is not available.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.     The Court's Tentative Conclusions Properly Attribute Fraudulent Intent and Behavior to Perlman, But Mistime the Genesis of that Deception.**

In its tentative conclusions, the Court hypothesized that from the time of the very first communications in evidence in this case, Perlman plotted to deceive Lauder and OL2 into giving him MOVA for little or nothing.  This observation discounts the universal consensus that both gentlemen went to great lengths to ensure that OnLive's employees were shielded as much as possible from the impact of OnLive's failure.  TT 66:25-69:6, 422:9-16, 432:1-7, 676:18-677:23, 790:13-21; PTX 23. It also discounts Perlman's acknowledged friendship with and long-standing generosity to LaSalle.  TT 43:19-52:4.  As Perlman himself acknowledged, the failure of OnLive caused Pearce and LaSalle to suffer actual and paper losses greater than nearly any other employee not hired by OL2 because of the number of options they owned.  PTX 23.004 ("Greg and Ken lost more equity than any other non-executives who were employed at the time of the ABC but were not hired back by OL2… To the extent there is some value in the MOVA assets, giving them to Greg and Ken not only is a reasonable thing to do for their careers, but it is fair for them to derive what benefit they can from it, and I'm sure it would be viewed very positively by OL2 people (or quite negatively were it not to happen)".)  The evidence in this respect is essential because it helps to explain more clearly what happened in the critical period of late September into mid-October 2012.

Perlman testified that he became furious with Pearce, LaSalle, and Lauder around October 2, when he gained the impression that Lauder was not planning to give MOVA to Pearce and LaSalle but instead the trio were to sell MOVA—intellectual property and physical assets—to companies which had formerly been customers of Rearden (when Rearden owned MOVA and started a MOVA services business) and were doing so in a way that would net LaSalle and Pearce a cumulative 25% of the resulting sales price (as opposed to 100% ownership of the intellectual property and physical assets).  PTX 023.001; PTX 025.002.  It is not completely clear (nor particularly relevant) what aspect of the situation upset Perlman more, whose behavior upset him more, and whether any of this anger was feigned to mask Perlman's supposed newfound desire to own MOVA himself.  Perlman has offered different explanations at different times.

What is pivotal is that during the negotiations to acquire MOVA from OL2, Perlman never



told LaSalle, Pearce, Lauder, OL2 or even his own attorney, Kalin, that his plans had changed and that he was now working to acquire MOVA for Rearden's benefit.  Perlman says he informed others of this (TT 402:13-16; 686:5-687:11), but no contemporaneous evidence and no witness testimony corroborates his statements.  The more plausible conclusion consistent with the evidence is that it was at this point that Perlman began his deception.  He felt betrayed, to varying degrees, by all of the principals involved at the time.  So, without telling anyone of his change in plans, he embarked on a ruse to acquire MOVA for Rearden.  And although things would be easier if LaSalle and Pearce remained with Rearden, he knew MOVA well enough that the two were not necessary—they could leave Rearden or stay, but he would have MOVA, and he would cheat Lauder to obtain it.

It is also possible (and similarly plausible in light of the documentary evidence as discussed further herein) to conclude that Perlman did not plan to seize MOVA for himself until February or March 2013, when he realized he was wrong about MOVA's value and learned that Original MO2 might sell it to DD3.  Again, Perlman's sense of ego, as well as his loss of control over the now potentially valuable MOVA, could have well kicked in to motivate this change of heart.

But in neither of these scenarios does Perlman ever tell Lauder or LaSalle prior to Original MO2's acquisition of MOVA that Perlman was working to benefit Rearden and not LaSalle.  In both of these scenarios Perlman's change of heart and uncommunicated subjective intent cannot save him from the legal consequences of his multitude of statements and actions by which he conveyed that MOVA was to go to LaSalle.  *See Hilleary v. Garvin*, 193 Cal. App. 3d 322, 327 (1987) ("[A plaintiff's] uncommunicated subjective intent is not relevant.  The existence of mutual assent is determined by objective criteria. The test is whether a reasonable person would, from the conduct of the parties, conclude that there was mutual agreement.")   These statements and actions overcome any presumption that MO2 belonged to Rearden and prevent Defendants from seeking declaratory relief because they give Defendants unclean hands.

## C.   The PIIA Does Not Apply.

In its tentative conclusions, the Court suggested that the PIIA applied and that the evidence might not be sufficient to show that Perlman and Rearden waived the PIIA.  A complete analysis of the pertinent contracts and the evidence adduced at trial shows that the PIIA does ***not*** apply because



1  none of the actions taken by Mr. LaSalle (or his company Original MO2) trigger the application of

2  the PIIA.  Thus, LaSalle did not breach his duty of loyalty (which, in any event, would not operate

3  to assign MOVA to Rearden).  Even if any activity triggered the application of the PIIA, Perlman

4  and Rearden waived any rights they might otherwise have had in MOVA, and if the PIIA were to

5  apply to this situation, Perlman and LaSalle modified the PIIA through their correspondence and

6  behavior.[5]  Even if none of that were true, the assignment of rights provision of the PIIA does not

7  apply to LaSalle and Original MO2's acquisition of MOVA.

8          **1.       Original MO2 and Mr. LaSalle Did Not Engage in any Business in any
                     way Competitive with Rearden During the term of LaSalle's
9                     Employment with Rearden.**

10         The PIIA defines the "Company's Business" as, in most relevant parts, "refer[ring] to the

11  intended business activities of the Company . . . include[ing] but not limited to . . . . (1) . . .

12  performance motion capture . . . (7) . . . development of motion, facial and surface capture

13  technology and related human and non-human 2D and 3D rendering and animation

14   technologies. . . ."  PTX 007.003.  During the tenures of LaSalle and Pearce at Rearden—which

15  began on August 20, 2012 and ended in October of 2012 for Pearce and March of 2013 for

16  LaSalle—neither engaged in any activity related to motion capture, much less "performance motion

17  capture" or the "development of motion, facial and surface capture technology."  PTX 8, 14, 41; TT

18  82:25-84:21; 128:6-24; 151:11-152:13; 332:23-324:21; 335:3-336:4  Nor could they.  Rearden was

19  not working on motion capture during that period TT 84:13-21; 128:17-21; 152:4-6; 333:13-21;

20  338:20-23; 339:23-340:2  The MOVA Assets remained in storage in San Francisco from the time

21

22  _____
    [5] As a threshold matter, the "Assignment of Rights " provision of the PIIA applies by its terms only
23  to Rearden proprietary information  acquired *by the employee:* "*I* hereby assign to the Company any
    and all rights, title and interest *I* may have or acquire in such Proprietary Information.  (PIIA at
24  Section B, p. 2; PTX 007.004 (emphasis added).)  The MOVA Assets were acquired from OL2 by
    Original MO2, not by employee LaSalle.  Original MO2 was not a signatory to the PIIA, and on the
25  face of the contract is not bound by its provisions.  There is no evidence that LaSalle came to own
    the MOVA Assets in his individual capacity.  He could not assign something which he never had.
26  Also, the PIIA is an employment agreement between employer and employee, not an accord
    between two companies.  By its express language, the Assignment of Rights clause thus does not
27  operate to automatically transfer the MOVA Assets from non-employee, non-signatory Original
    MO2 to Rearden.
28



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                    - 11 -

1   LaSalle moved them there at the end of August/beginning of September 2012 until at least May of

2   2013.  PTX 8, 14, 41; TT 69:9-22  Thus, MOVA could not have been used while LaSalle was a

3   Rearden employee even if his tenure extended to April 21, 2013, the date to which Defendants have

4   attempted (without proper justification) to stretch the term of the PIIA.  *See* TT 864:10-15.  Since

5   neither LaSalle nor Pearce engaged in any business—much less a business competitive with

6   Rearden—the PIIA does not apply.

7        Even assuming that the PIIA did apply to Original MO2 (which it did not), Original MO2

8   (including LaSalle's actions on its behalf) also did not breach the PIIA.  Original MO2's activities

9   during and for at least two months after Mr. LaSalle's August 20, 2012 to March 5, 2013

10  employment with Rearden were limited to purchasing MOVA and attempting to find a partner or

11  purchaser for the assets and getting that deal done.  It had and has nothing to do with offering or

12  providing services to customers or developing new motion capture technology (e.g. "the Company's

13  Business"):

14       THE COURT: Let me ask you a question, Mr. LaSalle.  I apologize if you said this earlier,

15       but I have been wondering.  Were your discussions with Digital Domain, Industrial Light

16       and Magic and Walt Disney about having them become customers of the new company's

17       motion capture services or about acquiring the new company or something else?

18       THE WITNESS: No. They were either about licensing or acquiring. They already were

19       past customers. I wasn't having any conversations about that at that point.
         THE COURT: Okay. So it was about their either taking a license to the technology so they
20       could go out into the market and sublicense it if they wanted to or just buying the company
         outright?
21

22       THE WITNESS: Yes.

23  Such efforts—acquiring and holding a technology and looking for someone to fund its revival—

24  are not listed as Rearden "business," and no evidence supports a colorable argument that they fall

25  within the scope of the PIIA given the terms as defined therein.    Moreover, what Rearden

26  actually did was incubate new technologies until they reached a "fall or fly" point and could be

27  pushed from the nest (and, unfortunately for Rearden, most—like Moxie and OnLive—fell).  *See*

28  TT 53:1-19;75:6-20; 326:13-3427:1.  Given Mova's status of ***beyond*** mature (to the point of being



1   outdated), (*see, e.g.* PTX 28; TT 90:23-92:3) it was not a technology that needed incubating, (*see*

2   TT 75:16-22) and in no way came within the scope of any activity Rearden engaged in from

3   August 2012 forward.  *See* TT 75:6-15 (Rearden was an incubator and the only thing it was

4   working on was DIDO).  The PIIA does not apply under these circumstances.

5          **2.      LaSalle Did Not Breach any Duty of Loyalty Because Original MO2
                     and MOVA Were Not "In Any Way Competitive With" Rearden.**

6

7          Similarly, arguments that LaSalle violated his duty of loyalty to Rearden have no merit.

8   None of the conduct reflected by the evidence in this case constitutes a breach of any duty of

9   loyalty, whether that imposed by the PIIA or pertinent California statutes.

10         The duty of loyalty imposed by the PIIA prohibits activities "in any way competitive with

11  the Company."  PTX 007.008.  Because, as discussed above, neither Original MO2 nor LaSalle and

12  Pearce did anything with any business "in any way competitive to the Company," while employed

13  by Rearden (again whether the end date is in March or April 2013) they could not and did not

14  violate this provision of the PIIA as written by Rearden.[6]

15         Nor did any of Original MO2, LaSalle's or Pearce's activities run afoul of any other duty of

16  loyalty that may have applied.  For example, California's statutory duty of loyalty (embodied in

17  Labor Code Section 2863) states that "An employee who has any business to transact on his own

18  account, similar to that intrusted to him by his employer, shall always give the preference to the

19  business of the employer."  LaSalle was never "intrusted" to purchase or sell companies for

20  Rearden (which was not in the business of buying then turning around and selling companies

21  anyway).  Even assuming *arguendo* that Rearden was in the facial motion capture business during

22

23  _____

    [6] Moreover, even assuming for the sake of discussion that purchase of technology, holding that
24  technology and subsequent attempts to get funding for or sell the technology constitute
    "competiti[on] with [Rearden]," LaSalle kept Perlman (his manager) and Ievers (HR) aware of his
25  activities (*e.g.*, TT 66:5-18, 148:15-149:12), and, as discussed in detail throughout this brief, they
    supported those activities until after Original MO2's purchase of MOVA from OL2 closed.  Plus
26  even if he did not, any such interpretation of the PIIA runs afoul of California Business &
    Professions Code section 16600, which bars post-termination restrictions on competition.  *Edwards*
27  *v. Arthur Anderson LLP*, 44 Cal. 4th 937, 948 (2008) (invalidating noncompetition agreement an
    employee was required to sign before commencing employment "because it restrained his ability to
28  practice his profession.")



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                    - 13 -

1   LaSalle's and Pearce's tenures beginning August 20, 2012, they both testified that they were not

2   "intrusted" with work of that nature, and no contemporaneous documentation suggests otherwise.

3   Thus, the California statutory duty of loyalty does not apply.

4           Moreover, under pertinent California law, LaSalle's actions with respect to MOVA

5   constitute (at most) "properly purchas[ing] a rival business" with a view to the possibility of

6   engaging in that business following "termination of employment" with Rearden.  No evidence was

7   adduced that LaSalle went beyond this limit to "solicit customers for such rival business" [the

8   provision of MOVA services] "before the end of his employment" or that he otherwise engaged in

9   "other similar acts in direct competition with the employer's business."  In fact, the evidence shows

10  the contrary:

11          THE COURT: Let me ask you a question, Mr. LaSalle. I apologize if you
            said this earlier, but I have been wondering.  Were your discussions with
12          Digital Domain, Industrial Light and Magic and Walt Disney about having
            them become customers of the new company's motion capture services or
13          about acquiring the new company or something else?

14          THE WITNESS: No. They were either about licensing or acquiring. They
            already were past customers. I wasn't having any conversations about that
15          at that point.

16          THE COURT: Okay. So it was about their either taking a license to the
            technology so they could go out into the market and sublicense it if they
17          wanted to or just buying the company outright?

18          THE WITNESS: Yes.

19          THE COURT: Okay. Thanks.

20  TT 168:20-169:10.  Moreover, no evidence was adduced at trial that LaSalle was asked about and in

21  response hid his purchase of or attempts to sell MOVA.  *Cf. Fowler v. Varian Assocs., Inc.*, 196

22  Cal. App. 3d 34, 42 (6th Dist. 1987)  ("When asked by [his employer] about [his prospective new

23  company's] plans, however, [the employee] refused to provide any such information on the ground

24  that he owed an obligation to [the principal of his prospective new company]. [The employee]'s

25  response was fundamentally inconsistent with his duty of loyalty to [his employer].")

26          Thus, LaSalle did not breach any duty of loyalty, whether imposed by the PIIA or California

27  law.

28



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                    - 14 -

### 3.     LaSalle was Legally Entitled to Quit his Job and Keep Salary Overpayments.

An at will employee may terminate his employment by giving notice to his employer. Cal. Lab. Code § 2922.  Indeed, LaSalle's employment agreement with Rearden stated: "you are free to resign from your employment at any time, for any reason or no reason at all, with or without cause and with or without notice." PTX 7, p. 1. In California, "[n]o set form of words is necessary; but any words or acts which show a clear intention" terminate an employment relationship.  *Percival v. Nat'l Drama Corp.*, 181 Cal. 631, 637, 185 P. 972, 974–75 (1919) (finding an employee was not discharged).

Here, LaSalle thought he was fired after he refused to acquiesce to Perlman's demands when Perlman told him he was fired at the February 26, 2013 meeting at Perlman's house. TT 155:23-158:22, PTX 48, PTX 98.  Although Ievers does not recall a March 1, 2013, conversation with LaSalle, she admits receiving a March 5, 2013 letter from him.  TT 161:6-22, PTX 55.  In that letter, LaSalle does not condition the end of his employment on anything, but simply says that "March 5th 2013, is the date of my termination of employment with Rearden, Inc." PTX 55.  He goes on to say that he "will be receiving a three week severance package," but does not agree with that assertion (which was based on what Perlman told him on February 26 (PTX 55; TT 160:6-162:9) as a condition of the termination of employment.

LaSalle never performed any work for Rearden after sending the March 5 letter.  TT 161:6-8. He never agreed to return to work.  TT 161:9-10.  He no longer considered himself an employee.  TT 161:11-13.  He filed no further expense reports.  TT 735:8-16.

Until it changed its mind, Rearden recognized that LaSalle was no longer an employee. On February 28, two days after Rearden fired LaSalle, Rearden processed what it called his "final" expense report.  TT 735:7-9, PTX 50.  For a check to be paid March 5, 2013, Rearden updated LaSalle's employment records to show that he was owed "separation pay."  TT 744: 21-745:4, PTX 54 ("check date" on upper right).  The amount of separation pay is equivalent to LaSalle's



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 15 -

1    annual salary, divided by 52, multiplied by 3 – just as LaSalle testified.[7]  On March 14, Rearden

2    removed LaSalle from the Rearden's security access list, thereby preventing him from entering the

3    very office that Rearden now alleges he still worked in.  PTX 99.

4         Even Rearden's current story, that it fired LaSalle on April 19, is inconsistent with the

5    paper trail.[8]  Although the HR director for Rearden swore that LaSalle had never resigned from

6    Rearden and that Rearden terminated him (TT 696:4-5, 702:2-12, 746:2-4), Rearden told its HR

7    services provider (TriNet) that it was processing LaSalle's resignation.  TT 749:9-19, DTX 309.

8    The only resignation that LaSalle conveyed to Rearden was his communication in March—there

9    was no other communication from LaSalle to Rearden concerning his employment status.

10        Even if Rearden did not fire LaSalle on February 26, LaSalle ended his at-will employment

11   by at least March 5.  He stated as much, explicitly.  He stopped going to work.  He submitted no

12   additional expense reports.  Rearden, for its part, understood this.  It processed his "final" expense

13   report, prepared a check including separation pay, and revoked his access to his office.  These

14   words and acts clearly establish not only that LaSalle terminated his own employment (which is

15   sufficient), but that Rearden understood as much (which is troubling in light of Rearden's

16   arguments and testimony to the contrary).

17        Once his employment was terminated, LaSalle was under no obligation to return the salary

18   overpayments made by Rearden following his departure.  Nor was Rearden entitled to a return of

19   any overpayments it might have made.  California law prohibits an employer from recouping any

20   part of a salary overpayment previously paid to an employee absent the employee's signed written

21

22   _____

     [7] An offer of this separation payment is also inconsistent with Rearden's contention that Mr. LaSalle
23   did anything wrong during the course of his employment.  As Perlman testified, "we don't give
     severance agreements to people who are doing something wrong relative to the company's
24   interests."  TT 853:1-2.  The fact that more than a week after the February 26 meeting, Rearden was
     still preparing to pay severance to LaSalle gives the lie to Rearden's current position that LaSalle
25   was "doing something wrong" while at Rearden.

26   [8] Interestingly, the date of termination (April 19, 2013) is the same date that, according to Perlman,
     a mysterious oral agreement assigned MOVA and the MOVA intellectual property from Original
27   MO2 to Defendant Rearden Mova (despite the fact that patents and copyrights cannot be assigned
     by oral agreements).
28



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                    - 16 -

1    agreement.  *See* Cal. Lab. Code § 221 ("[i]t shall be unlawful for any employer to collect or

2    receive from an employee any part of wages theretofore paid by said employer to said employee");

3    *Barnhill v. Robert Saunders & Co.*, 125 Cal.App.3d 1, 7 (1981) ("employer is not entitled to a

4    setoff of debts owing it by an employee"); *California State Emp's Assn. v. State of California,* 198

5    Cal.App.3d 374, 375, 378 (1988) (employer cannot make deductions from pay for prior

6    "erroneous salary advances" not "even for a prior overpayment").

### 4.    Perlman Waived LaSalle's PIIA.

8    Even if the PIIA between Rearden and LaSalle applied to the two third parties involved in

9    the MOVA Asset acquisition  (OL2 and Original MO2), the evidence presented at trial establishes

10    that Rearden (through its CEO Perlman) waived the right to enforce the contract against LaSalle

11    and/or Original MO2.  "***California courts will find waiver*** when a party intentionally relinquishes

12    a right or ***when that party's acts are so inconsistent with an intent to enforce the right as to***

13    ***induce a reasonable belief that such right has been relinquished***."  *Waller v. Truck Ins. Exch.,*

14    *Inc.,* 11 Cal. 4th 1, 33-34 (1995) *as modified on denial of reh'g* (Oct. 26, 1995) (internal quotation

15    and citation omitted, emphasis added).  "The burden … is on the party claiming a waiver of a right

16    to prove it by clear and convincing evidence that does not leave the matter to speculation, and

17    doubtful cases will be decided against a waiver." *Id.* at 31 (internal quotation omitted).  A party

18    can waive all contract rights, including waiving an anti-waiver provision, through his words or

19    conduct.  *See, e.g., Gould v. Corinthian Colleges, Inc.,* 192 Cal.App.4th 1176, 1180 (2011)

20    (finding that an "anti waiver provision would militate against a finding of waiver under most

21    circumstances" but such a clause is waived where its enforcement would be "absurd" or

22    "unconscionable"); *and Bettelheim v. Hagstrom Food Stores, Inc.* 113 Cal.App.2d 873, 878

23    (1952) (even a waiver clause may be waived by conduct).

24    Perlman's acts and statements between August 20, 2012 and February 26, 2013 were so

25    inconsistent with any intent to enforce the PIIA that they induced a reasonable belief that the right

26    to enforce the contract had been relinquished.  *See Waller,* 11 Cal.4th at 33-34.  Perlman knew

27    about LaSalle's desire to obtain the MOVA Assets for LaSalle's own benefit, and actively

28    encouraged LaSalle to acquire the MOVA Assets to that end.  In email which he forwarded to



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 17 -

1   LaSalle, Perlman explained to OL2's CEO Gary Lauder that "Greg and Ken want to try to keep

2   the MOVA business running…[and] are willing to find other work in between MOVA jobs," and

3   recommended that Lauder "transfer the assets to them through some means, and let them have a

4   go at it."  PTX 021.003.  In response to Lauder's agreement to follow his recommendation,

5   Perlman commented: "That's great.  It will mean the world to Greg and Ken," and then forwarded

6   this email to LaSalle.  PTX 021.001.  Perlman even went to far as to say that he would provide

7   LaSalle and Pearce legal and other assistance to locate and secure a "new home" for MOVA.  PTX

8   23.[9]

9          Perlman also expressly disclaimed any interest in acquiring the MOVA Assets on

10  Rearden's behalf.  Lauder summarized Perlman's statements in an October 4 email to LaSalle:

11  originally Lauder offered MOVA to Perlman "who said he did not want it, nobody would pay for

12  it and that we should just give it to you."  PTX 26.

13         Later, Perlman explicitly stated that he was not a party to the transaction between OL2 and

14  LaSalle's company, MO2.  In a November 18 email to counsel he admitted "that this transaction is

15  between Greg and OL2, and I am not a party involved.  I'm just offering suggestions and

16  information to the extent it is helpful."  PTX 035.001.  And other communications with LaSalle

17  and with lawyer Kalin during the period October 2012 into February evidence Perlman's clear

18  intent that Original MO2 was to obtain MOVA for LaSalle's benefit notwithstanding the PIIA (if

19  that contract even applied.  )  The transaction was always "for Greg" or "Greg's deal."  PTX 18,

20  19, 20, 21, 22, 25, 32.

21         Perlman made many written communications between August 20, 2012 and February 11,

22  2013 concerning the disposition of the MOVA Assets.  (See, e.g., PTX 8, 16, 17, 18, 19, 20, 22,

23  23, 25, 29, 32, 36 and 38; DTX 265.)  Based on those statements and his consistent

24  contemporaneous conduct, LaSalle reasonably believed that Perlman fully supported LaSalle's

25  _____

26  [9] Taken in context with all of the other references, "new home" refers to a partner, licensor or third
    party acquirer.  Perlman's litigation-induced testimony that "new home" refers to a facility for
27  MOVA (see TT 940:8-22) makes no sense and therefore deserves no weight.  Finding a new space
    in which to operate MOVA would have required a real estate broker, not a lawyer and someone to
28  assist with negotiations.



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                  - 18 -

1   and Original MO2's acquisition of Mova from OL2 for LaSalle's benefit.  That is especially true

2   in light of that fact that no contemporaneous writing reflects Mr. Perlman's post facto assertions

3   that Original MO2 was Rearden's subsidiary rather than LaSalle's own company.  None mentions

4   the PIIA between LaSalle and Rearden or its possible application to the transaction between third

5   parties Original MO2 and OL2.  And none suggests that the PIIA would vest ownership of the

6   MOVA Assets in Rearden.  The first hint of any such position does not appear until March of

7   2013—which was after Perlman told LaSalle his employment with Rearden was over, and well

8   *after* Original MO2's February 11, 2013 acquisition of MOVA from OL2.  *See* PTX 57.  But by

9   that point, Rearden's Perlman and Ievers were in frequent communication with their employment

10  attorneys.  *See* TT at 960:6-961:12. PTX 100.  All correspondence during the pertinent time period

11  — between August 2012 (when the PIIA was signed) and February 11, 2013 (when OL2

12  transferred Mova to Original MO2)—shows that the parties did not intend for the PIIA between

13  LaSalle and Rearden to apply to the transfer of Mova from OL2 to Original MO2.

14      Moreover, there is significant additional evidence that LaSalle and his company Original

15  MO2—not Perlman or Rearden—obtained ownership of the MOVA Assets in February 2013.

16  First, both the seller (Lauder on behalf of OL2) and the buyer (LaSalle on behalf of Original MO2)

17  intended that the MOVA Assets transfer to LaSalle's company Original MO2, not Perlman's

18  company Rearden through the February 11, 2013 Asset Purchase Agreement, and neither Perlman

19  nor Lauder ever communicated any change in this regard in a contemporaneous

20  document.  (TT 404:11-14; 405:24-406:20 (Lauder) ("Q.  Did you accept…Mr. Perlman's

21  recommendation … that Mova, in effect, be given to Mr. LaSalle and Mr. Pearce?  A. Yes"); TT

22  140:6-141:25; 141:21-22 (LaSalle) ("Q.  Did [Perlman] ever tell you that this [acquisition of

23  Mova] was for Rearden's benefit?  A. No.").)

24      Under the PIIA, LaSalle agreed to assign to Rearden certain rights to proprietary

25  information conveyed to and held by him *personally* (see PTX 007.004 ("I hereby assign to the

26  Company any and all rights…I may have or acquire in such Proprietary information), whereas the

27  MOVA physical assets and related intellectual property were conveyed to and held by a separately

28  formed company, Original MO2.  *See* PTX 042.010 (Asset Purchase Agreement between OL2 and



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                - 19 -

1    Original MO2 identifying LaSalle's home address).  There is no contemporaneous document

2    indicating that Rearden requested or LaSalle provided any broader agreement.

3           Perlman/Rearden LLC's longstanding corporate attorney, Kalin, recognized that Original

4    MO2 was not established as a Rearden division or subsidiary but instead for the benefit of

5    LaSalle.  In Bingham's engagement letter to LaSalle on behalf of Original MO2, Kalin made clear

6    there that even though "our fees will be paid by Rearden LLC, [n]evertheless, our engagement and

7    client relationship is with [Original MO2]." PTX 33; DTX 365 (engagement letter).  A separate

8    engagement letter would not have been necessary if Original MO2 had been a Rearden division or

9    subsidiary, and the record contains no evidence of separate engagement letters in connection with

10   representations of Rearden subsidiaries, such as Rearden Mova, LLC, much less for other

11   companies Mr. Kalin formed for Rearden or as Rearden subsidiaries.  And Perlman reiterated to

12   Kalin, again in November 2012 that "Greg was to get all the assets for free.  End of story."  PTX

13   87.  Perlman did not say that he, or Rearden, or some Rearden subsidiary was "to get all the assets

14   ….." for free or otherwise. Moreover, with respect to his characterization of Mova being a part of

15   "Greg's division" during his trial testimony, Perlman was confronted with the following testimony

16   from deposition:

17           Q:  Is there anything in writing anywhere which indicates that the Original MO2
             organization would be established as a division or subsidiary of Rearden?
18           ANSWER: Yes.
             QUESTION: Where?
19           ANSWER: In Greg LaSalle's PIIA.

20   TT 1102:22-1103:4.  The PIIA neither contains nor constitutes such a writing.  *See generally* PTX

21   7.

22           All corporate documents for Original MO2 — as well as all correspondence involving

23   Original MO2 and the Asset Purchase Agreement itself — reflect that as of February 11, 2013

24   LaSalle, not Perlman/Rearden, owned and controlled Original MO2 and the MOVA Assets

25   acquired on that date.   See, e.g., PTX 34, PTX 40, PTX 42, PTX 33; TT 109:15-110:12.  And

26   even after the ownership dispute arose, neither Perlman nor Rearden did anything to "correct" the

27   record with the California Secretary of State—as they naturally would have done if they believed

28   the PIIA applied and/or had not been waived.  TT 998:10-15.



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                    - 20 -

1   Furthermore, LaSalle paid personally the $1 purchase price for the MOVA Assets to OL2

2   from his personal checking account, and was not reimbursed by Rearden.  TT 143:2-8.  Similarly,

3   despite paying for the storage units that housed MOVA following the demise of OnLive and

4   before the purchase by Original MO2, LaSalle never requested reimbursement of those expenses

5   from Rearden.  *See* PTX 50, DTX 267, 275, 278, 280, 282 and 291 (expense reports submitted by

6   LaSalle between August 2012 and February 2013, none of which seek reimbursement for the

7   storage units housing Mova).

8   LaSalle relied on Perlman's representations that the transfer of the MOVA Assets by OL2

9   was for LaSalle's benefit—not Rearden's—to his detriment.  For example, LaSalle informed

10   Rearden on February 14—three days after the acquisition from OL2—that he needed "Mova

11   financials" since he owned the MOVA Assets and was "talking to some VFX companies" about

12   their possible re-sale and new employment for him and Pearce (*see* PTX 46)—which apparently

13   triggered the wrath of Perlman.  LaSalle also refused to provide the MOVA Assets when Perlman

14   demanded them in late February again because he believed he owned them, which caused his

15   separation from Rearden's employ in early March (*see* TriNet "Separation Pay One Time" for

16   earnings with "end date 3/5/13," PTX 54).

17   Finally, LaSalle took possession of the MOVA Assets, not Perlman/Rearden.  TT 189:20-

18   22.  Indeed, there is no evidence that Perlman or Rearden even tried to obtain possession of the

19   property as soon as they could after the transaction with OL2 was concluded.

20   Thus for at least these reasons (and more), Perlman's words and conduct leading up to and

21   through Original MO2's February 11, 2013 acquisition of MOVA clearly and convincingly

22   indicate that on behalf of  Rearden its CEO Perlman waived the right (if any) they may have had

23   under the LaSalle PIIA to the MOVA Assets.

24   **5.    The Parties to the PIIA Modified the PIIA Such That it Did Not Apply to LaSalle's Mova-Related Activities.**

25   Even if the PIIA could be construed—contrary to its express terms—to apply to acquisition

26   of the MOVA Assets by Original MO2, the contract was modified by Perlman's writings in his

27   multiple emails.  The sender's name typed on an e-mail is sufficient to constitute a "signed writing"

28



1   modifying a written agreement.  *Lamle v. Mattel, Inc.,* 394 F.3d 1355 (Fed. Cir. 2005) (applying

2   California law).  There are numerous writings of this sort in evidence in this case.  For example, in a

3   September 20, 2012 email which he forwarded to LaSalle and Pearce (PTX 021.001), Perlman

4   wrote that he wanted LaSalle and Pearce to "have a go at" the MOVA business and that although

5   he'd provide help and advice, they were to "get it running under their own steam."  PTX 021.003.

6   Perlman also wrote that he would let LaSalle and Pearce use Rearden's offices, host their website at

7   mova.com, and provide them with business advice.  PTX 021.004.  He wrote further that he

8   (Perlman) would help LaSalle with legal resources to create a company to hold the MOVA Assets.

9   PTX 020.001.  Similarly, when in late October 2012 he arranged for LaSalle's yet-to-be-formed

10  company (Original MO2) to be represented by the Bingham firm—(*see* PTX 28-PTX 33) Perlman

11  effectively modified the PIIA by sanctioning in writing the acquisition of MOVA for LaSalle's

12  benefit.  And, of course, the many further email writings by Perlman during the course of the

13  negotiations with OL2 —consistently referencing the acquisition as a deal to benefit LaSalle—

14  reinforce the conclusion to an even greater extent.

15          Moreover, a promise set forth in writing which modifies a duty under a contract not fully

16  performed on either side is binding notwithstanding lack of consideration so long as the

17  modification is fair and equitable in view of circumstances not anticipated by the parties when the

18  contract was made.  1 Witkin, *Summary of Cal. Law* (10th ed. 2014), Contracts § 964, p. 1056,

19  citing Restatement (Second) of Contracts § 89.  Therefore, it is reasonable to conclude that it was

20  fair and equitable to modify the PIIA to exclude the MOVA Assets because, among other reasons:

21              a.   Rearden was an incubator, and not in business of acquiring mature technology,

22                  much less mature facial motion capture technology (TT (LaSalle) 82:25-83:8; TT

23                  (Pearce) 326:13-327:1; TT (Ievers) 756:11-16; TT (Perlman) 769:9-22);

24              b.   Perlman stated repeatedly that he saw no value in the MOVA Assets and did not

25                  want them (e.g., PTX 021.002; PTX 026.001; TT (Pearce) 344:10-19); and

26

27              c.   the MOVA Assets were unusable without LaSalle and Pearce.  PTX 021.003.

28



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 22 -

The PIIA was also orally modified by the parties.  Oral modification is available where the underlying contract contains a writing requirement if the oral modification is fully executed.  *E.g.,* *D. L. Godbey & Sons Const. Co. v. Deane*, 39 Cal.2d 429, 432 (1952); Cal. Civ. Code § 1698 (b) ("A contract in writing may be modified by an oral agreement to the extent that the oral agreement is executed by the parties.").  Whether a written contract has been modified by an executed oral agreement is a question of fact. *Weber v. Jorgensen*, 16 Cal. App. 3d 74, 81 (1971).

As explained above, Perlman and LaSalle discussed and agreed that Original MO2 was formed to acquire the MOVA Assets for the benefit of LaSalle and Pearce, not the benefit of Perlman, and communicated their agreement to Lauder, the seller of the MOVA Assets.  PTX 021; Lauder Testimony, 405:24 – 406:20; LaSalle Testimony, 141:11-25.

Modification as contemplated was fully executed when the MOVA Assets were transferred from OL2 to Original MO2 on February 11, 2013—prior to the time Perlman announced that he had changed his mind.[10]  The PIIA was therefore modified even without a signed writing.

### 6.    LaSalle Did Not Misappropriate "Proprietary Information"; thus, the Assignment Provision Does Not Assign MOVA to Rearden.

The only assignment provision in LaSalle's employment agreement with Rearden is the PIIA's Assignment of Rights clause (Section B).[11]  PTX 007.004.  This language covers only Proprietary Information:  "I hereby assign to the Company any and all rights, title and interest I may have or acquire in … Proprietary Information." *Id*. The MOVA Assets are not Proprietary Information as Rearden elected to define that term.

The PIIA was part of the package of agreements which Rearden prepared and presented, and which LaSalle signed on August 20, 2012.  TT 69:23-70:23, 336:6-17, 728:21-729:23.  The agreements included an offer letter, the PIIA, and the Arbitration Agreement.  TT 728:21-729:23.  Under Cal. Civ. Code §1642, "Several contracts relating to the same matters, between the same

---

[10] After February 11, 2013, Perlman told LaSalle and Pearce that he had "changed his mind."

[11] Defendants seem to argue that LaSalle breached various other provisions of his employment agreement.  However, LaSalle is not a party (and was not allowed to attend trial as a party) and Defendants have not brought any claim against LaSalle for any such alleged breaches.  Moreover, as noted below many of the acts of which Defendants complain in the regard were not violations under applicable California law.



1  parties, and made as parts of substantially one transaction, are to be taken together."  Here, in

2  addition to the fact that the "Full Time Exempt Offer Letter" expressly states that "this letter, the

3  Proprietary Infomiation and Inventions Agreement, and the Mutual Agreement to Arbitrate Claims

4  (enclosed) contains our complete agreement regarding the terms and conditions of your

5  Employment,"  the three documents are between the same parties (Rearden and LaSalle), and were

6  made as part of substantially one transaction (the August 20, 2012 commencement of LaSalle's

7  employment with Rearden).  Further, according to Cal. Civ. Code § 1641, "The whole of a

8  contract is to be taken together, so as to give effect to every part, if reasonably practicable, each

9  clause helping to interpret the other."  Thus, the overall purpose of the transaction must be

10  considered in interpreting its parts.

11  The overall purpose of the PIIA is described in term 3 of the Offer Letter.  The PIIA was

12  intended to protect information that belonged to the Company or that was developed during the

13  course of employment: "As an employee of the Company, you will have access to certain

14  confidential information of the Company and you may, during the course of your employment,

15  develop certain information or inventions, which will be the property of the company.  To protect

16  the interests of the company … you are required to sign [the PIIA]."  PTX 007.001 (bottom).

17  The definition of Proprietary Information is consistent with that purpose: "For purposes of

18  this Agreement, 'Proprietary Information' is information that was or will be developed, created, or

19  discovered by or on behalf of the Company, or which became or will become known by, or was or

20  is conveyed to the Company, which has commercial value in the Company's Business."  PTX

21  007.003, A.3, ¶ 1.  According to that definition, and especially in light of the purpose of the PIIA,

22  the MOVA Assets are not Proprietary Information.

23  Although Rearden originally developed MOVA, it transferred the property to OnLive in

24  2007.  TT 61:7-10, 62:16-63:11, 329:9-13, 329:24-330:19, 671:25-672:12, 776:15-20; PTX 31,

25  PTX 42. The property was subsequently transferred to OL2 in 2012.  TT 778:7-10.  As a result, on

26  August 20, 2012, the MOVA Assets did not belong to Rearden.  TT 76:21-77:2, 259:7-12.  Nor

27  were they developed or improved by Rearden during the period of LaSalle's employment.  *See* TT

28  82:25-84:21, 128:6-21, 151:22-152:9, 338:20-23, 339:5-340:10, 340:14-22, 879:13-25 (no



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 24 -

1   mention of ongoing development), 925:2-3 (Rearden did not rebuild the MOVA hardware rig and

2   thus could not have used let alone further developed the technology).  Thus, the MOVA Assets, as

3   sold by OL2 to Original MO2, were not developed, created, or discovered by Rearden (the

4   "Company" in the PIIA) in or after August 2012.

5         The MOVA Assets also did not "become known" to Rearden during that period and were

6   not "conveyed" to Rearden during that period.  PTX 007.003, A.3, ¶ 1.  The only way to conclude

7   that they were is to assume that the sale by OL2 to MO2 in February 2013 operated to make the

8   MOVA Assets "known" or "conveyed" to Rearden.  Any such reasoning is circular; it assumes too

9   much and proves too little.  For example, Rearden developed MOVA in the first place, years prior

10  to 2012, and thus did not "become known" to Rearden during the 2012 and 2013 period covered

11  by LaSalle's PIIA.  Also, unless one begins this analysis by assuming that Original MO2 was

12  acting on behalf of Rearden, there is no evidence that during LaSalle's tenure at Rearden, Original

13  MO2 agreed to convey the MOVA Assets to Rearden.

14        On its face, then, the portion of the definition of "Proprietary Information" on which

15  Defendants rely thus does not apply to the MOVA Assets.  Because the MOVA Assets are not

16  "Proprietary Information," they are not covered by the Assignment of Rights provision of the

17  PIIA.

18        Further still, the physical elements of the MOVA Assets--as well as the Mova, LLC entity

19  which existed at the time--also fall entirely outside the scope of the Assignment of Rights

20  provision.  As defined in the Rearden document itself, Proprietary Information is limited to

21  various types of "information"  PTX 007.003, A.3, ¶¶ 1-2.  The definition does not encompass

22  physical assets nor any independent corporate entity  such as Mova, LLC.  For this reason as well,

23  the PIIA Assignment of Rights provision—again by its very terms—does not apply to much of

24  what constitutes MOVA.

25  **IV.    PERLMAN DISAVOWED ANY OWNERSHIP THAT REARDEN MAY HAVE
          HAD IN ORIGINAL MO2**

26        California Labor Code section 2860 states in relevant part that "[e]verything which an

27  employee acquires by virtue of his employment, except the compensation which is due to him from

28



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

his employer, belongs to the employer." Cal. Labor Code § 2860. "However, this statute is but an expression of the familiar principle that forbids an agent or trustee from using the trust property or powers conferred upon him for his own benefit, and it applies to a limited class of cases, primarily involving the exploitation of an employer's confidential information or trade secrets by a former employee to the employer's detriment. … Labor Code § 2860 does not grant NetApp a general property right for non-confidential, non-trade secret employee work product." *NetApp, Inc. v. Nimble Storage, Inc.*, No. 5:13-CV-05058-LHKHRL, 2015 WL 400251, at *17 (N.D. Cal. Jan. 29, 2015) (citations omitted).

"The statute [] does not apply to things an employee creates, as opposed to acquires" and does not apply to a product, even if created by the employee creates a product as part of his duties while employed, if "by appropriate agreement, the employee retains some right in or with respect to the product" 29 Cal. Jur. 3d Employer and Employee § 35 (case citations omitted). *See also Stevens v. Nat'l Broad. Co.*, 270 Cal. App. 2d 886, 890, 76 Cal. Rptr. 106, 108 (Ct. App. 1969).

Here, although LaSalle personally paid for Original MO2's acquisition of MOVA from OL2 (TT 142:20-143:8), it is true that Rearden paid the legal fees associated with both the establishment of Original MO2 and its acquisition of MOVA (TT 103:15-25). Also, it is undisputed that from the time of Original MO2's establishment on November 9, 2012, through the time MO2 acquired MOVA from OL2 on February 11, 2013, LaSalle was a Rearden employee. Nonetheless, Original MO2 does not belong to Rearden and Original MO2's acquisition of MOVA was not for the benefit of Rearden.

As explained above (in the section on waiver of the PIIA), Perlman proclaimed, often, that Original MO2 was LaSalle's company, that MOVA was being acquired for LaSalle's benefit, and that Perlman and Rearden were acting to assist LaSalle and not to obtain any financial benefits for themselves. These proclamations were made to LaSalle himself, to LaSalle's attorney Kalin, and to OL2 and Lauder. Not only did Perlman never say anything to the contrary (at least not until after the acquisition was complete), all of Perlman's actions were consistent with these proclamations.

"The doctrine of promissory estoppel … applies even though there is no misrepresentation: One who makes a promise upon which another justifiably relies may be bound to perform it, despite



1    lack of consideration; i.e., the estoppel is a substitute for consideration." 1 Witkin, Summary 10th

2    Contracts § 244 (2005).  Promissory estoppel requires that a promise be made and that it be

3    detrimentally relied on.  *Id.* § 245.

4      Perlman's words and deeds clearly convey a promise by Perlman/Rearden or an agreement

5    between LaSalle and Perlman/Rearden by which Perlman/Rearden were to help LaSalle create

6    Original MO2 and acquire MOVA.  The record establishes that, at the very least, this promise was

7    publicly made and was fully relied upon by LaSalle (and others).  LaSalle's reliance was to his

8    detriment, because instead of, e.g., seeking immediate employment (such as with DD3, Disney, or

9    LucasFilm), LaSalle focused his time and effort on obtaining MOVA for MO2 and aligning his

10   career with the success of MOVA, a success that Defendants have put at risk.

11     Moreover, Perlman's actions and statements go well beyond what is necessary to waive any

12   claim that he or Rearden may have to Original MO2 by dint of the circumstances of Original MO2's

13   founding.  As explained elsewhere in this Brief, waiver arises when a party intentionally

14   relinquishes a right, or when its acts are so inconsistent with an intent to enforce the right as to

15   induce a reasonable belief that such right has been relinquished. *Intel Corp. v. Hartford Acc. &*

16   *Indem. Co.*, 952 F.2d 1551, 1559 (9th Cir. 1991).  Perlman/Rearden's behavior and communications

17   express to any objectively reasonable observer that both Original MO2 and the acquisition of

18   MOVA by Original MO2 were for the benefit of LaSalle, even if almost completely funded by

19   Rearden and performed during the period of LaSalle's employment by Rearden.

20     For at least these reasons, the only objectively reasonable inference that can be drawn is that

21   Original MO2 belonged to LaSalle for the benefit of LaSalle, and that Original MO2's acquisition

22   of MOVA was, likewise, for the benefit of LaSalle.

23   **V.   THE RECORD CONTRADICTS DEFENDANTS' AND MR. PERLMAN'S STORY**
     **AT VIRTUALLY EVERY TURN.**

24
       The evidence adduced at trial—especially the contemporaneous documentary evidence—
25
     along with instances where no such evidence exists, cannot sustain Defendants' assertions regarding
26
     the key facts and events in this case.  As the following analysis illustrates, the necessary foundation
27
     is lacking for Defendants' claim of ownership of the MOVA Assets.
28



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

A.   **LaSalle and Pearce Were Not Resuming Former Job Duties When They Re-Joined Rearden in 2012 Because OL2, Not Rearden, Owned MOVA at the Time.**

The OnLive Assignment for Benefit of Creditors ("ABC") created a chaotic environment (TT 674:11-16)  and was not a "normal" time for Rearden.  TT 680:7-13.  The ABC took place on Friday, August 17, 2012.  LaSalle and Pearce executed Rearden employment agreements the following Monday, August 20, 2012.  PTX 7; DTX 262.  Rearden's HR Manager Ievers suggested that while Rearden's employment agreements typically include job descriptions, they were not provided due to the time crunch.  TT 680:1-18.

Perlman, who was present for all of the testimony in this trial, did not corroborate Iever's testimony.  He instead attributed the lack of job descriptions to LaSalle and Pearce "resuming" the roles they had when they had last worked for Rearden (*before* joining OnLive):

> Q. Why did they not need to include job descriptions?
> A. We don't add job descriptions when people are resuming the same job responsibilities that they had from a previous employment.
> Q. In August of 2012 how many people did Rearden rehire who had previously worked at Rearden?
> A. Five.
> Q. And did any of those employees have job descriptions as a part of their employment agreements?
> A. None did.

TT  786:10-19; *see also* TT 679:20-25.

This explanation is not only inconsistent with Iever's testimony, it is incredible.  Even if LaSalle and Pearce had the same titles , how could they be resuming the same duties they had at Rearden in 2006 (which were primarily focused on MOVA), if Rearden  did not own MOVA at the time of their hiring in August 2012, and it was not clear that Rearden ever would?   LaSalle and Pearce both testified—without contradiction—that neither of them performed facial motion capture work at Rearden starting in August 2012 or that doing so would be part of their job responsibilities.  TT 82: 25-83:10; 84:13-21; 128:6-21; 335: 3-8. Their initial jobs instead were to relocate the MOVA Assets to storage.  PTX 8, 14; TT 69: 9-22; 74: 18-23; 335:9-336:4.  For example, Pearce explained:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Q. Did you – did Mr. Perlman have a conversation – when Mr. Perlman offered you the job, did you have a conversation with Mr. Perlman about what your job duties would be?
A. No. The only thing that I did know is that we immediately has to get all of the Mova equipment out of the studio that Mova was in before the end of August so that we wouldn't be paying rent on that space for September.
Q. And when Mr. Perlman offered you the job, did he say that your job would involve facial motion caption work?
A. No.

TT 333:6-15.  Neither LaSalle nor Pearce knew what was going to happen with MOVA, which was owned by OL2 at the time:

> THE COURT:   Mr. Pearce, when it was said that Mova equipment needed to be packed up and moved out of the space by the end of August, 2012, was it your anticipation that that equipment would have, at that time as you understood it, any further use or this equipment would just go into storage?
>
> THE WITNESS:  I had no idea.

TT 333: 16-21;  *see also* TT 84: 22-85:1.  Indeed, Pearce ran out of work after the two weeks at Rearden.  TT 335:9-336:4; 342: 21-22.  Perlman's justification for absence of job descriptions is contrary to the record.

### B.   Perlman and Lauder Did Not Agree in September 2012 that Lauder Would Give MOVA to Perlman; Instead, Lauder and OL2 Agreed Only to Sell to LaSalle and Pearce.

Months after the fact, through his lawyer Eric Tate at Morrison and Foerster, Perlman claimed that following the demise of OnLive, "Gary Lauder, owner of OL2, had committed to transfer the Mova IP to Mr. Perlman."  PTX 066.001; *see also* TT 926:15-927:6.  Lauder, who is neither a party to nor affiliated in any way with any party to this case, made no such commitment. Indeed, according to Lauder, Perlman never expressed an interest in obtaining MOVA: "Originally, I offered it to Steve who said that he did not want it, nobody would pay for it and that we should just give it to [LaSalle]." PTX-26.001; *see also* TT 402:11-16.  This belies the further assertion advanced by Tate for Perlman that from the time LaSalle was hired by Rearden, it was his job to obtain MOVA for Rearden's benefit.  PTX 66.

Instead, consistent with *all* of the contemporaneous documentation and the testimony of LaSalle and Lauder, the deal was for the benefit of LaSalle and Original MO2 (and indirectly Pearce), not Perlman and Rearden.  *See also* PTX 18, 19, 20, 21, 22, 23, 29, 83, 85.  As discussed



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 29 -

above, Lauder and OL2 **only** agreed to sell on the terms by which Original MO2 acquired Mova **if** that sale for the benefit of LaSalle and Pearce:  "We both agreed to the recommendation by Steve that we give the company to Greg and Ken."  Tr. Trans, 407:17-18; *see also* PTX 18, 19, 20, 21, 22, 23, 24, 25, 26.  Lauder would **not** have sold the assets on those terms if they were for the benefit of Rearden and Perlman:

> Q. If someone had told you that the Mova assets were being transferred to the -- for the benefit of Mr. Perlman, would you have sold those assets for a dollar?
>
> A. Not without having a lot more due diligence. More likely, I would have tried to structure something whereby if it was successful, I would benefit in some way. But I would not have been philosophically averse to Steve making a business of it and my working out an arrangement with him.

(TT 406:12-20)  Thus, contrary to Perlman's representations, not only did Lauder not commit to transfer to Rearden/Perlman, that possibility was never discussed.

### C.    Perlman Never Told LaSalle or Pearce that he Would Support Their Acquisition of MOVA Only If They Left Rearden's Employ.

In his October 2, 2012 email to Lauder after learning of the potential sale of MOVA to a third party before gifting it to LaSalle and Pearce, Perlman stated that he was under the impression that "Rearden would need to support Greg and Ken until the transfer was complete, and then help on the legal/negotiation side to find a new home."  PTX 023.003.  Perlman's statement was consistent with his earlier recommendation to Lauder on September 20, 2012 that Perlman provide LaSalle and Pearce with use of Rearden's office space, email hosting and business advice to help them "get it running under their own steam."  PTX 018.001.  That was in fact the deal.  Perlman's assistance did not require LaSalle or Pearce to go off the Rearden payroll, as Perlman later asserted in litigation.  What LaSalle and Pearce needed to do to find a new home was to acquire MOVA, then either negotiate a deal with a third party to partner to acquire or license MOVA, or set up a shop on their own.  **None** of these activities violated the terms of the PIIA or the duty of loyalty.[12]  Rather

---

[12] Such activities constitute mere preparations to compete, which LaSalle and Pearce were entitled to undertake.  *See* Restatement (Second) of Agency, § 393 (e) (employee "is entitled to make arrangements to compete" prior to the end of employment).



than punish Pearce and LaSalle for engaging in these activities, Perlman offered to assist them. PTX 018.001, PTX 021.001, PTX023.003; PTX025.001; TT 92:25-94:3; 406:23-407:18.

Nonetheless, Perlman testified at trial that he told LaSalle and Pearce that he would only provide assistance if they were off the payroll:

> Q. At this time, September 20th – September of 2012, did you tell Mr. LaSalle and Mr. Pearce that what you suggest here at Item 3 by way of assistance applied only if they went off the Rearden payroll?
> A. Yes.
> Q. Did you tell them explicitly at that time?
> A. Sure

TT 930: 10-16.  This testimony is not reflected in any contemporaneous document nor did LaSalle or Pearce testify that they were advised as such.  At his deposition, Perlman himself equivocated on whether he made it clear to LaSalle and Pearce that they needed to leave the payroll, concluding "So whether or not I actually went and made this explicitly clear to them or not in September, I don't know exactly how much you went through this, but it wasn't necessary."  TT 933: 23-934:1.  The evidence thus does not support Perlman's attempt to recast his offers of assistance as contingent on LaSalle and Pearce leaving Rearden's employ.

> **D.   Perlman Never Told Anyone that LaSalle was Obtaining Mova for Rearden and, to the contrary, told Everyone that it was for LaSalle or LaSalle and Pearce.**

The contemporaneous written record contains no evidence supporting the notion that LaSalle (or Original MO2) was obtaining MOVA for Rearden or that Original MO2 was formed for the benefit of Rearden.  Aside from Defendants' litigation-motivated testimony, the record is devoid of *any* evidence whatsoever that Perlman *ever* communicated that Mova was being acquired by or for the benefit of Rearden at any time prior to or coincident with Original MO2's acquisition of MOVA.  None of the communications between Perlman/Rearden on the one hand and Lauder/OL2 on the other even hint that at the idea.  Nor do communications between Perlman/Rearden on the one hand and Kalin on the other.  The same is true with respect to contemporaneous written communications between Perlman/Rearden on the one hand and LaSalle on the other.  Furthermore, LaSalle testified that Perlman *never* told him that he was acquiring MOVA for Rearden or for Rearden's benefit.  TT 141:11-25.

1    Not only does the contemporaneous written record lack support for the notion that LaSalle

2 (or Original MO2) was obtaining MOVA for the benefit of Rearden, it expressly contradicts it.  In

3 the contemporaneous written evidence—including that dated after Perlman's purported October 2,

4 2012 change of mind—Perlman/Rearden repeatedly disavowed to any involvement in the

5 acquisition of MOVA to: Lauder/OL2, Kalin, and LaSalle.  For example:

6    - On September 20, 2012, Perlman told Lauder that Mova was outdated, not monetizable, and

7        probably not salable, and "suggest[ed] [that Mr. Lauder/OL2] transfer the assets to [Greg

8        and Ken] through some means, and let them have a go at it," indicating that he would let

9        Greg and Ken "use Rearden's SF office . . . [and] provide them with business advice and

10        help them over bumps (as [Mr. Perlman did] for many little companies."  PTX 018.001; TT

11        950:21-951:6On September 21, 2012, Perlman pinged Lauder, stating that "I hope the Mova

12        decision is straightforward and you can just enable Greg and Ken."  PTX 19.  Later that

13        same day, Lauder and OL2's management agreed to transfer the MOVA Assets to "Greg

14        and Ken."  (PTX 020.001-002)  Shortly thereafter, Perlman informed LaSalle and Pearce of

15        Lauder's decision.  (PTX 021.001.)

16    - On September 22, Perlman responded to Lauder that "[t]his was really the right thing to do,

17        and thanks for doing it.  I'll help Greg and Ken with the legal resources to set up a company

18        to hold the assets . . . ."  PTX 021.001.

19    - On October 2, after Lauder realized that he had a fiduciary duty to try to do something with

20        Mova before giving it to "Greg and Ken" and communicated as much, Perlman asked Mr.

21        Lauder to "please reconsider and simply transfer the MOVA Ssets to Greg and Ken.  *Even if*

22        *Greg and Ken end up setting up a deal with ILM or someone else*, let Greg and Ken

23        structure it.  For example, it might include moonlighting between projects, which is common

24        in the business . . . and that's just one example."  PTX 023.004 (emphasis added).

25    - On October 3, Perlman told Lauder that "I had told Greg and Ken that neither you nor I

26        would be profiting from the disposition of MOVA . . . and that I would help them at my cost

27        providing comp for a transition period."  PTX 025.001.

28    - On November 10, 2013, in a message to attorney Kalin alone, Perlman describes the deal



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 32 -

1   with Lauder as follows: "Greg was to get all of the assets for free.  End of story."  (PTX

2   87.001.)

3   -   On November 17, 2013, after introducing LaSalle to his long-time corporate lawyer Kalin so

4       that Kalin could help Mr. LaSalle form Original MO2 and acquire Mova, Perlman expressly

5       asked Kalin to "***please bear in mind that this transaction is between Greg and OL2, and I***

6       ***am not a party involved***.  I'm just offering suggestions and information to the extent it is

7       helpful."  PTX 035.001 (emphasis added).

8       In short, the only evidence supporting the theory that Mova was acquired by, for, or at the

9   direction of Rearden or any of its personnel is  self-serving, litigation-motivated testimony.  TT

10  951:25-952:3 The entire balance of the evidence—especially the contemporaneous written record—

11  contradicts that claim.

12      **E.    All Contemporaneous Evidence Contradicts Perlman's Testimony that MOVA
             was to be a Division or Subsidiary of Rearden after Original MO2 Purchased
13           It.**

14      Further self-serving testimony to the contrary notwithstanding, the contemporaneous written

15  record expressly contradicts the theory that MOVA was or was to be a division or subsidiary of

16  Rearden after Original MO2's acquisition.  For instance, both before and after the transaction,

17  Perlman repeatedly indicated that LaSalle and Original MO2 would need to get independent

18  funding for Mova—which is inconsistent with the notion that Mova was or was to become part of

19  and therefore funded by Rearden:

20  -   On November 9, 2012, Perlman stated to Kalin that "[t]here's zero chance Greg will get any

21      funding under those circumstances because if he ever creates a market for IP, OL2 will have

22      a right to it," the circumstances referred to being provisions in the draft agreement between

23      Original MO2 and OL2 containing language which, in Perlman's opinion, would leave OL2

24      with "a non-exclusive license for the IP for any use whatsoever they come up with in the

25      future."  PTX 085.001.

26  -   On November 27, Perlman stated to Kalin that "no one is going to provide any funding for a

27      business whose assets can be taken away for any reason in the future, and Gary had made it

28      very clear his purpose was to allow Mova to continue its business going forward."  PTX



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                    - 33 -

1    036.002.  The business contemplated by this statement was any Mova business Original

2    MO2 might be able to get if it successfully acquired Mova.  (*See id.*)

3        It does not make sense that LaSalle would need to get funding for Mova if Original MO2 (or

4    Mova) was or was to become a division or subsidiary of Rearden after the acquisition, as it would

5    have received funding from Rearden.

6        When confronted with emails that he himself had written and which discussed various

7    aspects of "Greg's" business (or, when directed to LaSalle, "your" business), Perlman repeatedly

8    tried to read "division" into the record despite its absence from the correspondence.  TT 999:23, TT

9    1002:12-22 ("division" appears in testimony struck by the Court), 1014:3-18, 1085:4-10.  As the

10   Court tentatively recognized, "Mr. Perlman's use of the word "Greg," for example, in an e-mail that

11   we discussed today did not mean Greg's division.  It meant Greg LaSalle."  TT 1119:18-20.

12       Yet again, Perlman's assertions at trial do not withstand scrutiny.

13   **F.    Perlman Never Fired Pearce; The Record Contains No Evidence Supporting a**

14   **Contrary Finding.**

15       Perlman testified that he "terminated [Pearce's] salary" because of Pearce's arrangement

16   with Lauder to sell MOVA.  TT 809: 25-812:11.  This testimony— like much of the rest of what

17   Perlman had to say at trial—is unsupported by the record.

18       Pearce testified that he ran out of work for Rearden in mid-September.  TT 342:18-343:3.

19   In early October 2012, Perlman and Pearce met to discuss Pearce's lack of work.  In that

20   conversation, Perlman offered to allow Pearce to go on an unpaid leave of absence with medical

21   benefits.  TT 350:3-19.  Pearce told Perlman that he was grateful.  TT 350:20-25.  This all took

22   place *before* Pearce contacted Lauder to inquire as to the status of MOVA.  TT 352:10-353:9.

23   Perlman did not dispute this timing in his testimony.

24       Thus, contrary to Perlman's contention at trial, placing Pearce on unpaid leave of absence

25   status was not prompted by Pearce's discussions with Lauder; Perlman had already decided that

26   Pearce would go on unpaid leave because there was no work for him to do at Rearden.  In fact,

27   after the conversation with Perlman about his employment status, Pearce was motivated to contact

28   Lauder to determine what was happening with MOVA:  "So it was either, I think the day after our



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                    - 34 -

1    initial discussion about leave of absence or it might have even have been the same day.  I was like:

2    Okay, I want to a [sic] find out what's going on so I can start planning if I'm going to have a

3    stretch without income or anything." TT 353:2-6.  Pearce then emailed Lauder.  PTX 024.003.

4         Perlman's statement to Lauder later that day that "Ken just dropped off of Rearden's

5    payroll" (PTX 023.001) is therefore consistent with Pearce voluntarily stepping away from

6    Rearden because there was nothing for him to do and going on unpaid leave of absence, as had

7    already been decided.  It is not a communication to Lauder (or anyone else) that Pearce's

8    employment had been terminated or was being punished.  Nor should it be interpreted as such in

9    the context of that email.  Perlman was complaining to Lauder that if Lauder and OL2 were going

10   to retain some of the profits from a sale of MOVA, then Lauder should front the costs for Pearce

11   and LaSalle's interim employment.  Perlman was not complaining about Pearce going behind his

12   back, he was complaining about what he perceived as an inequitable distribution of the costs of

13   helping Pearce and LaSalle until they could benefit from MOVA.

14        Moreover, Pearce's statement to Lauder that "It's not right that Steve is paying for my time

15   there and so I think it's time for me to move on" (PTX 024.001) was based on Pearce feeling

16   "uncomfortable with the idea of being paid for doing nothing" and had no connection to Pearce

17   and LaSalle's efforts to obtain MOVA from OL2.  TT 357:16-358:16.

18        In short, there is no documentary evidence that Perlman fired Pearce or punished Pearce

19   for some action he took.

20        Also contrary to Perlman's version of events relative to the change in Pearce's

21   employment status is that Ievers, *the HR Manager*, a long-time colleague of Pearce and a key

22   figure in a company of approximately 13 people, was not aware of Perlman's alleged firing of

23   Pearce or any association between his change in employment status and his behavior with respect

24   to MOVA:

25

26         Q. And Mr. Pearce left Rearden by mutual consent; correct?
           A. Yes.

27         Q. Did the changes in Mr. Pearce's employment status --
           because I believe he also went on -- he also went on unpaid
           leave at some point in 2012 or 2013; correct?

28         A. Yeah, he went on unpaid leave.



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

1
2
3
4
5
6
7

Q. Did the changes in Mr. Pearce's employment status -- let me ask it as two separate questions.
Did Mr. Pearce going on unpaid leave have anything to do with actions that he took with respect to Mova?
A. I'm unaware.
Q. Did Mr. Pearce's leaving the employment of Rearden have anything to do with his actions with respect to Mova?
A. I was instructed to do a termination, so I don't know actually.
Q. You were never told that these employment actions were being taken as a consequence for anything Mr. Pearce had done with respect to Mova?
A. No.

8      TT 747: 4-20.

9          Further still, when Pearce applied for California unemployment benefits, Rearden did not

10     object.  TT 746:19-747:3.  An employee is not eligible for unemployment benefits if he has been

11     fired for a breach of his material duty to the employer and that breach injured the employer's

12     business interests.  *See Irving v. California Unemployment Ins. Appeals Bd.*, 229 Cal. App. 4th

13     946, 959 (2014); Cal. Code. Regs. Tit. 22, §1256-30 ("Discharge for Misconduct – General

14     Principles").  That Rearden did not contest Pearce's unemployment application further

15     demonstrates that Pearce was not fired for breaching any duty of loyalty or other obligation to

16     Rearden or any other alleged misconduct involving MOVA.

17         If Perlman is to be believed, Ievers would have known that Pearce was fired and his attempt

18     to receive unemployment benefits would have been rejected.   Pearce—in his uncontradicted

19     testimony—explained that he had run out of work and Perlman offered to put him on unpaid leave.

20     Ievers' lack of knowledge of Pearce's supposed firing corroborates Pearce's testimony.   Only

21     Perlman's testimony is to the contrary.

22         This self-serving testimony is ***critical*** to Defendants' case.  It is the foundation for

23     Perlman's story that LaSalle went along with Perlman's plan for Rearden to acquire MOVA,

24     because Perlman alleges LaSalle did so out of fear that what (allegedly) happened to Pearce would

25     also happen to LaSalle.  Perlman stated:

26
27
28

I made it clear, because, in fact, I did terminate Ken Pearce's salary and, of course, Greg was well aware of that.  And so, you know, it – it's the most extreme, if you will – and I guess the word I'm hearing here is "sanction."  We probably wouldn't use that term, but if you were going to say what is the most extreme sanction against an employee, it would be to terminate them.  And particularly that's true if it's a long-term employee that you –



1  you've known for a long time.  For something to happen like that is very – very
2  severe.  And there is absolutely no question about what the message was to Greg in that
3  case; that if you get involved in a transaction with Mova for your own benefit or for the
   benefit of someone else or in any way for not – not for Rearden's benefit exclusively, then
4  this would be the consequence.

5  TT 906:8-22.  But since Pearce was not fired (and in fact continued to receive medical benefits as

6  Perlman and Pearce had previously arranged), and any change in Pearce's employment status was

7  unrelated to Pearce's MOVA-related actions, Perlman's assertion that LaSalle sought to acquire

8  MOVA for Rearden because he was afraid of getting fired has no foundation in fact.  *See also* TT

9  287: 2-14.  LaSalle and Pearce both understood that MOVA was being acquired from OL2 for

10  their benefit, not Rearden's.  *See, e.g.*, TT 141:11-25; 370:7-17.

11  **G.    The Contemporaneous Documentary Evidence Supports that Perlman Fired
             LaSalle During a February 26, 2013 Confrontation.**
12

13  Perlman testified that he did not fire LaSalle on February 26, 2013 and that he did not

14  promise LaSalle three weeks' severance.  Ievers testified that, despite the fact that LaSalle told her

15  on February 26, 2016 that he had been fired by Perlman, she was later informed that LaSalle had

16  not been fired at that time.  TT 852:5-853:4 (Perlman), 734:4-735:5 (Ievers).  Yet again, the

17  contemporaneous documents tell a different story—that on February 26,2013, Perlman did indeed

18  tell LaSalle that his employment with Rearden was over, and that he was indeed promised three

19  weeks' severance.

20  For example, on February 28, 2013, Ievers sent Perlman an email asking Perlman to

21  "[p]lease approve Greg's ***final*** expense report."  PTX 50 (emphasis added).  LaSalle submitted no

22  expense reports after February 28, 2013.  (*See* Exs. PTX 50, DTX 267, 275, 278, 280, 282 and 291

23  (all expense reports in the record, all dated on or before February 28, 2013).)  Obviously if

24  LaSalle's employment had not been terminated and if Ievers had not been so informed, she would

25  not have said "final" in this message.

26  Similarly, the very next salary installment arranged by Ievers for LaSalle demonstrates the

27  actual understanding between Rearden and LaSalle regarding severance.  The pay stub prepared for

28  LaSalle—for the brief period starting on March 1, 2013 and ending March 5, 2013 (which in and of



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 37 -

1   itself indicates end of tenure) —includes a line item for "Separation Pay One Time," a value for

2   "Rate" and a value for "Earnings." All reflect the severance Perlman told LaSalle he would get

3   during their February 26 meeting.  *See* PTX 054.001.  The "Rate" column corresponds to LaSalle's

4   hourly rate—his annual salary divided by the number of hours he was to work in a year.  The

5   amount in the "Earnings" column equals to the rate multiplied by 120—in other words, the rate

6   multiplied by three 40-hour work weeks.  This is consistent with LaSalle's testimony and

7   contradicts that of Perlman and Ievers, who may have an understandable tendency to try to protect

8   her boss and company in these proceedings.

9        Defendants' privilege log (PTX 100) also suggests Perlman terminated LaSalle's

10   employment on February 26, 2013.  Prior to February 26, 2013, only three entries (exclusive of

11   attachments to the communications) have to do with "employment law"—and all of those email

12   communications are with Jacqueline Cookerly Aguilera of Bingham McCutchen.  *See* PTX 100 at

13   Seqs. 1, 223-224.  On February 27—the day after LaSalle contends he was fired—Ievers and

14   Perlman both reach out to Kalin "seeking legal advice re employment law" and Ievers corresponds

15   with Perlman "reflecting legal advice re: employment law from Jacqueline Cookerly Aguilera of

16   Bingham McCutchen."  *See* PTX100 at Seqs. 249-253.  Correspondence related to employment

17   advice from Bingham attorneys continued internally at Rearden the next day and through March 3,

18   2013, two days before LaSalle's last day on the job.  *See* PTX100 at Seqs. 254-259.  After February

19   27, 2013, no communication appears on the log with any Bingham attorneys—much less regarding

20   issues of employment law.  (*See generally* PTX100.)  That is because Bingham had represented

21   LaSalle and Original MO2 wholly separate from Perlman and Rearden, which gave rise to the

22   conflict that Kalin later communicated prevented him from representing LaSalle.  *See* PTX59.001.[13]

23   Because the Bingham firm could not take on representation adverse to former clients LaSalle and

24

25   _____

    [13] If, as Perlman testified, Original MO2 had been formed as a subsidiary of or for the benefit of

26   Rearden or if LaSalle had been acting on behalf of Rearden , Bingham McCutchen could have
    represented Perlman in connection with this dispute.  The fact that Perlman and Rearden found

27   different employment counsel to handle LaSalle's departure suggests that Kalin understood that he
    was representing an independent LaSalle and Original MO2.

28



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

1    Original MO2, Perlman and Rearden had to find another firm.  No later than March 15, 2013,

2    Perlman engaged Tate of Morrison and Foerster, beginning a flurry of hundreds of emails between

3    Rearden on the one hand and Tate and his firm on the other.  PTX100, Seq. 261 *et seq*.  These

4    entries clearly reflect communications concerning the end of LaSalle's employment with Rearden,

5    as on March 27, 2013, Tate sent LaSalle a demand and was engaged in communications with

6    LaSalle and/or his attorneys for months after that.  *See* PTX-58 (demand letter to LaSalle); PTX-66;

7    PTX-67.[14]

8          Finally, LaSalle confirmed that he was told that his employment with Rearden was over

9    before he received any communication from any Defendant to the contrary.  (Compare PTX 55

10   (LaSalle confirming his employment was ending with three weeks' pay) with PTX 57, TT 734:1-

11   738:14 (subsequent communications claiming he was still employed).)

12         **H.    Original MO2 did not Transfer Mova to Any Rearden Entity or Perlman in**
           **April 2013.**

13

14         The Court tentatively found Perlman's testimony about a purported oral agreement by

15   LaSalle to transfer MOVA to Rearden "not credible" and thus tentatively concluded that no such

16   oral agreement exists.  TT 1121:12-16.  Perlman admitted at trial that there was no *written*

17   agreement purporting to transfer MOVA from Original MO2 to Rearden.  TT 976:10-24.  Perlman's

18   attempt to manufacture an alleged transfer of MOVA ownership in April 2013 has been debunked.

19   Perlman's lack of credibility on this subject—which goes to the ultimate issue of whether Rearden

20   acquired MOVA—calls further into question the veracity of Perlman's other statements as well.

21   Defendants' claim of ownership based on Perlman's testimony thus lacks the necessary

22   foundation.[15]

23   _____

24   [14] The March 27, 2013 demand letter uses the past tense in referring to events involving LaSalle
     "while employed" by Rearden, and never states that LaSalle was still employed by Rearden.  PTX
     58.

25   [15] VGH respectfully disagrees with the Court's tentative finding that Rearden already owned MOVA
     so the lack of any purported transfer did not matter.  TT 1121: 16-18.  Indeed, Perlman and

26   Rearden's consistent promotion of an unsupported theory that LaSalle transferred MOVA to
     Rearden in April 2013 (and their insistence, contrary to black letter law, that an oral agreement

27   could transfer patents and copyrights) is additional evidence that Perlman and Rearden were aware

28   that after February 11, 2013, Rearden did not own or control Original MO2 in the first place.



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 39 -

1    **I.   DIDO is Unrelated to Facial Motion Capture.**

2    Perlman testified that DIDO was "new motion capture work" that Rearden was working on

3    in September and October of 2012.  TT 793:23-794:3.  Self-serving, litigation-induced conclusions

4    aside, the balance of the record demonstrates that DIDO is ***not*** a motion capture technology (much

5    less a facial motion capture technology), but instead may have applications in *location* tracking.

6    Perlman does not even assert that there is anything linking DIDO to motion capture in the

7    2012/2013 overview of the technology, which is roughly contemporaneous with the MOVA

8    negotiations.  *See* DTX-255; TT 794:12-796:20.  Perlman does point to the much more recent 2015

9    white paper (DTX 326, referring to DIDO as pCell), which he testified "talks about how motion

10   capture worked in [] DIDO . . . ."  TT 798:6-9.  His testimony is simply not true.  The portion of the

11   document identified by Perlman refers to ***location positioning***, not ***motion capture***—and certainly

12   not the more demanding "facial motion capture." (*See id.* (identifying "Section 6.6 'Location

13   Positioning,' which is on Page 76"); DTX-326 at 76-77 (describing using DIDO to "determine user

14   position both horizontally and vertically").)  Everything referenced in DTX-326 describes "location

15   positioning"--the location of a mobile device (think what GPS does, but purportedly with better

16   resolution)--with resolutions ("precision") on the order of meters; in contrast, according to

17   Perlman's testimony, Mova captures "every little spot on your and are able to capture it, the whole

18   face, with a precision of about a fraction of a millimeter." (*Compare* DTX-326 at 76-77 (discussing

19   determining location positioning on the scale of meters) with TT 773:9-11 (describing Mova's

20   resolution as being sub-millimeter).)  Resolution on the order meters might work for tracking

21   motion of the faces of Mt. Rushmore (if someone were to try and walk away with them) or bodies

22   of the same scale, but not for human beings.  This explains why, as both LaSalle and Pearce

23   testified, no one at Rearden discussed even the possibility of leveraging MOVA with DIDO at any

24   time between August 20, 2012 and March 5, 2013, and confirms why there was no motion capture

25   work at Rearden during that timeframe.  *See, e.g.*, TT 82:25-85:16, 151:22-152:13, 338:20-

26

27

28



1    340:22.[16]

2        Similarly, Perlman's testimony does not support a finding that LaSalle had any technical role

3    with respect to DIDO.  Per Perlman, LaSalle was tasked with "obtaining the right kind of power

4    amplifiers," and LaSalle "was to go and help track down one that we could use and replace it."  TT

5    795:5, 796:14-15.  In other words, LaSalle was told what to procure and expected to procure certain

6    equipment; there is nothing in the record to suggest that he had a role in deciding what to procure or

7    any awareness of why what he was told to procure was particularly appropriate for DIDO, much

8    less that he had any involvement in determining that any such items were particularly appropriate.

9    In short, he followed a shopping list, but there is no evidence that he knew how those items came to

10   be on the list or had any part in including them there.

11   **I.    PROPOSED FINDINGS OF FACT**

12       **A.    THE PARTIES**

13   1.    The Plaintiff and Counterclaim Defendant is Shenzhenshi Haitiecheng Science and

14         Technology Co., Ltd. ("Plaintiff" or "SHST").  Dkt 1.

15   2.    Virtue Global Holdings Limited ("VGH") has filed a complaint as Intervenor. Dkt.

16         307.

17   3.    The Defendants are Rearden, LLC ("Rearden"), Rearden Mova, LLC ("Rearden

18         Mova"), MO2, LLC ("Defendant MO2"), and MOVA, LLC ("Defendant Mova").[17]

19         Dkt. 1.  Each of the Defendants is wholly owned or controlled (directly, indirectly

20         such as through trusts, or as subsidiaries of other entities) by Stephen Perlman.

21         Perlman Dep. Vol 1, 15:15-16:18 (Rearden), 16:23-17:9 (Rearden Mova), 25:25-

22         26:25 (Defendant Mova), 32:25-33:8 (Defendant MO2).

23   _____

   [16] As with DTX-326, none of the other exhibits Perlman discussed in connection with DIDO ever
24   use the phrase "motion capture."
   [17] There are two "Mova LLCs" and two "MO2 LLCs" in this case.  Original MO2 was formed by
25   LaSalle in November 2012, and dissolved by him in November 2013.  PTX 34, TT 188:19-24, PTX
   70.  Defendant MO2 was formed by Defendant Perlman on or about September 8, 2014.  TT
26   885:15-91, PTX 71.  Original Mova was registered with the California Secretary of State in 2004,
   later became a subsidiary of OnLive, Inc. ("OnLive") and then OL2, and was transferred in
27   February 2013 to Original MO2 along with the MOVA Assets.  Defendant Mova is a different
   entity, formed by Perlman on September 18, 2014.  TT 885:15-19.
28



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                    - 41 -

## B.     MOVA AND THE MOVA ASSETS

4.      MOVA is a system that performs facial motion capture to generate data which can be used to create animated versions of that facial motion.  TT 327:2-329:3, 671:9, 772:5-773:18.

5.      MOVA was developed by Rearden and introduced to the public in 2006.  TT 61:7-10, 329:9-13, 776:15-20.

6.      The MOVA Assets include all physical components that comprise MOVA and intellectual property.  The MOVA Assets also include computer software and the source code for that software.  The key physical components of MOVA are cameras, lights, and computers. Mounted on a metal tube frame, the lights and cameras surround the front half of a performer, illuminating and enabling each computer-controlled camera to capture a stream of information from a small segment of a facial performance. Combining data from the different cameras, each of which has a different perspective, allows creation of a three-dimensional representation of the performance.  *See* TT 58:24-59:6, 773:2-8.

7.      MOVA has been used mainly in the film industry, including for example to animate the face of the character "Thanos" in *Guardians of the Galaxy*, the face of the character "Colossus" in *Deadpool,* and the faces of George Clooney and Sandra Bullock in scenes in *Gravity*. *See, e.g.,* TT 193:16-24.

## C.     GREG LASALLE AND STEPHEN PERLMAN

8.      Stephen Perlman is the founder, CEO, and owner of Rearden, an "incubator" that develops ideas into businesses.  Perlman formed Rearden LLC in June 2006; its predecessor was formed in approximately 1999.  TT 325:12-17; *see also* 769:4-10 (referring to predecessor company formed in 1999.)

9.      Greg LaSalle and Perlman have known each other since at least the 1990s.  *See* TT 41:19-42:9 (discussing that LaSalle stayed with Perlman a few times before LaSalle moved to California in 2000).

10.      Until late February or early March 2013, when events giving rise to this litigation took place, LaSalle and members of his family had close relationships with Perlman and members of his family. In addition, again prior to February or March 2013, Perlman gave LaSalle and his



family gifts and financial support worth in excess of $1,400,000.  TT 43:14-45:24, 47:15-51:1, 51:10-52:4, 54:14-56:23.

11.     In 2000, after Perlman became financially successful, he offered LaSalle a job with a predecessor of Rearden. LaSalle accepted.  TT 53:20-25, 54:4-8.

12.     At Rearden (including its predecessor), LaSalle's initial assignments involved building a studio at Rearden's facility in San Francisco. He also contributed to development of MOVA and was a member of the MOVA team.  TT 56:24-61:8.

**D.      REARDEN TRANSFERS MOVA TO ONLIVE, WHICH FAILS**

13.     By 2007, Rearden spun MOVA off as part of an independent company called OnLive. At least a portion of the MOVA Assets were then owned by Original Mova, which became a subsidiary of OnLive.  TT 62:16-63:11, 329:24-330:19, 671:25-672:12; PTX 31 and PTX 42 (documenting that Original Mova owned at least some MOVA Assets).

14.     Perlman was President and CEO of OnLive and an investor in the enterprise.  TT 330:22-331:1, 396:19-24, 807:13-17.

15.     From 2007 until its August 2012 assignment for the benefit of creditors, OnLive focused primarily on internet gaming technology and not facial motion capture using MOVA. TT 62:21-63:6, 66:2-18, 670:21-671:4, 397:17-398.

16.     Starting in 2007, LaSalle and Ken Pearce worked for OnLive. Their group offered facial motion capture services utilizing the MOVA Assets. Although there was regular work, MOVA proved expensive to use and the MOVA business ran at a loss. Procedures, equipment, and software became outdated, but OnLive did not invest to improve efficiencies or to keep MOVA technology current. TT 65:13-66:18, 94:24-95:9, 206:23-207:2, 331:2-16, PTX 21, 397:23-398:1.

17.     OnLive failed and in August 2012 its assets, including MOVA, wound up being transferred to unrelated third-party OL2, Inc. ("OL2"). No Defendant owned any interest in OL2; nor did Perlman.  TT 66:25-68:13, 76:21-77:2, 332:4-9, 397:10-16 (Lauder was only initial shareholder), 398:2-3 (Perlman had no ownership interest), 673:2-17.

18.     At the time of the transfer from OnLive to OL2, Gary Lauder, was the sole investor in OL2.  TT 66:25-68:13, 395:15-19, 396:24-397:16.



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 43 -

19.     At the time of the transfer of MOVA Assets to OL2, MOVA personnel including LaSalle and Pearce were laid off from OnLive.  A large number of non-MOVA personnel were laid off from OnLive as well.  OL2 rehired some non-MOVA employees, but no one from the MOVA group.  Perlman arranged for Rearden to offer jobs to several former OnLive workers, including LaSalle and Pearce.  He also set up and contributed to a fund to cover COBRA payments for some of those laid off from OnLive who continued to be unemployed, and devoted his own time to helping a number of former OnLive employees find jobs.  TT 66:25-69:6, 422:9-16, 432:1-7, 676:18-677:23, 790:13-21

### E.     LASALLE IS HIRED (AGAIN) BY REARDEN

20.     On August 20, 2012, LaSalle and Pearce each signed a set of employment documents prepared by Rearden, including an offer letter, a Proprietary Information and Inventions Agreement ("PIIA"), and a Mutual Agreement to Arbitrate Claims ("Arbitration Agreement").  TT 70:5-23, 71:19-72:14, 432:8-10, 433:8-18, 728:21-729:24 PTX 7 (DTX 263), DTX 262.

21.     Contrary to policy and practice at Rearden, neither LaSalle nor Pearce was given a written job description then or later. When they received and signed employment papers presented by Rearden, neither LaSalle nor Pearce discussed the documents with anyone associated with Rearden.  TT 72:12-14, 73:22-75:1, 334:4-16, 337:4-8, 680:1-6, 729:24-730:2 (Perlman's decision), 730:19-21, 781:20-782:6. PTX 7 (DTX 263), DTX 262.

22.     At the time they began employment with Rearden in August 2012, no one told LaSalle or Pearce that their duties encompassed acquisition of the MOVA Assets for use by Rearden or even acquisition of the MOVA Assets for any purpose, and neither had any such understanding.  *See id.*; *see also* TT 76:8-20, 334:14-16, 335:3-8.

23.     LaSalle's activities as a post-August 2012 employee of Rearden involved removing MOVA Assets and other items from space leased by OnLive (which was being vacated), arranging for the MOVA Assets to be placed in storage, and then cleaning up and re-building Rearden's studio facility (which had seen little use during the period OnLive was in operation).   TT 69:9-22, 74:18-23, 128:6-24, 127:3-17, TT 204:4-12; PTX 37, PTX 39, PTX 41.

24.     During August and part of September 2012, Pearce assisted with efforts to remove



MOVA from the former OnLive facility, but then had little work to do.  TT 333:6-15, 342:18-343:3

25.     Neither LaSalle nor Pearce managed or supervised other Rearden employees after August 20, 2012. TT 74:5-15, 340:11-13.

26.     Neither LaSalle nor Pearce worked on facial motion capture for Rearden in 2012 or 2013.  TT 82:25-84:21, 128:6-21, 151:22-152:9, 338:20-23, 339:5-340:10, 340:14-22.

27.     Rearden did not provide facial motion capture services to third parties in 2012 or 2013.  TT 82:25-84:21, 128:6-21, 151:22-152:9, 338:20-23, 339:5-340:10, 340:14-22.

28.     During their post-August 20, 2012 period of employment by Rearden, neither LaSalle nor Pearce held any ownership interest in or was a member of Rearden LLC. TT 54:1-3, 75:4-5.

**F.     IN AUGUST 2012, THE FUTURE OF MOVA IS UNCERTAIN; PERLMAN WANTS OL2 TO GIVE MOVA TO LASALLE**

29.     In August 2012, the future of MOVA was uncertain.  MOVA Assets were owned by OL2, and no one else had rights to the property. 76:21-77:2, 259:7-12.

30.     Between August and October 2012, OL2 offered the MOVA Assets to Perlman and/or Rearden.  Perlman and Rearden declined.  Perlman never expressed to OL2 that he had any interest in MOVA; in fact, he expressly told Gary Lauder that he was not interested in MOVA. PTX 21, PTX-26.001; TT 343:14-344:19, 348:16-349:21, 398:4-7 (Lauder offered Perlman equity interest in OL2), 402:13-16 (Perlman never requested); *see also* PTX 25, 944:24-945:9, 946:23-947:17; TT 402:11-16.

31.     On September 19, 2012, LaSalle emailed Perlman with thoughts "about how Mova could be run in a profitable manner," because he wanted Perlman's input and guidance.  Later that day Perlman replied, stating "before getting into the business of running Mova, you need access to the gear," and informed LaSalle that he (Perlman) planned, at Lauder's request, to email Lauder with some ideas about MOVA.  PTX 17 (which is the same as DTX 265); TT 88:6-25, 247:24-248:24, and 791:19-793:22.

32.     The next day, September 20, 2012, Perlman proposed to Lauder that OL2 transfer the MOVA Assets to LaSalle and Pearce. Perlman summarized the status of MOVA as follows:



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 45 -

1     "[t]here has been effectively no R&D since 2006…; MOVA has been a slightly less than break-

2     even business (about $100K loss/year), but work has dropped off as the industry [moved to different

3     technology] and we've had no budget for R&D[,] [s]o they need to invest in R&D to stay

4     current;…. I don't see the patents as monetizable [in light of new industry techniques]."[18] He added

5     that he doubted a "buyer could be found, because the system is old and unusable without Greg and

6     Ken…." And he recommended that OL2:

7

8          "….let them have a go at it…. I'll … provide them with business advice and help
         them over the bumps (as I do for many little companies), but they need eventually
         [to] get it running under their own steam….MOVA is Greg and Ken's career right
         now, and I think it is the right thing to give them a shot to continue it."

9

10     PTX 018.001.  Perlman then further recommended that OL2 give MOVA to LaSalle and Pearce at

11     little or no cost. Perlman stated that he would let LaSalle and Pearce use Rearden's offices, host

12     their website at mova.com, and provide them with business advice. He also said he would help

13     LaSalle with legal resources to create a company to hold the MOVA Assets.[19]  PTX 018.001, PTX

14     021.001, PTX023.003; PTX025.001; TT 402:18-403:7, 89:19-95:9, 406:23-408:10, 927:10-930:8,

15     934:15-935:7.

16         33.      Within a few days after it was sent to OL2, Perlman forwarded a copy of his

17     September 20, 2012 message quoted above (along with related communications) to LaSalle and

18     Pearce.  PTX 21.001.

19         34.      On September 22, 2012, OL2 agreed to Perlman's proposal to give the MOVA

20     Assets to LaSalle and Pearce.  Perlman responded with thanks and wrote, "I'll help Greg and Ken

21     with the legal resources … but I'll leave it to them to put it together and drive it forward."  PTX 20.

22         35.      On September 28, 2012, Perlman wrote to Lauder to "Follow-up" on a number of

23     issues. In that e-mail, Perlman notes that in their discussion the day before, MOVA was "barely

24     discussed" and that transfer of MOVA was "stalled" because OL2 wanted to retain the MOVA

25

---

26     [18] Earlier, Perlman had made similar and consistent statements to LaSalle and Pearce, emphasizing
    that he had no interest in maintaining or investing in the MOVA business.  *See* TT 370:17-17.

27

28     [19] Perlman reiterated his commitment to help LaSalle and Pearce in later communications, for
    example on October 3, 2012.  *See* PTX 25.



patents and license them to LaSalle. Perlman wrote "Licensing patents adds layer of complexity …

for something that has no value." He also wrote "Respectfully, I suggest you sell ALL of MOVA

(patents, equipment, hardware, software, trademark, domain) to these guys [LaSalle and Pearce] and

give them a chance to do something with it. There is 6 years of history where it is VERY clear it

will never be a substantial business. Delaying it further or making it harder for them serves no one's

purpose." Perlman suggested that OL2 sell the MOVA Assets to LaSalle for $1 (one dollar).  PTX

22.

36.     Before making a final decision as to what to do with MOVA, OL2 explored

whether there were other possible buyers. LaSalle and Pearce identified prospects, and OL2 offered

to share 25% of any proceeds with LaSalle and Pearce.  PTX 023.001, 003, 27, TT 96:6-97:13,

251:24-252:25, 257:18-258:4, 360:15-361:14, 418:22-419:16, 423:5-19.

37.     On October 2, 2012, when Perlman learned that OL2 was attempting to sell

MOVA (rather than give it to LaSalle and Pearce) and that OL2 would give LaSalle and Pearce

25% of the sales price, Perlman told LaSalle, Pearce, and Lauder that he (Perlman) believed this

was a mistake and that OL2 should give LaSalle and Pearce the MOVA business, in part because

LaSalle and Pearce had lost more equity than any other non-executive OnLive employee when

OnLive went through its Assignment for Benefit of Creditors and giving them MOVA would be

reasonable, fair, and viewed positively. Perlman urged Lauder to give LaSalle and Pearce the

flexibility to figure out how to manage MOVA.  PTX 23, PTX 023.002 and 023.004 (Perlman

suggesting Lauder step back from the 75/25 split), PTX 023.004 (Pearce and LaSalle "lost more

equity than any other [OnLive] non-executives," TT 409:21-410:15 (Lauder discussing

correspondence with Perlman), TT 942:23-943:19.

38.     Later on October 2, Perlman explained that he was trying to provide "business

advocacy" for LaSalle and Pearce "while having no stake in it [MOVA]" himself.  PTX 023.003.

39.     Still later on October 2, Perlman reiterated that he was "acting as an advocate" for

LaSalle and Pearce and that he himself would not profit from MOVA. He urged Lauder to give

LaSalle and Pearce "100% of the assets." PTX 023.002, TT 411:3-20.

40.     On October 3, Lauder told Perlman that if a purchaser was not found quickly,



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                  - 47 -

1  OL2 would revert to the 25% Perlman proposal to sell the MOVA Assets to LaSalle and Pearce.

2  PTX 025.002.

3    41.    On October 3, 2012, at 12:18 AM, Lauder forwarded to Perlman the email in

4  which Pearce and LaSalle agreed to the 25/75 split.  Lauder wrote to Perlman: "This was in-part

5  triggered by your having said that you did not want it and that they probably lacked the business

6  acumen to make a business of it."  PTX 025.001.

7    42.    On October 3, 2012, at 8:24 AM, Perlman responded to Lauder's 12:18 AM

8  email.  Perlman wrote, in part: "As I said before, you need to talk to Greg regarding business. Since

9  you control the assets, you can do what you want and they have no say in it. When you are in a

10  position of power like that and a person's livelihood and career's work is at state, of course you can

11  get them to agree to almost anything. … Here, they are utterly beholden to you, so I would expect

12  you will get what you propose, up to the point there is nothing in it for them.  I had told Greg and

13  Ken that neither you nor I would be profiting from the disposition of MOVA, based on what you

14  represented and wrote, and that I would help them at my cost providing comp for a transition

15  period. While you have reneged from your commitment, I have not from mine, so Ken owes me

16  nothing for money spent supporting him so far… While I don't agree with your methods, I'm no

17  longer  involved. That said, I certainly hope there is as good an outcome as possible for Greg and

18  Ken, and I ask that you recognize how trivial a matter this is relative to your net worth (financially

19  and otherwise),  and how large is it relative to theirs." PTX 025.001.

20    43.    On October 3, 2012, LaSalle wrote to Lauder with some "Mova thoughts." PTX

21  27.

22    44.    On October 4, 2012, Lauder responded to LaSalle. PTX 27.003   Lauder wrote:

23      • "Originally, I offered it [the MOVA Assets] to Steve who said that he did not

24        want it, nobody would pay for it and that we should just give it to you. Since that

25        time, many of the things he has said to me turned out to not be fully accurate, so

26        that's why I thought that it would not hurt to ask. It did not occur to me that there

27        could be something worse than zero value, but I understand the concern."

28      • "When I got the email from Ken [Pearce] inviting a conversation, I called, we



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 48 -

talked, and I thought the solution that I proposed would be what was best for everyone. After Ken emailed me back and said that he talked w/you and that you both accepted the offer, I had assumed that you both were aligned on this."

- "Regarding the original offer to have the company & assets for free: I did take Steve's email suggesting that and forward it to CJ and asked them to effectuate that. Steve was copied on that, so I presume you saw that. Later, when I revisited the issue, I determined that:
    - 1) we have a fiduciary duty to all shareholders (I'm no longer the only one) to do a modicum of due diligence before relying on SGP's word, and
    - 2) starting to act on SGP's recommendation was not the same as having offer and acceptance (a contract)"

- "I understand your point about Mova's assets only being of value if you guys come with it. That puts you in a good negotiating position."

45.     By October 4, Lauder had contacted Disney, inviting Disney to express an interest in the MOVA Assets.  Pearce had written a technical description of MOVA and Lauder included that in his communication to Disney. 441:10-20, PTX 027.02 (by 10:43 PM on October 4, Lauder had already "heard back from Disney").

46.     On October 4, 2012, Lauder responded to an email from LaSalle, copying Charlie Jablonski and Eve Saltman.  PTX 27.  Lauder wrote:

- "Since email lacks tone of voice, you might have inferred that my comment about negotiating was said in an annoyed way. That's not the case. I was basically making the case that there's no sale scenario that is nonconsensual for you."

- "Since I have just heard back from Disney that they will pass, and you must know Dave Story's story, I think that we should proceed w/the first plan subject to any offers coming in (e.g. from some inquiries that Charlie has put out there). Also, by this email I am conveying to CJ & ES that I think that giving the patents may be better for us than licensing. What you are seeing here is an internal



communication. This does not constitute an offer to you, so please don't accept it. Assuming no indications of interest come in next week, then I hope we can close by the end of it. Do EITHER of you have any issues w/that plan? I see that you did not copy Ken. I am concerned that this could result in a similar disconnect as happened before, so I would appreciate his answer as well."

47.     The next day, October 5, 2012, LaSalle replied, including Pearce as well as the previous correspondence.  PTX 027.001-027.002.  He wrote:

- "First let me say thank you. My motives for Mova are purely based on the premise that it has been one of the absolute highlights of my life for many reasons and I would like nothing more than to see it continue in some fashion."

- "I have spoken with Ken and he is in agreement and we don't see any issues with what you've outlined below. He will concur by separate email."

48.     Later on October 5, 2012, Ken Pearce sent Lauder a confirmatory email.  PTX 27.001-002

49.     On November 5, 2012, Pearce began a mutually agreed unpaid leave of absence from Rearden (retaining medical benefits).  TT 350:3-351:14, 366:24-368:23, 747:2-20.[20]

50.     Starting on October 12, 2012, after attempts by OL2 to sell MOVA to third parties failed, Jablonski, Saltman, and Paquin (of OL2), Pearce, and LaSalle exchanged emails about the potential transfer of the MOVA Assets to a new LLC that LaSalle would create, and how to coordinate that transfer with a MOVA job scheduled for November 7, 2012  PTX 027A.001.  That job was not completed, and MOVA remained in storage before and after November 7.  TT 181:15-21 (remained in storage units through sale to SHST); 333:4-12 (Pearce's job as of August 20, 2012, was to put the MOVA Assets into a storage unit).

**G.     PERLMAN HELPS LASALLE ACQUIRE MOVA**

51.     After telling LaSalle, Pearce, and Lauder that he (Perlman) would help them establish a company to take ownership of the MOVA Assets and would also help them with the

---

[20]  The planned return to work day was February 4, 2013.  TT 437:16-23.



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

1   process of obtaining that ownership, Perlman did so. From the end of October 2012 until February

2   11, 2013, Perlman offered advice and suggestions regarding negotiations with OL2.  .

3       52.      On October 26, 2012, Perlman introduced LaSalle to Alan Kalin, an attorney at

4   Bingham McCutchen, to assist in the formation of a new entity and acquisition of the MOVA

5   Assets. The tone of the email is not one of an employer directing a subordinate to use corporate

6   counsel to facilitate a deal over which the employer will have ultimate authority, but is instead

7   consistent with a mentor referring (as the subject of the email says) a friend to potentially helpful

8   counsel, offering to provide ongoing advice, and picking up the tab.  PTX 29.

9       53.      Also on October 26, 2012, Perlman offered, on behalf of Rearden, to pay Original

10  MO2's legal bills at least through the conclusion of the acquisition of the MOVA Assets. PTX 29.

11      54.      Perlman subsequently reiterated the offer that he or Rearden would pay MO2's

12  legal bills on October 30.  PTX 032.001.

13      55.      LaSalle signed the engagement letter with Bingham McCutchen identifying the

14  entity to be formed—MO2 LLC ("Original MO2")—as the law firm's client.  The engagement

15  letter stated:  "fees for the formation of the Company [Original MO2] and the completion of the

16  purchase of assets of the Mova business from OL2, Inc. will be paid by Rearden LLC. Nevertheless,

17  our engagement and client relationship is with [Original MO2]."   PTX 33, p. 5; TT 109:15-110:12;

18  DTX 365; TT 306:7-9.

19      56.      On November 9, 2012, LaSalle formed Original MO2.  PTX 34, PTX 83, PTX 84,

20  TT 113:17-116:15.

21      57.      LaSalle continued to work as an employee of Rearden, but Perlman did not state

22  or suggest to LaSalle or Pearce that Original MO2 was a subsidiary or created for the benefit of

23  Rearden. TT 141:11-25, 364:14-23, 748:13-750:8.  With Perlman's knowledge, LaSalle worked

24  simultaneously on behalf of Rearden and Original MO2, although Mr. Perlman now alleges that

25  because, in his opinion, Original MO2 was a subsidiary of Rearden, LaSalle's work on behalf of

26  Original MO2 was on behalf of Rearden.  *See also* TT 148:15-149:12 (Perlman aware of LaSalle's

27  September-April discussions with, e.g., ILM and Walt Disney).

28      58.      Neither Rearden, any other Defendant, nor Perlman held an ownership interest in



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

Original MO2. LaSalle was its only owner and manager.   TT 113:12-116:15, 117:24-118:12; 119:16-120:7, 748: 13-750:4, 996:22-998:19 (Perlman references unproduced and uncorroborated "standing instructions" with Kalin, admits that no filed paperwork associates Original MO2 with him or Rearden);  PTX 34 (Secretary of State document), 40 (EIN from IS), 84 (attorney formation correspondence)

59.      From November 2012 into February 2013, Original MO2 negotiated (primarily via LaSalle but also via the attorneys at Bingham McCutchen) to purchase MOVA from OL2. TT 121:18-122:21.

60.      LaSalle kept Perlman informed; Perlman aided LaSalle.  TT 121:7-10, 123:11-13; PTX 34, 35, 38, 82, 83, 84, 85, 87, 89, 90, 92; DTX 370, 371, 372, 373, 376, 382, 383, 384.

61.      At no point before or during this negotiation process did Perlman state or suggest to LaSalle that once Original MO2 obtained the MOVA Assets, those would belong to Rearden or be for Rearden's benefit.  TT 141:11-25.  To the contrary, Perlman expressly stated that "Greg was to get all of the assets for free.  End of story."  PTX 87.

62.      To the contrary, on November 17, 2012, Perlman told Original MO2's attorneys at Bingham McCutchen that Original MO2's acquisition of the MOVA Assets "…is between Greg [LaSalle] and OL2, and I am not a party involved. I'm just offering suggestions and information to the extent it is helpful." PTX 35.

63.      On November 27, 2012, Original MO2's attorneys at Bingham McCutchen told OL2's attorney that LaSalle would be looking to raise money for Original MO2 following acquisition of the MOVA Assets. DTX 383, p.2. At the time, Perlman and LaSalle received copies of this communication. DTX 383, p.1. Perlman did not inform LaSalle, Pearce, or OL2 that there was no need for Original MO2 to raise money (e.g., because Original MO2 was or would be owned by Rearden or a subsidiary of Rearden).  TT 127:23-25.  Instead, Perlman repeated and endorsed in a message to LaSalle and Kalin the observation that LaSalle would need to raise money for the MOVA business. DTX 383, p.1.

64.      On January 13, 2013, Perlman advised Bingham McCutchen and LaSalle that the MOVA patents had no value and that if it were up to him (Perlman), following acquisition of



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 52 -

MOVA he would not pay patent maintenance fees and would withdraw pending patent applications. *See* PTX 38. Perlman recommended that LaSalle terminate all of the patents after acquiring them. *See, e.g.,* PTX 93; TT 136:2-21.

65.     In January 2013, Perlman announced during a social gathering that he had helped LaSalle acquire MOVA so that LaSalle could start a new business. LaSalle thanked Perlman for his support. TT 140:13-24.

66.     On February 11, 2013, Original MO2 bought MOVA from OL2 for one dollar. LaSalle paid the purchase price and continued to pay the costs to store MOVA. TT 143:2-4; *see* PTX [expense reports] (LaSalle's expense reports, which do not request reimbursement for MOVA). Rearden paid the legal expenses incurred by Original MO2 in this transaction.

67.     The February 11, 2013 Membership Interest and Asset Purchase and Sale Agreement between Original MO2 and OL2 by which Original MO2 obtained the MOVA Assets does not mention Perlman or any of the Defendants and contains a provision stating that there are no third party beneficiaries. PTX 42.

68.     Following the demise of OnLive, LaSalle and Pearce had tried to assure the survival of MOVA. When they learned that neither OL2 nor Perlman was willing to invest in MOVA, they contacted prior customers to explore interest in acquisition or partnering. One former customer was Digital Domain 3.0 ("DD3"), a visual effects company based in Los Angeles. LaSalle kept Perlman informed, disclosing contacts with DD3 in October 2012 and again in early 2013. Perlman never objected. *See, e.g.*, TT 66:5-18, 148:15-149:12.

69.     LaSalle and Pearce renewed contacts with potential customers and partners for MOVA in late January and early February 2013, when it became clear that Original MO2's acquisition of the MOVA Assets from OL2 would soon close. TT 148:2-149:19

70.     Soon after Original MO2 acquired the MOVA Assets, LaSalle and Pearce took additional steps to initiate a sale or other undertaking with a third party. For example, on February 14, 2013, LaSalle sent Perlman a list of MOVA patents and trademarks to ask Perlman's opinion as to what should be maintained. That same day, LaSalle asked Rearden CFO Cindy Ievers for help obtaining copies of MOVA financial statements to share with DD3 and others. Ievers provided that



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

1   help, and admitted she would not have done so if she had been aware at the time of any claim by

2   LaSalle that he owned MOVA.  PTX 45, 46, 47; TT 687:19-689:2.

### H.   AFTER ORIGINAL MO2 ACQUIRES THE MOVA ASSETS, PERLMAN CHANGES HIS MIND

71.    On February 15, 2013, Rearden CFO Ievers alerted LaSalle that Perlman wanted MOVA and that LaSalle should arrange a transfer to Rearden. LaSalle was surprised. He responded that if Perlman had changed his mind he should communicate that directly to him (LaSalle). TT 152:24-153:14; 690:9-691:3.

72.    Perlman and LaSalle met on February 26, 2013. Perlman claimed that MOVA was "his," that he wanted it back, and that LaSalle should give it to him. LaSalle responded that he did not understand the change, and reminded Perlman of the promises Perlman had made since August. LaSalle also reminded Perlman about LaSalle's talks with DD3 for possible purchase of MOVA along with hiring Pearce and LaSalle to re-start the MOVA business. Perlman insisted again that LaSalle respond immediately; LaSalle declined. Perlman fired LaSalle as a Rearden employee. PTX 49, 50, 98; TT 156:5-158:20, 731:13-732:23.

73.    A few days later, Perlman claimed that he had not fired LaSalle.  TT 160:6-22, 734:1-735:9.

74.    That prompted LaSalle to inform Ievers, on March 1, 2013, that his last date of employment would be March 5, 2013. And on March 5, 2013, LaSalle confirmed in writing the end of his employment with Rearden.  PTX 55, 54;  TT 160:6-22

75.    Sometime between February 26 and 28, 2013, Perlman also told Pearce that he (Perlman) had changed his mind about the MOVA Assets (and no longer wanted Pearce or LaSalle to own them) and told Pearce that Pearce and LaSalle should not have taken Perlman at his (earlier) word but rather should have known that he (Perlman) would change his mind.  TT 368:21-371:4

76.    Pearce ended his employment with Rearden on March 5, 2013.  TT 371:5-6

77.    On March 27, 2013, Rearden (via its attorneys) sent LaSalle a demand letter regarding the MOVA Assets. Rearden threatened to sue LaSalle for breach of the PIIA, asserting that the PIIA required LaSalle to transfer MOVA to Rearden. During April and May 2013, Rearden



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 54 -

(through its attorneys) discussed with LaSalle/Original MO2 (through their attorneys) resolution of issues surrounding ownership of the MOVA Assets.  PTX 58; TT 167:10-172:9.

### I.   LASALLE GUARANTEES A FUTURE FOR MOVA BY DECLINING TO SELL IT TO REARDEN

78.   After hearing Perlman's demands, LaSalle contacted Original MO2's counsel at Bingham McCutchen who had formed the company and assisted with its acquisition of MOVA.  The lawyer demurred: "Regarding you and Rearden I have a conflict of interests [sic] and cannot comment or discuss the matter with either side." PTX 59, Tr:166:6- 167:2

79.   On April 19, 2013, Rearden formed a new wholly-owned subsidiary, Defendant Rearden Mova LLC.  DTX 310, TT 864:20-21

80.   On March 27, 2013, LaSalle and Original MO2 received a letter from attorneys representing Rearden.  PTX 58.  LaSalle retained counsel and instructed them to negotiate with Rearden.  TT 167:10-170:15.  LaSalle's primary interests were re-establishing MOVA and securing employment for himself and Pearce.  TT 170:17-20.  Rearden offered nothing on either front.  TT 170:21-172:11.

81.   On or around April 2013, Rearden's attorneys sent a "settlement agreement" to LaSalle and Original MO2's lawyers, by which Rearden Mova would acquire the MOVA Assets from Original MO2. PTX 101; 971:13-17; 972:12-973:5

82.   That settlement agreement was never signed (TT 974:19-21) and LaSalle decided not to have Original MO2 sell MOVA to Rearden (TT 172:20-25).

83.   By contrast, DD3 was willing to pay for and then invest in MOVA, as well as to hire LaSalle and Pearce to lead the effort.  TT 189:9-15; *see also* TT 172:2-9.

84.   LaSalle decided to sell MOVA to DD3, which was replaced at the last minute by SHST.  TT 172:2-9, 172:20-173:5, 189:9-11.

85.   Relatedly, following due diligence DD3 wanted to move forward with purchasing MOVA from Original MO2.  TT 460:4-464:3.  DD3's then-CEO Ed Ulbrich asked Daniel Seah, a director appointed to DD3's board by the 70%-stakeholder in DD3's then-ultimate parent, to solicit the Board's approval.  *Id.*  Seah did so, but the board rejected his entreaties because DD3 had just



recently been purchased out of a bankruptcy proceeding, and the company was still losing money. *Id.; see also* TT 457:14-458:25. Believing MOVA important to the business, Seah solicited third-party investors. TT 463:4-464:10. Eventually, Seah found Xiao Ping, told her that there was an opportunity purchase MOVA and that if she did, he would do his best to license it to DD3 (which it ultimately did for $100,000—four times the fixed and certain cost of acquiring MOVA from Original MO2 and equal to that purchase price plus the $75,000 that was required to be put in escrow for four years), thus convincing her that it was a good investment. TT 464:11-466:1. Because time was of the essence to prevent DD3's competitors from buying MOVA, Seah told Xiao that it was a "take it or leave it" deal on the terms DD3 had negotiated. TT 465:19-24. Xiao, a wealthy Chinese investor, ultimately agreed to the deal, and as is common practice for such individuals in China, used one of her investment entities, SHST, to acquire MOVA. TT 455:25-466:12. Thus, DD3 arranged to vest MOVA ownership in unrelated SHST. TT 308:23-310:2. On May 8, 2013, SHST, Original MO2, and Original Mova (now a wholly-owned subsidiary of Original MO2) entered into an Asset Purchase Agreement. PTX 60A. SHST acquired title to the MOVA Assets for $25,000 plus other consideration. PTX 60A .009. The Asset Purchase Agreement was accompanied by patent, trademark, and copyright assignment agreements, also entered on May 8, 2013, by SHST and Original Mova. LaSalle signed these intellectual property assignments as CEO of Original Mova. PTX 61, 63A and 107. Payments called for by the Asset Purchase Agreement were made to Original MO2 on May 20, 2013. TT 176:16-20; PTX 64 (date is on bank processing stamp).

86.     The Asset Purchase Agreement has a choice of law provision which states it will "be construed in accordance with and governed by the laws of the State of California (without giving effect to principles of conflicts of laws)." PTX 060A.015.

87.     Section 5.1 of the Asset Purchase Agreement states: "The Closing shall take place by the electronic or physical delivery of documents on the Effective Date." The "Closing Deliveries" set forth in Sections 5.2 and 5.3 of the Asset Purchase Agreement were made. PTX 060A.009; TT 174:10-176:20, 610:20-612:12, 1030:4-1033:1.

88.     Section 8.6 (b) of the Asset Purchase Agreement allows counterpart execution and



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 56 -

1   exchange via fax, pdf, or "any other electronic means…." which "may be used in lieu of the original

2   Agreement for all purposes." PTX 060A.015.

3          89.     The Asset Purchase Agreement was signed by Original MO2, Original Mova, and

4   SHST. All exhibits to the Asset Purchase Agreement were signed by Original MO2, Original Mova

5   and SHST (to the extent an exhibit called for signatures of one or more of those entities).   PTX

6   60A, 61, 63A, 103, 104, 105 and 107; TT  1033:4-18; 1033:25 – 1034:23; 1036:12-1037:18.

7          90.     Both SHST and Original MO2 fully performed their respective obligations under

8   the Asset Purchase Agreement with one exception.  Rather than opening a third party escrow

9   account  for the $75,000 that was set aside by SHST to defend LaSalle in the event he was sued by

10  Rearden or Perlman, the parties agreed to maintain that sum in the trust account of the Original

11  MO2/LaSalle attorneys.  The $75,000 continues to be held in that trust account today.  TT 612:16-

12  613:6, 1033:4-1036:11.

13         91.     DD3 hired LaSalle and Pearce; both signed employment agreements with DD3 in

14  May 2013.  DTX 316, TT 198:23-199:4, 445:19-25. Although SHST obtained title to MOVA, the

15  MOVA Assets remained in storage for several months and then—also in May 2013—possession

16  was transferred directly to DD3.  TT 74:18-23, 181:15-21. Possession remained with DD3

17  thereafter, at least until the preliminary injunction ordered in Dkt. 188.  TT 189:20-22.

18         **J.      REARDEN DECIDES TO NOT PURSUE ITS CLAIMED OWNERSHIP OF**
            **MOVA**

19

20         92.     By the end of March 2013, Perlman knew about the sale of MOVA (286:7-

21  287:14), but continued to pursue LaSalle and Original MO2. PTX 58

22         93.     On June 29, 2013, a Rearden lawyer sent a demand via email asserting that

23  Rearden owned MOVA by virtue of the LaSalle PIIA and suggested arbitration as provided by the

24  Arbitration Agreement between Rearden and LaSalle. PTX 66; TT 182:13-183:20

25         94.     LaSalle, through his lawyer, denied Rearden's ownership claim but agreed to

26  arbitrate.  TT 185:22-186:4

27         95.     Rearden never initiated arbitration.  TT 750:25-751:3

28         96.     According to Perlman, Rearden decided to not arbitrate the issue of ownership of



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                     - 57 -

1    MOVA because the physical assets were outdated and any potential value rested with the MOVA

2    patents, which he thought Rearden would own if it paid maintenance fees.  TT 880:1-881:8, 915:14-

3    916:20, 925:4-23 (Perlman testifying that, despite his years of experience and battery of attorneys,

4    he avoided arbitration because he did not think he could obtain IP rights via that procedure.

5
6

       **K.**     **AFTER THREAT OF SUIT FROM REARDEN SUBSIDES, ORIGINAL MO2 IS DISSOLVED AND DD3 REVIVES MOVA**

7        97.      In June 2013, when it learned of new threats from Perlman, DD3 had not yet

8    licensed MOVA and was not offering  the MOVA service.  PTX 66 and 67; TT 614:16-615:22.

9        98.      SHST and Mova Technologies, LLC entered into an agreement effective

10    September 26, 2013, that granted an exclusive license to the MOVA Assets to Mova Technologies,

11    LLC in consideration for $100,000.  In an agreement also effective September 26, 2013, Mova

12    Technologies LLC exclusively licensed the MOVA Assets to DD3 for $100,000.  SHST retained no

13    continuing economic (e.g., royalty) interest in or control over the MOVA Assets.  PTX 68, 69;  TT

14    527:6-528:5, 540:7-17, 618:17-619:1; 619:8-620:7.

15        99.      DD3 invested to modernize and promote MOVA.  TT 189:12-15, 202:7-9. Over

16    the course of several years, these and other efforts restored the MOVA business.  TT 202:10-24,

17    387:16-390:21.

18        100.     There is no evidence that SHST participated in or directed DD3's MOVA

19    business.[21]

20        101.     Having sold the MOVA Assets to SHST, and with Rearden no longer making

21    threats, in November 2013 LaSalle dissolved Original MO2.  PTX 70; TT 187:8-188:18, 188:23-

22    189:2.

23
24

       **L.**     **RECOGNITION OF MOVA BY THE MOTION PICTURE ACADEMY PROVOKES A FIGHT**

25        102.     In August 2014, the Motion Picture Academy nominated MOVA for a scientific

26    and technical award. Among others, LaSalle was selected for recognition; Perlman was not. Later,

27

28

---

[21] Nor is there evidence that did VGH so when in late 2015 it obtained ownership of MOVA from SHST.



1    Perlman protested to the Academy. The Academy rejected his protests.  PTX 75; TT 388:23-389:6;

2    391:1-24

3          103.      On or about September 8, 2014, aware that Original MO2 had been dissolved,

4    Perlman formed Defendant MO2 using the same name.  PTX 71; TT 883:4-7; 885:15-25

5          104.      Rearden formed Defendant Mova on or about September 18, 2014.  TT 885:15-19

6          105.      Soon after, Rearden caused to be recorded in the USPTO the February 2013

7    agreement between OL2 and Original MO2, but misrepresented the contract as assigning the

8    MOVA patents to Defendant MO2.  PTX 72.004-36  TT 957:6-15, 965:18-970:7.

9          106.      Rearden then caused to be recorded an assignment of the MOVA patents from

10   Defendant MO2 (which never owned them) to Rearden Mova.  PTX 72.038-72.040

11         107.      In late December 2014, counsel for SHST contacted Rearden counsel about

12   correcting the record. There was no substantive response.  PTX 72; TT 627:6-16

13         108.      In January 2015, Perlman submitted "Statements of Interest" to the USPTO on

14   behalf of Rearden and Rearden Mova. These signed statements were tendered as evidence that

15   Rearden Mova owned the MOVA patents on behalf of Rearden. They recite the formation of

16   Rearden Mova on April 19, 2013, and state "the assets of MO2 LLC for the benefit of Rearden LLC

17   were *meant to be transferred* to Rearden Mova LLC for the benefit of Rearden LLC (emphasis

18   added) but do not mention any assignment from Original MO2 to Rearden Mova in April 2013, and

19   do not assert that the allegedly intended transfer actually took place.  DTX 238; TT 985:16 – 989:9

20   On January 14, 2015, Rearden petitioned the USPTO to expunge certain recordations.[22]  PTX 73

21         109.      In early 2015, several of the Defendants made public statements that they owned

22   MOVA. TT 989:15-991:2; PTX 74

23         110.      Defendants' recording of alleged assignments and their public assertions of

24   ownership challenged the legitimacy of SHST's ownership of the MOVA Assets and, consequently,

25   the rights of its exclusive licensee DD3.  In addition to the harm inherent in challenging ownership,

26   ───────────────

     [22] On July 28, 2015, the USPTO dismissed the petition, noting that the USPTO "acts in a ministerial
27   capacity in recording documents that have been submitted for recordation" and that "the recording
     of a document … is not a determination by the USPTO of the validity of the document per se or the
28   effect that document has on the title to a patent or application."



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                    - 59 -

1  resulting uncertainty caused a diminishment of interest from potential customers for MOVA and

2  interfered with continued investment in and development of the property.  PTX 75:015-019

3      111.    On February 20, 2015, SHST initiated this lawsuit to clear its title to the MOVA

4  Assets. (Dkt. 1)

5      112.    In June 2015, Defendants brought a motion for summary judgment based on

6  LaSalle's PIIA in an attempt to resolve in their favor the core question of who obtained ownership

7  of MOVA in February 2013. In October 2015, Judge Conti denied the motion.  (Dkt. 52).

8      113.    In April of 2015, DDHL recognized that an unrelated company that it did not

9  control held title and began to consider buying the MOVA Assets so that they would be within the

10  same corporate family as exclusive licensee DD3.  528:17-529:10.  At roughly the same time or

11  soon after, SHST told DDHL's CEO that it no longer wished to hold the assets. Id. 509:19-510:8.

12  DDHL agreed to purchase MOVA and arranged for subsidiary VGH to buy MOVA from SHST.

13  529:11-530:3.  Before the deal could close, however, Defendants proposed to file the

14  aforementioned early motion for summary judgment in this case on the issue of whether LaSalle's

15  employment agreement and the PIIA conferred ownership of MOVA on them.  (*See, e.g.*, Dkt. 26

16  (May 22, 2015 Joint Case Management Statement) at 10.)  After Judge Conti denied Defendants'

17  motion in mid-October 2015, the transaction moved forward. On December 17, 2015, VGH

18  purchased the MOVA Assets from SHST, subject to the license granted to DD3. The purchase price

19  was $50,000, paid up front by DDHL. Although the title holder changed, possession and use of

20  MOVA remained with DD3.  Both SHST and VGH signed the master agreement and each exhibit

21  for this transaction.  PTX 78; TT 478:8-20; 627:18-629:21

22      114.    Both SHST and VGH have attempted to pay maintenance fees on the MOVA

23  patents. TT 326:3-20

24  **II.    CONCLUSIONS OF LAW**

25       **A.    VGH HAS STANDING TO PROTECT ITS OWNERSHIP OF THE MOVA
            ASSETS AND TO ATTACK DEFENDANTS' CLAIMS OF OWNERSHIP**
26

27      115.    In order to have standing, a plaintiff must establish: (1) an injury in fact, (2)

28  causation, and (3) redressability. *Sprint Communications Co., L.P. v. APCC Servs., Inc.*, 554 U.S.



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 60 -

1   269, 273–74, 128 S. Ct. 2531, 2535, 171 L. Ed. 2d 424 (2008).

2       116.    VGH alleges that it is the owner of the MOVA Assets because it purchased the

3   assets from SHST on December 17, 2015. This allegation has at least prima facie support from

4   documents and evidence in the record, regardless of the ultimate resolution of this question at trial.

5   If VGH is the owner, then the assertions of ownership by Defendants, including their public

6   statements and their counterclaims against original plaintiff SHST, constitute an adverse claim to

7   VGH's title.  VGH therefore has standing to establish its ownership of the MOVA Assets.  *See, e.g.*,

8   Cal. Civ. Proc. Code § 761.020.[23]

9       117.    VGH also has standing to assert, independent of its claim that it has title, that

10  Defendants do not have title to the MOVA Assets and that VGH has been and continues to be

11  harmed as a result of Defendants' actual and threatened impairment of the business of exclusive

12  licensee DD3.  VGH has standing in these additional respects because (1) VGH is injured; (2) the

13  injury is caused by Defendants' assertion of ownership; and (3) the injury will be redressed by a

14  declaration that Defendants do not own the MOVA Assets.  *See Sprint Communications,* 554 U.S.

15  at 273–74.  Such a declaration may not inoculate VGH from claims of others, such as SHST or Mr.

16  LaSalle, but it will redress harm caused by Defendants.

17      118.    VGH thus has two independent claims for relief: first, that VGH owns the MOVA

18  Assets; second, that Defendants do not.

19

20  [23] Section 761.020 encompasses tangible personal property, which includes some of the MOVA
    Assets.  As to the remaining MOVA Assets, and in particular intangible personal property in the

21  form of intellectual property, a party asserting ownership has standing to vindicate such a claim
    pursuant to California's law of conversion or slander of title, for example. "Under California

22  common law, the elements of slander of title are publication, falsity, absence of privilege, and
    disparagement of another's title which is relied upon by a third party and which results in a

23  pecuniary loss." *HIF Bio, Inc. v. Yung Shin Pharm. Indus. Co.,* 600 F.3d 1347, 1355 (Fed. Cir.
    2010), *as amended on reh'g in part* (June 14, 2010) (citing *Smith v. Commonwealth Land Title Ins.*

24  *Co.,* 177 Cal. App. 3d 625, 630 (1986)).  Defendants published claims of ownership via false
    recordations of assignments and releases to the press.  The claims are false and made without

25  privilege, and VGH has alleged that they have caused potential customers to shy away from
    MOVA, resulting in loss to VGH's exclusive licensee, DD3.  "Under California law, the elements

26  of conversion are '(1) ownership or right to possession of property, (2) wrongful disposition of the
    property right of another, and (3) damages.'" *HIF Bio, In.,* 600 F.3d at 1355 (quoting *Don King*

27  *Prods./ Kingvision v. Lovato,* 911 F. Supp. 419, 423 (N.D. Cal. 1995)).  VGH's complaint in
    intervention, along with its proposed findings of fact and conclusions of law, state a claim of

28  conversion for which VGH may seek declaratory judgment of ownership.



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

119.     Even if the Court were to find that the assignment from SHST to VGH was void and VGH were to fail in its first claim, VGH can still demonstrate that Original MO2 properly took ownership of the MOVA Assets and none of Defendants acquired those assets from Original MO2. In that situation, it would be appropriate to grant VGH partial relief: denying a declaration that it owns the MOVA Assets, but affirming that Defendants do not.[24]

**B.     VGH OWNS THE MOVA ASSETS**

120.     VGH owns the MOVA Assets because VGH purchased them from SHST in a bona fide transaction with SHST. SHST had purchased the MOVA Assets from Original MO2 via an agreement that LaSalle and Original MO2 were entitled to enter and which was lawfully executed and fully performed. Original MO2 had acquired the MOVA Assets from OL2 for the benefit of Original MO2 and its sole manager and owner, LaSalle, and not for any of the Defendants.[25]

**1.     VGH has established a prima facie case that it owns the MOVA Assets**

121.     It is undisputed that on February 11, 2013, Original MO2 bought the MOVA Assets from OL2.  *See also* PTX 42.

122.     It also cannot be undisputed that the documentation establishing Original MO2, as well as the agreement by which Original MO2 bought the MOVA Assets from OL2, make no express mention of any Defendant.  Instead, the documentary evidence establishes that LaSalle was the organizer and agent for Original MO2, which had only a single manager.    According to the IRS EIN letter, LaSalle was the sole member of original MO2.  PTX 40  In the agreements with OL2 by which Original MO2 obtained the MOVA Assets, LaSalle is identified as "President" of Original

---

[24] If Defendants do not own the MOVA Assets, the Court may, but need not, reach the question of whether the current owner of the MOVA Assets is SHST (because it purchased them from Original MO2) or LaSalle (because Original MO2 never sold them and a dissolved LLC's assets are divided among the members of the LLC.)  *See* Cal. Corp. Code §§ 17707.04-06 (current statute) and §§ 17353 and 17354(a) (former statute).

[25] Defendants filed their response to VGH's Intervenor Complaint on November 7, 2016.  They did not assert any counterclaims against VGH.  In particular, they did not assert that any of them own the MOVA Assets.  However, in previous counterclaims against SHST, which has defaulted, Defendants did assert ownership of the MOVA Assets.



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                    - 62 -

1   MO2.  PTX 42.013

2       123.     Rearden and Perlman were contemporaneously aware of these documents, with

3   the possible exception of the IRS EIN letter.  Perlman, in multiple communications with LaSalle,

4   Pearce, Lauder, and Kalin, clearly and consistently disavowed any interest in the MOVA Assets as

5   well as in Original MO2 and instead proclaimed that they should or did belong to LaSalle.  Even

6   after disputes arose between Rearden/Perlman and LaSalle starting in February 2013, neither

7   Rearden nor Perlman took formal steps to try to remove LaSalle as the manager of Original MO2,

8   to make any submission to the State of California or the IRS to remove LaSalle or to assert

9   ownership or control of the entity in his stead, or to otherwise establish Rearden (or any other

10  Defendant's) ownership interest in either the entity or the property (such as through proceedings

11  under the Arbitration Agreement).  Thus, to break this link in the chain of title, Defendants must

12  prove that as of February 11, 2013, Original MO2⸺either directly or by virtue of LaSalle's

13  employment with Rearden⸺was obligated to transfer MOVA to one of them or that one of them

14  owned Original MO2.

15      124.     To prove a contract exists, the proponent of that contract must show that the

16  contract terms were clear enough that the parties could understand what each was required to do;

17  that the parties agreed to give each other something of value; and that that the parties agreed to the

18  terms of the contract.  (Judicial Council of California Jury Instructions ("CACI") 302.)

19      125.     "Contract formation is governed by objective manifestations, not subjective intent

20  of any individual involved. The test is 'what the outward manifestations of consent would lead a

21  reasonable person to believe.'" (*Roth v. Malson* (1998) 67 Cal.App.4th 552, 557 [79 Cal.Rptr.2d

22  226], internal citations omitted.)  CACI No. 302.  *See also Hilleary*, 193 Cal. App. 3d at 327 ([A]

23  plaintiff's] uncommunicated subjective intent is not relevant.); 11 Williston on Contracts §31:4 (4th

24  ed. 2015) ("The parties' expressed intent governs any subjective, unexpressed intent.").

25      126.     As explained in more detail below and as set forth in the facts above, VGH

26  introduced evidence that the MOVA Assets were sold from Original MO2 to SHST and then from

27  SHST to VGH.

28      127.     Because VGH has thus established prima facie cases that there were contracts



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                    - 63 -

1    transferring the MOVA Assets such that VGH now owns them, the burden shifts to Defendants to

2    establish that the apparent contracts are not what they seem.  *See* Rutter Group Prac. Guide Fed.

3    Civ. Trials & Ev. Ch. 8K-A [8:4825-4828] (2016).  *See also Levin v. United Airlines*, 158 Cal. App.

4    4th 1002, 1018 (2008).

5         128.     There is a written agreement between Original MO2 (including Original Mova)

6    and SHST calling for the sale and transfer of the MOVA Assets from Original MO2 to SHST.  PTX

7    60A, 61, 63A, 103.   The parties to this agreement signed the document, either with written

8    signatures or stamped "chops."  See, e.g., TT 1026:11-1028:16.  Deliveries identified as conditions

9    of closing were made.  See, e.g., TT 1028:13-1033:1.  Moreover, the parties performed the terms of

10   the agreement: Original MO2 was paid $25,000 and another $75,000 was set aside to indemnify

11   LaSalle in the event Perlman sued him, and Original MO2 assigned the MOVA Assets to SHST.[26]

12   TT 176:13-17, 1033:2-1036:11.  Employment agreements for LaSalle and Pearce were tendered,

13   signed, and honored.  DTX  316, TT 198:23-199:4, 445:19-25, 1032:19-22.  No later than

14   September 2013, Original MO2 caused all elements of the MOVA Assets to be delivered to SHST's

15   exclusive licensee DD3.  See, e.g., 181:15-21.  There is no evidence that Original MO2, Original

16   Mova, LaSalle, or SHST have challenged the existence or effectiveness of the agreement.  To the

17   contrary, they acted in accordance with such an agreement.    Thus, to defeat VGH's claim of title,

18   the burden shifts to Defendants to break this next link in the chain by establishing that the assets

19   were not transferred from Original MO2 to SHST.

20        129.     Finally, there is a written agreement between SHST and VGH by which the

21   MOVA Assets were sold by SHST to VGH.  PTX 69  The parties to this agreement signed the

22   document, either with written signatures or stamped "chops."  Moreover, the parties performed the

23   agreement: VGH paid SHST $50,000, and SHST assigned the MOVA Assets to VGH.[27]  There is

24   no evidence that SHST or VGH has challenged the existence or effectiveness of the agreement.  To

25   _____

26   [26] The document required that the $75,000 be placed in a third-party escrow account.  By subsequent
     agreement, the money instead remained in the trust account of the Original MO2/LaSalle attorneys
27   at the time.  The money remains there today.

28   [27] Less certain payments owed by SHST to VGH that were netted out of the $50,000.



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                - 64 -

1    the contrary, they acted in accordance with the agreement.    Thus, to defeat VGH's claim of title,

2    the burden shifts to Defendants to further establish that the assets were not transferred from SHST

3    to VGH.

4              **2.      Defendants have failed to establish that Perlman had any authority over
                        Original MO2**

5

6         130.    There is no evidence to corroborate Perlman's assertion that he had authority to

7    act on behalf of Original MO2.

8         131.    As noted above, the documentary evidence—including paperwork filed with the

9    California Secretary of State, correspondence from the IRS, contracts with third parties, and

10   communications from Perlman—is consistent with LaSalle being the sole individual with control of

11   Original MO2.  In contrast, there is no documentation associated with Original MO2 that suggests

12   Perlman was an officer, manager, or member of Original MO2 or had any authority to enter into

13   agreements on its behalf.

14        132.    The fact that Perlman advised LaSalle and Original MO2, paid legal fees

15   associated with establishing Original MO2 and negotiating with OL2, and offered office space and

16   facilities to Original MO2 does not establish that Perlman owned Original MO2.

17        133.    Employers often provide valued employees with perks—free services, goods and

18   other allowances in addition to their regular compensation.  For example, some Silicon Valley

19   employers provide free legal services, advice, and sponsorship to H1-B visa employees.  Likewise,

20   employers often provide assistance with down payments on valued employees' homes: "Down

21   payment assistance is just what it says: a benefit that helps employees obtain a down payment for a

22   home."  Jeffrey D. Mamorsky, 2 Employee Benefits Handbook section 63:77 (August 2016

23   Update); *see also* 9 No. 1 Employer's Guide Fringe Benefit Rules Newsletter, "Employer-Assisted

24   Housing, 21st Century Style" (2002) ("Employer assistance to employees in obtaining housing

25   (EAH) is again a growing benefit").  Defendants have cited no legal authority, and VGH is aware of

26   none, to support the proposition that helping an employee with personal endeavors—such as

27   purchasing a house or a business—confers on the employer ownership of the property involved.

28        134.    The facts of this matter illustrate the point.  LaSalle moved to California in 2000



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                    - 65 -

1    to work for a predecessor of Rearden.  He continued to work for one or another of Perlman's

2    companies for more than twelve years, and Perlman treated LaSalle generously as a valued

3    employee and friend throughout that time.  He helped LaSalle and his wife purchase a house.  Later,

4    through Rearden, he also helped his friend and long-term employee by arranging for Rearden to pay

5    legal fees incurred to form Original MO2 and to negotiate for Original MO2 to acquire MOVA.

6    Loaning (and in fact giving) LaSalle money to buy a home did not confer on Perlman an ownership

7    interest in that property.  Likewise, paying for Bingham's legal representation of Original MO2 did

8    not confer on Perlman or Rearden an ownership interest in Original MO2 or in the property which

9    Original MO2 acquired.

### 3. Defendants have failed to establish that LaSalle was obligated to manage Original MO2 for Rearden's benefit

#### a) LaSalle's 2012 employment agreements with Rearden do not reach Original MO2's purchase and management of the MOVA Assets

135.    LaSalle's employment agreements do not encompass acquisition and ownership of the MOVA Assets by Original MO2 or require that LaSalle assign them to Rearden.

136.    The PIIA was part of the package of agreements which Rearden prepared and presented, and which LaSalle signed on August 20, 2012.  The agreements included an offer letter, the PIIA, and the Arbitration Agreement.  Under Cal. Civ. Code §1642, "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."  Here, the three documents are between the same parties (Rearden and LaSalle), and were made as part of substantially one transaction (the August 20, 2012 commencement of LaSalle's employment with Rearden).  Further, according to Cal. Civ. Code § 1641, "The whole of a contract is to be taken together, so as to give effect to every part of it, if reasonably practicable, each clause helping to interpret the other."  Thus, the overall purpose of the transaction must be considered in interpreting its parts.

137.    The overall purpose of the PIIA is described in paragraph 3 of the Offer Letter. *See* PTX007.001.  The PIIA was intended to protect information that belonged to the Company or that was developed during the course of employment: "As an employee of the Company, you will



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

have access to certain confidential information of the Company and you may, during the course of your employment, develop certain information or inventions, which will be the property of the company.  To protect the interests of the company … you are required to sign [the PIIA]."

138.     The PIIA contains an Assignment of Rights provision (Section B) which states: "I hereby assign to the Company any and all rights, title and interest I may have or acquire in … Proprietary Information."  Contrary to Defendants' assertions, this provision did not create an obligation for LaSalle or Original MO2 to transfer the MOVA Assets to Rearden or manage them for Rearden's benefit.

### (1)     The "Assignment of Rights" does not apply to Original MO2

139.     First, the assignment provision applies on its face only to things acquired by the employee:  "*I* hereby assign … *I* may have or acquire in such Proprietary Information." PTX 007.004. (emphasis added).  The MOVA Assets were obtained from OL2 by Original MO2, not by employee LaSalle.  Original MO2 was not a signatory to the PIIA, and on the face of the contract is not bound by its provisions.  LaSalle did not own the MOVA Assets in his individual capacity.  The PIIA is an employer-employee agreement and not an accord between two companies.  The Assignment of Rights provision does not operate to transfer the MOVA Assets from non-employee, non-signatory Original MO2 to Rearden.

### (2)     The MOVA Assets are not "Proprietary Information"

140.     Second, the Assignment of Rights provision applies only to Proprietary Information.  *See* PTX 007.004.  The MOVA Assets are not Proprietary Information.

141.     As noted, the overall purpose of the PIIA, which must be considered when properly determining the scope of the definition of "Proprietary Information," is to protect information that belonged to the Company or that was developed during the course of employment. The textual definition of Proprietary Information is consistent with that purpose.  Proprietary Information is defined in section A.3 of the PIIA:  "For purposes of this Agreement, 'Proprietary Information' is information that was or will be developed, created, or discovered by or on behalf of



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

1   the Company, or which became or will become known by, or was or is conveyed to the Company,

2   which has commercial value in the Company's Business."

3       142.     According to that definition, and especially in light of the purpose of the PIIA, the

4   MOVA Assets are not Proprietary Information.

5       143.     On August 20, 2012, the MOVA Assets did not belong to Rearden.  Nor were

6   they developed later by Rearden during the course of LaSalle's employment.  Indeed, the MOVA

7   Assets, as sold by OL2 to Original MO2, were not developed, created, or discovered by Rearden

8   (the "Company" in the PIIA) in or after August 2012.  Although Rearden originally developed

9   MOVA, it transferred the property to OnLive in 2007.  On August 20, 2012, Rearden did not own

10  the MOVA Assets.

11      144.     Defendants argue that the language "or which became or will become known by,

12  or was or is conveyed to the Company" supports their argument.  It does not, unless one assumes

13  that at some point during the effective period of the PIIA the MOVA Assets became known by or

14  were conveyed to Rearden.  Defendants contend they did, but only by virtue of this provision of the

15  PIIA itself.  That circular reasoning assumes too much and proves too little.  The MOVA Assets did

16  not "become known" to Rearden or get "conveyed" to Rearden after LaSalle signed the August 20,

17  2012, employment package.  Rearden developed MOVA in the first place, years prior to 2012, and

18  thus they did not "become known" to Rearden during LaSalle's 2012 and 2013 tenure covered by

19  the PIIA.  As of August 20, 2012, the MOVA Assets belonged to OL2.  They remained in the

20  possession of OL2 until February 11, 2013, when Original MO2 purchased them. Original MO2 did

21  not—either then or later—transfer or assign the property to Rearden or a Rearden affiliate.  MOVA

22  thus was never "conveyed" to Rearden during the time of LaSalle's post-August 20, 2012

23  employment with the company.  Moreover, at least some of the MOVA Assets do not even fall

24  under the rubric "information"——rather they are physical assets and ownership interests in an entity

25  (Original Mova). On its face, then, the portion of the definition of "Proprietary Information" on

26  which Defendants rely does not apply to the facts of this matter.

27      145.     Because the MOVA Assets are not "Proprietary Information," they are not

28  covered by the Assignment of Rights provision of the PIIA.

INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 68 -

146.     They are also not encompassed by the Duty of Loyalty clause on which Defendants rely.  That provision states that there is a "relationship of confidence and trust" between LaSalle and Rearden "with respect to Proprietary Information."[28]  Because the MOVA Assets are not "Proprietary Information," they are not subject to that relationship.

### (3)  The MOVA Assets had no commercial value to Rearden on August 20, 2012

147.     According to the PIIA, only information with "commercial value in the Company's Business" can be "Proprietary Information." As of August 20, 2012, even though the form recites that Company Business included "development of motion, facial and surface capture technology," Rearden had not engaged in such activities since the transfer of MOVA to OnLive in 2007. Further, Rearden was not engaged in any such activity when LaSalle was hired by Rearden in August 2012.

148.     For this independent reason as well, Defendants' position that the MOVA Assets are Proprietary Information cannot be sustained.

### (4)  Any ambiguity in the employment agreement must be resolved in favor of LaSalle; extrinsic evidence and post-contract conduct should be considered

149.     To the extent there is ambiguity about the construction of the PIIA or other employment papers presented by Rearden and signed by LaSalle, "the language of a contract should be interpreted more strongly against the party who caused the uncertainty to exist."  Cal. Civ. Code § 1654.  Thus, any uncertainty as to the applicability of the PIIA to acquisition and ownership of the MOVA Assets must be decided against Rearden, which drafted the PIIA.

150.     Moreover, under California law, where the meaning of a contract is disputed, a court provisionally receives any proffered extrinsic evidence and determines whether the terms of the contract are reasonably susceptible to the interpretation advanced through that evidence.  *See Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1126-27 (2008) (even if a

---

[28] From time to time, Perlman and Defendants have asserted that LaSalle was a "fiduciary" of Rearden. That is not correct. Because LaSalle was never a member of Rearden (a California LLC), . California law imposes no fiduciary obligations on him. *See* Cal. Corp. C. § 17704.09.



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 69 -

1  contract appears unambiguous on its face, latent ambiguity may be exposed by extrinsic evidence

2  which reveals more than one possible meaning to which the contract's language is reasonably

3  susceptible and it is reversible error for the trial court to refuse to consider this extrinsic evidence);

4  *see also Miller v. Glenn Miller Prods., Inc.,* 454 F.3d 975, 989-90 (9th Cir. 2006) ("California law

5  recognizes that words of a written instrument often lack a clear meaning apart from the context in

6  which the words were written…").  If the language is reasonably susceptible to the proposed

7  meaning, the court admits the extrinsic evidence.  *Wolf,* 162 Cal. App. 4th at 1126-27.

8        151.     Extrinsic evidence is admissible here to show whether or not the parties intended

9  that an inventions agreement assign ownership rights to an employer. In *Mattel, Inc. v. MGA*

10  *Entertainment, Inc.,* 616 F.3d 904, 909-910 (9th Cir. 2010), for example, the Ninth Circuit held that

11  the District Court erred in failing to consider extrinsic evidence as to the parties' interpretation of an

12  inventions agreement which did not unambiguously require an assignment of an employee's idea

13  for a new line of fashion dolls. In a related case, *Mattel, Inc. v. MGA Entertainment, Inc.,* 782

14  F. Supp. 2d 911 (C.D. Cal. 2011), the district court ruled that "[b]ecause '[t]he fundamental goal of

15  contractual interpretation is to give effect to the mutual intention of the parties,' the Court may

16  consider extrinsic evidence of the parties' intent when a contract is ambiguous." (citations omitted)

17  *See also Orion Tire Corp. v. Goodyear Tire & Rubber Co.,* 268 F.3d 1133, 1138 (9th Cir. 2001).

18        152.     Extrinsic evidence surrounding the making of the contract, "including the object,

19  nature and subject matter of the writing," is admissible to clarify the parties' intent.  *Pacific Gas &*

20  *Elec. Co. v. G. W. Thomas Drayage & Rigging Co.,* 69 Cal. 2d 33, 40 (1968)(citation omitted);

21  *Pacific Gas & Electric Co. v. Zuckerman,* 189 Cal. App. 3d 1113 (1987) (reversible error to refuse

22  even provisionally to consider extrinsic evidence as to mutual intention of parties to contract).

23  Extrinsic evidence of the parties' conduct subsequent to contract formation is also admissible for

24  the purpose of illuminating the parties' intent at the time of contract formation.  *Caliber One Indem.*

25  *Co. v. Wade Cook Fin. Corp.,* 491 F.3d 1079, 1084 (9th Cir. 2007); *see also City of Hope National*

26  *Medical Center v. Genentech, Inc.,* 43 Cal. 4th 375, 393 (1980) ("A party's conduct occurring

27  between execution of the contract and a dispute about the meaning of the contract's terms may

28  reveal what the parties understood and intended those terms to mean").



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

153.     If there is no material conflict between the extrinsic evidence adduced, the court interprets the contract as a matter of law.  *Id.*  But when "there is a conflict in the extrinsic evidence, the factual conflict is to be resolved by the jury."  *Id.; see also Mattel, supra,* 619 F.3d at 910 (if the meaning of a term in an inventions agreement can be interpreted either to cover or not to cover a set of facts, "if the meaning turns in part on the credibility of conflicting extrinsic evidence, a properly instructed jury should have decided the issue").

154.     Further, the employment transaction here "may be explained by reference to the circumstances under which it was made, and the matter to which it relates."  Cal. Civ. Code § 1647.  "However broad may be the terms of the contract, it only extends to those things concerning which *it appears the parties intended to contract.*"  Cal. Civ. Code § 1648 (emphasis added).  When the terms of a promise are "in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it."  Cal. Civ. Code § 1649.

155.     The parties' conduct following execution of the PIIA and related agreements demonstrates further that they did not intend those agreements to cover the MOVA Assets.  A "party's conduct occurring between execution of the contract and a dispute about the meaning of the contract's terms may reveal what the parties understood and intended those terms to mean."  *City of Hope National Medical Center v. Genentech, Inc., supra,* 43 Cal. 4th at 393.  *See also Hilleary*, 193 Cal. App. 3d at 327 ("uncommunicated subjective intent is not relevant" to determine mutual assent.)  Here, between the time employment documents were executed in August 2012 and the time a dispute first arose (at the earliest in mid or late February 2013 *after* the MOVA Assets transfer from OL2 to Original MO2), the evidence demonstrates that the parties consistently wanted and acted to cause the MOVA Assets to go to Original MO2 for the benefit of LaSalle and Pearce, not Rearden.

            b)     LaSalle complied with the Duty of Loyalty Provision of the PIIA

156.     As explained above, the MOVA Assets are not Rearden "Proprietary Information" subject to the "relationship of confidence and trust" encompassed by the Duty of Loyalty clause referenced in the PIIA.

157.    But Defendants also attempt to rely on the non-compete language of the Duty of Loyalty section of the PIIA, which states that during his employment with Rearden, LaSalle will only compete with Rearden with the written consent of his manager and the Human Resources Manager responsible for his organization.  All of the evidence discussed above shows that up until the point Perlman terminated LaSalle's employment on February 26, 2013, Perlman was aware of and even encouraged or enabled LaSalle's creation and management of Original MO2 and that company's acquisition of the MOVA Assets from OL2.   Further still, and also as noted above, during the entire period they remained employed by Rearden after August 2012, neither LaSalle nor Pearce undertook any actual activity which was competitive with Rearden's "Company Business." Neither offered facial motion capture services to any actual or potential customer, and neither undertook any activity to further develop MOVA technology.  At most, LaSalle undertook preparations to compete, which is permissible under applicable California law.

158.    LaSalle could have done nothing more to comply with this provision.  In any event, a breach of this provision might lead to a potential cause of action against LaSalle, but it does not affect the chain of title for the MOVA Assets.

            c)      Even if the PIIA was originally applicable, it was modified

159.    Even if the PIIA can be construed to apply to the MOVA Assets, the contract was modified by Perlman's writings through many of the emails discussed above. The sender's name typed on an e-mail is sufficient to constitute a "signed writing" modifying a written agreement. *Lamle v. Mattel, Inc.*, 394 F.3d 1355 (Fed. Cir. 2005) (applying California law).  For example, in September 20, 2012, emails that he forwarded to LaSalle and Pearce, Perlman wrote that he wanted LaSalle and Pearce to "have a go at" the MOVA business and that although he'd provide help and advice, they were to "get it running under their own steam."  Perlman told LaSalle the he would let LaSalle and Pearce use Rearden's offices, host their website at mova.com, and provide them with business advice. He also told LaSalle that he (Perlman) would help LaSalle with legal resources to create a company to hold the MOVA Assets.

160.    Moreover, a promise set forth in writing which modifies a duty under a contract not fully performed on either side is binding notwithstanding lack of consideration so long as the



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 72 -

1  modification is fair and equitable in view of circumstances not anticipated by the parties when the

2  contract was made.  1 Witkin, *Summary of California Law* (10th ed. 2014), Contracts § 964,

3  p. 1056, citing Restatement (Second) of Contracts § 89.  Therefore, it is reasonable to conclude that

4  it was fair and equitable to modify the PIIA to exclude the MOVA Assets because when the

5  contract was signed (i) Rearden was not in the motion capture business, (ii) Perlman stated

6  repeatedly that he saw no value in the MOVA Assets and did not want them, and (iii) the MOVA

7  Assets were unusable without LaSalle and Pearce.

8        161.     The PIIA was also orally modified by the parties.  Oral modification is available

9  where the underlying contract contains a writing requirement if the oral modification is fully

10  executed.  *E.g., D. L. Godbey & Sons Const. v. Deane*, 39 Cal.2d 429, 432 (1952); Cal. Civ. Code

11  § 1698 (b) ("A contract in writing may be modified by an oral agreement to the extent that the oral

12  agreement is executed by the parties.").  Whether a written contract has been modified by an

13  executed oral agreement is a question of fact. *Weber v. Jorgensen*, 16 Cal. App. 3d 74, 81 (1971).

14        162.     As explained above, Perlman and LaSalle discussed and agreed that Original

15  MO2 was formed to acquire the MOVA Assets for the benefit of LaSalle and Pearce, not the benefit

16  of Perlman.

17        163.     Modification as contemplated was fully executed when the MOVA Assets were

18  transferred from OL2 to Original MO2 on February 11, 2013—prior to the time Perlman announced

19  that he had changed his mind.[29]  The PIIA was therefore modified even without a signed writing.

20                  d)     The PIIA is void and unenforceable

21        164.     Even if the PIIA applies to the MOVA Assets and was not modified, the

22  agreement is void and unenforceable under Cal. Bus. & Prof. Code §16600 ("every contract by

23  which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to

24  _____

25  [29] In late February 2013, Perlman told LaSalle and Pearce that he had "changed his mind."  TT
152:24-153:14; 690:9-691:3  Perlman has no credible explanation for actively helping Pearce and
LaSalle form their new business, for generally behaving in a manner consistent with Original MO2

26  (and not Rearden) acquiring MOVA, and for even stating that MOVA patents were not worth
maintaining—and saying nothing to the contrary before he told LaSalle and Pearce in late February

27  2013—after Original MO2 had acquired MOVA for LaSalle (and indirectly Pearce's) benefit—that
he had changed his mind and was again interested in MOVA.

28  



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

1    that extent void.”).

2        165.        Sections D and E of the PIIA require that the employee assign to Rearden

3    inventions “made, discovered, conceived, reduced to practice, or developed….within six (6) months

4    after the termination of ….employment ….” Such a post-termination assignment clause is an

5    unlawful restraint of trade under Cal. Bus. & Prof. Code § 16600. *See, e.g., Applied Materials, Inc.*

6    *v. Advanced Micro-Fabrication Equipment (Shanghai) Co.*, 630 F. Supp. 2d 1084 (N.D. Cal. 2009);

7    *Armorlite Lens Co. v. Campbell*, 340 F. Supp. 273 (S.D. Cal. 1972).  Likewise, a post-termination

8    non-solicitation provision is void and unenforceable under Cal. Bus. & Prof. Code § 16600. *VL*

9    *Systems, Inc. v. Unisen Inc.*, 152 Cal. App. 4th 708, 718 (2007); *Thompson v. Impaxx, Inc.*, 113 Cal.

10   App. 4th 1425, 1429 (2003). Inclusion of such restrictions⸺abridging strong public policy in

11   California⸺justifies invalidation of the entire contract in which they appear. “Courts reform

12   contracts only when the parties have made a mistake, and not for the purpose of saving an illegal

13   contract.  Illegal contracts are void.”  *Kolani v. Gluska*, 64 Cal. App. 4th 402, 406-407 (1998).  *See,*

14   *e,g, Applied Materials, Inc.,* 630 F. Supp. 2d at 1091; *O’Connor v. Uber Technologies, Inc.,* 311

15   F.R.D. 547, 559, n. 10 (N.D. Cal. 2015).

16       166.        In this instance, the outcome if Defendants’ interpretation of the PIIA were

17   accepted would be to preclude LaSalle and Pearce from future employment in their specialized

18   field. Such a result offends Cal. Bus. & Professions Code § 16600.  As Perlman himself recognized,

19   LaSalle and Pearce built careers around providing motion capture services to the film industry.

20   Perlman even admitted that the MOVA Assets were “not monetizable” and had no value without

21   Pearce and LaSalle. Accepting Defendants’ after-the-fact interpretation of the PIIA would convert

22   the contract into an unlawful restraint of trade and should not be permitted.  *Edwards v. Arthur*

23   *Andersen LLP,* 44 Cal. 4th 937, 948 (2008) (invalidating noncompetition agreement an employee

24   was required to sign before commencing employment “because it restrained his ability to practice

25   his profession.”)

             e)        Defendants waived any right to the MOVA Assets purportedly
                       conferred by the PIIA

26

27

28       167.        Waiver bars Defendants’ attempt to enforce any alleged transfer or obligation to



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED’S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                          - 74 -

1   transfer MOVA to Rearden or Rearden Mova based upon LaSalle having been employed by

2   Rearden.

3        168.    Waiver arises when a party intentionally relinquishes a right, or when its acts are

4   so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has

5   been relinquished. *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1559 (9th Cir. 1991).

6   Waiver may be implied through conduct manifesting an intention to waive. *Gould v. Corinthian*

7   *Colleges, Inc.*, 192 Cal. App. 4th 1176, 1179 (2011).

8        169.    "Waiver is the intentional relinquishment of a known right after full knowledge of

9   the facts . . . [and] does not require any act or conduct by the other party. Thus, the pivotal issue in a

10  claim of waiver is the intention of the party who allegedly relinquished the known legal right." *Old*

11  *Republic Ins. Co. v. FSR Brokerage, Inc.*, 80 Cal. App. 4th 666, 678 (2000) (citations omitted).

12       170.    A party's intent to waive a contractual right can be demonstrated through words or

13  conduct. *Biren v. Equality Emergency Medical Group, Inc.*, 102 Cal. App. 4th 125, 141 (2002);

14  *Wagner v. Glendale Adventist Med. Ctr.*, 216 Cal. App. 3d 1379, 1388 (1989) (finding waiver

15  where a party "behaved in a manner antithetical to one or more terms of an express written

16  contract").

17       171.    Defendants contend that Perlman could not have waived Rearden's right to the

18  assignment of the MOVA Assets because the PIIA contains a clause stating that any waiver of

19  rights under the agreement is not effective unless in a writing signed by Perlman and LaSalle.

20  (PIIA, Section M, p. 7).  However, "[a]t common law, an oral agreement is sufficient to modify or

21  rescind a written contract notwithstanding a provision in the written contract purporting to require

22  that subsequent modifications be evidenced by a writing, commonly called a 'no oral modification'

23  clause[.]" 10 Williston on Contracts § 29:42 (4th ed. 1999). Indeed, a clause requiring waiver to be

24  in writing may itself be waived by conduct.  *Bettelheim v. Hagstrom Food Stores, Inc.*, 113 Cal.

25  App. 2d 873, 878 (1952). *See also Gould*, 192 Cal. App. 4th 1176, 1180 (2011).  As set forth above,

26  Perlman waived the no oral waiver clause of the PIIA when he encouraged LaSalle to purchase the

27  MOVA Assets for LaSalle and Pearce's benefit.  After encouraging and facilitating the transfer of

28  the MOVA Assets from OL2 to Original MO2, Perlman cannot then point to this provision to claim



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 75 -

1   the MOVA Assets for Rearden or himself. *Shenzhenshi Haitiecheng Science and Technology Co.,*

2   *Ltd. v. Rearden, LLC, et al*., No. 15-CV-00797-SC, 2015 WL 6082028, *3 (N.D. Cal. October 15,

3   2015) (Conti, J.) (Dkt. 52.)

4       172.    Therefore, the doctrine of waiver also precludes Defendants' assertion of

5   ownership.

6               **4.    Defendants do not and cannot maintain their allegation that Original MO2 transferred the MOVA Assets to Defendants**

7

8       173.    Original MO2 did not sell the MOVA Assets to Rearden Mova before entering

9   into the May 8, 2013 agreement with SHST.

10       174.    In counterclaims against SHST, Defendants alleged that on April 19, 2013,

11   Original MO2 transferred the MOVA Assets to Rearden Mova.  (Dkt. 100, ¶ 109.).  This alleged

12   transfer was also the basis for various claims to title of the MOVA patents and trademarks that

13   Defendants sought to have recorded by the USPTO in September 2014.

14       175.    Defendants, however, appear to no longer assert this claim against VGH; nor

15   could they do so effectively.

16       176.    By the terms in these drafts, LaSalle's signature was required—despite

17   Defendants' contention that Perlman was empowered to sign on behalf of Original MO2, the drafts,

18   written by Rearden, state that LaSalle "is the sole member of and owns 100% of the membership

19   interest in [Original] MO2."  LaSalle's signature does not appear on any draft and LaSalle never

20   consented to, let alone signed, any such agreement.

21       177.    Also, the subsequent behavior of Original MO2 and Defendants is not consistent

22   with any credible belief on behalf of the parties that they had entered into such an agreement in

23   April 2013.   For example, in June and July of 2013, Rearden sent demand letters to LaSalle and

24   Original MO2. These demands do not reference any April 2013 agreement, which is inconsistent

25   with Rearden believing any such agreement existed.  Similarly, the "Statements of Interest"

26   Perlman submitted to the USPTO in January 2015, on behalf of Rearden and Rearden Mova recite

27   the formation of Rearden Mova on April 19, 2013, but do not mention any transfer of the MOVA

28   Assets from Original MO2 to Rearden Mova, much less any actual assignment in April 2013. They



1    also state "the assets of MO2 LLC for the benefit of Rearden LLC *were meant to be transferred to*

2    *Rearden Mova LLC for the benefit of Rearden LLC,*" (emphasis added) but do not assert that the

3    allegedly intended transfer actually took place.

4         178.    The subsequent behavior of Original MO2 is even more at odds with the

5    purported April 2013 contract. In correspondence with Rearden's attorneys, Original MO2 rebutted

6    the allegations in the Rearden demands. Original MO2 then proceeded to sell the assets to SHST, an

7    action which is entirely inconsistent with it believing it had just sold the assets to Rearden Mova.

8         179.    Additionally, Perlman has admitted that if there was an agreement reached in

9    April 2013 between Original MO2 and Rearden Mova or Rearden, it would have been oral rather

10   than written.  For at least the above reasons, this assertion is inconsistent with the conduct of

11   Original MO2, Rearden, and Rearden Mova. But even if an oral agreement had been reached, that

12   would not have been effective to transfer most MOVA intellectual property.  Duly executed

13   writings are required for valid assignments. *See* 35 U.S.C. § 261 (patents), 17 U.S.C. § 204(a)

14   (copyrights), and 15 U.S.C. § 1060 (a)(3) (trademarks on the principal register).

15        180.    Defendants, therefore, failed to establish the existence of any agreement assigning

16   the MOVA Assets from Original MO2 to Rearden Mova or Rearden.  In November 2013, LaSalle

17   dissolved Original MO2 without ever having entered any such agreement.

18        **5.**    **Payment of maintenance fees by Rearden does not establish ownership**

19        181.    As evidence that VGH does not own the MOVA Assets and that one or more of

20   Defendants do, Defendants have cited Rearden's payment of maintenance fees for various elements

21   of intellectual property that are part of the MOVA Assets.

22        182.    Payment of maintenance fees does not establish ownership. *See CopyTele, Inc. v.*

23   *E Ink Holdings, Inc.*, 962 F. Supp. 2d 1130, 1140 (N.D. Cal. 2013); 37 C.F.R. §1.366 ("any person

24   or organization may pay maintenance fees"). When considered against the backdrop of the dispute

25   between LaSalle and Rearden, along with Perlman's repeated advice to LaSalle and Original MO2

26   that they should not pay the maintenance fees, Defendants' evidence in this regard is, at best, indicia

27   of an attempt by them to unlawfully appropriate the MOVA Assets.

28        183.    The ***obligation*** to pay maintenance fees is one of several factors courts consider



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

when determining whether a patent license agreement is effectively a transfer of all rights to the patent, and it is a relatively minor one of those factors.  *See Alfred E. Mann Found. For Sci. Research v. Cochlear Corp.*, 604 F.3d 1354, 1359–60 (Fed. Cir. 2010).  The factor is normally considered, if at all, in the context of determining whether a license is exclusive or determining who has standing to assert a patent.  For example, if the obligation to pay maintenance fees is combined with an entitlement to manage the litigation, licensing, and transfer rights, then the obligation may corroborate an ownership interest.  *New Medium Technologies LLC v. Barco N.V.*, 644 F. Supp. 2d 1049, 1060 (N.D. Ill. 2007).  But even then, the obligation to pay fees "is not a conclusive factor." *CopyTele, Inc,* 952 F. Supp. 2d at 1140.  For example, the obligation may be the result of a contract compelling one party to pay those fees for the benefit of another.  *See  id*.

184.     There does not appear to be any case where payment of maintenance fees in and of itself was found to create an ownership interest in the underlying patents.  Nor does their appear to be any case which holds that ***after*** a patent had been transferred, a party can obtain or regain ownership of the patent by paying a maintenance fee.

185.     Here, there is no evidence or argument that Defendants were ***obligated*** to pay the maintenance fees.  They simply did so, apparently because Perlman believed they could thereby avoid arbitration with LaSalle with respect to MOVA ownership rights.  Yet even in this regard he later admitted that his understanding that payment of fees would in itself confer ownership was wrong.

186.     Because Perlman advised LaSalle not to maintain the patent portfolio there was no motivation or impetus for Original MO2 (or SHST after it) to assess whether maintenance fees were being paid or should be paid.  Once it learned, after September 2014, of Rearden's claim to own the patents, SHST and later VGH tried to pay these charges.  They discovered, however, that fees had already been paid pursuant to 37 C.F.R. § 1.366 (allowing "any person or organization" to "pay maintenance fees").  Even if patent ownership could be established merely by paying maintenance fees, the facts that Perlman advised LaSalle not to pay those fees and then laid in wait until MOVA achieved renewed success militate against allowing an inference of ownership from the payment of those fees.



1

### 6. Defendants have failed to overcome the evidence that Original MO2 sold the MOVA Assets to SHST.

2

3     187.     The evidence demonstrates in several different ways that in May 2013, Original

4     MO2 and SHST entered an agreement to transfer the MOVA Assets to SHST.

5          #### a) SHST is not a Sham Entity

6     188.     Underlying Defendants' theme with respect to SHST is the suggestion that SHST

7     does not exist or was somehow controlled by DD3's ultimate parent (DDHL).  This notion is

8     apparently based in large part on the fact that SHST stepped in for DD3 as purchaser at the last

9     minute, without doing its own due diligence.  It may also be based on the fact that few witnesses in

10    this case testified to direct communication with SHST or its principal, Xiao Ping, and that most

11    communication was routed through DDHL.

12    189.     From these premises, Defendants seem to request the Court infer that SHST is a

13    fiction.  Evidence adduced at trial, however, explains the short timeline for the acquisition.  It also

14    explains the paucity of direct communication and demonstrates that at times individuals not

15    employed by DDHL had direct correspondence with Xiao Ping in furtherance of SHST's

16    acquisition of MOVA.

17    190.     During DD3 discussions with Original MO2, DD3 was in dire financial straits.

18    The company had recently gone through bankruptcy and was hemorrhaging the cash infused into it.

19    *See supra* ¶ 85.  Because of this, its board was not willing move forward with any acquisition—

20    even one this small.  Seah, one of DD3's directors at the time, still wanted to lock down MOVA to,

21    for example, prevent someone else from acquiring it.  He needed to find someone to purchase it,

22    and that purchase would have to close quickly lest someone else obtain MOVA.  Thus, any deal

23    would have to be on terms already negotiated and based on the diligence DD3 had already

24    performed.  SHST agreed. *See id.*

25    191.     Defendants apparent argument that SHST is a fiction is not supported by any

26    direct evidence and does not make sense in light of the "money trail" in the record.  As discussed

27    above, SHST purchased MOVA for $25,000, and put another $75,000 into a four-year escrow.

28    SHST then received $100,000 for licensing MOVA, as well as another $50,000 (in value) when it



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 79 -

sold MOVA to VGH.  But for this lawsuit (and assuming that no charges are placed against the $75,000 (which remains in the Hopkins Carley trust to this day),SHST would have made profit of $125,000--five times its initial investment.  Even if the $75,000 is completely depleted, the SHST would have still made a $50,000 profit (twice its original investment).  If SHST were a sham created by DDHL (or its predecessors), there would be no reason for SHST to profit.

192.     As for communications with SHST, it is true that most of it was routed through DDHL employees.  As explained at trial, this was because Xiao Ping spoke Mandarin and did not trust her English, and DDHL was the most convenient source of Mandarin speakers for all of the principals in this matter. (TT 601:6-21)  Seah, however, testified to having direct communication with Xiao Ping.  (TT:494:8-495:3)  And the evidence demonstrates that Heyl also had direct communication with her.  In order to send her a parcel, he needed to provide her phone number to the delivery service.  She provided that number, which had a PRC country code, via email to him. DTX 400.

193.     It may be possible to make sense of the record and testimony even starting from the *assumption* that SHST was a sham.  However, Defendants bear the burden of establishing fraud, and they have not met it. For example, any claim of fraud requires harm to the entity allegedly defrauded, and there has been no alleged (much less established) harm to Original MO2, the counterparty to SHST.  *See Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 974.[30] The record does not establish, by a preponderance of the evidence, that SHST was a sham.

194.     For example, in addition to testimony about SHST discussed above, common sense dictates if DDHL could have controlled SHST, it would have put someone else in to run the company and provide the requested discovery rather instead of invoking the Court's ire and being found in default by having it disappear at an inopportune time, only to reappear at an equally inopportune time.

195.     But even assuming arguendo that SHST was a sham set up and controlled by

---

[30] If Defendants' argument lies in the theory of alter ego, "[a]lter ego is an extreme remedy, sparingly used" and absent evidence of both wrongdoing and injustice, alter ego doctrine cannot be invoked. *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 539, 99 Cal. Rptr. 2d 824, 836 (2000).



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

DDHL, Defendants fail to show how that that obviates VGH's claim, as ownership would still flow to DDHL.  DDHL is VGH's parent, and if SHST was a DDHL sham, DDHL would still control MOVA.

196.

### b)    The Contract Between Original MO2 and SHST is Valid and Enforceable

197.    For a contract to exist, the alleged terms of that contract must be clear enough that the parties could understand what each was required to do, the parties must exchange consideration, and the parties must have agreed to terms.  CACI 302 (2016).

198.    Here, all conditions are satisfied. There is no allegation that the terms of the May 2013 Asset Purchase Agreement were unclear to either Original MO2 or SHST. There is also no credible allegation of a failure of consideration: SHST paid $25,000 and gave other consideration as well (including putting aside $75,000 for a four year period to indemnify LaSalle), and Original MO2 transferred the MOVA Assets to SHST.

199.    One of Defendants' challenges rests on their assertion that the "chop" by which SHST executed the May 2013 Asset Purchase Agreement is insufficient to fully execute that agreement and that therefore no signed agreement exists.  This position lacks merit.

200.    Defendants also appear prepared to assert that it was not SHST that placed the chop on the relevant documents and on this basis assert that the agreements are not valid.  This position also lacks merit.

201.    First, the record supports the conclusion that the chop on the Asset Purchase Agreement was a legitimate executory signature for SHST. For example, there is no evidence that SHST was asked  to provide any additional form of execution and it continued to conduct business as if the Asset Purchase Agreement had been fully and properly executed—it accepted deliveries and made payments as required by the contract, several months later licensed the MOVA Assets it had obtained under the Asset Purchase Agreement and accepted payment in return, and eventually sold those MOVA Assets to VGH. These expressions of SHST's belief that it had entered into a valid agreement indicate that SHST's chop was an authentic signature.



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

202.     Moreover, the sufficiency of the chop under Chinese law is irrelevant. The subject contract contains a choice of law provision designating California law. As a result, the formation and validity of the May 2013 Asset Purchase Agreement is to be decided under California law. *See e.g,* 1 Witkin, *Summary of California Law*, § 82 (10th ed. 2005); *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 481 (1992) (upholding choice of law clauses as giving effect to the intentions of the parties); Restatement (Second) of Conflict of Laws §§ 187, 199 (1971).

203.     Second, the evidence shows that LaSalle's signature and SHST's chop were applied on every signature page associated with the agreement.  Some signature pages (and counterparts) admitted in evidence at trial bear signatures by all parties.  Where that was not the case, LaSalle and others testified to having seen, sent, and or received copies that were so signed. *See*, *e.g.*, TT 1025:3-12, 173:13-181:14; PTX60A, PTX61, PTX63A, PTX103-107.

204.     Under California law, unsigned contracts can bind parties, for example through partial performance. *See* 14 Cal. Jur. 3D Contracts § 158.3. ("The lack of a party's signature does not make a fully executed contract unenforceable.")  More generally, the conduct and relationship of the parties as well as all the circumstances of the case determine whether a contract has been formed. "Conduct will create a contract if the conduct of both parties is intentional and each knows, or has reason to know, that the other party will interpret the conduct as an agreement to enter into a contract." CACI 305 (2016)

205.     Here, Original MO2 and SHST had a written agreement with which they both fully complied and which neither challenged in the nearly four years since it was entered. Even if the SHST chop was not an effective signature, and even if some signature pages in the document were not signed by one or another of the parties, the conduct of Original MO2 and SHST, by way of complying with the provisions of the Asset Purchase Agreement and conducting subsequent business as if the terms of the contract had been effective, is sufficient to create a valid contract.

206.     Finally, as addressed above, even if SHST were a sham, or if representatives of DD3, VGH, or DDHL applied SHST's chop without authorization, that would not void the contract or even amount, in this context, to conduct that resulted in unclean hands.  Again, it is clear that Original MO2 entered into an agreement with some entity, from which it received consideration and



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

1   to which it transferred the MOVA Assets.  The identity of that entity was not relevant to LaSalle

2   and Original MO2, so long as LaSalle and Pearce were offered employment to work with MOVA.

3   TT 170:13-20.

4          **7.      Defendants have not carried their burden to establish that VGH's**
           **purchase of the MOVA Assets was the result of a fraudulent transfer**

5

6   207.      Defendants contend that SHST's sale of the MOVA Assets to VGH was

7   fraudulent and is therefore void. The burden of producing evidence to establish affirmative defenses

8   is on Defendants.  *See, e.g., Rodman v. Safeway*, 125 F. Supp. 3d 922, 938 (N.D. Cal. 2015) (Tigar,

9   J.); *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal App. 4th 1658, 1668 (2003).  Defendants'

10  currently raise fraudulent transfer as an affirmative defense, rendering this claim legally unviable.

    Even if it were viable, Defendants' assertion of fraudulent transfer would be to no avail.

11

12          a)      Defendants have neither pled nor proven harm and thus lack standing
                    to asset fraudulent transfer.

13  208.      To prevail on a claim of fraudulent transfer, Defendants must show (1) they are a

14  "creditor" with "a right to payment" from SHST; (2) that SHST transferred the MOVA Assets to

15  VGH; (3) that SHST transferred the MOVA Assets "with the intent to hinder, delay or defraud one

16  or more of its creditors;" (4) that Defendants "were harmed;" and (5) that SHST's conduct "was a

17  substantial factor in causing Defendants' harm."  *See* CACI 4200; Cal. Civ. Code § 3439.04 (a).

18  209.      Focusing on the fourth element, harm results when property is transferred beyond

19  the reach of the creditor.  As the court in *Mehrtash v. Mehrtash*, 93 Cal. App. 4th 75, 80 (2001)

20  explained:

21          A well-established principle of the law of fraudulent transfers is, "A transfer
            in fraud of creditors may be attacked only by one who is injured thereby.
22          ***Mere intent to delay or defraud is not sufficient; injury to the creditor must***
            ***be shown affirmatively. In other words, prejudice to the plaintiff is***
23          ***essential. It cannot be said that a creditor has been injured unless the***
            ***transfer puts beyond [her] reach property [she] otherwise would be able to***
24          ***subject to the payment of [her] debt."***

25  *Mehrtash*, 93 Cal. App. 4th at 80 (emphasis added, citations omitted); *see also Fidelity Nat. Title*

26  *Ins. Co. v. Schroeder*, 179 Cal. App. 4th 834, 845 (2009) (reaffirming "longstanding principle that

27  injury-in-fact is an essential element" of a claim under the statute and that "[a] creditor has not been

28  injured unless the transfer puts beyond reach property the creditor could subject to payment of his



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                    - 83 -

1   or her debt") and 8 Witkin, *Cal. Proc., Enforcement of J.* § 497 (5th ed. 2008)

2   210.   Injury is required for standing to assert fraudulent transfer: it is a "well-

3   established principle of the law of fraudulent transfers … that a transfer in fraud of creditors may be

4   attacked only by one *who is injured* by the transfer." *Kelleher v. Kelleher,* 2015 WL 5693726 at

5   *11 (N.D. Cal. Sept. 29, 2015).  *See also Lachapelle v. Kim*, No. 15-cv-02195, 2015 WL 5461542

6   *6 (N.D. Cal. Sept. 16, 2015) (finding failure of complaint to explain how allegedly fraudulent

7   transfer would affect creditor's ability to collect judgment was reason to dismiss complaint for

8   failure to state a claim of fraudulent transfer).  "A plaintiff must make an affirmative showing that it

9   was injured by a transfer in order to have statutory standing to pursue a fraudulent transfer claim

10  under CUFTA." *In re Blanchard*, 547 B.R. 347, 353 (Bankr. C.D. Cal. 2016).

11  211.   "A transfer in fraud of creditors may be attacked only by one who is injured by

12  the transfer. A creditor does not sustain injury unless the transfer puts beyond his reach property

13  which he otherwise would be able to subject to the payment of his debt." *Haskins v. Certified*

14  *Escrow & Mortg. Co.*, 96 Cal. App. 2d 688, 691 (1950).

15  212.   "A conveyance therefore, cannot be set aside by a creditor no matter how tainted

16  with fraud, unless some specified property upon which he has a right to file his claim has by the

17  fraudulent conveyance been placed beyond his reach. The mere intent to delay or defraud is not

18  sufficient, but there must also be an injury to the creditor which must be affirmatively shown."

19  *Costa v. Neves*, 12 Cal. 2d 121, 125 (1938).

20  213.   This is consistent with the purpose of the fraudulent transfer statute: "to protect

21  creditors by authorizing them to set aside transfers by which debtors try to avoid paying debts by

22  ***putting*** assets beyond creditors' reach" as opposed to those by which debtors are merely "***trying*** to

23  put assets beyond creditors' reach." *Renda v. Nevarez*, 223 Cal. App. 4th 1231, 1236 (2014)

24  (emphasis added).

25  214.   Here, the transfer of MOVA Assets from SHST to VGH has not "put beyond

26  [Defendants'] reach property they otherwise would be able to subject to the payment of a debt."

27  *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1066 (N.D. Cal. 2014). Further, even if fraudulent

28  intent can be inferred, "[M]ere intent to delay or defraud is not sufficient; injury to the creditor must



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 84 -

1  be shown affirmatively." *Mehrtash*, 93 Cal. App. 4th at 80.  Defendants did not plead in their

2  answer to the VGH complaint in intervention, and at trial introduced no evidence to establish that

3  the MOVA Assets were ever beyond their reach or that of the Court. The property has always been

4  in the possession non-party exclusive licensee DD3 and subject to the Court's jurisdiction. Indeed,

5  VGH intervened in this case to obtain a declaration of ownership. *See In re Beverly*, 374 B.R. 221,

6  236 (B.A.P. 9th Cir. 2007), *aff'd in part, dismissed in part*, 551 F.3d 1092 (9th Cir. 2008)

7  ("[S]pecific evidence may negate an inference of fraud notwithstanding the presence of a number of

8  'badges of fraud.'").

9       215.     Finally, the Court has in fact exercised its jurisdiction over the MOVA Assets and

10  VGH: the MOVA Assets are currently the subject of the Court's preliminary injunction and are in

11  "a secure location of Defendants' choosing." (Dkt. 188 at 16.)

12       216.     Because there is no pleading or proof of harm, Defendants fail to state a claim for

13  fraudulent transfer.

14              b)     Defendants failed to show that they are a "creditor" of SHST

15

16       217.     The first element of a fraudulent transfer claim is that the asserting party (here,

17  Defendants) be a "creditor" with "a right to payment" from the alleged fraudulent transferor (here,

18  SHST).

19       218.     If VGH succeeds in establishing that it is entitled to declaratory judgment that

20  Defendants do not own the MOVA Assets, then Defendants' fraudulent transfer claim against

21  SHST, and its use of that claim as an affirmative defense against VGH, necessarily fail. If they have

22  no ownership interest in the MOVA Assets, Defendants have no basis to assert that any of them is a

23  creditor of SHST.

24              c)     Defendants have not met their burden to establish that SHST had<br>                   "intent to hinder, delay or defraud"

25       219.     Defendants assert that SHST's intent to hinder, delay, or defraud its creditors is

26  demonstrated by "badges of fraud."  However, they failed to satisfy their burden to establish the

27  "badges of fraud" on which their arguments rely.

28       220.     First, VGH paid SHST fair and reasonable compensation for MOVA.  In 2013,



SHST paid Original MO2 $25,000 for the MOVA Assets (plus a refundable sum scheduled to be returned to SHST in February 2017).  SHST then granted an exclusive license to DD3 in exchange for $100,000.  After DD3 re-established the viability of MOVA, VGH acquired the MOVA Assets from SHST in 2015 for $50,000, and took title subject to the exclusive license.  That was not sham consideration or an unfairly low price.  VGH paid *twice* what SHST originally paid, despite there being no recurring revenue associated with the already-licensed asset, which for SHST was a solid return on an investment it held for roughly 2 ½ years.  Because owning MOVA had strategic value to VGH and its ultimate parent DDHL, it paid what was *at least* fair and reasonable compensation.

221.     Second, the purported exclusion of liabilities was ineffective as a matter of law and any fraudulent intent that could be inferred from it is negated by the context in which the provision existed.  The SHST/VGH assignment agreement contained a provision excluding any of SHST's already-incurred liabilities related to the pending litigation from the liabilities assumed by VGH.  On the other hand, VGH paid SHST $50,000 up front and specifically contemplated that VGH, and not SHST, would be found to be the real party in interest in this litigation (and thus subject to any resulting liability).[31]  Moreover, as a matter of law, successors in interest are bound where the subject matter of a pending action is transferred.  *See Sunnyside Dev. Co., LLC v. Opsys Ltd.*, No. C 05 0553 MHP, 2007 WL 2462142, at *5 (N.D. Cal. Aug. 29, 2007); *see also In re Bernal*, 207 F.3d 595, 598 (9th Cir. 2000) ("The action may be continued by or against the original party, and the judgment will be binding on his successor in interest even though he is not named." (quoting 7C Wright, Miller, & Kate, Federal Practice and Procedure § 1958 (2d ed. 1986)).  Here, the MOVA Assets were the subject matter of a pending action.  As a result, so long as it was a substituted party in this lawsuit, VGH was bound notwithstanding the contractual disclaimer.  What might otherwise appear to have been an avoidance strategy is not under the law, and the purported "badge" is not one.

222.     Third, although Defendants assert that the transfer from SHST to VGH was a transfer to an insider, they have no proof to back it up.  An insider is someone with a special

---

[31] The contract called for VGH to pay $25,000 up front and an additional $25,000 if this litigation resolved favorably. PTX 078.003;  VGH paid $41,288.25 up front. PXT 79; PTX 80; TT 531:7-16.



1   relationship, control, or influence, such as a spouse, parent, or partner.  *See In re Serrato*, 214 B.R.

2   219, 229 (N.D. Cal. 1997); *S.E.C. v. Whitworth Energy Res. Ltd.*, 26 F. App'x 723, 724–25 (9th Cir.

3   2002); *Annod Corp. v. Hamilton & Samuels*, 100 Cal. App. 4th 1286, 1298 (2002).  The evidence

4   shows that SHST was and is independent from and unaffiliated with VGH, DD3, or DDHL.  There

5   were no directors or officers in common, and no other entity involved in this case exerted control

6   over SHST.  *See* ¶ 85, *supra*. Also, in and of themselves certain events in this case demonstrate that

7   VGH could not exert control or influence over SHST.  For example, if VGH could influence or

8   control SHST, VGH would have used that power to obtain cooperation from SHST in discovery,

9   which would have greatly simplified VGH's prosecution of the merits of its claims.

10          223.     Fourth, Defendants have not demonstrated that the timing of the SHST/VGH sale

11   was related to keeping the MOVA Assets out of their reach. By April 2015, DDHL was considering

12   buying the MOVA Assets so that they would be within the same corporate family as exclusive

13   licensee DD3.  At roughly the same time or soon after, SHST decided it no longer wished to hold

14   MOVA and communicated that to DDHL's CEO.  Although SHST and DDHL were in negotiation

15   in 2015, it would have made no sense to move forward with the sale while Defendants' potentially

16   dispositive summary judgment motion was pending because the decision on that motion could have

17   resulted in a determination that SHST did not even own the MOVA Assets.  Following the

18   summary judgment order, negotiating, documenting, and ultimately executing transfer of title from

19   SHST to VGH took two months and closed, as many corporate deals do, before the end of the

20   calendar year.  The transaction, like many business transactions, had its own momentum.  It was not

21   driven by Defendants' new counterclaims, which were not even raised as a possibility until the first

22   part of December 2015 and which by nothing more than happenstance were first allowed one day

23   prior to closing.

24          224.     Fifth, Defendants failed to demonstrate that the transaction was intentionally

25   concealed from them. VGH moved voluntarily and with a reasonably short time to substitute into

26   this case under Fed. R. Civ. P. 25.  Because "…Rule 25(c) is wholly permissive there is no time

27   limit on moving to substitute under its provisions."  7C Wright & Miller, Fed. Prac. & Proc. Civ. §

28   1958 (3d ed.).  The case law is replete with instances of delay far longer than the two months



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

involved here.  *See, e.g., Gen. Battery Corp. v. Globe-Union, Inc.*, 100 F.R.D. 258, 259 (D. Del. 1982) (years passed before notice of several transfers and substitution).  Additionally, VGH notified Defendants of the transfer of its own accord and made no effort to hide what had occurred.  When that substitution was undone, VGH moved quickly to intervene, and the Court granted that intervention over Defendants' objections.  SHST initiated this litigation and then VGH assumed the mantel of plaintiff as soon as reasonably possible.  VGH made every effort to remain in the case and then reenter it.  When a preliminary injunction issued, VGH complied and arranged for DD3 to turn over the physical elements of the MOVA Assets to be kept in escrow.  In other words, Defendants have not supplied evidence of concealment by SHST or VGH.

225.    Sixth, Defendants failed to show that the value of consideration SHST received from VGH was not reasonably equivalent to the value of the licensed MOVA Assets.  Perlman admitted that the MOVA Assets were worthless before and at the time Original MO2 acquired them in February 2013, and this is consistent with third-party OL2 selling them to Original MO2 for one dollar.  On May 8, 2013, SHST agreed to acquire the MOVA Assets for $25,000 and to set aside $75,000 to indemnify LaSalle in the event Perlman sued him. Then, on September 26, 2013, SHST licensed the MOVA Assets to DD3, exclusively, for $100,000. On December 17, 2015, VGH purchased the MOVA Assets from SHST, subject to the license granted to DD3. The agreed price for the property was $50,000. As a result, SHST ultimately realized a $125,000 return on an original $25,000 investment.  Defendants have not shown that such a return was somehow indicative of fraud.  Similarly, Defendants provided no explanation or evidence at trial to establish that when VGH paid SHST $50,000 for assets initially acquired for $25,000, that was an unreasonable or questionable deal in financial terms.

226.    Seventh, Defendants have submitted no evidence that the MOVA Assets represented all of what SHST owned at any time relevant to this case.

227.    Defendants' attempt to characterize this transaction as fraudulent is thus not supported by the evidence.  What they allege to be badges of fraud are factually inaccurate or have reasonable explanations that are more plausible than the nefarious assumptions postulated but not proven by Defendants.



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

228.     The transfer of the MOVA Assets from SHST to VGH was not fraudulent. It is valid and effective.

## C.   DECLARATORY JUDGMENT THAT NONE OF THE DEFENDANTS OWNS THE MOVA ASSETS

229.     Even if the transfer of the MOVA Assets from SHST to VGH was fraudulent or the original purchase by SHST is voided, that does not mean that any of the Defendants own the MOVA Assets.

### 1.     Even if the Original MO2 sale of the MOVA Assets to SHST cannot be sustained, MOVA does not belong to any of the Defendants

230.     It is undisputed that on February 11, 2013, Original MO2 took title to and became the owner of the MOVA Assets.

231.     As explained previously, at the time Original MO2 was dissolved, it had not transferred any assets to any of Defendants, and LaSalle had always been the sole member and manager of the company. If the MOVA Assets were never properly sold to SHST, then ownership remained with Original MO2 and continued to rest with that entity until the time it was dissolved. The assets of a dissolved LLC are divided among the members of the LLC. *See* Cal. Corp. Code §§ 17707.04-06 and §§ 17353 and 17354(a) (former statute). The statutes govern how assets are to be allocated among the members, but in the event of an LLC having a sole member, that member receives the dissolved LLC's assets. As the sole member of Original MO2, LaSalle—and not any Defendant—would be entitled to receive the MOVA Assets.

232.     In light of this law, Defendants contend that the PIIA required LaSalle to assign those assets to Rearden or manage them for Rearden's benefit or that the PIIA operated to assign assets. As set forth above, however, this is incorrect. It is also a claim that is not before this Court. Defendants have not brought an action against LaSalle, who is not a party to this case.

233.     Moreover, Defendants may not bring such a claim before this Court. The Arbitration Agreement (part of the package LaSalle signed on August 20, 2012) applies to "all claims or controversies … whether or not arising out of my employment (or its termination)…" and specifically covers "claims for breach of any contract or covenant (express or implied)" and "tort



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 89 -

1  claims." If Defendants wish to bring a claim for breach of contract against LaSalle, they should do

2  so pursuant to the terms of the Arbitration Agreement.

3          **2.      If the transfer from SHST to VGH was fraudulent, the MOVA Assets
                  belong to SHST, not any of the Defendants.**
4

5          234.      Defendants assert that if a transfer is fraudulent under the California Uniform

6  Voidable Transfer Act, then it is void as a matter of law. If the sale of the MOVA Assets from

7  SHST to VGH is voided, then the MOVA Assets belong to SHST, which was the seller in the

8  putatively voided sale. The MOVA Assets cannot go to any Defendant even under claims asserted

9  against the defaulted SHST, because the allegations in Defendants' counterclaims against SHST are

10 all predicated on ownership by one or more Defendants. Under these circumstances and in light of

11 the analysis presented above, no Defendant had or could have had any ownership interest in MOVA

12 from or after February 11, 2013.

13         **J.      Defendants Have Not Carried Their Burden of Proof with Respect to Their
                  Affirmative Defenses**
14
                 **1.      Defendants have not demonstrated laches, acquiescence, or estoppel**
15

16         235.      "A defendant must demonstrate three elements to successfully assert a laches

17 defense: (1) delay in asserting a right or a claim; (2) the delay was not reasonable or excusable; and

18 (3) prejudice to the party against whom laches is asserted." *Magic Kitchen LLC v. Good Things Int'l*

19 *Ltd.*, 153 Cal. App. 4th 1144, 1157 (2007). *See also Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 955

20 (9th Cir. 2001). Indeed, "[p]rejudice is never presumed; rather it must be affirmatively

21 demonstrated by the defendant in order to sustain his burdens of proof and the production of

22 evidence on the issue." *Miller v. Eisenhower Medical Center,* 27 Cal. 3d 614, 624 (1980) (*en*

23 *banc*). Defendants cannot meet this burden.

24         236.      SHST did not "unreasonably delay" bringing this lawsuit to establish its title to

25 the MOVA Assets. (Defendants' Answer and Affirmative Defenses ("Answer"), ¶¶ 35-37, Dkt.

26 326.) To the contrary, SHST filed its complaint in February 2015, soon after Defendants recorded

27 inaccurate assignments of the MOVA patents and trademarks in the USPTO, and within a month or

28 so after several Defendants made public statements that they owned MOVA. For its part, VGH



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

- 90 -

1  moved for leave to file its intervenor complaint on the same day the Court clarified that VGH was

2  no longer a party to this case due to the order setting aside substitution.

3          237.     Nor has any "delay" prejudiced Defendants "who have made continuous and

4  substantial investments related to the MOVA Assets."  (Answer, ¶ 37, Dkt. 326.)  As the evidence

5  shows, licensee DD3, LaSalle, Pearce, and others—not Defendants—invested time, effort, and

6  money to modernize, improve, and promote MOVA after Rearden failed to pursue its supposed

7  ownership rights through arbitration back in 2013.

8          238.     Defendants' affirmative defense of equitable estoppel is equally unavailing.  To

9  prove estoppel, Defendants must show "(a) a representation or concealment of material facts (b)

10  made with knowledge, actual or virtual, of the facts (c) to a party ignorant, actually and permissibly,

11  of the truth (d) with the intention, actual or virtual, that the ignorant party act on it, and (e) that party

12  was induced to act on it."  13 Witkin, *Summary of California Law*, (10th ed. 2005) Equity, § 191, p.

13  527; *see also* Cal. Evid. Code § 623.  "The burden is upon the party asserting estoppel to prove all

14  the elements constituting it."  *Ware Supply Co. v. Sacramento Sav & Loan Ass'n*, 246 Cal. App. 2d

15  398, 407 (1966).  Defendants cannot establish any of the elements of estoppel.

16          239.     Defendants allege that VGH and SHST never informed Defendants of their

17  ownership claim nor were Defendants "aware of VGH's and SHST's alleged ownership and alleged

18  licensing of the MOVA Assets and provisions of services. . ." (Answer, ¶¶ 38-39, Dkt. 326.)

19  Defendants, therefore, say they relied on VGH's and SHST's "misleading silence" to their

20  detriment because "their ownership" of MOVA was put "in doubt" and "proper credit" denied.  (*Id.*

21  at ¶40.)  The evidence, however, contradicts these allegations:  Perlman knew about the sale of

22  MOVA no later than May 2013.  In June and July 2013, he continued to pursue LaSalle and

23  Original MO2, but never initiated proceedings to assert ownership claims.  As for VGH's later

24  claim of ownership, VGH notified Defendants of the acquisition from SHST, substituted into the

25  case, and then intervened when the substitution was set aside.  As a result, Defendants were at all

26  relevant times aware of the claims of ownership adverse to what Defendants now assert, and there

27  were no efforts to conceal these claims. Under these circumstances, Defendants cannot meet their

28  burden to show that estoppel applies.



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

**2.      Defendants have not proven unclean hands**

240.      Defendants also bear the burden of proving, by clear and convincing evidence, "unclean hands." *POM Wonderful LLC v. Coca Cola Co.,* 166 F. Supp. 3d 1085, 1092 (C.D. Cal. 2016). The unclean hands doctrine "demands that a plaintiff act fairly in the matter for which he seeks a remedy. He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim." *Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 978 (1999).

241.      Defendants base this affirmative defense on the single conclusory allegation that VGH, DDHL, SHST and DD3 all "acted improperly, violating good faith and conscience, in the alleged acquisition of the MOVA Assets and subsequent use of them." (Answer, ¶¶ 41-42, Dkt. 326.) Ownership of the MOVA Assets, however, is the ultimate issue to be decided at trial. VGH's assertion of its ownership rights does not constitute "unclean hands" and Defendants have not provided evidence to the contrary.

**3.      Defendants have not proven waiver**

242.      Waiver arises when a party intentionally relinquishes a right, or when its acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished. *Intel Corp.*, 952 F.2d at 1559. The party claiming waiver must prove it by "clear and convincing evidence." *Rodman v. Safeway Inc.,* 125 F. Supp. 3d 922, 940 (N.D. Cal. 2015) (Tigar, J.) (citing *Waller v. Truck Ins. Exch., Inc*., 11 Cal., 4th 1, 31 (1995), *as modified on denial of rehearing* (Oct. 26, 1995)).

243.      Defendants allege that "authority from at least one of the Defendants was required for the proper transfer of the MOVA Assets" and that VGH and SHST "freely and knowingly gave up any right it may have had relating to any Defendant doing so, in that VGH and SHST never contacted any Defendant concerning an acquisition of the MOVA Assets." (Answer, ¶¶ 44-45, Dkt. 326.) But the evidence establishes that none of the Defendants owned MOVA from or after 2007 when it was transferred to OnLive or when it went from OnLive to OL2. Then, with Perlman's knowledge and support, Original MO2 was formed for the benefit of LaSalle (along with Pearce) to purchase the property from OL2. Original MO2 acquired the assets, then sold them to SHST, which



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)

1   in turn sold them to VGH, the current owner of MOVA.  The evidence adduced at trial corroborates

2   this valid chain of title.  Because Defendants have not been able to show that any of them held title

3   at any time relevant to this dispute, their consent was not required and they cannot meet their

4   burden with respect to the defense of waiver.[32]

5

6   DATED:  December 22, 2016                     Respectfully submitted,

7                                                KILPATRICK TOWNSEND & STOCKTON LLP

8                                                By:  */s/ Jon Michaelson*
9                                                JON MICHAELSON
                                                 SCOTT KOLASSA
                                                 FRANCES B. COX
10                                               HOLLY GAUDREAU
                                                 BENJAMIN KLEINMAN-GREEN
11

12

13

14

15  69004939V.1

16

    _____

17  [32] In response to Defendants' previous declaratory counterclaim for ownership, SHST and VGH
    asserted the affirmative defenses of laches and unclean hands.  Since Defendants have not renewed
18  this counterclaim against VGH as an intervenor, VGH has not asserted these affirmative defenses.
    However, to the extent the status of the pleadings is unclear and Defendants are asserting rights that
19  implicate these defenses, VGH respectfully incorporates by reference paragraphs 164 – 167 of the
    Intervenor Virtue Global Holdings Limited's Proposed Findings of Facts and Conclusions of Law
20  previously filed with the Court on November 3, 2016 (before Defendants filed their Answer on
    November 7, 2016) then lodged with the Court on November 9, 2016 (Dkt. 332.)).
21

22  In its proposed Conclusions of Law, VGH states why laches and unclean hands by Defendants
    barred their claim of ownership. With respect to laches, Defendants became aware of their supposed
23  rights in March or April 2013, but delayed asserting their claim in any proper tribunal until after
    SHST filed this action—even though LaSalle (through his attorneys) had agreed to arbitrate these
24  same claims more than two years earlier. Defendants also have unclean hands because, in an
    attempt to obtain ownership of the MOVA Ass99999ets, Perlman formed Defendant MO2, a
25  company with a name identical to Original MO2.  Perlman also caused false recordings to be made
    in the USPTO involving purported transfers of the MOVA Assets by Defendant MO2, which did
26  not even exist at the time the assignments supposedly occurred.  *See also* SHST's Opposition to
    Defendants' Motion for Summary Judgment on Defendants' Counterclaim for Declaratory Relief
27  (Dkt. 44 at 23-25.)

28



INTERVENOR VIRTUE GLOBAL HOLDINGS LIMITED'S
POST TRIAL MEMORANDA; CASE NO. 3:15-CV-00797 JST (SK)                    - 93 -