1

2

3

4                                UNITED STATES DISTRICT COURT

5                               NORTHERN DISTRICT OF CALIFORNIA

6

7    SHENZHENSHI HAITIECHENG               Case No.15-cv-00797-JST
     SCIENCE AND TECHNOLOGY CO.,
8    LTD., ET AL.,                          **STATEMENT OF DECISION**

9                    Plaintiffs,

10            v.

11   REARDEN LLC, et al.,

12                   Defendants.

13

14           This matter came before the Court for trial on December 5, 6, 7, 8, 12, 13, and 14, 2016.

15   The parties submitted proposed findings of fact and conclusions of law on December 22, 2016.

16   Having considered the evidence, and the parties' arguments, [1] and good cause appearing, the Court

17   now finds and orders as follows:

18   **I.      FINDINGS OF FACT**

19           This case concerns a dispute about ownership of the physical equipment and intellectual

20   property that the parties refer to collectively as the "Mova Assets," the "Mova technology," or

21   simply "Mova."  The Mova Assets are used for facial motion capture – the process of capturing

22   the deformation of the surface of the human face for use in computer graphics, animation, and

23   similar applications.  Mova has been used in many successful movies.

24           At the heart of the case is the relationship between two men:  Greg LaSalle and Steve

25   Perlman.  Perlman is an inventor and entrepreneur who has owned and operated various

26   companies.  In 2006, he founded Rearden LLC, which he describes as a "technology and creative

27   _____

28   [1] The Court has also incorporated the parties' stipulated facts where appropriate.  ECF No. 318 at
     7-10.

United States District Court
Northern District of California

incubator." There were corporate predecessors to Rearden[2] that performed a similar function. Perlman has been the CEO of Rearden since its inception.  Rearden develops new technologies, assigns them to subsidiaries, and – if the technologies are successful – spins the subsidiaries off as separate companies.[3]

Greg LaSalle is an audio and visual engineer whose formal education was in music. Following graduation from college, he taught at a music academy, then started and successfully operated a chain of music stores on the East Coast.  In 2000, LaSalle became aware of an opportunity to work for Perlman.  He sold his music stores and moved to California.

Two other Rearden employees are also relevant to this story.  Cindy Ievers has been the Human Resources Manager of Rearden LLC and its predecessor-in-interest since 2004, and has also served as Controller and Vice President of Finance.  She is currently Vice-President of Finance and HR Manager.  Ken Pearce is an engineer with a long and successful career in the computer graphics and animation field.  Pearce began working for Rearden in 2003 as the Director of Visual Development.

As a result of the events underlying this case, LaSalle and Perlman no longer speak.  Prior to those events, however, the two men were extremely close.  LaSalle would spend time with Perlman and his family several times per month outside of work.  LaSalle was at the hospital when both of Perlman's children were born.  With one exception, they spent each Christmas and New Year's Eve together since LaSalle joined the company.

Over the years, Perlman was also very generous with LaSalle.  For example, Perlman took LaSalle's family with his own family on vacation; he frequently treated LaSalle to skiing trips and dinners; he allowed LaSalle to use his family home in Lake Tahoe; in certain years, he gave LaSalle and his wife substantial cash gifts; and he paid for medical services to help LaSalle recover from a serious accident.

_____

[2] The entity known as Rearden LLC seems to have been known by various other names at different times, such as Rearden Steel Studios and Rearden Labs.  For purposes of this order, the Court refers to the entity simply as Rearden or Rearden LLC.
[3] No party's witnesses were entirely credible, and neither side succeeded in presenting a totally coherent picture of the historical facts, but Steve Perlman's testimony was the most credible and conflicts in the testimony have largely been resolved in his favor.

When LaSalle joined the company that became Rearden, Perlman was building the facility that would become Rearden Studios.  Perlman told LaSalle he wanted the facility to serve several functions – as a business incubator, but also to develop motion capture technology.  Motion capture is a process of recording the actions of human actors, and using the information generated from that recording to animate digital models in computer animation.  LaSalle assumed both responsibilities shortly after joining Rearden.

Rearden's first motion capture technology was called Contour.  Work on Contour began in earnest in 2003 or 2004.  At that time, there existed good motion capture technology for the human body, but not yet for the face.  The goal of Contour was to accurately capture the way the face moves, i.e., to capture the surface of the skin deforming over time.  Contour was associated with an entity Perlman established called Mova, which he moved into its own space in San Francisco separate from the Rearden space.  Because of this association, people began to refer to the Contour technology as "Mova."

Mova technology consists of two components.  One is the hardware, which is a series of synchronized lights, cameras and associated hardware that records the actor's performance.  The second is a software component that turns the recorded images into 3D scans per frame and then into data that can be used for computer generated images.  There also is special material that is applied to the surface of the human face.

The Mova development team consisted of LaSalle, Perlman, Pearce, and others.  Initially, LaSalle's role was to support Perlman and other team members, but eventually LaSalle became the motion capture supervisor, in charge of setting the system up, running the system and overseeing the team that would process the data.  However, LaSalle was not individually responsible for the development of any aspect of the Mova technology.  The development happened as part of a team process.  After years of development, the Mova technology made its debut in the summer of 2006.  The Mova technology is the subject of several patents.

In 2007, Perlman transferred the Mova technology to OnLive, one of Perlman's incubated companies.  OnLive had originally been a video game streaming service, and the remainder of its business did not relate to motion capture or the production of content for motion pictures.  When

United States District Court
Northern District of California

United States District Court
Northern District of California

1   the Mova technology moved to OnLive, Pearce and LaSalle moved with it.  OnLive began

2   providing Mova services to customers, which were chiefly film studios who wanted to use OnLive

3   to create content for motion pictures.  OnLive's customers included the Walt Disney Company,

4   Digital Domain (a visual effects company), and Industrial Light & Magic.  Mova was not

5   profitable at this time.

6          In August 2012, OnLive went through an assignment for the benefit of creditors.[4]  As part

7   of that process, OnLive was shut down and reborn as a new company called OL2.  The Mova

8   Assets were transferred from OnLive to OL2.  Because Gary Lauder was the Managing Director

9   of Lauder Partners LLC ("Lauder Partners"), which had been the lead investor in OnLive, he

10  began running OL2.  OL2 hired 60 of OnLive's employees, but did not hire LaSalle or Pearce,

11  both of whom lost their jobs.

12         Perlman then rehired both LaSalle and Pearce to work at Rearden.  On August 20, 2012, at

13  the beginning of their reemployment, LaSalle and Pearce each signed an Employment Agreement,

14  a Proprietary Information and Inventions Agreement ("PIIA"), and an Agreement to Arbitrate,

15  which were Rearden's standard employment documents, on August 20, 2012.  LaSalle's title was

16  General Manager and also "Motion Capture Supervisor."  Relevant to the this case, Section A.2 of

17  the PIIA defines "[Rearden's] Business" to include "creation and production of . . . special effects,

18  performance motion capture,  . . . video editing," and "development of motion, facial and surface

19  capture technology and related human and non-human 2D and 3D rendering and animation

20  technologies."  Section A.3 of the PIIA defines "Proprietary Information" as "information that was

21  or will be developed, created, or discovered by or on behalf of the Company, or which became or

22  will become known by, or was or is conveyed to the Company, which has commercial value in the

23  Company's Business."  "By way of illustration but not limitation, Proprietary Information

24  includes . . . intellectual property . . . including but not limited to all copyrights, patents,

25

26  _____

27  [4] "An assignment for the benefit of creditors (ABC) is a business liquidation device available to an insolvent debtor as an alternative to formal bankruptcy proceedings."  David S. Kupetz, "Assignment for the Benefit of Creditors: Effective Tool for Acquiring and Winding Up Distressed Businesses," Business Law Today (Nov. 2015) (https://www.americanbar.org/publications/blt/2015/11/05_kupetz.html)

28

1    trademarks, service marks, trade secrets, [and] contract rights."  Section B of the PIIA, entitled

2    "Assignment of Rights" states: "All Proprietary Information . . . is and shall be the sole property

3    of the Company.  I hereby assign to the Company any and all rights, title and interest I may have

4    or acquire in such Proprietary Information."

5          Exhibit A to the PIIA provides a space for the employee to list "all Inventions or

6    improvements relevant to the subject matter of my employment by the Company and/or that relate

7    to the Company's Business . . . that I desire to remove from the operation" of the PIIA.  LaSalle

8    placed an "x" next to a sentence indicating that there were no such inventions or improvements he

9    wished to exclude.  The documents also included a section entitled "Duty of Loyalty," which

10   provided, "I agree that during my employment with the company, I will not provide consulting

11   services to or become an employee of any other firm or person engaged in a business in any way

12   competitive with the company without first informing the company of the existence of such

13   proposed relationship and obtaining the prior written consent of my manager and the human

14   resources manager responsible for the organization in which I work."

15         In September 2012, shortly after LaSalle rejoined Rearden, Perlman discussed the

16   possibility of LaSalle and Pearce acquiring Mova from OL2.  Perlman stated that he would help in

17   the negotiations, pay any legal fees required to establish an acquiring subsidiary, and then give the

18   new Mova entity whatever office space and back office support were necessary to ensure that

19   Mova could be successful.  He also said that LaSalle and Pearce could run Mova as a separate

20   company.  His intention was to regain control of the Mova technology on behalf of Rearden.

21         LaSalle testified that Perlman also told him and Pearce that Perlman would take these steps

22   so that LaSalle and Pearce, not Rearden, could own Mova.  He testified that Perlman said that

23   neither Perlman nor Rearden would maintain any ownership interest in Mova and that Perlman

24   would not exercise any management of it.  According to LaSalle, Perlman provided no explanation

25   as to why he was making such an offer other than to state that he knew that LaSalle and Pearce

26   "didn't have a lot of cash."  Perlman denied ever having made that offer, and the Court finds that

27   no such offer was made.  In fact, as LaSalle and Pearce knew, Rearden had no such intention.  He

28   intended to re-acquire the Mova Assets that Rearden had lost when OnLive went through an

United States District Court
Northern District of California

5

1   assignment for the benefit of creditors.  He wanted LaSalle and Pearce to *run* Mova, but not to

2   *own* it.

3          However, although he never made any promises or representations to LaSalle or Pearce

4   about their owning the Mova Assets, Perlman did make representations to third parties to that

5   effect.  Specifically, in September 2012, Perlman approached Gary Lauder about transferring the

6   MOVA Assets from OL2 to a new entity that would be managed by LaSalle and Pearce.  Perlman

7   noted that the Mova Assets had never been profitable; that the technology was becoming stale and

8   would require investment in research and development; that the patents were not "monetizable";

9   and there was unlikely to be a third-party buyer because the system was old and "unusable"

10  without LaSalle and Pearce.  He stated that he would provide office support and advice, but that

11  LaSalle and Pearce would "need eventually [to] get it running under their own steam."  In a

12  separate communication, Perlman said, "My motives for Mova are based purely on the premise

13  that it has been one of the absolute highlights of my life for many reasons and I would like nothing

14  more than to see it continue in some fashion."  The essence of this and other communications from

15  Perlman to Lauder was that (1) Mova was nearly worthless and (2) Perlman intended for Lauder to

16  give Mova to LaSalle and Pearce to own and run on their own.

17         Lauder understood Perlman's intention to be that LaSalle and Pearce would both own and

18  run Mova after the transfer.  He testified, "In all of our interactions on the subject, I was – the

19  same concept was always reiterated; that this is for Greg and Ken.  He never insinuated 'and

20  him.'"  But Perlman was masking his true intentions.  Perlman's comments to Lauder about the

21  relative lack of value of the Mova Assets was simply a negotiating tactic to encourage Lauder to

22  sell the assets or give them away cheaply – and Perlman knew that Lauder would only do that for

23  LaSalle and Pearce, but not for Perlman.  Perlman knew that Lauder had no interest in OL2

24  continuing to own the Mova Assets, because OL2 had no interest in facial motion capture

25  technology.  However, he also knew that Lauder was more likely to transfer the Mova Assets for

26  little or nothing to LaSalle and Pearce, whereas he would have sold Mova to Perlman only at a

27  much higher price, if at all.  And Perlman knew that although the Mova technology needed

28  updating, there was demand in the market for the technology, and only one other significant

United States District Court
Northern District of California

6

competitor in the facial capture area.

Lauder was receptive to Perlman's suggestion because he had little interest in the Mova technology and it was not part of OL2's core business.  He agreed with Perlman that the technology was relatively old and would need to be updated.  The manuals and other documentation for the MOVA equipment were also out of date.  Lauder recognized that Pearce and LaSalle were the only ones capable of operating the equipment.  Finally, the technology had not been profitable; in September 2012, MOVA was losing approximately $100,000 per year.  And Lauder seemed to like the idea of letting LaSalle and Pearce have the technology.

Perlman's assumption that Lauder would not have simply given the Mova Assets to Perlman, as he was prepared to do for LaSalle and Pearce, was confirmed by Lauder's testimony.  Lauder stated that he was happy to sell the assets to LaSalle and Pearce for a dollar – effectively giving them away for nothing – but he was unwilling to give the MOVA assets to Perlman "without having a lot more due diligence."  There was a high degree of competitiveness, and perhaps a tinge of personal animus, between Lauder and Perlman.  It is possible that Lauder would not have been willing to sell Mova to Perlman for any acceptable price.  Perlman either knew or suspected this.

While these negotiations were under way, Lauder realized that he could not just give the Mova Assets away without seeing if there was a more profitable alternative, because he had an obligation to maximize the financial return to the owners of OL2.  He concluded that he need to try to sell the Mova Assets to a third party before offering them to LaSalle and Pearce at little or no cost.  Lauder communicated to Pearce and LaSalle that he would sell Mova to a third-party buyer if one could be found and share 25 percent of the sale proceeds with them.  If he wasn't able to find a buyer within a short period of time, then he intended to give the Mova Assets to Pearce and LaSalle as originally discussed.  Lauder identified potential buyers based on information from LaSalle:  LaSalle contacted the potential buyers first to let them know the assets were available before Lauder contacted them.  Beginning in September 2012, LaSalle started talking to potential purchasers of the Mova Assets.  He spoke to the Chief Technology Officer of The Walt Disney Company; someone at Industrial Light & Magic; and the president of Digital Domain.  None of

1    them expressed interest in purchasing the Mova Assets.

2         Lauder did not tell Perlman about his plan to sell the Mova Assets to a third party and give

3    LaSalle and Pearce a cut of the action, and he was under no duty to do so.  However, neither

4    LaSalle nor Pearce told Perlman either.  They knew that Perlman would conclude – correctly –

5    that LaSalle's and Pearce's actions were a violation of their obligations to Rearden under their

6    Employment Agreements and PIIAs, because LaSalle and Pearce were employed by Rearden at

7    that time.

8         Notwithstanding Lauder, LaSalle, and Pearce's efforts at secrecy, on October 2, 2012

9    Perlman found out about Lauder's plan and became very angry.  He confronted both LaSalle and

10   Pearce.  LaSalle falsely told Perlman that only Pearce, and not LaSalle, had discussed the 25

11   percent arrangement with Lauder.  Because Perlman believed that the plan had been Pearce's idea

12   – and not LaSalle's – he directed his anger only at Pearce.  He terminated Pearce's salary almost

13   immediately.

14        Lauder's efforts to find a buyer were unsuccessful, however.  When Lauder concluded that

15   he would not be able to find a buyer for the Mova Assets, in October 2012, he agreed to Perlman's

16   original proposal – to transfer the Mova Assets to a new corporate entity to be established by

17   LaSalle at virtually no cost.[5]  Perlman introduced LaSalle to Alan Kalin, an attorney with whom

18   Perlman had worked before.  LaSalle/Kalin set up a new limited liability corporation called MO2,

19   LLC for the purpose of receiving the Mova Assets.  Rearden LLC paid all California corporation

20   fees associated with the formation of MO2, LLC.  Rearden LLC also paid all of MO2, LLC's legal

21   fees associated with the transfer of the Mova Assets from OL2.

22        The reason Perlman set up a separate corporate entity was to create a new subsidiary of

23   Rearden that could manage the assets while maintaining the appearance – consistent with his

24   representations to Lauder – that LaSalle would be taking ownership of Mova.

25

26   [5] After the collapse of Lauder's efforts to sell the MOVA assets to a third party, Pearce was not
     directly involved in the subsequent transfer of assets from OL2 to MO2, LLC and the subsequent
27   sale to SHST.  Greg LaSalle kept him apprised of his activities in that regard.  Pearce did not
     expect to have any ownership in the assets at the conclusion of LaSalle's transaction, but he did
28   expect to go to work for DD3.

In October 2012, LaSalle began emailing directly with Ed Ulrich, the CEO of a company called Digital Domain 3.0 Inc. ("DD3"), about DD3 purchasing the Mova technology from LaSalle once MO2 had acquired it. Ed Ulbrich was the CEO of DD3 between September 2012 and July 2013. Ulrich suggested that LaSalle and Pearce could manage the Mova technology after DD3 acquired it. Ulrich expressed interest, and DD3's acquisition of Mova began to move forward.[6]

Although LaSalle was still employed by Rearden, he did not tell Perlman about these email communications. LaSalle also did not use his Rearden email address for these communications. LaSalle testified that the only reason he did not tell Perlman about these conversations was because he "wasn't seeking [Perlman's] advice at that time." This testimony was not credible. The actual reason LaSalle did not tell Perlman about these communications or use his Rearden email address is that he wished to keep the communications confidential. He knew that the communications violated his obligations to Rearden, and he was preparing wrongfully to take Rearden's intellectual property for himself. He knew that Perlman had fired Pearce for attempting to participate in a sale of the Mova Assets, and knew that Perlman would probably fire LaSalle if he became aware of LaSalle's actions. As Stephen Perlman testified, the unmistakable message to LaSalle from the termination of Pearce's salary was "that if you get involved in a transaction with Mova for your own benefit or for the benefit of someone else or in any way for not – not for Rearden's benefit exclusively, then this would be the consequence."

In fact, at other times in his testimony, LaSalle suggested that Perlman was actually aware of LaSalle's efforts to sell the Mova Assets. This suggestion was also false. Although LaSalle and Perlman communicated constantly by email, including about the most ordinary and day-to-day Rearden matters, there is no evidence that they ever communicated about this topic. That makes the fact of such communication unlikely. Moreover, Perlman's strong negative reaction when did finally learn of the sale is inconsistent with his being aware of the negotiations. So is his reaction when he learned about the original sale effort by Gary Lauder.

_____

[6] Why DD3 was interested in purchasing Mova from LaSalle, but not from OL2 or Gary Lauder, is not clear in the record.

1    MO2, LLC was incorporated on November 9, 2012.  MO2 was owned by Rearden LLC as

2    of the date of its formation.  The Articles of Incorporation identify LaSalle as the agent for service

3    of process, and state that the LLC will be managed by "one manager," but does not identify who

4    that manager will be.  The fact that LaSalle signed as organizer does not mean that he was a

5    manager or a member (i.e. owner) of the LLC.

6        LaSalle then began in earnest to consummate two separate transactions – the sale of the

7    Mova Assets from OL2 to MO2, which he kept Perlman apprised of, and the sale of the same

8    assets from OL2 to DD3, which he kept hidden from Perlman.

9        On February 5, 2013, LaSalle signed a non-disclosure agreement ("NDA") with DD3.  He

10   then forwarded the executed NDA to Joseph Gabriel.  He concealed this action from Perlman.

11       On February 11, 2013, MO2, LLC acquired the Mova Assets from OL2, Inc. for

12   consideration of one dollar.

13       On February 14, 2013, LaSalle told Perlman that he intended to take the Mova Assets for

14   his own use.  He did not tell Perlman that he intended to sell the assets to DD3.

15       On February 25, 2013, Ulrich texted LaSalle, "We want to make this happen," and LaSalle

16   texted back, "Me to [sic] but if I have to cut away from Steve tomorrow I'd like to be pretty sure

17   and I have a few questions."  LaSalle knew that when Perlman became aware of the proposed sale

18   to DD3, he would react negatively.

19       On February 26, 2013, LaSalle and Perlman took a walk near Perlman's home in Palo

20   Alto.  LaSalle told Perlman that he was negotiating a sale of the MOVA Assets to a third party.

21   Perlman told LaSalle that the Mova Assets belonged to Rearden and that LaSalle would have to

22   turn over the management of MO2 to Perlman.  Perlman told him that if he completed the Mova

23   transaction, he would be fired.  LaSalle refused to agree to give up the Mova Assets, and said he

24   needed time to make a decision.  In fact, what LaSalle really wanted was time to complete the sale

25   of the Mova Assets before Rearden or Perlman could interfere.  As the parties were discussing this

26   dispute, on March 1, 2013, he wrote to Cindy Ievers, Rearden's head of Human Resources, "to

27   clear my head a bit, I'd like to go to CT [Connecticut].  It's my dad's 80th birthday next week.

28   Are there things I need to sign?  If so, I can do that soon so I can take off.  Thanks."  LaSalle had

United States District Court
Northern District of California

no intention of going to Connecticut, however; he was just trying to buy time. That same day, March 1, 2013, he sent a text to Ed Ulrich, stating "I'd like to fill the K bins in a bit, so I'm wondering if you have an ETA on your HR contacting us [LaSalle and Pearce]. If it would help, we can come down there. Thanks." He then texted Ulrich again, stating "Okay. Will drive to L.A. tomorrow. Thanks." The reason for LaSalle's duplicity with Ievers is that he knew his conduct was wrongful.

Between March 1 and March 7, both Perlman and Ievers made numerous attempts to reach LaSalle by text to discuss the Mova Assets, but he did not respond substantively. Instead, he began to try to create a clean break in his relationship with Rearden in anticipation that he would complete a sale. On March 5, 2013, LaSalle wrote to Ievers, and stated that "pursuant to our conversation of March 1," March 5, 2013 would be his last day with the company, and he would receive a three-week severance payment. In fact, he and Ievers had no such discussion on March 1, 2013 and no one from Rearden had ever offered LaSalle a severance payment.

On March 6, 2013, Ievers sent LaSalle a copy of his PIIA to remind him of his obligations to Rearden. On March 7, 2013, LaSalle sent his PIIA to Gabriel. Daniel Seah, the CEO of DD3, also reviewed LaSalle's PIIA. Thus, prior to the closing of the transaction, DD3 was aware of LaSalle's obligations to Rearden and knew that LaSalle was not the true owner of the Mova Assets.

On March 12, 2013, Ievers forwarded a copy of LaSalle's employment agreement to him and stated, "You need to review your employment agreement." She directed his attention specifically to the PIIA. On March 20, 2013, Perlman wrote to LaSalle, again reminded him of his obligations under the PIIA, and again asked for the return of the MOVA assets. On March 27, 2013, a lawyer representing Rearden sent a letter to LaSalle, reminding LaSalle of the provisions of his employment agreement and the PIIA, stating that the Mova Assets belonged to Rearden, and demanding that LaSalle transfer the Mova Assets to Rearden.

Sometime in March 2013, DD3 concluded that it should locate ownership of the Mova Assets in a Chinese company so that Perlman and Rearden would not be able to obtain money damages if they decided to bring suit for misappropriation of the Mova Assets. On March 26,

11

United States District Court
Northern District of California

2013, LaSalle sent Mark Heyl, his lawyer, an email in which he said:  "Digital Domain contacted me late today and said they are going to move forward with both the asset sale and employment agreement . . . .  They are going to actually acquire the Mova Assets through one of their Chinese companies.  I believe this is so it would be nearly impossible for Steve to go after them. The sale price will be lower, 25K . . . .  They will indemnify me against any claims brought by Rearden or Steve Perlman.  There will also be some changes to the compensation package."  Heyl advised LaSalle that, in fact, "enforcing any indemnification obligation against a Chinese company would be nearly impossible."  The reason that DD3 structured the transaction is that DD3's principals and agents[7] knew that LaSalle was not the true owner of the Mova Assets.

LaSalle had originally discussed the sale or license of the Mova technology with other entities besides Digital Domain, including the Walt Disney Company and Industrial Light and Magic.  LaSalle disclosed the March 27, 2013 letter from Rearden's lawyers to prospective purchasers.  Once LaSalle disclosed the March 27 letter, Disney and ILM dropped out of the negotiations; DD3 stayed in the negotiations but dropped its price.  DD3's representatives had already received a copy of the PIIA, and knew that LaSalle was not the true owner of the Mova Assets, but also knew that LaSalle was not in a position to seek the highest possible price once Rearden appeared to be asserting a claim.

In April 2013, Perlman called Joseph Gabriel, the general counsel of DD3, and told him that he was aware that LaSalle was trying to sell the Mova Assets to DD3.  He told Gabriel that LaSalle was not the owner of the assets.

While these events were transpiring, LaSalle kept receiving paychecks from Rearden until April 2013, which he cashed.  He did not return any of that money to Rearden.  Greg LaSalle's last day as an employee of Rearden LLC was April 21, 2013.

The sale of the Mova Assets closed on May 8, 2013.  At the last moment, DD3 substituted in a Chinese entity, SHST, as the buyer, just as Gabriel had discussed with LaSalle.  The purchase price dropped from $100,000 to $25,000.  The purchase agreement states, in part, "Seller has

---

[7] For these purposes, DD3's agents include Shenzhenshi Haitiecheng Science and Technology Co., Ltd. ("SHST"), whose role is discussed further below.

United States District Court
Northern District of California

1   advised purchaser that since February 11th, 2013 Steven Perlman, whether individually or in his

2   apparent capacity as an officer or manager of Rearden, LLC or any of its related companies has

3   communicated the possibility of claims against seller and/or Greg LaSalle in relation to the Mova

4   [A]ssets." The sale documents also included an indemnification provision protecting LaSalle

5   against claims by Rearden, and the placing of $75,000 in escrow to deal with such claims – three

6   times the amount of cash that LaSalle received directly. Both LaSalle and SHST knew at the time

7   the transaction closed that LaSalle did not own the Mova Assets and did not have the authority of

8   either Rearden or MO2 to sell them.[8]  One of the reasons SHST/DD3 paid three times as much

9   into escrow as they paid LaSalle directly is that they knew he did not own the Mova Assets.

10          Amit Chopra, a director and employee of Digital Domain Holding Company – the holding

11   company for the various Digital Domain companies – testified that Chopra testified that the reason

12   DD3 did not acquire the Mova Assets, as it was originally intended to do, was that DD3 did not

13   have the cash flow. This explanation was false. After SHST spent a total of $100,000 to *own* the

14   Mova Assets, DD3 paid SHST $100,000 for just a *license* to those assets. Also, once the

15   transaction closed, Greg LaSalle and Ken Pearce immediately began working for DD3 at six-

16   figure salaries. In fact, the true reason SHST was used as the buyer was to allow DD3 to use the

17   physical assets, while ownership of the assets and the risk of any liabilities resided with SHST in

18   China. In fact, the Digital Domain entities had decided in March 2013, long before the close of

19   the May transaction, to use a Chinese entity as the purchaser for reasons having nothing to do with

20   DD3's cash position.

21          From February 2013 through the present, Rearden has paid the maintenance fees and

22   continued to prosecute office actions for the Mova patents and trademarks. SHST has at no time

23   paid any maintenance fees on any of the MOVA patents or trademarks anywhere in the world.

24          Although LaSalle represented to Ulrich at one point that he would repay the legal fees that

25   Rearden advanced for the acquisition of the Mova Assets by MO2, LLC, and also asked Cindy

26

27   [8] Significantly, in all of his many communications with Perlman and Rearden's other
     representatives, at no time prior to the closing of the Mova Assets transaction did LaSalle provide
28   an interpretation of the PIIA, or his obligations under it, that would have excused his conduct or
     made it lawful.

United States District Court
Northern District of California

1    Ievers for an estimate of the total amount expended (presumably so he could reimburse them), in

2    fact he has never reimbursed any portion of those fees.  LaSalle has never made a maintenance

3    payment on any MOVA patent or trademark.

4            Since May 2013, the Mova Assets have been used in several big-budget Hollywood films,

5    including "Batman v. Superman" and "Deadpool."

6            In 2015, the Academy of Motion Arts and Pictures bestowed a Science and Technical

7    Achievement Award on some of the inventors of the MOVA technology.

8            Following the SHST/DD3/MO2 transaction, SHST purported to sell the Mova Assets to

9    Plaintiff Virtue Global Holdings, Ltd. ("VGH") while leaving any associated liabilities with

10   SHST.  The purpose of this transaction on the part of VGH and SHST was to frustrate Rearden's

11   rights as a creditor and as the true owner of the Mova Assets.  VGH knew that SHST was not the

12   true owner of the Mova Assets, because the same persons involved in the VGH/SHST transaction

13   were aware of Rearden's claims of ownership from a before the time of the MO2/SHST

14   transaction.

15   **II.      CONCLUSIONS OF LAW**

16           Greg LaSalle was an employee of Rearden at the time MO2 acquired the Mova Assets.  He

17   established MO2 using money provided by Rearden; and under the terms of his employment

18   agreement and the PIIA, the Mova Assets belonged to Rearden.  Greg LaSalle was an employee of

19   Rearden at the time MO2 acquired the Mova Assets.  He established MO2 and acquired the Mova

20   Assets using money provided by Rearden; and under the terms of his employment agreement and

21   the PIIA, the Mova Assets belonged to Rearden.

22           LaSalle's conduct in signing the DD3 NDA without Perlman's knowledge and selectively

23   including Perlman in e-mails with counsel while setting up MO2, but excluding him from others;

24   the secrecy of his negotiations with DD3 from Perlman; and his evasiveness

25   in February and March of 2013 all show that LaSalle was aware that he had acquired the Mova

26   Assets for Rearden's benefit and that his attempts to transfer the Mova Assets to

27   himself, DD3, or SHST were wrongful.  Also, the fact that Steve Perlman became angry when he

28   learned that Gary Lauder was considering transferring the assets to a third party and then giving

1    Greg LaSalle and Ken Pearce a percentage makes it unlikely that Perlman would have paid his

2    own money to facilitate a transaction that would have had the same purpose and effect.  Greg

3    LaSalle knew that, which is why he concealed the true facts from Perlman.

4           MO2, LLC's purported sale of the Mova Assets to SHST was ineffective, because Greg

5    LaSalle did not own the Mova Assets, did not own MO2, LLC, and was not authorized to conduct

6    the sale on MO2's behalf.

7           SHST, DD3, and VGH knew that LaSalle did not own the Mova Assets, and did not have

8    actual or apparent authority to sell the Mova Assets.  Neither SHST nor DD3 nor VGH took the

9    Mova Assets in good faith.  Joe Gabriel, who acted on behalf of all those entities, was aware of

10   LaSalle's employment agreement and his obligations under the PIIA.  Indeed, these parties were

11   so cognizant of these obligations that they established an escrow to fund the payment of claims

12   related to them.  Given the close relationship between SHST, DD3, DDHL, VGH, and Joe

13   Gabriel, it is reasonable to infer that all of those parties were aware of LaSalle's PIIA obligations,

14   and the Court finds that they were so aware.

15          Rearden, and not plaintiff VGH, former plaintiff SHST, or DD3, owns and at all relevant

16   times has owned the MOVA Assets.  LaSalle's actions in acquiring MOVA for MO2 were

17   performed under his Employment Agreements with Rearden.

18          VGH argued that the PIIA was unenforceable under California Business and Professions

19   Code § 16600, et seq.  "Business and Professions Code section 16600 has consistently been

20   interpreted as invalidating any employment agreement that unreasonably interferes with an

21   employee's ability to compete with an employer *after* his or her employment ends.  However, the

22   statute does not affect limitations on an employee's conduct or duties *while* employed."  Angelica

23   Textile Servs., Inc. v. Park, 220 Cal. App. 4th 495, 509 (2013) (emphasis in original) (internal

24   citations omitted); see also Loughlin v. Ventraq, Inc., No. 10-CV-2624-IEG BGS, 2011 WL

25   1303641, at *4 (S.D. Cal. Apr. 5, 2011) (Plaintiff does not dispute that section 16600 does not

26   affect an employee's duty not to compete with an employer *during the course of his employment.*)

27   (emphasis in original).  The Court concludes that Rearden's PIIA is a valid and binding

28   enforceable agreement under California law.

United States District Court
Northern District of California

15

1    The Court further finds that the MOVA Assets fall within the scope of LaSalle's PIIA with

2    Rearden.  The PIIA expressly includes proprietary information relating to both performance

3    motion caption and facial motion capture technology.  See Trial Ex. 7 (defining "the Company's

4    [Rearden's] Business" to include "creation and production of . . . special effects, performance

5    motion capture, . . . video editing," and "development of . . . facial . . . capture technology. . .").

6    The PIIA defines "Proprietary Information" as "information that was or will be developed,

7    created, or discovered by, or was or is conveyed to the Company, which has commercial value in

8    the Company's Business . . . intellectual property . . . including but not limited to all copyrights,

9    patents, trademarks, service marks, trade secrets, contract rights."  Therefore, the PIIA provides

10   that if the MOVA Assets were developed by Rearden, which is admitted, or conveyed to Rearden,

11   which they were, they fall within the scope of the PIAA.  Those assets therefore belonged to

12   Rearden.

13       VGH argued at trial that the PIIA should not apply to the MOVA Assets, either because

14   Rearden should be estopped from asserting its rights based on representations made by Perlman to

15   LaSalle, or that Perlman waived Rearden's rights under the PIIA by allowing LaSalle to start his

16   own business with those assets.  The Court rejects these arguments.

17       First, the Court is not persuaded that Perlman intended to "gift" the MOVA Assets to

18   LaSalle or that he made representations to that effect to either LaSalle or Pearce.  Although

19   Perlman was generous with LaSalle as an incident to their friendship, the notion that Perlman

20   would give away an entire successful technology is inconsistent with Perlman's personality and

21   without precedent in the two men's relationship.  The suggestion, absent any evidence other than

22   LaSalle's assertion, that Perlman would conduct business in this way strains credulity.  This by

23   itself dooms VGH's estoppel defense.

24       Second, equitable estoppel requires proof of "(1) a representation or concealment of

25   material facts (2) made with knowledge, actual or virtual, of the facts, (3) to a party ignorant,

26   actually and permissibly, of the truth, (4) with the intent, actual or virtual, that the latter act upon

27   it, and (5) the party must have been induced to act upon it."  San Diego Mun. Credit Union v.

28   Smith, 176 Cal. App. 3d 919, 923 (1986); see also Cal. Evid. Code § 623 ("Whenever a party has,

United States District Court
Northern District of California

16

by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it."). There was no evidence presented at trial that plaintiff VGH (or DD3 or SHST) ever relied on any statements or omissions by Rearden or Perlman. To the contrary, all of the evidence at trial established that VGH (and DD3 and SHST) were well aware of Perlman's claim of ownership of MOVA at the time that VGH was alleged to have acquired those assets from SHST (and when SHST purported to acquire them from MO2 and Greg LaSalle). That Gary Lauder may have relied on Perlman's representations is irrelevant, because he was not injured and he is not party. Nor can VGH (or SHST or DD3) rely on LaSalle's testimony regarding Perlman's representations, because the Court rejects LaSalle's testimony on this issue as not credible.

VGH also defends on the ground of waiver. The burden is on the party claiming waiver to show, by clear and convincing evidence, that "there [was] an existing right, a knowledge of its existence, and an actual intention to relinquish it, or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished." Silva v. Nat'l Am. Life Ins. Co., 58 Cal. App. 3d 609, 615 (1976). "[D]oubtful cases will be decided against a waiver." Waller v. Truck Ins. Exch., Inc., 11 Cal. 4th 1, 31 (1995), as modified on denial of reh'g (Oct. 26, 1995) (internal quotation omitted). No waiver occurred in this case.

First, Section P.6 of the PIIA states: "No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach. No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right. The Company shall not be required to give notice to enforce strict adherence to all terms of this Agreement." (Trial Ex. 7, at 007.010.) No such writing was presented at trial.

Second, there is evidence that Rearden contacted LaSalle repeatedly, beginning in February 2013, to obtain a return of the MOVA Assets, including through its attorneys. He fired Ken Pearce in October 2012 when he believed that Pearce had acted inconsistently with the PIIA as related to the Mova Assets. Had he known that LaSalle was working in Pearce, he surely would have fired LaSalle also. This conduct is not consistent with a waiver.

17

1    Finally, Perlman credibly testified that he never intended to waive Rearden's rights under

2    LaSalle's PIIA, or any other similar agreement, at any time, and Ms. Ievers testimony supported

3    Perlman's testimony.

4    Rearden did not fire Greg LaSalle at any time before the Mova Assets were purportedly

5    transferred.  LaSalle did not quit Rearden.  Even though he was an at-will employee, he did

6    not effectively terminate his employment.  His insistence on a severance payment, which had not

7    been offered, turned his communication into something other than a resignation.  He was

8    an employee of Rearden so long as Rearden paid his salary and he continued to accept it.  LaSalle

9    was an employee until at least April 21, 2013.

10    VGH does not own the Mova Assets because Rearden owns them.

11    The Court's prior injunction is dissolved.  Rearden may take possession of the Mova

12    Assets forthwith.

13    In light of these conclusions, the Court need not reach the parties' remaining arguments.

14    The Court sets a status conference for September 6, 2017 at 2:00 p.m.  By August 30, 2017

15    at 5:00 p.m., the parties are ordered to file a Joint Case Management Statement identifying the

16    tasks, if any, that remain before the Court can enter judgment.  If the parties, or either party,

17    believes that judgment may be entered now, then that party or those parties should attach a

18    proposed form of judgment to the Joint Case Management Statement.

19    IT IS SO ORDERED.

20    Dated:  August 11, 2017

21    _____

22    JON S. TIGAR
     United States District Judge

23

24

25

26

27

28

*United States District Court*
*Northern District of California*