Martin Quinn, Esq.
JAMS
Two Embarcadero Center
Suite 1500
San Francisco, CA  94111
Telephone: (415) 982-2567
Fax: (415) 982-5287

SPECIAL MASTER

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

| | |
|---|---|
| SHENZHENSHI HAITIECHENG SCIENCE AND TECHNOLOGY CO., LTD., a People's Republic of China corporation,<br><br>Plaintiff,<br><br>and<br><br>VIRTUE GLOBAL HOLDINGS LIMITED, a business company incorporated in the British Virgin Islands,<br><br>Intervenor,<br><br>v.<br><br>REARDEN, LLC, a California Limited Liability Company; REARDEN MOVA, LLC, a California Limited Liability Company; MO2, LLC, a California Limited Liability Company; and MOVA, LLC, a California Limited Liability Company,<br><br>Defendants. | Case No. 4:15-cv-00797 JST (SK)<br><br>**SPECIAL MASTER'S ORDER NO. 6: REARDEN'S MOTION REGARDING SCOPE OF ASSET RETURN (Hrg. 9/24/20)** |
| AND RELATED COUNTERCLAIMS. | |

On September 24, 2020 the Special Master heard argument by a virtual Zoom conference on Defendant Rearden's Motion Regarding Scope of Asset Return.  Counsel for both parties and representatives of Forensic Expert DisputeSoft were present, as well as Stephen Perlman, CEO of

1

Rearden. Having considered all written and oral argument and evidence presented, the Special Master now rules as follows.

This motion presents three issues regarding the manner in which DisputeSoft shall carry out its duty to "identify Recoverable Mova Assets … [which] shall be returned to Rearden…" ECF No. 534 at 5:21-6:21. First, to what extent shall DisputeSoft identify and oversee the destruction or return to Rearden of all duplicates of Mova software, code and digital files whether located on active storage or backup tapes? Second, to what extent shall DisputeSoft identify and return to Rearden Mova output files generated by VGH/DD3 after April 21, 2013? Third, how shall DisputeSoft complete its inventory of Mova hardware (e.g., computers, hard drives, cameras, servers) located at VGH/DD3 premises?

<u>Background Facts and Prior Court Orders</u>

The starting point is the series of key Court orders directing the return of Mova Assets to Rearden.

The Injunction. The Court issued a preliminary injunction on June 17, 2016 that enjoined VGH (and others acting in concert with it, including DD3) from "using…concealing…any Mova Asset in its possession, custody or control." It further required VGH to transfer any physical Mova Assets to a secure location within 10 days. Mova Assets were defined as "MOVA Contour Reality Capture…technology, or related hardware and software, source code…business records, and various physical goods." ECF No. 188, 15:21-16:4. The injunction became effective on June 20, 2016 when Rearden posted the required bond. VGH did box up and move into a storage escrow what purported to be the Mova Assets, including computers and hard drives.

It is undisputed that in the days and weeks following the injunction VGH/DD3 violated it by using Mova software intensively and aggressively to create images for the movie "Beauty and the Beast" among other projects.[1] VGH's counsel acknowledged at the hearing that VGH had

---

[1] Rearden states that "in the 24 hours from June 28, 2016 through June 29, 2016, DD3 documents show that many terabytes of output data were created by devoting virtually all of DD3's Los Angeles computer and disk resources around-the-clock to processing MOVA files. In just that one 24-hour period, so many copies of Contour MultiMesh and Stitch software programs were running on dozens of DD3 computers at once that DD3 was generating half a terabyte of output every hour." Rearden Initial Brief, p. 10, fn. 8. VGH did not deny or rebut that statement in its papers or at the hearing.

used the Mova software to produce "7-10 days of output." DisputeSoft stated at the hearing that it has ascertained that VGH's post-injunction use of Mova lasted not for 7-10 days, but "through most if not all of July." It is also undisputed that in 2017 VGH/DD3 provided a third party software developer with a small part of the Mova source code which the developer used, along with unrelated software, to create a new software product known as Double Digital. And, despite the order to escrow all Mova Assets, including software, Rearden discovered on opening the escrow facility in October 2016 that all the computers and hard drives stored there had been wiped clean and that VGH had escrowed no Mova software. ECF No. 570-1, Perlman Decl., §5. VGH did not dispute this assertion in its papers or at the hearing.

The preliminary injunction was dissolved on August 11, 2016 with entry of the Statement of Decision which ordered that "Rearden may take possession of the Mova Assets forthwith." ECF No. 427.

Statement of Decision. Following a bench trial the Court entered its Statement of Decision on October 2, 2017, finding that Rearden, not VGH or DD3, at all relevant times was the sole owner of the Mova Assets. As noted, the Court ordered that the Mova Assets be returned to Rearden "forthwith." ECF No 427. The Statement of Decision said nothing about continued use of the Mova Assets, presumably because the Court assumed that they had been in escrow for the last 15 months and would indeed be returned "forthwith."

Asset Return Order. On October 2, 2017 the Court also entered its Order Regarding Return of the Mova Assets. ECF No. 449. The Order again required VGH to return to Rearden "forthwith" the following relevant assets: "MOVA software, Source code, and Output files — All software, source and object code related to the MOVA Assets, including the Contour program and all related MOVA Contour output files created by MOVA that were taken by Mr. LaSalle and/or others…from Rearden…." *Id.* at 1:10-14.

Order Enforcing Judgment, Appointing Special Master. On April 10, 2019 the Court entered its Order Granting Motion to Enforce Judgment. The Court recited the history of VGH's non-compliance with its orders to return the Mova Assets, determined that VGH had "willfully

disobeyed" its orders, and directed the appointment of a Special Master to oversee the identification and return of the remaining Mova Assets. ECF No. 521.

Order Appointing Special Master. On June 17, 2019 the Court ordered the appointment of Hon. Edward Infante (Ret.) as Special Master to oversee the "identification, preservation, and return to Rearden of any and all MOVA Assets in the possession of VGH" or any party acting in concert with VGH. ECF No. 529. The current Special Master operates under the same directions. ECF No. 549.

Order Appointing Forensic Expert. On August 20, 2019 Judge Infante appointed DisputeSoft as the Forensic Expert. He directed DisputeSoft to ensure the return to Rearden of all "Recoverable MOVA Assets" which were defined as, (1) "All software, source, and object code related to MOVA Assets, even if subsequently modified, and all MOVA Contour output files, transferred to Original MO2 in February 2013 or taken by Mr. LaSalle and/or others…from Rearden…prior to February 2013"; and (2) all hardware and business records transferred in February 2013 or taken by LaSalle or others. ECF No. 534. The Order went on to direct DisputeSoft to "endeavor to avoid unnecessary disruption to DD3, and before engaging in any collection activity that is overly disruptive to DD3's engineering operations to "confirm that in its expert opinion … such action is necessary and is not, for example, cumulative of work already done." *Id.* at 5:25-6:2.

The parties stipulated that the date Mova Assets were taken from Rearden by Mr. La Salle and others was April 21, 2013, not February. ECF No. 537.

Joint Instructions. On or about May 26, 2020 the parties agreed on Joint Instructions to DisputeSoft setting forth the protocol for its work. In relevant part, the Instructions provided, "Recoverable Mova software assets identified by DisputeSoft will be limited to files created prior to April 21, 2013. DisputeSoft may consider files created after to April 21, 2013 to be recoverable Mova software assets if such files are copies of recoverable Mova software assets created prior to April 21, 2013. Furthermore, DisputeSoft may consider compiled executable files or libraries created after April 21, 2013 to be recoverable Mova software assets if such files appear to have been created from recoverable Mova source code created prior to April 21, 2013.

4

Any pre-April 21, 2013 Mova files (including executables and compiled code) contained inside of post-April 21, 2013 archives will be considered recoverable Mova software assets. Recoverable Mova software assets will be limited to original Mova Contour code and modifications of that code. Files which belong to Direct Drive, Masquerade, and Avom, or other software are not considered to be Mova software assets, except to the extent they consist of files that are identical or nearly identical to pre-April 21, 2013 Mova files."

Analysis

Duplicates Issue

In the course of its review of Mova software DisputeSoft has encountered hundreds, maybe thousands, of copies of duplicate Mova software and output, and has requested guidance on how thorough it needs to be to identify and remove all such duplicates. Some duplicate copies are located on main storage; others are on over 28,000 backup tapes. DisputeSoft reports that the backup tapes have a high-level catalog known as NetBackup which assists in locating relevant files, but there are also hundreds of unused disks in boxes that are not indexed in any way. DisputeSoft reports that it has already found tens of thousands of source and binary files that are "likely Mova assets" and is likely to find many more.

Open Storage. VGH stated at the hearing that it has no objection to DisputeSoft proceeding as it sees fit with respect to duplicates that are not on backup tapes. As to such digital files, DisputeSoft is directed to use its discretion and expert judgment to locate as many of these duplicate Mova files as possible within a reasonable period of time and at a proportionate cost.

The Special Master recognizes that it is infeasible to ensure 100% recovery of every duplicate file located on every employee workstation, server, or hard drive. To that end, DisputeSoft shall prioritize its search to emphasize recovery of duplicate Mova files that can potentially be of commercial use to VGH, or that VGH could use to restore Mova code. It shall also prioritize its search to workstations, servers, hard drives, and other systems primarily used in the ordinary course of business to generate or store Mova output. To the extent that workstations, servers, hard drives, or other systems are offline, DD3, under DisputeSoft's direction, shall stand up such systems and make their contents available for inspection.

Backup Tapes.  Backup tapes present a difficult logistic problem.  DD3 backs up data many times daily across several sets of tape, both onsite and off-site, and commingles on multiple tapes Mova and non-Mova data.  DD3 accesses backup tapes daily in the ordinary course of business, each time restoring data from a backup tape.  Files are listed in the NetBackup catalog.  Both the tapes themselves and the hardware they run on are aged and prone to failures and breaking.  To purge a Mova file from backup DisputeSoft (or VGH/DD3 working under DisputeSoft's direction) would need to locate the file, restore the file, delete it, and then re-create the backup system without the deleted Mova material.  Given the obsolete nature of DD3's backup system, its limited staff availability due to the pandemic, and frequency with which DD3 is required to restore data from backup tapes to support its regular business operations, this effort would require considerable effort over an extended period of time, significantly disrupting DD3's ongoing business.

VGH proposes that instead of deleting the material the backup tapes be placed with a third party escrow holder who would oversee DD3's access to the tapes and provide Rearden with some kind of log and copies of the material accessed.  Under this proposal, entries for all files identified as Mova assets would be removed from the NetBackup Catalog, which VGH says would make them extremely challenging to access.  Further, VGH would pay the cost of such an arrangement.  Rearden opposes this escrow arrangement because it would require it for years to monitor VGH's daily access to these tapes, review copies of the accessed material to determine if it composed Mova assets, and then try to enforce its right to have that material destroyed. Rearden is a 10-person company for which this ongoing task would be prohibitively disruptive.

The Special Master finds that VGH's escrow proposal is ultimately unworkable. DisputeSoft has determined that, if files are not purged from underlying backup tapes, the NetBackup Catalog can be rebuilt from the files on those tapes, which would make it easy to restore access to Mova assets that should otherwise have been deleted. Even if this issue could be remedied by way of an escrow agent, as proposed by VGH, it would be an unreasonable burden for Rearden and/or DisputeSoft to constantly monitor DD3's many requests for backup data for an unknown period of time.

A reasonable effort must be made to identify, return, and purge Mova files from DD3's backup tapes, including both primary and secondary backup tapes. As the primary bottleneck to the asset return process is DD3's limited and obsolete backup system (which for example uses NetBackup version 7.5, for which its vendor stopped providing technical support in 2017), the most cost efficient solution would be for DD3 to purchase additional backup hardware (and likely upgraded software) that can dedicated to the asset return effort. Such a purchase would be significantly cheaper than the many staff hours that would be needed by all parties involved to manage the logistics of sharing an obsolete backup system.

To that end, the Special Master orders that DisputeSoft shall be authorized to direct DD3 to purchase additional backup hardware and software as necessary to expedite the asset return work without unduly impeding upon DD3's regular business operations. DisputeSoft, in directing DD3 to purchase such hardware and software, will consult with DD3 to find a cost-efficient solution that is compatible with DD3's existing infrastructure. Further, DisputeSoft will only direct DD3 to purchase such hardware and software once it has determined that the number of backup tapes at issue is indeed unmanageable given DD3's current backup capabilities and availability.

Mova Output Files Issue

Types of Mova Output Files To Be Recovered. Rearden does not insist on return of certain types of Mova-related output. It does not want output that is customer-facing, that is, output image files prepared for and delivered to clients, including industry-standard file types such as .jpg, .bmp and .mov. Instead, Rearden insists on the return of the remaining non-client facing, intermediate types of Mova output files, such as .raw, .obj, .rpt, .log, .pset, .ma and other similar files which are generally intermediate "behind the scenes" files created using Mova software, but not actual videos or images that would be delivered to a client.

Mova Output Files Generated Prior to April 21, 2013. It is undisputed that all Mova output files generated before April 21, 2013, as well as all Mova source and object code and all other Mova software, are to be returned to Rearden — and indeed should have been returned three years ago when VGH was ordered to return them "forthwith." DisputeSoft shall consult both

7

parties regarding video and image files created prior to April 2013: DD3's predecessors worked on some such files, which may not be returnable to Rearden; other video and image files contain no input from DD3's predecessors, and all these, if any, are returnable to Rearden.

Mova Output Files Generated from 4/21/13-6/20/16. During these three-plus years after Mr. LaSalle took the Mova Assets from Rearden, no court had determined that Rearden owned the Mova Assets and that VGH had no legitimate right to use them. VGH concedes that it continued to use Mova in its usual business to generate images and perform other services for clients. The Preliminary Injunction on June 20, 2016 did not determine ownership, but did order VGH to sequester all the physical Mova Assets (as distinguished from intellectual property) in an escrow facility and to cease using them. VGH should at that time have placed in escrow all the Mova technology, including at least the non-client facing output files in its possession.

The Statement of Decision on August 11, 2017 determined that Rearden had the sole right to the Mova Assets, and ordered that they be returned to it "forthwith." That requirement was echoed in the Asset Return Order on October 2, 2017, but it limited the material to be returned to that "taken by Mr. LaSalle and/or others." Output files generated after April 21, 2013 were not taken by Mr. La Salle because they did not exist when he was at VGH and took Mova from Rearden. Therefore, a literal reading of the Asset Return Order would dictate that VGH is not obligated to return to Rearden Mova output files generated after April 21, 2013 and before entry of the preliminary injunction.

The Special Master largely concurs that output files generated during this period need not be recovered and returned — with one exception. DisputeSoft has advised the Special Master that one type of Mova output, so-called .ma files, are not truly or exclusively output, but rather are more like software and may contain large chunks of Rearden Mova code. VGH could potentially use such .ma files to recreate the Mova software including source and other code. Even though these .ma files were not taken by Mr. La Salle from Rearden prior to April 2013, they are plainly Mova assets that VGH ought to have placed in escrow in 2016 and turned over to Rearden in 2017. Therefore, DisputeSoft shall recover and return to Rearden all .ma files that contain Mova software created during this period, but no other output files.

Mova Output Files Generated After Entry of the Preliminary Injunction on 6/20/16. Notwithstanding the wording of the Asset Return Order that can be read to limit recovery of output files to those created prior to April 21, 2013, it would be unconscionable and contrary to the core findings of the Court to permit VGH to retain output files that it created in violation of the Preliminary Injunction. The Court found not only that VGH was not the rightful owner of the Mova Assets, but that it had obtained them by trickery and in bad faith. Immediately following entry of the Preliminary Injunction, VGH not only continued to use the Mova Assets to create output for clients, it intensified that use over the next two months — and perhaps longer depending on DisputeSoft's findings. It compounded its misconduct by failing to deposit the Mova Assets in escrow, and then failing to turn vast amounts of them over to VGH — thus necessitating this complex process with a Forensic Expert and Special Master.

VGH argues in effect that misconduct does not matter. It draws an analogy to an author who types his novel on a stolen typewriter, or uses a pirated copy of Microsoft Word, who might suffer some monetary penalty, but would not be said to lose ownership of the novel itself. The Special Master respectfully discounts the relevance of this analogy to a situation where a party deliberately and repeatedly violates a court order.

The Special Master concludes that deliberate, repeated violation of a Court order is not something a Court should readily countenance, let alone reward. It goes without saying that a court has full authority and responsibility to enforce its own orders. The Special Master concludes that this requires that VGH relinquish all Mova output files of the types mentioned above — again, not including client-facing actual image and videos files — generated after entry of the Preliminary Injunction on June 20, 2016.

<u>Hardware Inventory Issue</u>

VGH expressed concern that DisputeSoft would spend too much time and money fulfilling its obligation to identify and recover all Mova hardware (cameras, computers, hard drives, and the like). DisputeSoft advises that it will complete its in-person search of VGH's Los Angeles office and its video search of the Vancouver office in about 6-10 hours at an estimated total cost in the $3,000 range, barring any unforeseen difficulties. At the hearing the parties

agreed that this estimate was reasonable in comparison with the estimated value of the hardware at issues, and that DisputeSoft should complete this task as envisioned.

Order

Good cause appearing, it is ordered that:

1. DisputeSoft shall use its best efforts within a reasonable time and at a proportionate cost to recover all duplicates of Mova assets located on VGH active storage.

2. With respect to duplicate files on backup tapes, DisputeSoft shall first determine how many backup tapes will need to be addressed as part of the Mova return effort. If the number of tapes would be unmanageable to handle given DD3's current backup hardware, DD3 shall purchase, in consultation with DisputeSoft, backup hardware and software that can be dedicated to the asset return effort.**.**

3. DisputeSoft shall proceed as quickly and efficiently as possible to identify and recover all Mova output files that are not client-facing, industry standard-format images or video files as described above. It shall identify and recover all other intermediate Mova output files of the types described above, for each time period as set forth below.

4. DisputeSoft shall recover all Mova files and software that were generated prior to April 21, 2013 of the types described above.

5. For Mova output files generated during the period April 21, 2013 to June 20, 2016, DisputeSoft shall recover only Mova output files of the .ma type that contain Mova software, or any other type that demonstrably includes what DisputeSoft in its judgment regards as substantial Mova software

6. For Mova output files generated after June 20, 2016, DisputeSoft shall recover all Mova output files that are not client-facing, industry standard-format video or image files as described above. DisputeSoft shall follow the guidance set forth above as to file types.

7. DisputeSoft shall complete its inspection and recovery of Mova hardware at VGH's Los Angeles office (in-person) and Vancouver office (by video) as quickly and efficiently as possible. The Special Master recognizes that complete identification of 100% of all Mova

hardware may be impossible, so DisputeSoft shall use its best efforts to perform the task as completely and as reasonably possible.

8. Except as explicitly altered by this Order, all prior orders of the Court and the Special Master as to asset return shall remain in effect.

Dated: October 13, 2020

_____
Martin Quinn, Special Master

## PROOF OF SERVICE BY E-Mail

Re: Shenzhenshi Haitiecheng Science and Technology Co., Ltd. vs. Rearden LLC, et al.
Reference No. 1100105909

I, Sandra Chan, not a party to the within action, hereby declare that on October 13, 2020, I served the attached SPECIAL MASTER'S ORDER NO. 6: REARDEN'S MOTION REGARDING SCOPE OF ASSET RETURN (Hrg. 9/24/20) on the parties in the within action by electronic mail at San Francisco, CALIFORNIA, addressed as follows:

Karen I. Boyd Esq.
Jennifer Seraphine Esq.
Zhuanjia Gu Esq.
Turner Boyd LLP
702 Marshall St
Suite 640
Redwood City, CA   94063
Tel: 650-521-5935
Email: boyd@turnerboyd.com
seraphine@turnerboyd.com
gu@turnerboyd.com
   Parties Represented:
   MO2, LLC
   Mova, LLC
   Rearden LLC
   Rearden Mova, LLC

Ms. Keeley Irene Vega
Jacob S. Zweig Esq.
Turner Boyd LLP
702 Marshall St
Suite 640
Redwood City, CA   94063
Tel: 650-521-5935
Email: vega@turnerboyd.com
zweig@turnerboyd.com
   Parties Represented:
   MO2, LLC
   Mova, LLC
   Rearden LLC
   Rearden Mova, LLC

Jon Michaelson Esq.
Kilpatrick Townsend & Stockton LLP
1080 Marsh Rd.
Menlo Park, CA   94025
Tel: 650-614-6462
Email: jmichaelson@kilpatricktownsend.com
   Parties Represented:
   Virtue Global Holdings Limited

Benjamin M. Kleinman Esq.
Kilpatrick Townsend & Stockton LLP
Two Embarcadero Center
19th Floor
San Francisco, CA   94111-3834
Tel: 415-576-0200
Email: bkleinman@kilpatricktownsend.com
   Parties Represented:
   Virtue Global Holdings Limited

Frank H. Busch Esq.
Wagstaffe, von Loewenfeldt, Busch & Radwick LLP
100 Pine St.
Suite 725
San Francisco, CA   94111
Tel: 415-357-8902

Email: busch@wvbrlaw.com
　　Parties Represented:
　　MO2, LLC
　　Mova, LLC
　　Rearden LLC
　　Rearden Mova, LLC

　　　　I declare under penalty of perjury the foregoing to be true and correct. Executed at San Francisco, CALIFORNIA on October 13, 2020.

_Sandra Chan_
Sandra Chan
JAMS
SChan@jamsadr.com