Jennifer Seraphine (State Bar No. 245463)
seraphine@turnerboyd.com
Jacob S. Zweig (State Bar No. 296129)
zweig@turnerboyd.com
TURNER BOYD LLP
702 Marshall Street, Suite 640
Redwood City, California 94063
Telephone: (650) 521-5930
Facsimile: (650) 521-5931

Frank Busch (State Bar No. 258288)
busch@wvbrlaw.com
WAGSTAFFE, VONLOEWENFELDT,
BUSCH & RADWICK LLP
100 Pine Street, Suite 725
San Francisco, California 94111
Telephone: (415) 357-8900

Attorneys for Defendants

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| SHENZHENSHI HAITIECHENG SCIENCE AND TECHNOLOGY CO., LTD., a People's Republic of China corporation,<br><br>　　　　　　　Plaintiff,<br><br>and<br><br>VIRTUE GLOBAL HOLDINGS LIMITED, a business company incorporated in the British Virgin Islands,<br><br>　　　　　　　Intervenor,<br><br>　　v.<br><br>REARDEN, LLC, a California Limited Liability Company; REARDEN MOVA, LLC, a California Limited Liability Company; MO2, LLC, a California Limited Liability Company; and MOVA, LLC, a California Limited Liability Company,<br><br>　　　　　　　Defendants.<br><br>AND RELATED COUNTERCLAIMS. | Case No. 4:15-cv-00797 JST (SK)<br><br>**MOTION FOR RELIEF FROM SPECIAL MASTER INTERIM REPORT NO. 3**<br><br>Date: TBD<br>Location: Courtroom 6, 2nd Floor<br>Judge: Honorable Jon S. Tigar<br>Action Filed: February 20, 2015 |

# NOTICE OF MOTION AND MOTION

TO THE COURT, ALL PARTIES, AND ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT at a time to be determined by the Court in the Courtroom of the Honorable Jon S. Tigar, at Courtroom 6, 2nd Floor, 1301 Clay Street, Oakland, CA 94612, Defendants Rearden LLC, Rearden Mova LLC, MO2 LLC and MOVA LLC (collectively, "Defendants" or "Rearden") will, and hereby do, move the Court for relief from the Special Master's Interim Report #3. Specifically, pursuant to Federal Rule of Civil Procedure 53, Local Rule 72-2, and ECF 549 ¶ 6, Rearden seeks relief from the following:

1. The Special Master's description of Order #10 as giving "DisputeSoft discretion to ignore innocuous records such as invoices," and describing certain MOVA Assets as "valueless files." (ECF No. 586 ("Report 3") at 2:26. 3:14); and

2. The Special Master's finding that it is "infeasible" and/or "not practically possible" to "literally apply" the Court's orders because "[t]he cost and time required would exceed any practical benefit to be gained" (Report 3 at 3:11-15).

## I.     INTRODUCTION

On March 30, 2021, Rearden filed a Motion for Relief of Special Master Oder No. 10. ECF 585. On March 31, 2021, the Special Master filed Report 3, part of which has direct bearing on the Rearden's Motion for Relief.[1] ECF 586. Rearden does not object to the Special Master's report on Master's Orders #3 or #6-9, and thanks him for his assistance in resolving the matters set forth therein. However, Rearden respectfully objects to the Special Master's report on Order #10, for the same reasons as Rearden objected to Order #10 itself.

## II.    OBJECTION TO REPORT #3

Rearden respectfully disagrees with Report 3's characterization of Order 10. While the Report seeks to justify the limits placed on enforcement of the Court's orders, it does not fairly explain what those limits are. The Report states:

---

[1] Pursuant to the Order Appointing Special Master Quinn, Rearden is required to include the Record for Review with any objections. ECF No. 549 at § 6(c). Report 3 issued without briefing, and there is therefore no specific record for review related to it.

MOTION FOR RELIEF                            1                       CASE NO. 4:15-CV-00797-JST (SK)

As to business records, the Master directed DisputeSoft to focus on technical documentation that could be used to *employ or recreate Mova software* and *gave DisputeSoft discretion to ignore innocuous records such as invoices* …As to software/output files, DisputeSoft was directed to focus on files that could be used to *recreate or use Mova technology*." Report 3 at 2:24-26, 3:1-2 (emphasis added).

Based upon this characterization of only returning stolen files deemed (by a non-MOVA expert) to enable DD3 "to recreate or use MOVA technology" and not returning many other stolen files, Report 3 concludes that DD3 should not be required to "literally" follow the Court's orders because doing so allegedly "would exceed any practical benefit to be gained." *Id.* 3:12-13. Rearden strongly disagrees, as detailed below.

Setting aside harm to Rearden, Rearden objects to both the Special Master's Order No. 10 and Report 3 because DD3 should be required to literally adhere to this Courts' repeated orders to return "any and all" MOVA Assets to Rearden. ECF No 549 at 1:25-2:4; *see also* ECF No. 188 at 15:27-16:1; ECF No. 427 at 18:11-12; ECF No. 449 at 1:2-5. None of the Court's orders was limited in any respect by a comparison of DD3's cost of compliance, or to anyone's opinion on the "practical benefit" of the MOVA Assets to Rearden. This is consistent with the Court's findings, as compliance costs incurred by DD3 result directly from its knowing participation in the taking of the MOVA Assets from Rearden, and its clear violation of the Court's preliminary injunction. ECF No 427 at 13:13, 15:7-9 (Court's findings of fact regarding theft); ECF No. 577 at 9:6-11 (Special Master's findings of fact regarding violation of preliminary injunction). That the recovery cost is high is *entirely* of DD3's own doing for not only repeatedly ignoring the Court's order and lying about compliance, but as now revealed, using MOVA on a *massive scale*, resulting in millions of potential MOVA Asset files residing on its systems *right now*. Rearden's position on this matter is more fully set forth in its objection to Order 10, and therefore need not be repeated here.

In addition, the Special Master is not correct that there is no practical benefit to Rearden from the return of any and all MOVA Assets. That assumption has been made with no evidentiary hearing, and no evidence offered by any party. Rearden has not been given the opportunity to, and

has not, submitted evidence on these points, not least because before Order 10 (and the descriptions in Report 3) Rearden had no reason to believe evidence regarding the value of any particular subset of the MOVA Assets was relevant to the question of whether or not DD3 should comply with the Court's orders.  If the Court concludes that such evidence would be relevant, Rearden makes the following offer of proof:

1. <u>Rearden has *no* copies of most files being recovered from DD3, and unless they are ordered returned, they will be forever lost to Rearden</u>. DD3's initial theft of Rearden's property was not a mere copying.  Instead, rogue employees Greg LaSalle and Ken Pearce physically stole both production drives *and their backup disks* with Rearden's files.  And, to the extent they were able, stole and then destroyed copies of files on Rearden's network storage. The files found by DisputeSoft are in most cases the only copies that exist and should be returned to Rearden.

2. <u>No stolen MOVA Assets are "innocuous"; all stolen MOVA Assets must be returned</u>. The MOVA Contour system is a highly complex system designed by top specialists in their fields and evolved through years of effort. Further, its value in making some of the highest grossing films of all time without Rearden's consent is complex enough to be the subject of pending litigation.  There is therefore no litmus test that can decide what stolen MOVA Asset is or isn't "innocuous". The Special Master's example of an allegedly "innocuous … invoice" illustrates the issue:  For example, invoices identify trade secrets such as the particular brand and formulation of fluorescent makeup used by MOVA as a result of years of trying hundreds of kinds on performers with different skin types in different real-world scenarios. Invoices also identify MOVA customers, vendors, rates paid, and other similar information to which DD3 is not entitled.  Rearden also uses information on invoices for purposes as diverse as marketing MOVA, supporting its damage models in litigation, and developing further product enhancements.

3. <u>Stolen MOVA R&D records would not be apparent to someone who is not a facial capture expert</u>. R&D records include conventional files such as emails, spreadsheets,

presentations, and documents that are not obviously valuable technology files. All R&D records are highly valuable to Rearden, documenting experimental results for ongoing development and evidencing conception dates.

4. <u>DD3 made thousands of copies of the MOVA Assets, and also deeply intermingled the stolen MOVA Assets with its own files, making the recovery process difficult and expensive</u>. When DD3 swore that it had placed all of the MOVA Assets into storage within a few days of the Preliminary Injunction Order, the implication of such an allegedly quick return was that DD3 had kept the MOVA Assets completely isolated from its own files to be easily collected. What DisputeSoft has now shown is that DD3 did the *exact opposite*: it deliberately intermingled the MOVA Assets in and amongst its own files making it immensely difficult and expensive to extract them, while placing *no files* into storage. Rearden should not be denied return of its stolen property because of DD2 is incurring high cost due to intermingling of its own doing.[2] Rearden has gone to great lengths to help streamline the return of the MOVA Assets (including as reflected in Order 10 and Report 3). But Rearden cannot be expected to give up on its recovery of stolen property because DD3 deliberately made it difficult to recover.

5. <u>Report 3 inaccurately states Rearden has been given "an opportunity to retain all Mova-related documents it wanted (even those the appeared innocuous)"</u>. Report 3 proposes that Rearden review "iterative lists of the documents [the forensic expert] intended to recover, and examples of those it would not recover." To start with, these lists are enormous entirely due to the industrial-scale use of MOVA Contour by DD3 in willful violation of the Courts orders. Rearden can't possibly review them all and

---

[2] DD3 is by no means the only company to pay a rogue employee to steal technology and use the technology on an industrial scale, intermingling it with its own, resulting in an enormous cost of recovery. In *Waymo v. Uber* (3:17-cv-00939), Uber paid a rogue employee to steal thousands of files of Waymo self-driving car software, which Uber copied and used at an industrial scale, intermingling vast numbers of Waymo files with its own. Just like here, an expert found it very costly to separate the Uber's technology from Waymo, resulting in Uber exiting the self-driving car business and Uber paying Waymo $245 million and the rogue employee paying $179 million.

then explain why each files is "not innocuous". Rearden should not be required to justify the return of stolen files. "Any and all" stolen MOVA Assets should be returned to Rearden at DD3's cost.

### III. CONCLUSION

DD3 paid a rogue employee to steal most of the *only* copies the MOVA Assets and, as the forensic expert has determined, while falsely swearing compliance, repeatedly disregarded the Court's Orders and used the MOVA Assets on a massive industrial scale, intermingling millions of copies of files with its own. Rearden objects to the Report 3's suggestion that Rearden should receive back anything less than *any and all* MOVA Assets, as that term was defined by the Court and applied to the documents by the Special Master's Order 6.  It also objects to Report 3's assumption that any MOVA Assets are valueless (or that Rearden must explain their value), a conclusion reached with no evidentiary analysis or connection to the Court's orders.

Dated: April 7, 2021				Respectfully submitted,

					_____/s/_____
					Frank Busch
					WAGSTAFFE, VON LOEWENFELDT,
					BUSCH & RADWICK LLP
					100 Pine Street, Suite 725
					San Francisco, California 94111
					Telephone: (415) 357-8900

					*Attorneys for Defendants*